Robert V. Prongay (SBN 270796)
  rprongay@glancylaw.com
Charles Linehan (SBN 307439)
  clinehan@glancylaw.com
Pavithra Rajesh (SBN 323055)
  prajesh@glancylaw.com
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Attorneys for Plaintiff Karoline Kampe*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KAROLINE KAMPE, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | |
| VOLTA INC., SCOTT MERCER, and FRANCOIS P. CHADWICK, | |
| Defendant. | |

Plaintiff Karoline Kampe ("Plaintiff"), individually and on behalf of all others similarly situated, by and through her attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, her counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Volta Inc. ("Volta" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Volta; and (c) review of other publicly available information concerning Volta.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired Volta securities between August 2, 2021 and March 28, 2022, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Volta partners with real estate and retail businesses to locate and deploy its electric vehicle charging stations. The Company generates revenue from advertising on its content-driven charging stations, installing and maintaining the charging stations, and delivering electricity at the charging stations.

3.      On August 26, 2021, Volta Industries, Inc. ("Legacy Volta"), a private entity, and Tortoise Acquisition Corp. II, a special purpose acquisition company, completed a business combination pursuant to which the combined entity was named Volta Inc. (the "Business Combination").

4.      On March 2, 2022, after the market closed, Volta revealed that the financial impact of the restatement of its third quarter 2021 financial results was greater than previously disclosed, expecting to report a net loss of $69.7 million for the quarter. On this news, the Company's share price fell $0.11, or 2.6%, to close at $4.01 per share on March 3, 2022, on unusually heavy trading volume.

5.      Then, on March 21, 2022, Volta announced that it would reschedule its fourth quarter and full year 2021 financial results. On this news, the Company's share price fell $0.38, or 8.4% to close at $4.12 per share on March 21, 2022, on unusually heavy trading volume.

6.      Then, on March 28, 2022, Volta announced that its founders, Scott Mercer and Christopher Wendel, had resigned from their positions as CEO and President, respectively, and from the Board of Directors of the Company. On this news, the Company's share price fell $0.76, or 18%, to close at $3.37 per share on March 28, 2022, on unusually heavy trading volume.

7.      Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that Volta had improperly accounted for restricted stock units issued in connection with the Business Combination; (2) that, as a result, the Company had understated its net loss for third quarter 2021; (3) that there were material weaknesses in the Company's internal control over financial reporting that resulted in a material error; (4) that, as a result of the foregoing, the Company would restate its financial statements; (5) that, as a result of the foregoing, Legacy Volta's founders would imminently exit the Company; (6) that, as a result, the Company's financial results would be adversely impacted; and (7) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

8.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**JURISDICTION AND VENUE**

9.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

11.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District.

12.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

13.     Plaintiff Karoline Kampe, as set forth in the accompanying certification, incorporated by reference herein, purchased Volta securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

14.     Defendant Volta is incorporated under the laws of Delaware with its principal executive offices located in San Francisco, California. Volta's Class A common stock trades on the New York Stock Exchange ("NYSE") under the symbol "VLTA," and its warrants trade on the NYSE under the symbol "VLTA.WS."

15.     Defendant Scott Mercer ("Mercer") was the Company's Chief Executive Officer ("CEO") at all relevant times.

16.     Defendant Francois P. Chadwick ("Chadwick") was the Company's Chief Financial Officer ("CFO") at all relevant times.

17.     Defendants Mercer and Chadwick (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  The Individual Defendants were provided with copies of the Company's reports and press releases

alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

18.     Volta partners with real estate and retail businesses to locate and deploy its electric vehicle charging stations. The Company generates revenue from advertising on its content-driven charging stations, installing and maintaining the charging stations, and delivering electricity at the charging stations.

19.     On August 26, 2021, Volta Industries, Inc. ("Legacy Volta"), a private entity, and Tortoise Acquisition Corp. II, a special purpose acquisition company, completed a business combination pursuant to which the combined entity was named Volta Inc. (the "Business Combination").

### Materially False and Misleading

### Statements Issued During the Class Period

20.     The Class Period begins on August 2, 2021.[1] On that day, the Company filed its proxy statement and prospectus on Form 424b3, soliciting stockholder approval of the Business Combination (the "Proxy Statement"). The Proxy Statement stated that, following the closing of the business combination "Messrs. Mercer and Wendel will hold approximately 37.3% of the voting power" of the Company because they held all of the issued and outstanding Class B common shares. Class B shares have ten votes per share, while Class A shares have one vote per share. Under Risk Factors, the Proxy Statement stated, in relevant part:

[1] Unless otherwise stated, all emphasis in bold and italics hereinafter is added.

***If Volta is unable to attract and retain key employees and hire qualified management, technical, engineering and sales personnel, its ability to compete and successfully grow its business would be harmed.***

Volta's success depends on the continuing services of key employees, including members of its management team. The loss of any of these individuals could have a material adverse effect on Volta's business, financial condition and results of operations. Volta's success also depends, in part, on its continuing ability to identify, hire, attract, train and develop and retain highly qualified personnel. The inability to do so effectively would adversely affect its business. Competition for employees can be intense, particularly in the San Francisco Bay Area where Volta is headquartered, and the ability to attract, hire and retain them depends on Volta's ability to provide competitive compensation. In addition, Volta competes for qualified personnel with its other competitors in the EV charging industry, who may seek to hire Volta's employees from time to time due to their industry expertise. Volta may not be able to attract, assimilate, develop or retain qualified personnel in the future, and failure to do so could adversely affect its business, including its growth prospects and ability to expand into new markets and geographies.

21.    The Proxy Statement reported selected financial data for Legacy Volta, including:

Behavior and Commerce revenue increased by $2.4 million, or 212%, from March 31, 2020 to March 31, 2021, primarily due to large sales of media campaigns with several national brands in the three months ended March 31, 2021.

Network Development revenue decreased by $1.3 million, or 57%, from March 31, 2020 to March 31, 2021, primarily due to a decrease in installation service revenue of $0.7 million due to less construction activity occurring in the three months ended March 31, 2021 compared to the three months ended March 31, 2020 and a decrease in infrastructure sales of $0.8 million due to no infrastructure sales occurring in the first quarter of 2021, offset by an increase in operations and maintenance revenue of $0.2 million due to an increase in the number of cumulative completed projects.

Charging Network Operations revenue decreased by $0.5 million, or 100%, from March 31, 2020 to March 31, 2021, due to no regulatory credit sales occurring in the three months ended March 31, 2021.

Volta has earned $0.2 million in Network Intelligence revenue since it began generating Network Intelligence revenue in November 2020.

*       *       *

*Selling, General and Administrative*

Selling, general and administrative expenses increased by $50.3 million, or 475%, for the three months ended March 31, 2021 as compared to the three months ended March 31, 2020. This was primarily driven by an increase in non-cash stock-based compensation of $45.3 million, driven primarily by the issuance of restricted stock awards to executive employees in the first quarter of 2021. This was also driven by an increase in legal, finance, tax and accounting services expense of $1.4 million, an increase in payroll costs for salaried employees of $1.7 million and an increase in research and development prototyping expense of $1.2 million related to charging technology improvement efforts. The payroll related cost increase was

mainly driven by an increase in Volta's salaried employee headcount to 153 from 136 for the three months ended March 31, 2021 and 2020, respectively.

\*      \*      \*

*Net Loss*

Net Loss increased by $52.1 million, or 397%, from March 31, 2020 to March 31, 2021, primarily due to an increase of $1.1 million in cost of revenues, an increase of $51.1 million in operating expenses and an increase in interest expense of $0.6 million, partially offset by a $0.8 million increase in revenue.

22.     The Proxy Statement also disclosed certain material weaknesses in Legacy Volta's internal control over financial reporting:

In connection with the preparation and audit of Volta's consolidated financial statements for the years ended December 31, 2020 and 2019, material weaknesses were identified in its internal control over financial reporting. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of Volta's annual or interim financial statements will not be prevented or detected on a timely basis. The following deficiencies in internal control over financial reporting were identified as material weaknesses:

- Volta did not design and maintain formal accounting policies, procedures and controls over significant accounts and disclosures to appropriately analyze, record and disclose complex technical accounting matters, including equity transactions and asset retirement obligations, commensurate with its accounting and reporting requirements.

- Volta did not maintain a sufficient complement of personnel to ensure appropriate segregation of duties to ensure that all journal entries and reconciliations were reviewed by an individual other than the preparer. Additionally, the Chief Financial Officer had inappropriate access rights in the general ledger system.

- Volta did not design and maintain formal accounting policies, procedures and controls over significant accounts and disclosures to appropriately prevent, detect or correct material misstatements which resulted in a high volume of correcting journal entries recorded subsequent to year-end; and

- Volta did not design and maintain effective controls over certain information technology general controls for information systems that are relevant to the preparation of its consolidated financial statements. Specifically, Volta did not design and maintain program change management controls to ensure that information technology program and data changes affecting financial IT applications and underlying accounting records are identified, tested, authorized and implemented appropriately during migration.

23.     On August 26, 2021, the Company announced the closing of the Business Combination.

24.    On November 10, 2021, Volta announced its third quarter 2021 financial results in a press release that stated, in relevant part:

**Results for Third Quarter 2021**

Revenue grew 77% YoY to $8.5 million, compared to $4.8 million in the prior-year period, largely attributable to strong growth within Behavior and Commerce. Behavior and Commerce revenue grew to $7.4 million from $2.2 million in the prior-year period, primarily due to increased sales of media campaigns with national brands. Network Development revenue decreased YoY due to a decrease in customer-owned installations.

*      *      *

Selling, general and administrative expenses were ***$29.0 million***, compared to $9.0 million in the prior-year period. This was primarily due to planned growth initiatives that resulted in increased costs, including bonuses and commissions of $2.2 million and additional insurance costs of $1.2 million, ***with one-time expenses related to non-cash stock-based compensation of $4.2 million*** and professional services fees of $3.2 million incurred related to the de-SPAC process.

***Net loss was $43.1 million***, compared to a loss of $14.5 million in the prior-year period, and earnings before interest, taxes, depreciation and amortization (EBITDA) was a loss of $38.3 million compared to a loss of $9.5 million in the prior-year period.

*      *      *

**Full Year 2021 Outlook**

Based on current business conditions, business trends and other factors, for the full year ending December 31, 2021, the Company expects:

- Revenue in the range of $32 million to $36 million

- Total signings to be in the range of 600 sites to 700 sites

- Total operational stalls in the range of 2,300 to 2,500, with 1,300 plus stalls in our construction queue.

25.    On November 12, 2021, Volta filed its quarterly report on Form 10-Q for the period ended September 30, 2021 (the "3Q21 10-Q"), substantially affirming the previously reported financial results. Specifically, it stated, in relevant part:

Compensation expense related to stock-based awards was recorded in selling, general and administrative in the condensed consolidated statements of operations and comprehensive loss for $4.6 million and $0.3 million for the three months ended September 30, 2021 and 2020, respectively, and $51.4 million and $0.8 million for the nine months ended September 30, 2021, and 2020 respectively.

26.    The 3Q 10-Q reiterated the previously disclosed material weaknesses:

As disclosed in our prospectus filed pursuant to Rule 424(b)(3) of the Securities Act on September 29, 2021, in connection with the preparation of Volta's condensed consolidated financial statements as of and for the years ended December 31, 2020 and 2019, certain material weaknesses were identified in Volta's internal control over financial reporting. A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of Volta's interim or annual condensed consolidated financial statements will not be prevented or detected on a timely basis. The material weaknesses were as follows:

- Volta did not design and maintain formal accounting policies, procedures and controls over significant accounts and disclosures to appropriately analyze, record and disclose complex technical accounting matters, including equity transactions and asset retirement obligations, commensurate with its accounting and reporting requirements.

- Volta did not maintain a sufficient complement of personnel to ensure appropriate segregation of duties to ensure that all journal entries and reconciliations were reviewed by an individual other than the preparer. Additionally, the Chief Financial Officer had inappropriate access rights in the general ledger system.

- Volta did not design and maintain formal accounting policies, procedures and controls over significant accounts and disclosures to appropriately prevent, detect or correct material misstatements which resulted in a high volume of correcting journal entries recorded subsequent to year-end; and

- Volta did not design and maintain effective controls over certain information technology general controls for information systems that are relevant to the preparation of its condensed consolidated financial statements. Specifically, Volta did not design and maintain program change management controls to ensure that information technology program and data changes affecting financial IT applications and underlying accounting records are identified, tested, authorized and implemented appropriately during migration.

27.     Under "Risk Factors," the 3Q21 10-Q stated, in relevant part:

***If Volta is unable to attract and retain key employees and hire qualified management, technical, engineering and sales personnel, its ability to compete and successfully grow its business would be harmed.***

Volta's success depends on the continuing services of key employees, including members of its management team. The loss of any of these individuals could have a material adverse effect on Volta's business, financial condition and results of operations. Volta's success also depends, in part, on its continuing ability to identify, hire, attract, train and develop and retain highly qualified personnel. The inability to do so effectively would adversely affect its business. Competition for employees can be intense, particularly in the San Francisco Bay Area where Volta is headquartered, and the ability to attract, hire and retain them depends on Volta's ability to provide competitive compensation. In addition, Volta competes for qualified personnel with its other competitors in the EV charging industry, who may seek to hire Volta's employees from time to time due to their industry expertise. Volta may not be able to attract, assimilate, develop or retain qualified personnel in the future, and failure to do so could adversely affect its business,

including its growth prospects and ability to expand into new markets and geographies.

28.    On February 25, 2022, after the market closed, Volta filed a Form 8-K with the SEC stating that its Audit Committee determined that the Company's third quarter 2021 financial statements would be restated. The Company stated, in relevant part:

On February 24, 2022, the Audit Committee of the Board of Directors (the "Audit Committee") of Volta Inc. (the "Company" or "Volta") reached a determination that the Company's unaudited condensed consolidated financial statements and related disclosures included in its Quarterly Report on Form 10-Q for *the three and nine months ended September 30, 2021 (the "Relevant Periods") contained an understatement of stock-based compensation resulting in an understatement of the Company's net loss. The Company improperly assessed the accounting grant date of certain of the Company's restricted stock units ("RSUs") to be November 8, 2021, resulting in an understatement of stock-based compensation in the Relevant Periods.* Upon further review, the Company determined the correct grant date under Audit Standard Codification 718 for these RSUs was August 26, 2021. The impact of correcting the accounting grant date is to shift the reporting periods in which stock-based compensation expense is recognized, and the Company expects that the preliminary, unaudited adjustments to stock-based compensation will increase net loss by approximately $26.7 million for the three and nine months ended September 30, 2021.

The understatements during the Relevant Periods relate to stock-based compensation expense for certain of the Company's RSUs granted pursuant to the Company's Founder Incentive Plan, which was approved in connection with the Company's business combination with our predecessor entity, Tortoise Acquisition Corp. II, pursuant to the Business Combination Agreement and Plan of Reorganization, dated as of February 7, 2021, by and among Volta, SNPR Merger Sub I, Inc., SNPR Merger Sub II, LLC, and Volta Industries, Inc.

The Company, in consultation with the Audit Committee, has determined that (i) the unaudited condensed consolidated financial statements and similar communications by the Company relating to the Relevant Period should no longer be relied upon and (ii) *it is appropriate to correct the error resulting in the understatements for the Relevant Periods by restating such unaudited condensed consolidated financial statements because the understatements are material to the Company's previously issued unaudited condensed consolidated financial statements*. The Company notes that:

•The adjustments do not impact revenue as presented on the consolidated statements of operations and comprehensive loss for the Relevant Period.

•The adjustments do not affect the total cash flows from operating, investing or financing activities as presented on the condensed consolidated statements of cash flows for the Relevant Period.

•While the understatements impact the timing of recognizing stock-based compensation expense, they do not impact the number of shares awarded, the timing of issuance of shares, or the aggregate amount of equity-based compensation expense to be recognized from the awards.

•The Company's management and the Audit Committee have determined the understatements were unintentional and were not the result of fraud or any other attempt to deceive.

*Preliminary Estimated Impact of Understatements*

The Company intends to restate its financial statements for the Relevant Periods, which will be addressed in an amendment to the Form 10-Q for the quarter ended September 30, 2021, to record the understatements. The estimated financial impact of this adjustment is an approximately $26.7 million increase to stock-based compensation and corresponding increase to paid-in capital, ***resulting in an approximate net loss for the three and nine months ended September 30, 2021 of $14.5 million and $69.7 million, respectively.***

29.     The above statements identified in ¶¶ 20-28 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that Volta had improperly accounted for restricted stock units issued in connection with the Business Combination; (2) that, as a result, the Company had understated its net loss for third quarter 2021; (3) that there were material weaknesses in the Company's internal control over financial reporting that resulted in a material error; (4) that, as a result of the foregoing, the Company would restate its financial statements; (5) that, as a result of the foregoing, Legacy Volta's founders would imminently exit the Company; (6) that, as a result, the Company's financial results would be adversely impacted; and (7) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

30.     The truth began to emerge on March 2, 2022, after the market closed, when Volta revealed that the financial impact of the restatement was greater than previously disclosed. Specifically, the Company filed an amended Form 8-K with the SEC noting that:

The estimated financial impact of this adjustment is an approximately $26.7 million increase to stock-based compensation and corresponding increase to paid-in capital, resulting in an approximate net loss for the three and nine months ended September 30, 2021 of $69.7 million and $155.5 million, respectively.

31.     On this news, the Company's share price fell $0.11, or 2.6%, to close at $4.01 per share on March 3, 2022, on unusually heavy trading volume.

32.     The above statements identified in ¶ 30 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that, as a result of material errors in the Company's financial statements, Legacy Volta's founders would imminently exit the Company; (2) that, as a result, the Company's financial results would be adversely impacted; and (3) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

33.     The truth continued to emerge on March 21, 2022 when Volta announced that it would reschedule its fourth quarter and full year 2021 financial results, which had been expected to be released that day. In a press release, the Company stated:

> Volta Inc. ("Volta" or "the Company") (NYSE: VLTA), today announced that it will be rescheduling its fourth quarter and year end 2021 conference call once it completes the necessary review of its financial results. Today, the Company will file an amendment to its quarterly report on form 10-Q for the quarter ended September 30, 2021.

34.     On this news, the Company's share price fell $0.38, or 8.4% to close at $4.12 per share on March 21, 2022, on unusually heavy trading volume.

35.     On March 22, 2022, Volta filed its amended 3Q21 10-Q. According to the explanatory note, the restatement was to correct the accounting for the Company's stock-based compensation, which had been understated:

> In connection with the preparation of the Company's financial statements for the year ended December 31, 2021, the Company reviewed its grant agreements for equity-based awards to determine stock-based compensation expense. Based on this review, the Company determined that it improperly assessed the accounting grant date of certain of the Company's restricted stock units ("RSUs"), resulting in an understatement of stock-based compensation for the three and nine months ended September 30, 2021. Stock-based compensation expense for these RSUs should have been recognized during the reporting period ending September 30, 2021 as the accounting grant date for these grants occurred during that period. The impact of correcting the error is to shift the reporting period in which stock-based compensation is recognized, resulting in an increase of previously reported net loss by $26.7 million for the quarter ended September 30, 2021. As previously disclosed in the Company's unaudited condensed consolidated financial statements for the quarter ended September 30, 2021, the Company's management and the Audit Committee of the Company's Board of Directors determined that material weaknesses existed in the Company's internal control over financial reporting due to the lack of formal accounting policies, procedures and controls over significant accounts and disclosures to appropriately analyze, record and disclose complex technical accounting matters, including equity transactions, commensurate with its

accounting and reporting requirements, and due to the lack of effective controls over certain information technology general controls for information systems that are relevant to the preparation of its condensed consolidated financial statements, specifically program change management controls to ensure that information technology program and data changes affecting financial IT applications and underlying accounting records are identified, tested, authorized and implemented appropriately during migration. These material weaknesses in the Company's internal control over financial reporting that resulted in the understatement of stock-based compensation.

36.     The amended 3Q21 10-Q also restated the evaluation of the Company's controls and procedures to disclose that material weaknesses in Volta's internal controls led to a material error in its financial statements:

As discussed in the Explanatory Note to this Amendment No. 1 and in connection with the Restatement of our unaudited condensed financial statements as of, and for the three and nine months ended, September 30, 2021, we determined that our previously reported material weaknesses, namely that our review control over the completeness and accuracy of our stock-based compensation reporting and program change management controls to ensure that information technology program and data changes affecting financial IT applications and underlying accounting records are identified, tested, authorized and implemented appropriately during migration did not operate effectively, resulting in a material error in the financial statements.

37.     The above statements identified in ¶¶ 33, 35-36 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that, as a result of material errors in the Company's financial statements, Legacy Volta's founders would imminently exit the Company; (2) that, as a result, the Company's financial results would be adversely impacted; and (3) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**Disclosures at the End of the Class Period**

38.     Then, on March 28, 2022, Volta announced that its founders, Scott Mercer and Christopher Wendel, had resigned from their positions as CEO and President, respectively, and from the Board of Directors of the Company. In connection with their resignations, Messrs. Mercer and Wendel "are converting their existing Class B share holdings and equity awards to Class A stock."

39.     In a Form 8-K filed the same day, Volta stated:

Mr. Wendel's resignation is effective immediately, while Mr. Mercer will continue as Chief Executive Officer for a transition period ending on the earlier of (i) the date on which the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2021 is filed with the Securities and Exchange Commission and (ii) April 29, 2022. Mr. Mercer will serve as an independent advisor to the Company's board of directors (the "Board") through March 31, 2023.

In connection with their resignations, each of Mr. Mercer and Mr. Wendel (the "Executives") has resigned as a member of the Board, effective immediately, Vincent T. Cubbage and Katherine J. Savitt have been appointed as Co-Chairpersons of the Board and Ms. Savitt has ceased to be Lead Independent Director.

40.     On this news, the Company's share price fell $0.76, or 18%, to close at $3.37 per share on March 28, 2022, on unusually heavy trading volume.

## CLASS ACTION ALLEGATIONS

41.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Volta securities between August 2, 2021 and March 28, 2022, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

42.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Volta's shares actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Volta shares were traded publicly during the Class Period on the NYSE. Record owners and other members of the Class may be identified from records maintained by Volta or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

43.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

44.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

45.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Volta; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

46.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

47.     The market for Volta's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Volta's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Volta's securities relying upon the integrity of the market price of the Company's securities and market information relating to Volta, and have been damaged thereby.

48.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Volta's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Volta's business, operations, and prospects as alleged herein.

49.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Volta's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

50.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

51.     During the Class Period, Plaintiff and the Class purchased Volta's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

52.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were

1    materially false and/or misleading; knew that such statements or documents would be issued or

2    disseminated to the investing public; and knowingly and substantially participated or acquiesced

3    in the issuance or dissemination of such statements or documents as primary violations of the

4    federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by

5    virtue of their receipt of information reflecting the true facts regarding Volta, their control over,

6    and/or receipt and/or modification of Volta's allegedly materially misleading misstatements and/or

7    their associations with the Company which made them privy to confidential proprietary

8    information concerning Volta, participated in the fraudulent scheme alleged herein.

9                    **APPLICABILITY OF PRESUMPTION OF RELIANCE**

10                         **(FRAUD-ON-THE-MARKET DOCTRINE)**

11           53.     The market for Volta's securities was open, well-developed and efficient at all

12   relevant times.  As a result of the materially false and/or misleading statements and/or failures to

13   disclose, Volta's securities traded at artificially inflated prices during the Class Period.   On

14   September 17, 2021, the Company's share price closed at a Class Period high of $13.04 per share.

15   Plaintiff and other members of the Class purchased or otherwise acquired the Company's

16   securities relying upon the integrity of the market price of Volta's securities and market

17   information relating to Volta, and have been damaged thereby.

18           54.     During the Class Period, the artificial inflation of Volta's shares was caused by the

19   material misrepresentations and/or omissions particularized in this Complaint causing the damages

20   sustained by Plaintiff and other members of the Class.  As described herein, during the Class

21   Period, Defendants made or caused to be made a series of materially false and/or misleading

22   statements about Volta's business, prospects, and operations.  These material misstatements and/or

23   omissions created an unrealistically positive assessment of Volta and its business, operations, and

24   prospects, thus causing the price of the Company's securities to be artificially inflated at all

25   relevant times, and when disclosed, negatively affected the value of the Company shares.

26   Defendants' materially false and/or misleading statements during the Class Period resulted in

27   Plaintiff and other members of the Class purchasing the Company's securities at such artificially

28   inflated prices, and each of them has been damaged as a result.

55.    At all relevant times, the market for Volta's securities was an efficient market for the following reasons, among others:

(a)    Volta shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, Volta filed periodic public reports with the SEC and/or the NYSE;

(c)    Volta regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)    Volta was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

56.    As a result of the foregoing, the market for Volta's securities promptly digested current information regarding Volta from all publicly available sources and reflected such information in Volta's share price. Under these circumstances, all purchasers of Volta's securities during the Class Period suffered similar injury through their purchase of Volta's securities at artificially inflated prices and a presumption of reliance applies.

57.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the

importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

58.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Volta who knew that the statement was false when made.

## FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and

### Rule 10b-5 Promulgated Thereunder

### Against All Defendants

59.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

60.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Volta's securities at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

61. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Volta's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

62. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Volta's financial well-being and prospects, as specified herein.

63. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Volta's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Volta and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

64. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's

management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

65.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Volta's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

66.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Volta's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Volta's securities during the Class Period at artificially high prices and were damaged thereby.

67.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Volta was experiencing, which were not disclosed by Defendants, Plaintiff and other members

of the Class would not have purchased or otherwise acquired their Volta securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

68.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

69.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act

### Against the Individual Defendants

70.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

71.     Individual Defendants acted as controlling persons of Volta within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

72.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

73.     As set forth above, Volta and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

DATED:  March 30, 2022

**GLANCY PRONGAY & MURRAY LLP**

By:   */s/ Pavithra Rajesh*

Robert V. Prongay
Charles Linehan
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:  (310) 201-9150
Facsimile:  (310) 201-9160
Email:  info@glancylaw.com

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007

*Attorneys for Plaintiff Karoline Kampe*

## SWORN CERTIFICATION OF PLAINTIFF

## VOLTA INC. SECURITIES LITIGATION

I, Karoline Kampe, certify that:

1.  I have reviewed the Complaint, adopt its allegations, and authorize the filing of a Lead Plaintiff motion on my behalf.

2.  I did not purchase the Volta Inc. securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.  I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.  My transactions in Volta Inc. securities during the Class Period set forth in the Complaint are as follows:

    (See attached transactions)

5.  I have not sought to serve, nor served, as a representative party on behalf of a class under this title during the last three years, except for the following:

6.  I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

3/28/2022
_____
Date

_____
Karoline Kampe

**Karoline Kampe's Transactions in Volta Inc. (VLTA)**

**Account 1**

| Date | Transaction Type | Quantity | Unit Price |
|---|---|---|---|
| 2/28/2022 | Bought | 2 | $4.4600 |
| 3/1/2022 | Bought | 11 | $4.2700 |
| 3/7/2022 | Bought | 8 | $3.7400 |
| 3/28/2022 | Sold | -21 | $3.3200 |

**Account 2**

| Date | Transaction Type | Quantity | Unit Price |
|---|---|---|---|
| 2/28/2022 | Bought | 50 | $4.0000 |
| 3/2/2022 | Bought | 45 | $4.2200 |
| 3/15/2022 | Bought | 173 | $4.0400 |
| 3/16/2022 | Bought | 500 | $4.3350 |
| 3/23/2022 | Sold | -230 | $4.3332 |
| 3/25/2022 | Bought | 25 | $4.1595 |
| 3/25/2022 | Bought | 48 | $4.1300 |
| 3/28/2022 | Sold | -218 | $3.3316 |
| 3/28/2022 | Sold | -393 | $3.3326 |