POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
Facsimile: (212) 661-8665
jpafiti@pomlaw.com

*Lead Counsel for Plaintiffs*
*and the Class*

[Additional Counsel on Signature Page]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| KAROLINE KAMPE, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>VOLTA INC., SCOTT MERCER, FRANCOIS P. CHADWICK, CHRISTOPHER WENDEL, BRANDT HASTINGS, TORTOISE ACQUISITION CORP. II, VINCENT T. CUBBAGE, STEPHEN PANG, JUAN J. DABOUB, KARIN M. LEIDEL, and SIDNEY L. TASSIN,<br><br>Defendants. | Case No.: 4:22-cv-02055-JST<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br><u>CLASS ACTION</u><br><br><u>JURY TRIAL DEMANDED</u><br><br>Judge: Hon. Jon S. Tigar |

# **TABLE OF CONTENTS**

I.     INTRODUCTION .............................................................................................. 1

II.    JURISDICTION AND VENUE ......................................................................... 7

III.   PARTIES ........................................................................................................... 8

       A.     Plaintiffs ................................................................................................ 8

       B.     Defendants ............................................................................................ 8

IV.    CONFIDENTIAL WITNESSES ..................................................................... 10

V.     VIOLATIONS OF THE SECURITIES ACT ................................................. 12

       A.     Tortoise Acquisition Corp. II's "De-SPAC" Merger with Volta ................. 12

       B.     Substantive Allegations ...................................................................... 17

              1.     Volta's History and Business Model ......................................... 17

              2.     Mercer and Wendel's Unexpected "Resignations" .................... 18

              3.     Volta Disclosed Unsupported and Unrealistic Projections for the
                     Number of Charging Stations it Would Install .......................... 26

              4.     Volta's Improper Practices Depleted its Cash Balance Throughout the
                     Class Period ............................................................................... 36

              5.     Confidential Witnesses Describe How Volta's Improper Accounting
                     Practices Caused Its Financial Problems ................................... 39

              6.     Volta's Products Were Not Ready When it Went Public ............ 44

              7.     Volta's Improper Revenue Recognition Practices ...................... 44

              8.     Volta's False and Misleading Reporting of Financial Information ... 47

              9.     Plaintiffs and Class Members Suffered Damages ...................... 57

       C.     False and Misleading Statements for the Securities Act Claims .............. 57

       COUNT I: FOR VIOLATIONS OF SECTION 11 OF
       THE SECURITIES ACT OF 1933 ....................................................................... 71

       COUNT II: FOR VIOLATIONS OF SECTION 15 OF
       THE SECURITIES ACT OF 1933 ....................................................................... 73

VI.    VIOLATIONS OF SECTION 14(a) AND 20(a) OF THE EXCHANGE ACT ..... 74

       A.     The Truth Begins to Emerge ................................................................ 75

       B.     No Safe Harbor .................................................................................... 81

       COUNT III: FOR VIOLATIONS OF SECTION 14(a) OF THE SECURITIES
       EXCHANGE ACT OF 1934 AND SEC RULE 14a-9 ....................................... 82

       COUNT IV: FOR VIOLATIONS OF SECTION 20(a) OF THE SECURITIES
       EXCHANGE ACT OF 1934 IN CONNECTION WITH THE PROXY
       CLAIMS .............................................................................................................. 84

VII.   VIOLATIONS OF SECTION 10(b) AND 20(a) OF THE EXCHANGE ACT ..... 85

       A.     Additional Substantive Allegations ..................................................... 85

       B.     False and Misleading Statements ........................................................ 98

       C.     Additional Scienter Allegations ......................................................... 135

              1.     Defendants Knew of Facts Critical to Volta's Core Operations and
                     Spoke About Them in Detail, Showing Their Awareness of These
                     Issues ....................................................................................... 135

              2.     Statements by CWs Support an Inference of Scienter for Mercer,
                     Wendel, and Chadwick ............................................................. 137

              3.     The Departure of Key Executives Supports an Inference of Scienter ..... 138

4. Defendants Had Motive to Continue their Fraudulent Conduct to Promote Volta When it Went Public and to Maintain an Artificially High Stock Price to Obtain Additional Financing ............................................. 140

D. The Truth Begins to Emerge ............................................. 141

E. The Presumption of Reliance Applies ............................................. 143

F. No Safe Harbor ............................................. 145

COUNT V: FOR VIOLATIONS OF SECTION 10(b) OF THE SECURITIES EXCHANGE ACT OF 1934 AND SEC RULE 10b-5 ............................................. 145

COUNT VI: FOR VIOLATIONS OF SECTION 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934 ............................................. 148

VIII. CLASS ACTION ALLEGATIONS ............................................. 149

IX. PRAYER FOR RELIEF ............................................. 151

X. DEMAND FOR JURY TRIAL ............................................. 151

Lead Plaintiff Steve Padget and additional plaintiffs Eric M. Walden and Jason Eckert ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through Plaintiffs' attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, the investigation by Plaintiffs' counsel, which includes without limitation: (a) review and analysis of regulatory filings made by Volta Inc. ("Volta" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Volta; (c) interviews of former employees of Volta; (d) review of analyst reports of Volta; and (e) review of other publicly available information concerning Volta.[1]

## I.    INTRODUCTION

1.    Volta partners with real estate and retail businesses to deploy charging stations for electric vehicles at retail locations. The Company generates revenue primarily from selling advertising on media screens on its charging stations.

2.    Volta was formed through a merger, or de-SPAC transaction, between Volta Industries, Inc., a private entity, and Tortoise Acquisition Corp. II ("Tortoise"), a special purpose acquisition company (or SPAC), that was completed on August 26, 2021 (the "Merger").

3.    This is a class action on behalf of persons and entities that (i) purchased or otherwise acquired Volta securities pursuant and/or traceable to the Registration Statement for the Merger (the "Securities Act Class"); (ii) beneficially owned and/or held SNPR Class A common stock (*i.e.*, Tortoise's common stock) as of July 15, 2021 and were eligible to vote on the Merger at Tortoise's August 25, 2021 extraordinary general meeting (the "Section 14(a) Class"); or (iii) purchased or otherwise acquired Volta securities between August 2, 2021 and November 14, 2022, both dates inclusive (the "Class Period" for the "Section 10(b) Class").

4.    From the time Volta went public through its SPAC Merger, it failed to disclose

---

[1] Emphases in this Consolidated Amended Complaint are added, unless noted otherwise below.

substantial flaws in its business that Defendants covered up by engaging in serious accounting violations and other financial improprieties.

5.    Defendants' misconduct began to be revealed when Volta's founders, Defendants Scott Mercer and Christopher Wendel, were fired from the Company on March 28, 2021, just six months after it went public. Volta's stock price fell 18% on this news alone. But Defendants did not at that time disclose the Company's underlying problems, or even the true nature of Mercer and Wendel's departures. Instead, Defendants portrayed the Company's founders as having resigned on voluntary and amicable terms. That account is contradicted by the descriptions of former employees who made clear that Mercer and Wendel "were ousted from their own company."

6.    Volta's improper practices also started to come to light when the Company revealed on March 2, 2022, that its failure to properly account for Mercer and Wendel's stock-based compensation in its first quarterly report as a public company resulted in a net loss for the nine months ended September 30, 2021, of $155.5 million, which was $85.8 million greater than what Volta had disclosed previously. This accounting error was a blatant violation of Generally Accepted Accounting Principles ("GAAP"), including Accounting Standards Codifications ("ASC") 718, the rule that covers stock-based compensation. Former employees of Volta called this error "glaring" in light of the fact that the amount was larger than the Company's revenue for the year, and attributed it to malfeasance given that all Volta and its senior executives had "ever done is lie about everything."

7.    Volta's setbacks shortly after it went public were just the tip of the iceberg. Other problems remained hidden by the Company's deep-seated culture of deception used to cover-up its poor financial performance. A former Vice President of Media Sales (CW 1), who was one of four regional sales managers across the country, explained that once Volta's executives "got slapped and got in trouble for the Q3 [financial misstatements around stock compensation] they chalked it up to error. They were cooking the books and then they got caught! You can't do that as a public company!"

8.    This is just one example of former Volta employees from across the Company's operations, who interacted with Volta's senior executives, describing how Volta engaged in

accounting violations and disclosed unfounded financial figures that were not supported by the Company's underlying operations.

9.     For example, one of Volta's key metrics was the size of its charging network, measured by the number of charging stations that it installed. This figure was particularly important because as Volta installed more charging stalls around the country, it created a larger "network effect" that made advertising across its network more valuable to its customers. Volta highlighted this aspect of its business in the Investor Presentation that it used to market the Merger to investors—noting that "Chargers grow in value as the network scales"—and multiple former employees confirmed its importance to Volta's business model. Volta's ability to make money was therefore doubly affected by the number of charging stations that it had. Fewer stations meant not only that Volta had fewer places to sell ads, but also that even the stations that it had available were worth less to its advertisers.

10.     Volta's projections for the number of charging stalls that it would install were unsupported because the Company failed to account for the many hurdles that it faced in installing new chargers, including regulatory issues, difficulties negotiating with property owners, and an inexperienced team. Multiple former Volta employees viewed the Company's projections for how many chargers it would install as completely unrealistic from as early as the time it went public. For example, CW 2, who worked with the site hosts on whose property Volta installed its chargers, stated that Volta's projections for the number of charger installations that it would complete by the end of 2021 and 2022 were "off from the beginning." This witness explained that Volta's projections "were never correct" and "they were throwing out a number to look good." Another witness, who was a senior marketing employee, called Volta's projections for the number of chargers it would install "fantasy land," in light of all of the obstacles that it faced.

11.     The problems with Volta's business impacted its accounting in several crucial ways. The Company was constantly cash-strapped and struggled to maintain enough cash to grow its business in the way it had promised at the time of the Merger. Volta's senior executives therefore instructed employees not to pay amounts owed to the property owners that hosted Volta's charging

stations. Defendants engaged in this practice for the express purpose of making Volta's finances look better to investors. A former employee (CW 3) whose job was to get property owners to host Volta's chargers on their properties, stated that there were dozens of companies to which Volta owed sums of approximately $500,000.

12.    This delinquency in paying Volta's site partners resulted in poor relationships with large property owners that Volta had promoted as being a crucial part of its business. Rather than having the positive relationship with these important clients that Volta touted, Volta was actually engaged in tense discussions with them and was on the verge of losing their business, which was essential to Volta bottom line. Volta's description of its cash balances and liabilities was also highly misleading because these disclosures did not explain that Volta's executives allowed it to become delinquent in its payments to important business partners in order to make the Company's cash balances appear much larger than they actually were, at the risk of losing substantial business with Volta's key site hosts.

13.    This practice of withholding timely payments owed to key business partners is just one example of Volta's accounting improprieties. Volta's former Controller (CW 4) described how they would get into shouting matches in their failed attempts to try to get the Company's executives to engage in honest financial reporting.

14.    Volta also violated GAAP rules for revenue recognition to make its revenues look larger than they actually were. CW 1 explained that during every quarter from at least two years prior to the SPAC Merger through the third quarter of 2021, Volta's sales team would approach advertisers toward the end of each quarter to get the advertisers to agree to "pull" ads from a subsequent quarter forward to the current quarter so that Volta could book the revenue for those ads in the current quarter. This witness specifically recalled Volta's Executive Vice President of Sales — who reported to Mercer and Wendel — instructing the Sales team to do this for the third quarter of 2021 to make Volta's revenue figures look better in its first quarter as a public company. The Sales team would convince advertisers to agree to this by giving them free ads in the current quarter. This meant that Volta was booking revenue for free ads that the advertisers were not actually paying for.

The witness described it as "dishonest" and "robbing Peter to pay Paul." As this witness explained, ***"[t]he rules are what they are, and we broke them. We used to run media, run it early — it could be free as far as anybody knew — so we could say we actualized revenue to book revenue early. It was lying*."**

15.    This practice of pulling forward revenue to an earlier quarter is a clear violation of GAAP rules described in ASC 606, covering revenue recognition practices. It also set Volta up for failure because it made selling ads in subsequent quarters more difficult when the advertisers whose revenue Volta was pulling forward would not be paying for additional ads in the subsequent quarter.

16.    While this witness stated that Volta stopped this accounting violation around October 2021, Volta never admitted this violation to the public and never issued a restatement for it. That means that even after this practice stopped, every time Volta continued to disclose its revenues from earlier periods without disclosing this violation, as Volta did every quarter during the Class Period, those statements were blatantly false. Moreover, because Volta never disclosed this accounting impropriety to the public, it gave investors an unwarranted, overly optimistic view of the Company's ability to earn revenue in the future.

17.    Volta's former Controller (CW 4) corroborated CW 1's description of improper revenue recognition practices. CW 4 stated that the shady accounting practices at Volta included how the Company handled revenue recognition. The witness observed that "[i]f you recognize revenue too soon," that is when there are problems. This witness stated that employees referred to the improper accounting practices of Volta's senior executives as "Wendelian math [referencing Defendant Wendel]: take our numbers and add some extra ingredients" and "creative accounting." CW 4 described Mercer's motivation for these types of practices as his wanting to put Big Oil out of business.

18.    The statements by former Volta employees based on their firsthand observations are damning evidence in and of themselves of Volta's accounting violations and financial improprieties. They are even stronger evidence because of the multiple witnesses from across the Company that repeatedly corroborated each other's account on many different points.

19.     At bottom, Volta was not ready to go public when it did because, as explained by CW 2 and CW 6, the Company did not yet have a large enough charging network, and its products were not sufficiently advanced, to meet its business goals along the timeframe that it set out in connection with its SPAC Merger. Defendants therefore gave investors an unrealistic picture of Volta's performance and capabilities, engaging in accounting violations to cover-up its operational deficiencies.

20.     Multiple witnesses confirmed that these fundamental problems resulted in Mercer and Wendel's termination in March 2022, as well as Volta's subsequent steep decline in performance. After that major executive shakeup, Volta proceeded to announce extremely disappointing results over the course of 2022, including consistently failing to meet its previously stated goals for the number of chargers it would install and the amount of revenue it would earn; lowering, and then withdrawing entirely, its future guidance for these metrics; and reporting a rapidly decreasing cash balance that prevented the Company from being able to grow its business at the rate Volta had promised. Volta's former employees explain that these negative developments were the direct and logical result of the fraud perpetrated by Defendants since Volta's inception as a public company.

21.     For example, pulling forward revenue to earlier quarters made Volta less able to meet its revenue goals in subsequent quarters. Similarly, when Volta was finally forced to pay its overdue liabilities that Defendants papered over earlier, it expended an unexpected amount of cash, making it even less likely to meet its prior growth projections. On November 15, 2022, after Volta reported its disappointing results for the third quarter of 2022, Barclays noted that Volta had unexpectedly spent $30 million that it "***incurred largely in observance of some sort of contractual agreements from what we can tell.***" This increased "cash burn" hampered Volta's ability to grow and raised "doubt about the company's 'ability to continue as a going concern' with liquidity being an issue in 4Q."

22.     Volta's steep decline has been devastating to investors. The Company's stock traded at a closing price of $9.30 per share on August 26, 2021, the day that the Merger closed, and reached as high as $13.04 on September 17, 2021. It has consistently fallen since that time and has not closed above $9.30 since December 9, 2021. Volta's share price then dropped precipitously over the course

of 2022, as the news described above emerged and showed investors the true nature of the Company. Volta's stock price closed at $3.20 per share on March 30, 2022, when the initial complaint in this action was filed, and at a mere $0.86 on the day before this Amended Complaint was filed. The Company's valuation dropped so much that on January 18, 2023, Volta announced that it was being acquired by Shell in a deal that valued Volta at just $169 million—a mere 12% of the $1.4 billion that the Registration Statement valued Volta at—destroying well over $1.2 billion in shareholder value.

## II.    JURISDICTION AND VENUE

23.    Certain claims asserted herein arise under Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act," 15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

24.    Additional claims asserted herein arise under Section 11 and 15 of the Securities Act of 1933 (the "Securities Act," 15 U.S.C. §§ 77k and 77o).

25.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa).

26.    This Court also has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v).

27.    This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331.

28.    Venue lies in the Northern District of California pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because Defendants transact business in this District and because the Company's principal executive officers, are and at all relevant times were, located in this District. Venue is also proper in this District pursuant to 28 U.S.C. §§ 1391(b)–(d) because many of the acts and transactions that constitute the violations of law complained of in this Amended Complaint, including the dissemination to the public of materially false or misleading statements, occurred or emanated from within this District.

29.     In connection with the acts, omissions, conduct, and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, the facilities of the national securities markets, and interstate telephonic and digital communications systems.

### III.     PARTIES

**A.     Plaintiffs**

30.     Lead Plaintiff Steve Padget ("Lead Plaintiff"), as set forth in an updated Certification attached to this Complaint (Exhibit A), acquired Volta securities at artificially inflated prices during the Class Period and suffered damages upon revelation of the alleged corrective disclosures or materialization of undisclosed risk. Lead Plaintiff bought Tortoise securities prior to the Record Date and held those securities through the Merger, at which point Lead Plaintiff bought Volta securities through the conversion of Tortoise securities in the Merger.

31.     Plaintiff Eric M. Walden, as set forth in an updated Certification attached to this Complaint (Exhibit B), acquired Volta securities at artificially inflated prices during the Class Period and suffered damages upon revelation of the alleged corrective disclosures or materialization of undisclosed risk.

32.     Plaintiff Jason Eckert, as set forth in a Certification attached to this Complaint (Exhibit C), acquired Volta securities at artificially inflated prices during the Class Period and suffered damages upon revelation of the alleged corrective disclosures or materialization of undisclosed risk.

33.     Lead Plaintiff and the Plaintiffs referenced in ¶¶ 30-32 above are referred to collectively as "Plaintiffs".

34.     Plaintiffs purchased shares pursuant and/or traceable to the Registration Statement that was issued in connection with Volta's SPAC Merger that closed on or around August 26, 2021.

**B.     Defendants**

35.     Defendant Volta is incorporated under the laws of Delaware with its principal executive offices located in San Francisco, California. Volta's Class A common stock trades on the

New York Stock Exchange ("NYSE") under the symbol "VLTA," and its warrants trade on the NYSE under the symbol "VLTA WS." Each whole redeemable warrant is exercisable for one share of Class A common stock at an exercise price of $11.50 per share.

36.    Defendant Scott Mercer was Volta's CEO, Founder, and Chairman prior to the issuance of the Registration Statement and the beginning of the Class Period, until his departure upon the filing of the Company's Form 10-K for 2021 on April 15, 2022.

37.    Defendant Francois P. Chadwick was the Company's Chief Financial Officer ("CFO") prior to the issuance of the Registration Statement and the beginning of the Class Period, until his departure from the Company on August 22, 2022.

38.    Defendant Christopher Wendel was the Company's President and Founder prior to the issuance of the Registration Statement and the beginning of the Class Period, until his departure from the Company on March 28, 2022.

39.    Defendant Brandt Hastings served as Volta's Chief Revenue Officer from November 2020 until his appointment as Chief Commercial Officer on June 13, 2022, a position which he currently holds. Hastings served as Volta's Interim CEO from April 15, 2022 until June 12, 2022.

40.    Defendant Tortoise Acquisition Corp. II ("Tortoise") was a special purpose acquisition company ("SPAC") incorporated in the Cayman Islands for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization or similar business combination with one or more businesses or assets. Tortoise's principal executive officers were in Overland Park, Kansas. Tortoise underwent a domestication to the state of Delaware as part of its de-SPAC transaction with Volta (the Merger). Prior to the Merger, Tortoise's common stock traded on the NYSE under the symbol "SNPR," and its redeemable warrants, exercisable for shares of common stock at an exercise price of $11.50 per share, traded on the NYSE under the symbol "SNPR WS".

41.    Defendant Vincent T. Cubbage was the CEO and President of Tortoise from its inception through the Merger, was a Volta Director at all relevant times, was Co-Chairperson of Volta from Mercer's resignation until Cubbage's appointment as Interim CEO of Volta on June 13,

2022, and has served as Interim CEO of Volta since that time. Defendant Cubbage signed the Registration Statement.

42.    Defendant Stephen Pang was Tortoise's Chief Financial Officer from July 2020, and served on its Board of Directors since the completion of its IPO in September 2020, until the Merger. Defendant Pang signed the Registration Statement.

43.    Defendant Juan J. Daboub served on Tortoise's Board of Directors from the completion of its IPO in September 2020 until its merger with Volta. Defendant Daboub signed the Registration Statement.

44.    Defendant Karin M. Leidel served on Tortoise's Board of Directors from the completion of its IPO in September 2020 until its merger with Volta. Defendant Leidel signed the Registration Statement.

45.    Defendant Sidney L. Tassin served on Tortoise's Board of Directors from the completion of its IPO in September 2020 until its merger with Volta. Defendant Tassin signed the Registration Statement.

46.    Defendants Volta, Mercer, Chadwick, Wendel, Hastings, Tortoise, Cubbage, Pang, Daboub, Leidel, and Tassin are referred to collectively as "Defendants."

47.    Defendants Volta, Mercer, Chadwick, Wendel, Tortoise, Cubbage, Pang, Daboub, Leidel, and Tassin are Defendants in Plaintiffs' claims under Sections 11 and 15 of the Securities Act and in Plaintiffs' claim under Sections 14(a) and associated Section 20(a) claim under the Exchange Act.

48.    Defendants Volta, Mercer, Chadwick, Wendel, Hastings, and Cubbage are Defendants under Plaintiffs' claim under Section 10(b), and associated claim under Section 20(a), of the Exchange Act.

## IV.    CONFIDENTIAL WITNESSES

49.    Statement from interviews with the following confidential witnesses ("CWs") are included throughout this Complaint.

50.    CW 1 was a Vice President of Media Sales at Volta from several years before the

SPAC Merger to the time in 2022 around when many other employees left the Company. Until the beginning of 2022, CW 1 reported to Volta's Executive Vice President of Sales, who, in turn, reported to Wendel and Mercer. After then, the witness reported to Volta's Senior Vice President of Media Sales. Starting in 2020, this witness was one of four regional sales managers, with several media seller reports.

51.     CW 2 worked at Volta from May 2021 to December 2021 as an Enterprise Program Manager, and reported to the Company's Vice President of Strategic Programs and Customer Success, who in turn reported to Defendant Brandt Hastings, the Chief Revenue Officer (and eventual Interim CEO following Mercer's departure). CW 2's job was to work on renewing business with Volta's clients on whose property it installed charging stations and to whom it sold ads, including tracking station performance and installations and corresponding with Volta's clients.

52.     CW 3 worked at Volta from October 2018 to October 2022 and was Vice President of Enterprise Sales and Director of Charging Stations since early 2021. CW 3 had frequent direct contact with Wendel, and the witness's supervisor reported to Wendel. The witness also had contact with Mercer during the first three years that the witness was at the Company and met with Board Chair Cubbage four times. This witness's job was to acquire clients or site hosts (*i.e.*, property owners) who would host charging stations on their properties. This consisted of REITs (real estate investment trusts), national retailers, and third-party property managers. CW 3 reported to the Senior Vice President of EV Charging until October 2021, to Brandt Hastings from October 2021 to late February or early March 2022, and to the Executive Vice President of Sales until October 2022. CW 3 was furloughed from Volta in October 2022 along with 54% of personnel – approximately 160 to 170 people.

53.     CW 4 was Volta's Controller, who worked in that role from mid-2017 to early 2020. CW 4 reported to Volta's CFO (including Debra Crow), who, in turn, reported to Wendel. CW 4 had regular contact with Mercer and Wendel, including reporting to Wendel at various times, having management meetings with Mercer, and being available as needed for Board meetings.

54.     CW 5 was an Assistant Controller at Volta from January 2019 to June 2020 and

reported to the Company's Controller (CW 4) who, in turn, reported to the Company's Chief Financial Officer (including Debra Crow).

55.    CW 6 worked at Volta from August 2019 to April 2022 as a Senior Product Manager, who reported to the Company's Vice President of Product, who, in turn, reported to its Chief Technology Officer, Praveen Mandal.

56.    CW 7 was a Senior Director of Product Marketing at Volta from February 2019 to October 2022. This witness reported to Volta's Chief Marketing Officer, who in turn reported to Mercer (followed by Hastings and Cubbage).

57.    CW 8 was Vice President of Data and Insights at Volta from April 2018 to September 2022.

58.    CW 9 was a General Manager of Media Sales for Volta in Hawaii from May 2018 to April 2021. This witness was a sales executive whose job was to sell media space on Volta's screens on its charging stations.

## V.    <u>VIOLATIONS OF THE SECURITIES ACT</u>

59.    This Section and Counts herein expressly do not incorporate any of the allegations in Sections VI and VII below. For purposes of this Section and the claims alleged herein, it is as though Sections VI and VII are not part of this Complaint. As stated herein, the allegations in this Section arise under strict liability and none of the allegations herein shall be interpreted as alleging intentional or reckless misconduct or alleging that any of the Defendants acted with scienter or fraudulent intent.

### A.    **Tortoise Acquisition Corp. II's "De-SPAC" Merger with Volta**

60.    Tortoise was a special purpose acquisition company incorporated in the Cayman Islands for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization or similar business combination with one or more businesses or assets.

61.    In September 2020, Tortoise completed its initial public offering ("IPO") in which it sold 34,500,000 units at a price of $10.00 per unit (including the exercise in full by the underwriters of their option to purchase up to an additional 4,500,000 units), generating gross proceeds of $345

million. The units were listed on the New York Stock Exchange, with each unit consisting of one Class A ordinary shares and one-fourth of one redeemable warrant, with each whole warrant entitling the holder thereof to purchase one Class A ordinary shares at an exercise price of $11.50 per share.

62.    Simultaneously with the IPO, Tortoise completed the private sale of 5,933,333 warrants (the "Private Placement Warrants") at a purchase price of $1.50 per Private Placement Warrant to TortoiseEcofin Borrower (associated with the SPAC's sponsor), generating gross proceeds of $8,900,000. These warrants, like the warrants that were part of the units issued in the IPO, each entitled the holder to purchase one Class A ordinary shares at an exercise price of $11.50 per share.

63.    Tortoise represented at the time of its IPO that it "intends to focus its search for a target business in the broad energy transition or sustainability arena targeting industries that require innovative solutions to decarbonize in order to meet critical emission reduction objectives."

64.    In recent years, SPACs have become magnets for fraud, which has caused great concern among U.S. regulators and investors. The SEC has criticized SPACs because of their apparent tendency to encourage fraud based on a misperception that they present a lower risk of liability for forward-looking statements, as noted by John Coates, Acting Director, Division of Corporate Finance at the SEC, makes those "involved in a []SPAC feel comfortable presenting projections and other valuation material of a kind that is not commonly found in conventional IPO prospectuses"—exactly as Defendants did here.[2]

65.    This view by those involved in SPACs, however, misstates the law because companies should not be insulated from the legal requirements that apply to IPOs just because they go public, achieving the same result as an IPO, by merging with a SPAC. In the view of the SEC, any claim that the securities laws do not adequately cover SPACs "is overstated at best, and

---

[2] John Coates, *SPACs, IPOs and Liability Risk under the Securities Laws*, U.S. Sec. & Exch. Comm'n (Apr. 8, 2021), https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws?utm_medium=email&utm_source=govdelivery.

potentially seriously misleading at worst."

66.    SPACs also create perverse incentives for their managers and key employees. If a SPAC does not merge with another company within a certain amount of time (typically two years), it must return investors' funds. This may cause a SPAC to agree to a merger at all costs. In addition, because key employees of SPACs will otherwise lose their employment at the end of the life of the SPAC, they have an incentive to find a target for acquisition no matter what, in order to obtain employment at the acquired company. They also have incentives to choose one target over another based on the differing compensation they may receive through becoming an employee at different targets. All of these incentives may cause the managers of a SPAC to overlook problems at a target company they favor, or to present a target company in misleadingly favorable light to ensure the company is acquired.

67.    On February 7, 2021, Tortoise announced that it planned to merge with Volta Industries, Inc. ("Legacy Volta"), a private entity, in what is known as a "De-SPAC" transaction (the "Merger"). The new combined entity following the Merger would be named Volta Inc. ("Volta" or the "Company").

68.    On May 14, 2021, Tortoise filed with the SEC the initial Registration Statement on Form S-4 for the shares that would be issued in the Merger.[3] The Registration Statement was amended several times, including on June 25, July 15, and July 29, 2021. The version that was filed on July 29, 2021 was the final version of the Registration Statement that was filed prior to Volta's de-SPAC merger with Tortoise.

69.    Each version of the Registration Statement was signed by Defendants Cubbage, Tortoise's CEO, President, and Director (who was designated as its Principal Executive Officer); Pang, its CFO and Director (who was designated as its Principal Financial Officer and Principal Accounting Officer); and Directors Daboub, Leidel, and Tassin. The Registration Statement also included a preliminary Proxy Statement/Prospectus for the Merger.

---

[3] The Registration Statement states that it was filed with the SEC on May 14, 2021 and it was accepted by the SEC on that date, with a filing date noted by the SEC of May 17, 2021.

70.     The Registration Statement was declared effective on August 2, 2021. That same day, the final Proxy Statement and Prospectus for the SPAC merger was filed with the SEC on Form 424(b)(3). The preliminary and final Proxy Statements/Prospectus (the "Proxy" or "Proxy Statement") stated that it was part of the Registration Statement. The Proxy Statement announced that the extraordinary general meeting at which Tortoise shareholders would vote on the Merger with Volta would be held on August 25, 2021, and that the Record Date for shareholders to be able to vote at the meeting required them to have held Tortoise SNPR shares as of July 15, 2021. The Proxy Statement was signed by Cubbage on behalf of Tortoise. It also included the Merger Agreement and Plan of Reorganization between Tortoise and Legacy Volta, which was signed by Cubbage on behalf of Tortoise and by Mercer on behalf of Legacy Volta.

71.     The Registration Statement registered 165,078,050 shares of Volta Class A Common stock, 22,066,892 shares of Volta Class B common stock, and 8,625,000 warrants to purchase Volta Class A common stock. This covered to the 34.5 million shares of Class A common stock and 8,625,000 warrants that were issued in Tortoise's prior IPO, 8,625,000 shares that would be issuable upon the exercise of these warrants, and an additional 144,019,942 shares (including a combination of Volta Class A and Class B shares) that would be issued or reserved to be issued in connection with the Merger.

72.     The Registration Statement explained that "[i]mmediately prior to the consummation of the Business Combination," Tortoise, which was incorporated in the Cayman Islands, would "effect a deregistration under the Cayman Islands Companies Law (2020 Revision) and a domestication under Section 388 of the Delaware General Corporation Law, pursuant to which TortoiseCorp's jurisdiction of incorporation will be changed from the Cayman Islands to the State of Delaware." All of the securities being registered would then be issued by Tortoise, which would be called Volta Inc. following this transaction.

73.     Under this registration structure, all of Volta's registered shares and warrants following the Merger, including shares and warrants that were previously issued pursuant to Tortoise's IPO, were newly registered and issued under the Registration Statement for the Merger.

74.    The Volta shares that were registered in connection with the Merger included a substantial amount of shares that were being issued to Legacy Volta's prior shareholders (including Mercer and Wendel) and to investors in a private placement that would close concurrently with the Merger. The Registration Statement anticipated that "upon completion of the Business Combination, the ownership of New Volta will be as follows" (assuming that "that no public shareholders elect to have their public shares redeemed," which they had a right to do prior to the Merger for $10 per share):

| | Shares of New Volta Class A Common Stock | % of Total New Volta Class A Common Stock | Shares of New Volta Class B Common Stock | % of Total New Volta Class B Common Stock | % of Total Voting Power |
|---|---|---|---|---|---|
| Historical Rollover Shareholders[1] | 88,728,871 | 50.9% | 1,907,872 | 16.7% | 37.3% |
| Public shareholders | 34,500,000 | 19.8% | — | — | 12.0% |
| New Private Placement Investors | 30,000,000 | 17.2% | — | — | 10.4% |
| Initial shareholders | 8,625,000 | 4.9% | — | — | 3.0% |
| Scott Mercer[2] | 5,862,393 | 3.4% | 7,176,406 | 62.8% | 26.9% |
| Christopher Wendel[3] | 6,649,012 | 3.8% | 2,347,621 | 20.5% | 10.4% |
| **Total** | **174,365,276** | **100.0%** | **11,431,899** | **100.0%** | **100.0%** |

75.    Approval of the Merger, including required conditions for the closing to occur, required the votes of "the holders of at least two-thirds of the Class A Ordinary Shares and Class B Ordinary Shares entitled to vote and actually casting votes thereon at the extraordinary general meeting, voting as a single class."

76.    The Merger would pass under "an ordinary resolution under Cayman Islands law, being the affirmative vote (in person, online or by proxy) of the holders of a majority of the Class A Ordinary Shares and Class B Ordinary Shares entitled to vote and actually casting votes thereon at the extraordinary general meeting, voting as a single class."

77.    On August 25, 2021, Tortoise announced that "[a]pproximately 96% of the votes cast on the business combination proposal at the Extraordinary General Meeting were in favor of

approving the business combination."

78.     The Merger closed the following day, on August 26, 2021, with the shares of the new combined company, Volta, trading on the New York Stock Exchange.

B.     **Substantive Allegations**

1.     **Volta's History and Business Model**

79.     Volta deploys electric vehicle charging stations by partnering with real estate and retail businesses to place charging stations at their locations. The Company generates revenue from advertising on its content-driven charging stations, installing and maintaining the charging stations, and delivering electricity at the charging stations. Volta also enters into contracts with property owners in which Volta pays the property owners for the ability to place the Company's charging stations on their property.

80.     Defendant Mercer founded Volta in 2010. Defendant Wendel subsequently joined Volta as a co-founder. Mercer served as Volta's CEO and Wendel as its President until their abrupt departures from the Company that were announced on March 28, 2022.

81.     The Registration and Proxy Statements promoted Volta by stating that it "primarily owns, operates and maintains EV charging stations and has expanded its network across the United States to include more than 1,700 chargers across 24 territories and states that have generated over 165,000 charging sessions per month on average for the three months ended March 31, 2021, forming one of the most utilized charging networks in the United States." These documents described the Company's prospects in glowing terms, stating that "[t]o take advantage of the expected growth opportunity presented by the EV market, Volta intends to rapidly expand its network of charging stations, using its proprietary data-driven planning tools to identify high-traffic, high visibility site partner locations that it believes would benefit most from its EV charging solutions and garner the highest usage from Volta's driving community, while delivering the most value for Volta's media and advertising partners."

82.     The Registration and Proxy Statements explained that Volta offers three types of charging options, Level 2 charging stations, Level 2 charging towers, and DC Fast Charging

Stations, stating that "Volta's EV charging equipment consists of a managed network of Level 2 and DCFC chargers equipped with digital displays (which Volta refers to as its 'content-driven' charging stations) and Level 2 charging towers without digital displays."

83.     These documents also stated that "Volta deploys its EV charging platform network by either leasing space at host site locations for the installation of Volta-owned charging stations or by selling charging stations to select site hosts and performing related maintenance services. Volta also generates Behavior and Commerce revenue through the delivery of media partner content across both Volta-owned and site partner-owned charging stations equipped with digital displays."

84.     Volta's main source of revenue is "from the sale of media display time on its charging stations to its commercial partners, as well as to site hosts who wish to display additional media content on Volta's charging stations." These advertisements come from the property owners on whose property Volta places its charging stations and from third-party advertisers. According to the Registration and Proxy Statements, "Volta's primary business is focused on leasing premier space from real estate and retail partners and other site hosts to place its content-driven EV charging stations near site entrances, which are highly visible to both pedestrian and vehicular traffic, creating a desirable platform for brands and Volta's commercial partners to deliver their media content." This revenue accounted for 74.5% of Volta's total revenue for the three months ended March 31, 2021.

85.     Similarly, the Registration and Proxy Statements noted that Volta's "[r]evenue is derived primarily by selling paid content on the media-enabled charging station network and selling, installing and maintaining charging stations," with the selling of paid content on charging stations categorized as "Behavior and Commerce" revenue and the revenue from "installation services, operation and maintenance services" categorized as Network Development revenue.

86.     The Registration and Proxy Statements stated that Tortoise's Board determined that Volta's fair market value exceeded $1.4 billion.

### 2.     Mercer and Wendel's Unexpected "Resignations"

87.     On March 28, 2022, Volta abruptly announced that Mercer and Wendel were resigning from their positions as CEO and President of the Company, respectively, and from their

1   roles on Volta's Board of Directors.

2       88.     Volta disclosed in a Form 8-K that it filed with the SEC that day "that the Company

3   and the Company's Chief Executive Officer, Scott Mercer, and the Company's President,

4   Christopher Wendel, have agreed to the resignation of each of Mr. Mercer and Mr. Wendel as an

5   officer and employee of the Company. Mr. Wendel's resignation is effective immediately, while Mr.

6   Mercer will continue as Chief Executive Officer for a transition period ending on the earlier of (i)

7   the date on which the Company's Annual Report on Form 10-K for the fiscal year ended December

8   31, 2021 is filed with the Securities and Exchange Commission and (ii) April 29, 2022. Mr. Mercer

9   will serve as an independent advisor to the Company's board of directors [] through March 31,

10  2023."

11      89.     According to Volta, as part of their resignations, Mercer and Wendel agreed to

12  "convert[] their existing Class B share holdings and equity awards," which entitled them to greater

13  voting power, to ordinary Class A stock.

14      90.     While the announcement said that Mercer would stay on as CEO for a brief transition

15  period (that ended up concluding just two weeks later, when Volta filed its 2021 10-K on April 15,

16  2022), he and Wendel resigned from Volta's Board of Directors "effective immediately." Volta's

17  press release stated that Mercer would serve as an advisor to the Board through March 31, 2023.

18      91.     The Company appointed Defendant Cubbage (who was Tortoise's CEO prior to the

19  Merger) and Kathy Savitt, another Director, as new Co-Chairs of the Board to replace Mercer.

20      92.     Mercer and Wendel's resignations came as a complete surprise to the market because

21  Volta did not give any prior indication that they would be leaving the Company. The Company's

22  press release announcing their resignations tried to paint the picture of an amicable parting, quoting

23  Cubbage as stating that "[w]ith Volta's listing as a public company last August, the Board and

24  Founders mutually determined that now is the right time to identify new leadership with experience

25  in managing public companies to serve the best interests of stakeholders and unlock the company's

26  full value potential."

27

28

93.     The Form 8-K that Volta filed in connection with the resignations disclosed that Volta entered into "settlement and release agreements with each of Mr. Mercer and Mr. Wendel (the 'Separation Agreements')", under which they would, among other things, (i) each receive continued payment of his base salary for six months, and continued healthcare coverage for up to twelve months, following his resignation; (iii) each not stand for reelection to the Board (in Mr. Mercer's case, until after December 31, 2025); (iv) "the unvested awards of 5,250,000 market-vesting restricted stock units held by Mr. Mercer and 4,500,000 market-vesting restricted stock units held by Mr. Wendel, in each case granted on November 15, 2021, will remain outstanding and subject to vesting and settlement into shares of Class A Common Stock based on achievement of the applicable share price thresholds"[4]; (v) "the outstanding, unvested portion of equity-based awards granted [to Mercer and Wendel] prior to August 26, 2021, will become fully vested"; and (vi) "all other outstanding unvested Company equity awards held by the Executives, consisting of 4,923,695 restricted stock units held by Mr. Mercer and 3,492,972 restricted stock units held by Mr. Wendel will be immediately forfeited." In addition, Mercer would receive a $375,000 consulting fee in exchange for his serving "as an independent advisor to the Board through March 31, 2023."

94.     The Separation Agreements for Mercer and Wendel that Volta subsequently filed with the SEC as exhibits to its 2021 Form 10-K provided that each of their "separation[s] from the Company and the Board [would] be deemed a voluntary resignation."

95.     Statements by former employees of Volta confirm that, contrary to Defendants characterizations, Mercer and Wendel did not agree to resign "voluntarily" and that it was not "mutually determined that now [was] the right time" for them leave.

96.     CW 2, an Enterprise Program Manager at Volta from May 2021 to December 2021, stated that Mercer was "checked out" during the six months that this witness worked at the

---

[4] These share price thresholds were that "one third of these awards will vest if the price of the Company's common stock equals or exceeds $15.00, one third of these awards will vest if the price of the Company's common stock equals or exceeds $20.00, and one third of these awards will vest if the price of the Company's common stock equals or exceeds $25.00 (in each case for 20 trading days within any 30-trading-day period on or prior to August 26, 2026)."

Company, from May to December 2021. The witness thought that Mercer was pushed out of the Company, and described an off-site team-building event at TopGolf in the fall of 2021, after the Merger, that Mercer and Wendel did not attend, which this witness found to be odd. This witness described this as part of a post-Merger pattern of Mercer and Wendel being less involved in the Company.

97.    Similarly, CW 1, a Vice President of Media Sales at Volta from several years before the SPAC Merger to the time in 2022 around when many other employees left the Company, discussed Mercer and Wendel's departures from the Company as part of a string of executive resignations. The witness stated that the first questionable resignation involved former CFO Debra Crow, a one-time confidante of Wendel's, who CW 1 said left Volta approximately one month before the Merger closed in August 2021. This witness explained that Crow initially stepped down from her position as CFO and took on a "made-up" title but did little to nothing in the role. This witness stated that they heard, while having a business dinner with two colleagues who were VPs of Sites Sales, among others, that Crow did not want to stay with Volta as it went public and did not want to sign her name on its SEC filings "because she didn't want to go to jail."

98.    Volta's vague public statements about the status of Crow's employment with the Company are consistent with CW 1's description, though these public statements failed to disclose the full picture. When Volta announced on April 19, 2021, that it was appointing Chadwick as the new CFO, it stated that "Debra Crow, Volta's previous CFO who helped take Volta from a Series C funding to the present, will remain with Volta as a senior executive reporting to Mr. Wendel." Volta stated in the Registration Statement that Chadwick started serving as CFO in April 2021. Then, Volta's financial statements for the six months ended June 30, 2021, which were filed with the SEC on September 1, 2021, described Crow as "a prior executive officer of Legacy Volta was terminated on July 31, 2021." Other SEC filings by Volta (such as its first quarterly 10-Q after the SPAC merger, filed on November 12, 2021) describe Crow as the "former Volta CFO," without specifying the end of her tenure as CFO. These deliberately vague disclosures make clear that Crow technically continued to be employed by Volta for three months after she stopped serving as CFO, without

stating the role or purpose of that employment

99.    CW 1 also stated that Mercer and Wendel's departures were suspicious, including the timing of a farewell email that Mercer sent in the early morning hours – between 4 and 5 am – without any other statements or goodbyes from either of the two executives. In the email, Mercer stated that he and Wendel were leaving on their own accord, off to the next big thing. But then Defendant Cubbage "said something completely different — [essentially] that they were ousted from their own company."

100.    This witness recalled that a few days after Mercer sent his early-morning email discussing his resignation, Volta had its usual all-hands Zoom meeting on a Friday. CW 1 observed that at this Friday all-hands meeting shortly after Mercer and Wendel's departures were announced, Cubbage and others from the C-suite seemed like they were reading from a script when discussing this topic.

101.    But, CW 1 explained, it was not until a few weeks later, at another Zoom meeting, that the Board really addressed Mercer and Wendel's departures. At that point, Cubbage "took charge." The witness stated that "[t]hese are pretty much his exact words: 'Sometimes after a company goes public - you have to credit the founders for their idea [of Volta] - but it becomes clear that the founders are not able to execute and get the company to the next level.' He [Cubbage] made it clear that they [Mercer and Wendel] got kicked to the curb." CW 1 stated that Cubbage's message was that the Board lost confidence in Mercer and Wendel's ability to grow the Company and take it to the next level.

102.    This witness also described CFO Chadwick's departure, which was announced on June 13, 2022, as another instance of the string of suspicious departures from the Company. Tellingly, Volta has not been able to find a long-term CEO since Mercer's departure. Brandt Hastings, who had been Volta's Chief Revenue Officer, became Interim CEO upon Mercer's resignation, with Cubbage serving as Co-Chairperson, but served in this role for only approximately two months. On June 12, 2022, Volta appointed Cubbage as Interim CEO, who, as the head of Tortoise and with a background in finance rather than the electric charging or vehicle market, was

plainly a temporary choice as CEO. Yet, to this day, Volta has been unable to find a permanent CEO. CW 1 asked rhetorically, when discussing Volta's string of executive departures and its inability to find a permanent CEO, "[w]ho wants to work at this company after all of this?"

103.    CW 3, a Vice President of Enterprise Sales and Director of Charging Stations at Volta since early 2021, similarly noted that Crow was the first significant executive to leave the Company and that other senior executives, General Counsel Jim DeGraw and Chief Human Officer Julie Rogers, left at the same time as Chadwick. Consistent with this description, Volta announced in an SEC filing on June 10, 2022 that Chadwick notified Volta on June 6, 2022 that he would resign. In that same filing, Volta announced that "[t]he following executives have recently departed from the Company: Julie Rogers, Chief People Officer of the Company, Praveen Mandal, Chief Technology Officer of the Company, and James DeGraw, General Counsel, Secretary, and Chief Administrative Officer of the Company."

104.    This witness stated that it got to the point where "[w]e didn't know who was running the ship." This witness also was not surprised that Volta could not find a new permanent CEO in light of all of the executive departures and the Company's financial difficulties. In response to a staff question in the second or third quarter of 2022, Cubbage stated that Volta had met with several candidates, and reviewed a total of 30, but had not found the right one. According to CW 3, "[p]eople were incredulous" in response. This witness also noted that neither Hastings nor Cubbage, the two Interim CEOs following Mercer and Wendel's departure, had any experience running a company in Volta's industry.

105.    CW 7, a Senior Director of Product Marketing at Volta from February 2019 to October 2022, also stated that it seemed like Mercer and Wendel were ousted by the Board and that Volta could not and cannot find a new CEO because no one else wants it and "[n]o one will touch them."

106.    Mercer's early morning email has been corroborated by other former Volta employees. CW 8, a Vice President of Data and Insights at Volta from April 2018 to September 2022, similarly described Mercer's 4:30 am resignation email as a complete surprise to the witness

and other employees, and that it was clear to the witness that Mercer was forced out of the Company. CW 8 believed that it was a Board decision to push Mercer out because they did not have confidence in Mercer to move Volta forward following the SPAC merger.

107.    Likewise, CW 6, a Senior Product Manager at Volta from August 2019 to April 2022, recalled that Mercer and Wendel each sent terse or cryptic emails around the time of their resignations. Mercer notified Volta employees that he was leaving the Company in an early morning email sent on or around March 28, 2022 that the witness recalled was sent at 4:44 a.m. The email talked about Mercer "moving on, but it was unclear why." The witness explained that Mercer was forced out of Volta because the Company was Mercer's "baby, if nothing else. Why would he leave unless this is more like he's been forced to leave or something's wrong. It didn't convey honesty or direction." The witness also stated that upon Mercer and Wendel's resignations, they were immediately deactivated from Volta's internal Slack channel.

108.    CW 6 also described an all-hands Company meeting during the witness's last week at Volta in April 2022 at which Volta executives, including General Counsel Jim DeGraw, Chief People Officer Julie Rogers and interim CEO Brandt Hastings, discussed Mercer and Wendel's departures. This witness confirmed the sense from other witnesses that "[t]hey all seemed to be reading off a script. It seemed like there were things they could and couldn't say." Because this witness was soon leaving the Company, someone pressed them to ask the "tough question" everyone was wondering. The witness therefore asked, "Why are Chris and Scott no longer on the company Slack if they are still working for us? Are they fired or not?" But the witness stated that "[w]e never got a clear answer."

109.    CW 1 confirmed the account of CW 6 that at this meeting, CW 6 pushed the question about the nature of the Co-Founders' departure, because, as CW 1 explained, it was off-putting to receive a farewell email from Mercer at around 4 a.m.

110.    CW 3 also confirmed that neither Mercer nor Wendel resigned on their own accord. The witness stated that "[w]e were absolutely told in no uncertain terms this was a mutual separation of parties – and it was not." The witness based this statement on a short conversation with Wendel, a

text message exchange with a current employee, and information that the witness received from an in-house attorney at Volta. The short conversation with Wendel took place on the telephone in or around early May 2022 (around six weeks after Wendel left the Company). The witness stated that Wendel "implied this was an unfortunate set or series of events that 'I wish would have ended differently.'" CW 3 then had a later conversation with an in-house attorney who intimated that then-General Counsel Jim DeGraw had convinced the Company's Board to push out Wendel and Mercer. The witness also described how, on the morning of March 28 — a Monday — Mercer sent an internal email that announced his resignation that was widely regarded as strange, and there was a sense internally that Mercer may not have actually sent it himself.

111.   Then, CW 3 explained, within 24 hours of Mercer's email, Volta called an all-hands meeting, led by Cubbage. The story employees heard aligned with a press release the Company released that the departure was mutually agreed upon. But "[e]very one of us in our guts knew they didn't just one day over a weekend [decide to] walk away from the thing they'd spend 13 years working on." The witness stated that "[n]o one trusted leadership after the spin that this was a mutually agreed upon situation. Brandt [Hastings] and Cubbage read off a script on Zoom. After that, it was all fully scripted. Questions (to leadership) were submitted and vetted in advance."

112.   In addition, CW 3 confirmed the statements by CW 6 that despite Volta's statement that Mercer would stay on in an advisory role, Volta employees never heard from Mercer again – not in an email, on Zoom, or in any other capacity. He moved all his belongings out of Volta within three weeks. This was the start of a seismic upheaval that shook the Company, leaving them largely rudderless and leaderless. The witness also recalled a later text exchange with a Vice President of Sales who was the third employee at Volta, who said, effectively, "'you know this wasn't their choice." The Vice President of Sales found this out from a private conversation with Mercer in someone's house in San Francisco. In addition, the Vice President of Sales told CW 3 that as part of their exit agreement/understanding, Mercer and Wendel were not supposed to speak with or have contact with certain Volta employees for a period of time.

113.   Financial Analysts were likewise surprised by Mercer and Wendel's departures. For

example, Canaccord published a report on March 28, 2022, downgrading its outlook on Volta, noting that Mercer and Wendel had resigned "[u]nexpectedly," which "*was a surprise to us*, especially after meeting Scott [Mercer] and Chris [Wendel] a few weeks earlier at headquarters. *Neither gave any indications that they were on the way out; rather, both seemed like active and invested founders*." Cantor Fitzgerald likewise noted on that same day that "the transition changes were **unexpected**." The *Motley Fool* noted that "Mercer's departure isn't the only one rattling shareholder confidence. Effective immediately, Chris Wendel, Volta's co-founder and president, has also resigned from the company and the board."

### 3.    Volta Disclosed Unsupported and Unrealistic Projections for the Number of Charging Stations it Would Install

114.    Volta's former employees consistently attested to Volta's improper practices throughout its business that led to the misstatement of key financial metrics -- including the number of charging stations that the Company was installing, revenues, liabilities, and Mercer and Wendel's stock-based compensation.

115.    One of Volta's key metrics that it disclosed to investors was the number of charging stations that it installed. The more charging stations and screens that it had, the more advertisements it would be able to sell (each charging station generally had two screens.) Volta gave lofty predictions for the number of charging stations that it would install following the Merger.

116.    For example, in an investor presentation that Volta and Tortoise gave in connection with the proposed merger, filed with the SEC on February 8, 2021 (and a revised version that was filed on June 17, 2021) (the "Investor Presentation"), Volta told investors that it expected to have 6,492 cumulative charger installations by the end of 2022, as compared to 3,142 through 2021 and just 1,507 that it actually had through 2020:



117.    Based on these figures, Volta projected that it would have $141 million in revenue in 2022 and $47 million in revenue in 2021, as compared to $25 million that it had in 2020. Volta also predicted that its revenue would grow at a compound annual growth rate ("CAGR") of 100% from 2020 through 2025—in other words, that its revenue would **double every year** for its first five years as a public company:



118.    Volta also represented in the Investor Presentation that its "Network traction builds flywheel velocity" because it had 1,507 charging stations installed as of January 1, 2021, it had 1,112 additional stations contracted for, and it had 10,068 additional stations in the "Pipeline."

119.    When Volta updated the Investor Presentation on June 17, 2021, it described its "[e]xpected best-in-class growth" as "due to extensive development backlog." It stated that its "[c]urrent pipeline unlocks unit economic growth" because while it had 1,877 chargers installed as of March 31, 2021, it was already contracted to install an additional 1,267 chargers and had approximately 10,000 more in the "pipeline" based on "station potential under currently signed" agreements with property owners such as large retail chains and real estate owners. This updated presentation also described Volta's revenue growth as even better than before, estimating that it would achieve a five-year compound annual growth rate of 108% from 2020 through 2025.

120.    Volta confirmed the importance of the number of charging stations installed in its periodic SEC filings, where it explained:

> Volta's management uses Total Stations Installed for internal network planning and forecasting purposes, including to evaluate the potential Behavior and Commerce revenue generating capacity of its charging network, which is generated through delivery of content by Volta's partners across both Volta-owned and its network partner-owned charging stations. In addition, Total Stations Installed provides the basis for Volta's assessment of its charging network operations as well. Volta believes that this performance measure provides meaningful, supplemental information regarding the Volta charging network that helps illustrate trends in its business and operating performance. Volta believes that this performance measure is helpful to its investors as it is used by management in assessing the growth of the Volta charging network.

121.    The Investor Presentation also stated that Volta was addressing a "trillion dollar market" and compared itself to Netflix, Amazon, and Airbnb, analogizing Volta's approach to fueling to the how Netflix disrupted the television and dvd rental markets, Amazon disrupted the retail market, and Airbnb disrupted the hotel market.

122.    The Investor Presentation also touted Volta's purported "track record underwritten by established partners and client success," highlighting the "Network Development" customers that served as hosts for its charging stations and the high-profile companies that contributed to the

Company's "Behavior & Commerce" revenue that was comprised primarily of revenue from ad sales:



123.    Volta's ability to increase the number of charging stations it had was important not just because more charging stations provided more screens on which it could sell ads, but also because, according to Volta's statements in the Investor Presentation, even existing "[s]tations grow in value as the network scales."

124.    Former employees confirm this dynamic. CW 2 was an Enterprise Program Manager whose job was to work on renewing business with Volta's clients on whose property it installed charging stations and to whom it sold ads. The witness had two major accounts, Kroger and another large supermarket chain. CW 2 explained that the network of media screens had no value until there was enough penetration in the designated marketing area in all relevant states to actually sell advertising. The witness explained that "[w]e might be in 50 Kroger stores, but it was not enough for them to want to spend on advertising because we couldn't prove that we had market penetration." The witness stated that when they left Volta in December 2021, the Company had installed stations at only 50 or 60 Kroger stores (approximately 16% to 20% of stores), but Volta needed 60% of the

300 stores that Kroger had allowed for before they could sell advertising. This witness also stated that Volta did not "have enough engineers or bandwidth or money to spend" to meet the threshold needed and "[i]t's going to take forever to get there and it's a huge money suck." They described Volta's business model as "not ready for prime time" and "awful."

125.    CW 2 viewed the Company's projections on the number of stations it would install as clearly "bulls***". For example, the witness explained that Volta's projections did not account for the complicated regulatory approval process for its charging stations. The witness explained that "[y]ou could spend a year going to city council meeting[s] to get one station approved." This witness also noted other factors that made installations more costly than Volta had planned for, including having multiple property owners for a single location, separate from the client that Volta was dealing with, who would all need to approve the installation; "blackout days" on which the location did not let work on installations take place; navigating local bureaucracies for items such as zoning issues; and dealing with local store managers even after a large company allowed Volta to install charging stations at its locations. Because of these difficulties, Volta's projections on the number of charger installations that it would complete by the end of 2021 and 2022 were "off from the beginning." To make matters worse, this witness observed Volta employees doing these tasks without the proper experience. This witness thought that the Company's projections "were never correct" and "they were throwing out a number to look good."

126.    Other employees confirmed these problems with Volta's business model. CW 9, a General Manager of Media Sales in Hawaii from May 2018 to April 2021, explained that Volta needed a certain number of screens installed before it could make deals to sell advertisements to certain customers. It was clear to this witness that Volta did not have enough station installations, and by extension enough screens, to attract big customers. The witness stated that "[t]here were a lot of team meetings on the digital sales side where we'd say we can't get enough deals because there were not enough screens. Big clients would say 'When you have three times the footprint, then we'll make a deal.' My team on the mainland was always hustling management to get more screens, stations, installs in the ground." But, this witness explained, the problem was that Volta was facing

an uphill battle against real estate companies, bureaucracies, governments, and competition.

127.    Similarly, CW 4 also did not see it as possible for Volta to reach the installation projections that it disclosed in its Investor Presentation. As the witness explained, Volta "always had very lofty goals when it came to installs, and they were always behind and goals were always missed during my tenure."

128.    CW 3, who worked at Volta from October 2018 and was a Vice President of Enterprise Sales and Director of Charging Stations since early 2021, had frequent direct contact with Wendel, and the witness's supervisor reported to Wendel. The witness also had contact with Mercer during the first three years that the witness was at the Company and met with Board Chair Cubbage four times. This witness's job was to acquire clients or site hosts (*i.e.*, property owners) who would host charging stations on their properties. This consisted of REITs (real estate investment trusts), national retailers, and third-party property managers. CW 3 reported to the Senior Vice President of EV Charging until October 2021, to Brandt Hastings from October 2021 to late February or early March 2022, and to the Executive Vice President of Sales until October 2022. CW 3 was furloughed from Volta in October 2022 along with 54% of personnel – approximately 160 to 170 people.

129.    CW 3 was very critical of Volta's projections for the number of charging stations and media screens that it would install, calling them not realistic because the Company never had the financial capacity to install or manufacture that many stations. The witness specifically cited the Company's goal of reaching 3,100 charger installations by the end of 2021 and 6,500 in 2022, which were prepared by Drew Bennett, Volta's executive who was in charge of network operations. (This is consistent with the Investor Presentation, where Volta projected 3,142 stations installed by the end of 2021 and 6,492 by the end of 2022.) The witness stated that at the time of the SPAC transaction, those projections were wildly overoptimistic, noting that "[w]e barely had 3,100 stations in the ground in 15 years of business, and they expected to double that in one year time? How obtainable does that sound to you? It was excruciatingly irresponsible and inaccurate."

130.    CW 3 also confirmed the logistical difficulties associated with installing charging stations that other witnesses noted above. A major component of this was that every charging station

location was unique, with different property owners, varying real estate and particular local laws and ordinances. "None of this happens easily or swiftly," the witness noted, adding that 30% of the deals done on the sales side are never installed because Volta could not get the requisite permits approved by local governing bodies. In other cases, Volta could get permits, but clients were not willing to commit.

131.    This witness also described other reasons why Volta's installation projections were unrealistic. For example, Volta was not realistic about the time it takes to negotiate a deal with large retailers like Kroger or Kohl's Department Stores. In addition, CW 3 explained that Volta was starting to see stiff competition enter the market. This competition increased "in 2019-2020, when, all of a sudden, competitors of ours – Tesla, EVGO – that had never offered rent to site hosts, paid $500,000 for a 20-year easement."

132.    CW 3 also explained that Volta's projections were unrealistic because not all stations had two media screens per station, some stations were deployed without any screens in some markets because of permitting issues, and in several instances, projects did not move forward even after a deal was signed.

133.    Furthermore, CW 3, explained that Volta's revenues were significantly diminished by the Company's inability to install the number of charging stations needed to reach the level of scale at which it could attract large advertisers (such as Coca Cola). The witness explained that "[i]f Volta can get to 10,000 screens in 5,000 units, that's a game changer for ad revenue. Then you have scale." Otherwise, without achieving that level of scale, revenue projections were pie-in-the-sky numbers. "You have no metrics, no auditing, no way to justify that [your ad rates] are in line with the market. They had no[] proof of concept or efficacy [to show] advertisers."

134.    Similarly, CW 1, a Vice President of Sales, recalled that Drew Bennett, Volta's Senior Vice President of Network Operations, who Volta hired in February 2021, reported in a meeting in New York in May 2022 that Volta's C-Suite executives attended, that the Company was not going to meet its goals for the number of stations that would be installed. The witness described this executive as saying "straight out" that "[w]e're not going to get there." In response to this report,

"[t]he C-suite was pissed. But his audience – media leadership and sales people — appreciated his honesty." The Sales team appreciated this because if Volta had fewer stations installed than expected, that meant that they would be able to sell fewer ads. CW 1 noted the network effect whereby big companies that Volta wanted to sell ads to (including large national brands) would only be interested if Volta had a sufficient number of stations installed. This witness explained that Volta's revenue projections were assuming that big companies such as these would come onboard to sell ads, but they were not going to do so until Volta reached a certain number of stations. This witness also described the Sales team's reaction to Bennet's statement that Volta would not meet its installation goal as "good for him. Someone's being honest, because it was always lies, lies, lies."

135.    CW 1 also noted that the number of charging stations that Volta stated it planned to install was deceptive. The witness described, based on communications with the Site Sales team, these metrics as "knowingly inflated to impress the Street. Everyone was told to keep their mouth shut."

136.    In addition, CW 1 described how Volta was frequently not in compliance with local laws or ordinances applicable to its charging stations. "I was told 99% of all stations in a major city in the U.S. that was a big market for Volta are in some type of violation, like signage code. Scott's [Mercer] mentality was 'F*** that' — he said that every other day — 'Put them in anyway.'" This problem led to a few charging stations needing to be taken out, and costing Volta "more than $1 million to correct, if they were even correctable." This witness learned this information from Volta's General Manager at the end of December 2021, as well as from another executive, the Vice President of Enterprise Solutions.

137.    CW 1 also noted, consistent with the descriptions of other witnesses, that it took a long time to complete installations because of permitting and other logistical details. As such, Volta's pre-Merger guidance for its charging station projections was unrealistically ambitious. "I would call it wildly overly optimistic," this witness stated, adding that the overly inflated projections may have contributed to the resignations of Wendel and Mercer. This witness also described Volta's failure to perform despite knowing full well what it costs to install stations and the accompanying

issues with installations, which led advertisers to become frustrated with Volta.

138.    Yet another witness confirmed these points. CW 7 was a Senior Director of Product Marketing at Volta from February 2019 to October 2022. This witness reported to Volta's Chief Marketing Officer, who in turn reported to Mercer (followed by Hastings and Cubbage). CW 7 described Volta's projections around station installations, including 6,500 at the end of 2022, as "fantasy land," especially considering bureaucratic and governmental challenges. The witness stated that "[t]o me it was completely bizarre." This witness also described Volta's projections for station installations as "wildly overoptimistic. I couldn't figure it out."

139.    In addition, CW 7 stated that a large number of Volta's stations are not fully permitted, and many agreements are ending or will soon end because unlike other charging companies, Volta offered five-year outs instead of ten years. And in many places, the Company can't generate ad revenue because of local laws that prohibit advertising on anything other than what is on the premises. For example, Kroger can advertise for itself on stations on its property, but the companies that sell products at its stores cannot advertise.

140.    Despite Volta's lofty statements, the Company utterly failed to meet its projections for the number of charging stations it would install. When the Company announced its results for the fourth quarter and full year 2021, on March 21, 2022, it had just 2,330 stalls installed through the end of 2021, as compared to the 3,142 stations that it projected in the Investor Presentation, and revenues of just $32 million, as compared to $36 million that it had projected.

141.    Volta also lowered its projections for 2022 even more drastically when it announced its 2021 results on March 21, 2022. The Company estimated that it would install between 1,700 and 2,000 new charging stalls and have between $70 million and $80 in revenue in 2022. These figures were vastly lower than the 3,350 chargers and the $108 million in revenue that Volta projected in the Investor Presentation.

142.    Analysts took note of these discrepancies. For example, on April 1, 2022, after Volta announced its full year results for 2021, Cantor Fitzgerald published a note in which it lowered its 12-month price target on Volta's shares "to $9 from $13 due to slower-than-expected charger growth

and lower revenues."

143.    Moreover, Volta's underwhelming numbers of installed chargers were even lower than they appeared because Volta differentiated between "stations" and "stalls." Volta stated that "[a] stall is attributed to a station based on the number of vehicles that can charge concurrently and there are certain configurations of Volta sites where one station is capable of charging more than one vehicle at a time." For example, Volta's Form 10-K for 2021 (which was not filed until April 15, 2022) showed that it had 2,330 total "stalls" installed as of the end of the year, but it had just 2,264 total "stations" installed. In other words, Volta would sometimes count a single "station" as multiple "stalls," even though it never made that distinction in the Registration or Proxy Statements, where the Company discussed just the total number of *stations* installed.

144.    Volta's problems only got worse as time progressed. On September 28, 2022, Volta announced that it was firing 10% of its workforce, had reduced 18% of its workforce since June 1, 2022, and that it was lowering its revenue guidance for the third quarter to between $13.5 million and $14.5 million (lower than the $17 million to $18 million it had projected when it announced its second quarter results on August 11, 2022). Also in this September 28, 2022 announcement, Volta disclosed that it was "withdrawing its full year 2022 revenue and install guidance until further notice."

145.    Volta announced the results for the third quarter of 2022 on November 14, 2022, and stated that it had installed a total of only 3,093 stalls in its entire history, including just 173 stalls in that quarter, and that its revenue for the quarter was $14.4 million. Given that Volta had 2,330 total stalls installed at the end of 2021, this means that it installed just 763 stalls in the first three quarters of 2022.

146.    These figures were drastically lower than what Volta projected in connection with the Merger ($108 million in revenue and 3,350 installations[5] in 2022), and even lower than the already reduced figures that Volta projected at the beginning of 2022 (of 1,700 to 2,000 new stalls and

---

[5]  This figure of 3,350 stalls installed in 2022 is based on subtracting the total 3,142 chargers projected by the end of 2021 from the 6,492 total projected by the end of 2022.

revenue of $70 million to $80 million in 2022).

147.    Volta's revenue shortfall only got worse as time went on because as Volta failed to install the number of charging stations that it had planned on, the Company would not benefit from its promise that "chargers grow in value as the network scales."

### 4.    Volta's Improper Practices Depleted its Cash Balance Throughout the Class Period

148.    Volta encountered extreme challenges in its ability to fund its business because it depleted its cash balance. As of September 30, 2021, soon after the completion of the Merger, Volta had $331 million in cash and equivalents on hand to funds its business.[6] This number dropped precipitously in each of Volta's successive quarterly reports as a public company, to $262.3 million as of the end of 2021, $205.4 million as of March 31, 2022, $105.3 million as of June 30, 2022, and a meager $15.6 million as of September 30, 2022.

149.    CW 3 confirmed that Volta was running out of cash needed to meet its installation goals and described the Company as cash-strapped. For example, Volta touted some of its big-name agreements for charger installations, such as with Walgreens, where the agreed deal was for Volta to install 200 stations per year for five years. But as of October 2022, when the witness left the Company, Volta had installed only 20 chargers and Walgreens was livid. The witness stated that Volta was "on the precipice of losing" the contract and "[t]here was no path forward because there was no money. They can't pay for chargers or installs."

150.    CW 3 also described Volta's lack of cash available to fund its operations. The witness stated that "[a]n executive vice president told me off-the-record in June or July 2022 that we only have $55 million left the bank." At this point in time, Volta's "leadership refused to approve capital allocation for any new builds." CW 3 stated that it appeared in the recent earnings calls that Volta had lied to investors. "They were not telling the truth about the fact that they are almost out of cash. This is failure on a thousand levels." The witness stated that these problems occurred because Volta

---

[6] Mercer provided this figure on the Company's November 10, 2021 earnings call for the third quarter of 2021.

overstaffed and overcommitted when the witness believes the executive team clearly knew some time in the first quarter of 2022 that the Company was headed for financial dire straits.

151.    CW 1 confirmed these problems with Volta's projections for how many charging stations it would install and its cash balance. This witness stated that Volta spent money at a burn rate of $40 million per quarter while it had $105 million in the bank. The Company's leadership tried to compare its revenue model to Google and Facebook, which this witness viewed as lies or omissions, with fudged earnings figures. The witness described this image as "a smoke-and-mirrors game on what the real valuation was and what revenue we were generating as media sellers."

152.    Furthermore, the cash balances that Volta reported were misleading because Volta was taking extreme steps to avoid paying its liabilities in order to make its cash balances look better than they were, as described further below. (*See infra* ¶¶ 161-74).

153.    Analysts consistently lowered their valuation of Volta as this news of its depleted cash balance and failing to meet its installation and revenue figures emerged. For example, after Volta lowered its guidance on September 28, 2022, D.A. Davidson lowered its price target for the Company to $2 per share and maintained its neutral rating based on the weaker guidance, and lowered it again to $1 on November 15, 2022 after the Company announced its third quarter results—as compared to D.A. Davidson's far-higher price target of $11 per share and buy rating on October 5, 2021, shortly after Volta went public. Similarly, on September 30, 2022, Roth Capital Partners lowered its price target from $2.50 to $1.50 per share and maintained its neutral rating, and lowered its price target again on November 15, 2022 to $1 per share—as compared to their price target of $18 per share and buy rating on November 11, 2021.

154.    And on September 29, 2022, Cantor Fitzgerald lowered its 12-month price target to $3 per share and maintained its neutral rating, and then lowered it again to $2 per share on November 15, 2022—as compared to Cantor Fitzgerald's price target of $13 per share and overweight rating on December 14, 2021.

155.    By April 19, 2022, D.A. Davidson expressed concern that based on Volta's cash burn, "we would expect the company to seek additional funding and/or explore other financing

arrangements for its strategic site/stall expansion plan by mid-2023."

156.    D.A. Davison's expectations turned out to be prescient, as Chadwick, on May 13, 2022, stated during an earnings call regarding Volta's quarterly financial results for the first quarter of 2022, that "Volta [would] be raising non-diluted capital to continue to accelerate the deployment of stalls in our network." Even this statement, however, misstated Volta's true financial position because Volta did not have access to that type of capital given its underlying problems.

157.    Analysts' concerns about Volta's cash flow increased following this news. For example, D.A. Davidson "estimate[d] VLTA has just one year of cash on hand, or until approximately early 2023. Based on what we learned from VLTA's 1Q22, we would expect the company to seek additional funding and/or explore other financing arrangements for its strategic site/stall expansion plan by late 2022 to early 2023 (sooner than the mid-2023 timeline we had previously contemplated)." Cantor Fitzgerald likewise responded to this news on May 18, 2022, noting that "we become a bit more conservative in the short term, as the company will need to secure an additional $250-300M in funding sometime this year" and "we remain cautious until additional funding can be secured."

158.    But investors still did not know at this point the full extent of Volta's liquidity problems or the underlying improper practices that caused them. Concerns about Volta's liquidity worsened over time. Barclays warned on November 15, 2022, that Volta was "stuck between a rock and a hard place," and "there is doubt about the company's 'ability to continue as a going concern' with liquidity being an issue in 4Q." Barclays also noted that while Volta had previously warned about its ability to continue as a going concern, that "concern is especially acute today" based on the disclosures that Volta made about its "cash burn" in connection with the third quarter of 2022. Barclays added that it had serious concerns about Volta's solvency given its very low cash balance and the fact that it spent approximately $30 million to deploy 173 chargers during the third quarter of 2022, as compared to approximately $33 million spent on 372 chargers the prior quarter. Barclays also observed that this $30 million was spent on "construction work in progress, which VLTA incurred largely in observance of some sort of contractual agreements from what we can tell."

Barclays was therefore concerned about Volta's continued viability, noting that even if it could raise $150 million in 2023, which was the market cap of the Company, that "would only address cash burn while revenues will be unable to grow in a meaningful" because Volta would still not be able to increase the number of stations it was installing. Barclays also stated that Volta had cut its expenses, "including a 54% reduction in full-time headcount," because if its "ongoing liquidity concerns." Barclays lowered its price target to just $0.50 per share, as compared to its prior price target of $2 per share.

159.    While Barclays was surprised by Volta's "higher than anticipated cash burn during 3Q," the confidential witnesses discussed below explain that Volta's improper accounting and financial practices – which Defendants concealed from the public – caused the Company's financial problems. For example, Volta had higher expenses because it got into disputes for failing to pay the owners of the properties where its charging stations were located, and ended up incurring large costs on these overdue payments.

### 5.    Confidential Witnesses Describe How Volta's Improper Accounting Practices Caused Its Financial Problems

160.    All of these problems—Volta's underwhelming number of charging stations, revenue and cash balance—were a result of underlying problems that were present in the Company all along and that led to Mercer and Wendel's ouster. A plethora of confidential witnesses, former Volta employees, consistently confirm the fundamental flaws in Volta's operations, accounting practices, and business model which Defendants misrepresented and which led to Mercer and Wendel being forced out of the Company. These problems include (1) Volta's improper revenue recognition practices; (2) Volta's shrinking cash balance that it artificially propped up by shirking on its liabilities to property owners; (3) Volta's culture of improper financial and accounting practices, and (4) as explained above, myriad regulatory and logistical hurdles that made installing charging stations take much longer than Volta represented.

161.    An Assistant Controller at Volta from January 2019 to June 2020 (CW 5), who reported to CW 4 (who, in turn, reported to the Company's Chief Financial Officer (including Debra

Crow)), described several problems with Volta's financial reporting and system of internal controls. This witness stated that internal controls developed by the Company's Controller were often ignored or overridden by Mercer, Wendel, and Crow. This witness recalled "bumping heads" with Crow "over the letter of [Volta's] contracts" with property owners for the rental of space for Volta's charging stations, because the witness raised questions regarding several of Volta's practices relating to its contracts and was viewed by Crow as a potential problem and a "squeaky wheel." The witness stated that there were things to be uncovered, which the witness suspected may have spurred the resignations of Volta's senior executives.

162.     For example, CW 5 stated that Volta was "flubbing numbers here and there, especially with big contracts like Brookfield/GGP. You do what you can to keep the wheels on the bus – to look attractive to investors." (Brookfield is one of the largest real estate investors in the world. Volta's Investor Presentation noted above listed Brookfield Properties as the first REIT (real estate investment trust) that Volta did business with as part of its "track record underwritten by established partners and client success." GGP is one of the largest shopping-mall operators in the United States and is owned by Brookfield.) As this witness explained, Brookfield/GGP owned properties attached to shopping malls, which Volta contracted with to install charging stations. Volta repeatedly failed to meet the deadlines for the payments owed under its contracts with Brookfield/GGP. The witness stated that "[w]e were never timely. We were always late. They would pick and choose who we would pay." The witness also stated that Volta was not compliance with System and Organization Control Compliance standards for internal controls "to prevent fraud."

163.     The witness stated that they and the Controller would try to adhere to the contracts that Volta signed, but there were times when Mercer and Wendel, aided by Crow, would override their efforts. The witness and the Controller would provide accounting details and numbers to Crow, who would then present them to Mercer and Wendel. The Controller and Crow did not see eye-to-eye on these matters. Crow would come back and order the Controller to make changes to the accounting, which the Controller was not comfortable doing. The Controller would try to correct Crow, but Crow, as the CFO, had the final say. The witness believed that Wendel and Mercer

directed Crow, based on how they wanted the numbers to look, and that Mercer and Wendel would have known all along about the questionable accounting practices that Volta engaged in. The witness explained that "[y]ou don't even have to be a forensic accountant [to see that]. Just a general accountant and [knowledge of] basic math."

164.    CW 5 also described how they were excluded from meetings that they expected to be included in as an Assistant Controller. In addition, the Controller, who this witness reported to, was overruled by Wendel and Crow as to when paying liabilities owed under contracts could be paid, especially on bigger contracts, with the witness noting one instance in particular where holding cash, in lieu of paying liabilities, was helping Volta survive. Volta would do what it could to keep collections letters at bay and not bring it to the attention of investors. The witness stated that "Mercer and Wendel at times would do whatever it took to keep the lights on" and make the Company's cash balance look better. The mentality was "whatever it took – do that."

165.    As the witness explained, "[w]e had gotten letters on behalf of Brookfield/GGP that we were not in compliance [with the contract]. Hundreds of thousands [of dollars] past due." The witness described this issue as having been the result of CFO Crow, acting on behalf of Wendel and Mercer, wanting to ensure that Volta's cash balance looked impressive to investors. In effect, the witness explained, Volta was reporting fraudulent numbers and was in breach of its contracts to paint a rosier picture and look more attractive financially. This witness described Volta as having a pattern and practice of not always paying its liabilities and other contractual obligations, in order to make its cash balance look better to investors than it really was. It was actions like this that led to Volta's poor or dishonest accounting and financial reporting practices. The witness also described Wendel reaching out to personal friends to borrow money to make payroll.

166.    CW 5 suspected that Francois Chadwick, Volta's CFO after Crow, may have eventually blown the whistle on Volta's dishonest accounting, which led to Chadwick resigning from the Company.

167.    Overall, CW 5 explained that, when it came to keeping books, Mercer and Wendel did what they had to do to keep relationships with clients and investors happy and they should have

known better. The witness concluded that "[f]rom what was happening then under my umbrella at the time I was there, I'm not surprised that the end result is what it is."

168.    CW 4 confirmed the statements by CW 5. CW 4 reported to Volta's CFO, who, in turn, reported to Wendel. CW 4 had regular contact with Mercer and Wendel, including reporting to Wendel at various times, having management meetings with Mercer, and being available as needed for Board meetings.

169.    CW 4 stated that they were pushed out of Volta because they had daily disagreements with Crow, sometimes devolving into hostile shouting matches. The witness explained that they were not the "Yes Person" that Volta wanted. The witness made their disagreements known and explained that "[a]t some point you lose the battle, but at least you get to book the objection."

170.    CW 4 also stated that when the witness received the sales projections for the coming fiscal year, as a matter of practice, they would reduce them by 10% to 15% and use that figure in their projections for the amount of cash and runway that the Company would have available, affirming their view that those sales projections were inflated and cash balances were often limited.

171.    CW 4 also confirmed the observations of CW 5 that Volta did not pay its contractual obligations on time. The witness also referenced the large real estate contract with Brookfield/GGP under which Volta would owe large amounts, such as $50,000 or $200,000 on certain dates, which was booked on a large, detailed schedule. There were many unpleasant conversations with Brookfield/GGP. The witness recalled one quarter when a large payment was due and Volta's executives said, "We know. We're not paying it yet." Sometimes this witness could not obtain payment authorizations even after setting up a wire transfer and past due payments would get delayed by months. These practices took place "[b]ecause we needed ending cash to look" better. The witness explained that the Board looked at the two topline items, cash and revenue, "[b]ut we were in violation of the contract. We were not following our fiduciary duties." The witness recalled some properties sending Volta to collections.

172.    CW 3 similarly confirmed Volta's problems managing its real estate partnerships that other witnesses discussed. One of the costliest mistakes occurred with Brookfield/GGP (discussed

above). Brookfield which had partnered with Volta for years, was a unique client, because Volta developed, owned and operated its own stations – except for Brookfield. Brookfield struck a deal where it paid for 51% of the capital expenditures for equipment and installation, taking a majority ownership position. In exchange, Brookfield paid Volta $18 million to deploy the sites, along with service and maintenance fees, and Volta would pay an inflated rental rate. But because of issues with Volta's financial accounting systems and structures, the Company was often late paying rent to Brookfield, which led to default notices and angry phone calls from Brookfield. Even more problems arose when it was revealed that Volta had not paid taxes to the local tax authority for three to four years. "That was not a small mistake and it was not a small amount of money." Volta was slow to respond, which forced Brookfield to pay the back taxes. Brookfield then charged Volta for this, plus service fees and interest markups, which caused a large rift in the partnership. Brookfield hired a new CFO, who came to Volta in early 2022, irate over the tax snafu and Volta's chronically late payments. Volta finally paid Brookfield back in 2022 and the new CFO insisted that, over a six-month period, Volta buy back all ownership of stations that Brookfield had invested in. This is consistent with Volta's unexpected and unexplained large expense in the third quarter of 2022 that Barclays noted on November 15, 2022, as "incurred largely in observance of some sort of contractual agreements from what we can tell." (*See supra* ¶ 158).

173.     On top of that, CW 3 said that there were dozens of companies to which Volta owned sums of approximately $500,000. There was some speculation that Cubbage was trying to bury Volta on purpose to declare bankruptcy and wipe out its debt.

174.     CW 6, who worked on product development and planning, reiterated the statements by the witnesses described above that Volta was notoriously slow at paying its vendors, which this witness attributed to a general lack of financial accounting preparedness. At one point after Volta went public, this witness was negotiating vendor contracts as the product lead for new station enhancements that required updated hardware and software for media and data collection. CW 6 said that those contracts slowed dramatically, because he or she could not get them past Legal and Finance approval. The witness "could see them pumping the brakes because they couldn't afford the

contracts."

### 6.    Volta's Products Were Not Ready When it Went Public

175.    CW 6 described a fundamental problem with Volta's business, that its products were not developed enough at the time it went public via the SPAC Merger. According to this witness, who worked on product development and strategy as a Senior Product Manager, when Volta did a product launch, "it felt bumpy." Also, when Volta went public in 2021, it had additional products that "were in the more nascent stages," such as a fast charger and nonmedia charging stations, which were not fully developed. The witness stated that Volta might have been ready to go public in 2024 when its future charger would be ready, but the timeframe that it chose was "too ambitious."

### 7.    Volta's Improper Revenue Recognition Practices

176.    CW 1 (a Vice President of Media Sales at Volta from several years before the SPAC Merger to the time in 2022 around when many other employees left the Company) described observing Volta's pattern and practice of improper accounting practices that the witness called "creative accounting," or "robbing Peter to pay Paul" in terms of "how they would book and record revenue" from media sales on Volta's balance sheet. The witness described how it was common to run media early to book the sale and claim, or "pull," the revenue into the earlier quarter as a way of boosting quarterly earnings, even if it meant the Company was already in the hole starting the next quarter.

177.    In particular, CW 1 explained that if Volta was short on its projected revenue goal toward the end of a quarter, the Sales team was told to approach their advertisers who had already committed to running ads in the subsequent quarter, to see if the ads could be run in the current quarter so that Volta could book the revenue for those ads in the current quarter. The Sales team was told to incentivize the advertisers to run ads when the advertisers did not plan to or want to by giving them bonus ads for free. The advertisers did not have to pay for the ads until the later quarter in which they actually wanted their ads to run. Advertisers generally agreed to this because it was free extra advertising for them in the earlier, intervening quarter. They would only not agree if their ads

were not ready yet in the earlier quarter or if the ads were tailored to the later time such as for a seasonal promotion. The Media Sales team was given this instruction in meetings by the EVP of Sales that the witness reported to and who reported to Mercer and Wendel. The witness stated, "To me, that's not honest."

178.    CW 1 also explained that this practice had been happening at Volta for at least two years prior to the SPAC Merger, and had gone on every quarter since then through the third quarter of 2021. This was a very common practice as a way to meet revenue goals. The witness recalled it taking place specifically in connection with the third quarter of 2021 because that was Volta's first quarter as a public company. The witness stated that Volta was short on its revenue goals and the Sales team was told by the EVP of Sales that "you need to book as much revenue as possible. We can't post we're short in our first public reporting." The witness explained that Volta also did this before it was public to try to show its ability to obtain revenue, stand out from its competitors, and increase its valuation in the private market.

179.    The witness explained further that by pulling ad runs forward, the advertiser would essentially get "two for the price of one." The witness questioned this practice because then Volta was "going to be in the same situation in the next quarter. We were robbing Peter to pay Paul." So for the advertisers, part of the campaign would be free. The advertisers would get what they wanted in later quarter. Volta was just booking the revenue in the earlier quarter so it could say it had the revenue then. This practice would allow Volta to say it realized revenue in one quarter, but it would then have a shortfall in the next quarter because it would not be booking any revenue in the next quarter for the advertisers for which the Company ran ads and booked revenue early. After this took place in the third quarter of 2021, the witness stated that "there was so much chatter that the numbers weren't correct."

180.    CW 1 also explained that before Volta went public, "we would account however the heck we wanted to." The witness stated that while he or she was not an accountant, employees talked about order matching when recording revenue, in terms of what Volta actually sold and delivered, and "we didn't do that – and I think it was a bit more creative." The witness also stated that "I don't

think it's fair to investors who gave their money away when we say we have this much revenue coming in and we did this when often that wasn't accurate." The witness also stated that "[t]he rules are what they are, and we broke them. We used to run media, run it early — it could be free as far as anybody knew — so we could say we actualized revenue to book revenue early. It was lying."

181.     This witness was sure that Mercer and Wendel were aware of this practice of pushing sales into an earlier quarter to boost revenue reporting. The witness also confirmed that Chadwick knew about this practice because after the third quarter of 2021, Chadwick instructed the Sales team to stop it because Volta was now a public company. The witness thus described this practice as not only "dishonest" and "desperate," but also "stupid." In addition, the witness stated that this practice took place during the third quarter of 2021 and did not stop until around October 2021.

182.     Overall, CW 1 stated that "[t]he last year has been [lie] after [lie] after lie." The witness described having seen a pattern of lying and deception among Volta executives as the Company ramped up its effort to go public, stating "I think investors were duped."

183.     CW 4 (who reported to Volta's CFO and Wendel, and had contact with Mercer and the Board), corroborated CW 1's description of improper revenue recognition practices. CW 4 stated that he or she saw shady accounting practices at Volta, such as how the Company would handle revenue recognition. The witness observed that "[i]f you recognize revenue too soon," that is when there are problems.

184.     CW 4 did not think Volta was ready to go public because of its inadequate accounting processes, and thought that when the witness left the Company in 2020 that Volta would not be ready to go public for two to three years. For example, Volta took an inordinate amount of time to close its books each month, and even then, they would find mistakes. The witness told Crow that the Company would not be ready to go public for two or three years, and described the plan to go public sooner as "a little typical – not to take financial issues to heart." The witness also told the team that if Volta were to have an audit of its internal controls, "we'll fail. The processes were not there. The staff was not there. The systems were not there." The reason for this was that proper financial accounting was not a priority. The witness also stated that when Chadwick became CFO, he should

have known better about these internal control deficiencies. But the witness also noted that "[p]eople who disagreed with [the Company's leadership] did not do very well."

185.    As an example of Volta's lack of internal controls, the witness recalled that Mercer would just hand out the corporate credit card number and not mention it to accounting, so they had no idea who was charging what, and ended up having to cancel the credit card on multiple occasions. The witness stated that "[y]ou cannot do things like that and think you're ready to go public." As another example of internal control deficiencies, the witness explained that "[t]he person processing invoices should not do bank reconciliation and should not be the person who signs the check."

186.    CW 4 explained that Mercer and Wendel's motivation was that they wanted to be big shots and to receive speaking engagements and invitations. Mercer wanted to put Big Oil out of business, and Wendel was willing to embellish to be the big shot. CW 4 explained that "[w]e used to jokingly refer to something in finance called "Wendelian math: take our numbers and add some extra ingredients. Don't have that invoice yet? Don't have that signed yet? It just takes 'creative accounting.'"

187.    As an example of the inadequacy of Volta's accounting practices, CW 4 noted that "We were still on QuickBooks. How you can ever take a company public on QuickBooks is crazy." (QuickBooks is an accounting software that is intended for small businesses, not purportedly billion-dollar companies such as Volta.)

### 8.    Volta's False and Misleading Reporting of Financial Information

188.    Based on consultation with an accounting expert, Volta's revenue recognition practices described above by its former employees violated Generally Accepted Accounting Principles ("GAAP").

189.    The accounting profession and the SEC recognize GAAP as the uniform rules, conventions, and procedures necessary to define and reflect accepted accounting practices. GAAP rules are primarily promulgated by the Financial Accounting Standards Board ("FASB") and have been codified since 2009 in its Accounting Standards Codifications ("ASC"). These rules, referred to

as ASCs, represent the source of authoritative GAAP for nongovernmental entities such as Volta. (ASC 105, *Generally Accepted Accounting Principles*, section 10-05-1).

190.    Separately, SEC Regulation S-X states that financial statements filed with the SEC that are not prepared and presented in accordance with GAAP "will be presumed to be misleading or inaccurate, despite footnote of other disclosures[.]" (17 C.F.R. § 210.4-01(a)(1).) Violations of GAAP, therefore, bear on whether SEC Regulations (for publicly-traded companies) have been properly followed and satisfied.

191.    The FASB has also issued guidance in the form of Statements of Financial Accounting Concepts ("FASCON"s), which set forth the conceptual framework underlying GAAP, as well as its objectives, qualitative characteristics, and other concepts used in the development of GAAP.

192.    As the FASB has explained, the "objective of general-purpose financial reporting is to provide financial information about the reporting entity that is useful to existing and potential investors, lenders, and other creditors in making decisions about providing resources to the entity." (FASCON No. 8, *Conceptual Framework for Financial Reporting* ("FASCON No. 8") as amended in August 2018, OB2[1]). FASCON No. 8 continues in relevant part:

> Investors', lenders' and other creditors' expectations about returns depend on their assessment of the amount, timing and uncertainty of (the prospects for) future net cash inflows to the entity…. Consequently, existing and potential investors, lenders and other creditors need information to help them assess the prospects for future net cash inflows to an entity.
>
> To assess an entity's prospects for future net cash inflows, existing and potential investors, lenders, and other creditors need information about the resources of the entity, claims against the entity, and how efficiently and effectively the entity's management and governing board have discharged their responsibilities to use the entity's resources….
>
> Many existing and potential investors, lenders, and other creditors cannot require reporting entities to provide information directly to them and must rely on general purpose financial reports for much of the financial information they need. Consequently, they are the primary users to whom general purpose financial reports are directed. (FASCON No. 8, OB3–OB5).

193.    FASCON No. 8 also notes that for financial information to be useful "it must be

relevant and faithfully represent what it purports to represent," and its usefulness "is enhanced if it is comparable, verifiable, timely, and understandable." (FASCON 8, QC4). It elaborates:

> Relevant financial information is capable of making a difference in the decisions made by users. Information may be capable of making a difference in a decision even if some users choose not to take advantage of it or already are aware of it from other sources.
>
>               * * *
>
> Financial reports represent economic phenomena in words and numbers. To be useful, financial information not only must represent relevant phenomena, but it also must faithfully represent the phenomena that it purports to represent. To be a perfectly faithful representation, a depiction would have three characteristics. It would be complete, neutral, and free from error. (FASCON No. 8, QC6, QC12).

### a)    Volta Violated Revenue Recognition Rules

194.    Volta's practice of pulling forward revenue to an earlier quarter by giving advertisers free ads that were not what the advertisers signed up for or were actually paying for—as described by CW 1 and CW 4 (*see supra* ¶¶ 176-83)—was a clear violation of revenue recognition principles.

195.    Even if Volta stopped this practice after the third quarter of 2021, it subsequently continued to misstate its revenue from earlier periods and did not issue a restatement that was required to correct its prior accounting violations. By maintaining these past false revenue figures, Defendants continued to give investors a false impression of Volta's finances. In fact, however, Volta's revenue recognition violations made it less able to attain future revenue because the advertisers whose revenue Volta improperly reported prematurely would not be buying additional ads in the subsequent quarter in which the advertiser had actually contracted for its ads to run.

196.    Revenue is a critical measure both for entities trying to earn a profit from their operations as well as users of financial statements trying to assess an entity's financial performance and position. Revenue measures, in the most basic sense, "the transfer of promised goods or services to customers in an amount that reflects the consideration" that the entity would expect to receive for providing those goods or services. (ASC 606-10-05-3[2])

---

[2]  FASB, ASC 606, *Revenue from Contracts with Customers* (May 2014), available at https://www.fasb.org/jsp/FASB/Document_C/DocumentPage?cid=1176164076069&acceptedDisclaimer=true.

197.    The accrual-based financial reporting framework of GAAP is particularly concerned with the proper procedures for "recognition" of revenue. In accordance with the matching principle, revenue is measured and reflected in financial statements as the amount that qualifies for recognition, for goods sold or services provided, over (or throughout) a specific period of time. CW 1 noted that Volta was violating the matching principle. *(See supra* ¶ 180).

198.    Under GAAP, the first step in evaluating revenue recognition is to understand the economics of the transaction or arrangement. Developing this understanding would involve consideration of relevant contracts or agreements, including obtaining an understanding of the products and/or services to be delivered and the timing of when such delivery (and customer acceptance) shall occur.

199.    Under FASCON No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises* ("FASCON No. 5"), "[r]evenues are not recognized until earned" and "are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues." (FASCON No. 5, ¶ 83).

200.    In December 1999, the SEC published Staff Accounting Bulletin ("SAB") No. 101[4] ("SAB 101"), which provides interpretive guidance on how a public entity should apply the revenue recognition criteria set forth in FASCON No. 5. Under SAB 101, revenue should not be recognized until it is "realized or realizable and earned," and therefore an entity should not recognize revenue until "all of the following criteria are met" (SAB 101):

- Persuasive evidence of an arrangement exists,

- Delivery has occurred or services have been rendered,

- The seller's price to the buyer is fixed or determinable, and

- Collectability is reasonably assured.

201.    These concepts were subsumed by the FASB framework for accounting rules with

---

[4] SEC Staff Accounting Bulletin No. 101, *Revenue Recognition in Financial Statements*, 17 C.F.R. Part 211 (Dec. 3, 1999), available at http://www.sec.gov/interps/account/sab101.htm.

ASC 605, *Revenue Recognition*. However, beginning January 1, 2018, public companies were required to adopt a new standard set forth in ASC 606. This standard not only includes identifiable changes to the way revenue is recognized, centered significantly on the recording of known offsets to revenue at the time transactions are recorded, but also affects prior industry-specific rules surrounding the recording of revenue and accounting for the collection of receivables.

202.    Under ASC 606, more specific criteria must be met for an entity to recognize revenue. As set forth in the Summary of ASC 606:

> The core principle of this Topic is that an entity recognizes revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services.

203.    To achieve that core principle, an entity should apply the following steps (ASC 606 at 2; *see also* ASC 606-10-05-2 to -4):

> Step 1: Identify the contract(s) with a customer.
>
> Step 2: Identify the performance obligations in the contract.
>
> Step 3: Determine the transaction price.
>
> Step 4: Allocate the transaction price to the performance obligations in the contract.
>
> Step 5: Recognize revenue when (or as) the entity satisfies a performance obligation.

204.    ASC 606 also identifies additional conditions upon which each principle's criteria would be considered met. Specifically, "identifying a contract" for Step 1 requires that all the following criteria be satisfied (ASC 606-10-25-1.):

> a)  The parties to the contract have approved the contract and are committed to perform their respective obligations.
>
> b)  The entity can identify each party's rights regarding the goods or services to be transferred.
>
> c)  The entity can identify the payment terms for the goods or services to be transferred.
>
> d)  The contract has commercial substance.

e) It is probable that the entity will collect substantially all of the consideration to which it will be entitled in exchange for the goods or services that will be transferred to the customer … [and] the amount of consideration to which the entity will be entitled may be less than the price stated in the contract if the consideration is variable because the entity may offer the customer a price concession.

205. As for determining when "the entity satisfies a performance obligation" (for Step 5 above), ASC 606 explains that such performance obligation is satisfied when a "promised good or service (that is, an asset)" is transferred "to a customer" and that "[a]n asset is transferred when (or as) the customer obtains control of that asset." (ASC 606-10-25-23).

206. Volta's practice of booking revenue in an earlier quarter than advertisers wanted their ads run was a clear violation of these basic revenue recognition rules under ASC 606. Volta's attempts to paper over its revenue shortfalls in one period by giving advertisers free ads in that earlier quarter did not satisfy the principles set out in ASC 606 for proper revenue recognition in the earlier quarter, because advertisers still wanted, and were paying for, ads in the later quarter – a performance obligation that Volta still needed to satisfy. The advertising customers would not be paying Volta any additional money in exchange for the free earlier ads, and the ads in the later period would still need to be run for the contract (and the performance obligation) to be satisfied. Furthermore, Volta would have less revenue in the subsequent quarter because the advertiser would not be paying again for the ads that were already expected to run in the subsequent quarter. (ASC 606 at 2; *see also* ASC 606-10-05-2 to -4).

207. Volta's practice also violated ASC 606 because it did not properly "identify the payment terms for the goods or services to be transferred" and the earlier ads for which Volta booked revenue did not have any "commercial substance." (ASC 606-10-25-1).

208. Volta also violated GAAP revenue recognition principles because, as described above, those rules require a consideration of the actual economics of the transaction.

209. Volta's practice of booking revenue on free ads that ran earlier than the ads that customers actually contracted to pay for is the digital-advertising equivalent of "channel stuffing."

The SEC explains that "'[c]hannel stuffing' denotes the pulling forward of revenue from future fiscal periods by inducing customers" -- as Volta did here "through price discounts, extended payment terms or other concessions -- to submit purchase orders in advance of when they would otherwise do so. Material undisclosed channel stuffing may cause a company's reported results of operations to be misleading." Furthermore, the SEC explains that "undisclosed or inadequately disclosed acceleration of sales through 'channel-stuffing' . . . materially distorted the Company's reported results of operations and contributed to the inaccurate picture of a successful turnaround."[7]

210.     Similarly, other sources explain that "[c]hannel stuffing is a deceptive business practice" that "typically would take place immediately prior to a reporting period such as quarter-end or year-end, so that management, fearful of bad consequences to their compensation, can 'make their numbers.'" As with what Volta did here, channel stuffing "is usually achieved by offering lucrative incentives, including deep discounts, rebates, and extended payment terms, to persuade distributors and retailers to buy quantities in excess of their current needs." This practice "is frowned upon by [the SEC] as a practice used by companies to accelerate revenue recognition to reach short-term revenue and earnings targets, and as such, misleading to investors." Moreover, channel stuffing "always catches up with the company, because it cannot maintain sales at the rate it is stuffing. Channel stuffing is not confined to the wholesale and retail trade; it can take place in the industrial sector, high tech industry, and the pharmaceutical industry as well."[8]

211.     While Volta's accelerating of revenue took place in the context of its displaying digital advertising, as opposed to with the sales of physical goods, it has the same core characteristics of channel stuffing in that Volta gave its customers more product (here, ads) than the customer wanted or was willing to pay for so that Volta could book revenue earlier than the customer was willing to pay for the product, with the result being that Volta would eventually have

---

[7] *In the Matter of Sunbeam Corp.*, Respondent., Release No. 1393 (May 15, 2001) (available at https://www.sec.gov/litigation/admin/33-7976.htm#P64_15318).

[8] All quotations in this paragraph are from:
https://www.investopedia.com/terms/c/channelstuffing.asp.

to report less revenue for those customers in a subsequent quarter when they stopped this deceptive practice.

### b)     Volta's Revenue Recognition Practices Violated the Principle of Neutrality

212.     "According to the FASB, one of the fundamental qualitative characteristics of useful financial information contained in financial statements that purport to be in accordance with GAAP that is 'likely to be most useful to the existing and potential investors…for making decisions about the reporting entity on the basis of' financial information" is **faithful representation.** ((FASCON No. 8, ¶¶ QC1, QC5.)). Faithful representation with respect to financial reporting according to the FASB in FACSON 8, if it is to "be useful," refers to financial information that "not only must represent relevant phenomena, but it ***also must faithfully represent the phenomena that it purports to represent***. To be a perfectly faithful representation, a depiction would have three characteristics. It would be ***complete, neutral,* and *free from error***." (FASCON 8, QC12 (emphasis added in bold)).

213.     A complete depiction of an entity's financial position and the results of its operations includes all information necessary for a user to understand the phenomenon being depicted, including all necessary descriptions and explanations. In certain instances, "a complete depiction also may entail explanations of significant facts about the quality and nature of the items, factors and circumstances that might affect their quality and nature, and the process used to determine the numerical depiction." (FASCON 8, ¶ QC13).

214.     "To be neutral, the financial information must be without bias in the selection or presentation of financial information. (FASCON 8, ¶ QC14)."

215.     Volta's revenue recognition practices plainly violated this basic GAAP principle of "neutrality" because, in addition to violating revenue recognition principles, they did not "faithfully represent" Volta's revenue from media sales, were not "complete, neutral, and free from error," and did not provide a "complete depiction" of the source or proper timing of the revenue. They also were not neutral and free from bias and were not "useful" to investors "for making decisions about" Volta. Instead, Volta's reporting of revenue figures gave investors a false impression of Volta's financial

performance and prospects because the reported figures were incorrect and were biased toward inflating revenue in the current quarter at the expense of revenue in future quarters, a practice that would inevitably lead to revenue shortfalls in subsequent periods — to the detriment of investors.

### c) Volta's Reporting of its Liabilities and Cash Balances Was False and Misleading

216.    Volta's reporting of its liabilities on its leases with property owners that the Company paid to host its charging stations, as well as its available cash balance to funds its operations, was highly misleading and deceptive to investors.

217.    As described by multiple confidential witnesses discussed above, Volta did not tell investors that its payments owed to its key site owners were long overdue and led to contentious discussions with the site owners that put Volta's relationships with the site owners at risk. The Company was behind on these contracts specifically because its senior executives wanted to make the Company's cash balance look better. Volta's reporting of its liabilities on its leases with site owners and of its cash balance were therefore biased toward making Volta's cash balances look better than they actually were while failing to disclose the urgent need to pay significant liabilities or else risk losing a substantial amount of business. Volta also exacerbated this problem by failing to pay taxes due on certain properties for several years.

218.    Volta's reporting of its liabilities and cash balances was misleading because Volta claimed it had adequate cash reserves and strong relationships with site hosts while failing to disclose that its liabilities to its site hosts were so overdue that Volta was on the verge of losing those key relationships. These statements were particularly misleading because Volta misrepresented its relationship with its site hosts as one of its main strengths.

### d) Volta's Projections of Station Installations Were False, Misleading, and Unfounded

219.    Volta's projections for the number of charging stations that it would install were false because they had no basis in fact. Multiple company insiders discussed above described how these projections were not realistic in light of the substantial difficulties that Volta faced installing charging stations, including-local regulations that impeded installations, difficulties reaching

agreements with site hosts, having unqualified employees on these projects, and mounting costs.

220. Volta's unfounded projections for the number of station installations were one of the key metrics that it reported to investors. For example, on August 15, 2022, the SEC questioned the basis for Volta's recent revenue outlook. Volta responded in a September 9, 2022 letter by explaining that this metric is:

> [H]elpful to investors because it provides supplemental information that, when combined with the information included in our financial statements, promotes a more meaningful understanding of the quality and sustainability of our performance, as well as additional insight to the Company's future growth plans." [Volta explained that it provided targeted ranges for revenue, the number of total incremental stalls connected, and the total incremental connected sites, in order] to give investors an indication of our future growth plans and, more importantly, the expected pace of that growth. Given our relatively small size in relation to the potential opportunity for growth across the entire electric vehicle charging sector, we believe disclosing target ranges for connected stalls, sites and total revenue is helpful to investors because this information provides context around the pace of our growth relative to trends impacting the entire sector in which the Company operates

221. These projections for station installations were especially important because Volta highlighted the "network effects" that its stations would have in which each station would be more valuable as its total network increased and large companies would then see more value in advertising on Volta's far-reaching network. As Volta highlighted on multiple slides in the Investor Presentation, "Chargers grow in value as the network scales."

222. Several confidential witnesses discussed above confirmed the importance of network effects to Volta being able to obtain revenue from key advertisers. These witnesses also corroborated each other in attesting to the fact that Volta was far from achieving these network effects and was therefore still unable to sell ads to key large advertisers. Volta's unfounded projections for the number of charging stations it would install were therefore not only false and misleading in their own right, but also adversely affected Volta's revenue projections, which depended on Volta having a certain number of stations installed.

### 9.     Plaintiffs and Class Members Suffered Damages

223.     Volta's decline since the time of the Merger, and its many false and misleading statements concerning its operations and basic business model, resulted in Mercer and Wendel's departures from the Company and the Company's continued drop in value after that time as it continued to report poor financial performance that was the result of the underlying problems that Defendants masked. Volta's stock traded at a closing price $9.30 per share on August 26, 2021, the day that the Merger closed. It consistently fell since that time and has not closed above that price since December 9, 2021. Volta's stock then dropped precipitously over the course of 2022, as the news described above emerged and showed investors the true nature of the Company. Volta's stock closed at $3.20 per share on March 30, 2022, when the initial complaint in this action was filed. It has dropped even further since then and closed at just $0.86 on the day before this Amended Complaint was filed. The Company's valuation dropped so much that on January 18, 2023, Volta announced that it was being acquired by Shell in a deal that valued Volta at just $169 million—a mere fraction of the $1.4 billion that the Registration Statement valued Volta at—destroying well over $1.2 billion in shareholder value.

### C.     False and Misleading Statements for the Securities Act Claims

224.     On May 14, 2021, Tortoise filed its initial Registration Statement on Form S-4 with the SEC in connection with the Merger. The Registration Statement was signed by Defendants Cubbage, Pang, Daboub, Leidel, and Tassin. Volta is responsible for the statements in the Registration Statement about the Company because Volta and its management, including Defendants Mercer, Wendel, and Chadwick, prepared that information for the purpose of being disseminated in the Registration Statement. Defendants Mercer, Wendel, and Chadwick are further responsible for the statements in the Registration Statement to the full extent permitted by law, due to their respective roles as control persons of Volta.

225.     The principal factors the Registration Statement disclosed that Tortoise considered as supporting the Merger included:

*Volta's Strong Customer Demand*. The TortoiseCorp Board considered the national

real estate footprint and portfolio of long-term contracts that Volta has with leading grocery store chains and real estate investment trusts including Giant Food, Albertsons Companies, Kroger and Brookfield Properties.

*Volta's Revenue Diversity and Unit Economics*. The TortoiseCorp Board considered Volta's multiple revenue streams and the expectation that Volta's charging stations will grow in value as its network scales due to the impact of network effects.

. . .

*Financial Condition*. . . . The TortoiseCorp Board also considered the fact that after consummation of the Business Combination (and assuming no redemptions), Volta would have enough cash on hand to fund the planned expansion of its charging infrastructure through 2025. . . .

*Operating History and Management Team*. The TortoiseCorp Board considered the fact that Volta has a ten-year operating history, which has enabled it to build a strong management team that is expected to remain with the post-combination company and continue to seek to execute Volta's strategy.

226.    The statements in ¶ 225 were materially false and misleading because: (1) as alleged in more detail by CWs 3 and 9, contrary to having "[s]trong [c]ustomer [d]emand," many of Volta's potential customers would not make deals with Volta until its charging network grew to scale, a point which Volta had not reached at the time the Registration Statement was filed; (2) as alleged in more detail by CWs 3, 4, 5, and 6, contrary to having "[s]trong [c]ustomer [d]emand," Volta routinely did not pay its contractual obligations on time, which allowed it to delay accounting for its liabilities and to keep cash on hand, but soured relationships with larger customers; (3) as alleged in more detail by CWs 1, 2, 3, 4, 6, and 7, Volta's projected ability to scale its network was unrealistic because (i) it did not account for regulatory, logistical, and bureaucratic difficulties inherent in installing its charging stations; (ii) Volta already had a history of missing projections at the time of the Registration Statement; (iii) Volta was frequently not in compliance with local laws and ordinances applicable to its charging stations; (iv) Volta's products were not developed enough at the time it went public; (v) Volta did not account for competition in the market slowing its growth; and (vi) Volta did not have enough cash on hand to install the number of requisite stations; and (4) as alleged in more detail by CWs 1, 4, 5, and 6, Volta would not have enough cash on hand to fund its expansion because at the time the Registration Statement was filed, Volta was already inflating

metrics to investors and not paying its contractual obligations in order to keep cash on hand.

227.    The Registration Statement also stated that, following the closing of the Merger, "Messrs. Mercer and Wendel will hold approximately 37.3% of the voting power" of the Company because they held all of the issued and outstanding Class B common shares. Class B shares have ten votes per share, while Class A shares have one vote per share.

228.    Under Risk Factors, the Registration Statement stated, in relevant part:

> ***If Volta is unable to attract and retain key employees and hire qualified management, technical, engineering and sales personnel, its ability to compete and successfully grow its business would be harmed.***
>
> Volta's success depends on the continuing services of key employees, including members of its management team. The loss of any of these individuals could have a material adverse effect on Volta's business, financial condition and results of operations. Volta's success also depends, in part, on its continuing ability to identify, hire, attract, train and develop and retain highly qualified personnel. The inability to do so effectively would adversely affect its business. Competition for employees can be intense, particularly in the San Francisco Bay Area where Volta is headquartered, and the ability to attract, hire and retain them depends on Volta's ability to provide competitive compensation. In addition, Volta competes for qualified personnel with its other competitors in the EV charging industry, who may seek to hire Volta's employees from time to time due to their industry expertise. Volta may not be able to attract, assimilate, develop or retain qualified personnel in the future, and failure to do so could adversely affect its business, including its growth prospects and ability to expand into new markets and geographies.

229.    The statements in ¶¶ 227-28 were materially false and misleading because: (1) as alleged in more detail by CW 2, Volta had already employed inexperienced personnel incapable of navigating the complicated regulatory, bureaucratic, and logistical difficulties associated with installing Volta's charging stations; (2) as alleged in more detail by CWs 1, 4, and 5, Volta's management ignored or overrode internal controls, used "Wendelian math," and knowingly inflated metrics to impress investors.

230.    The Registration Statement also gave the following projections that were prepared by Volta for its revenue and other key financial metrics through 2025:

|  | Fiscal Year Ending December 31, | | | | |
|  | 2021E | 2022E | 2023E | 2024E | 2025E |
|  | (in millions) | | | | |
| Total Revenue | $ 47 | $ 141 | $ 280 | $ 492 | $ 826 |
| Gross Profit | 19 | 66 | 135 | 242 | 436 |
| Total Operating Expenses | (59) | (92) | (149) | (211) | (303) |
| EBITDA | (30) | (1) | 33 | 109 | 252 |

231.    The Registration Statement also stated that Volta prepared these projections based on "the following assumptions that Volta's management believes to be material:

With respect to Total Revenue:

. . .

An increase in Volta's projected charging station network capacity from 3,142 charging stations in 2021E to 26,242 charging stations in 2025E (70% CAGR from 2021E to 2025E) and representing a 3% and 5% market share of U.S. public chargers, respectively (based on total U.S. chargers projected by BNEF);

. . .

An increase in the average number of available media screens from 2,237 in 2021E to 14,817 in 2025E (60% CAGR from 2021E to 2025E), which creates national scale for Volta's Behavior and Commerce activities;

A decrease in the cost per thousand impressions ("CPM") rate of approximately 2.5% from 2021E to 2025E as the network grows beyond core media markets;

With respect to Gross Profit:

An increase in Gross Profit from -15% in 2021E to 47% in 2025E driven by economies of scale in the sale of media content, maturation of the charge-for-charge effort and robust build out of the data product;

A decrease in cost of station installation and hardware, Level 2 and DCFC, based on assumed efficiencies related to larger quantity orders as Volta scales its network development as well as planned outsourcing of station manufacturing;

A decrease in hardware related costs of Level 2 and DCFC stations from approximately $25,000 in 2021E to approximately $11,000 in 2025E (-19% CAGR from 2021E to 2025E);

A decrease in installation related costs of Level 2 and DCFC stations from approximately $26,000 2021E to approximately $15,000 in 2025E (-13% CAGR from 2021E to 2025E);

232. The Registration Statement also explained that Volta's projected revenue was based on Volta "scaling with accelerating deployment of its station network. Network effects are driven by completion of national coverage of key media markets, growing EV penetration and full build out of its technological capabilities."

233. The statements in ¶¶ 230-32 were materially false and misleading because: (1) as alleged in more detail by CWs 3 and 9 many of Volta's potential customers would not make deals with Volta until its charging network grew to scale, a point which Volta had not reached at the time the Registration Statement was filed; (2) as alleged in more detail by CWs 1, 2, 3, 4, 6, and 7, Volta's projections for installing screens and generating revenue therein had no basis because (i) Volta did not account for regulatory, logistical, and bureaucratic difficulties inherent in installing its charging stations; (ii) Volta already had a history of missing projections at the time of the Registration Statement; (iii) Volta was frequently not in compliance with local laws and ordinances applicable to its charging stations; (iv) Volta's products were not developed enough at the time it went public; (v) Volta did not account for competition in the market slowing its growth; and (vi) Volta did not have enough cash on hand to install the number of requisite stations; (3) as alleged in more detail by CWs 1, 4, 5, and 6, Volta would not have enough cash on hand to fund its expansion to scale because at the time the Registration Statement was filed, Volta was already and inflating metrics to investors, and not paying contractual obligations in order to keep cash on hand; and (4) as alleged in more detail by CWs 1 and 4, Volta had been, since some time several years before the SPAC Merger, improperly recognizing revenue by pulling revenue into earlier quarters when it should not have been recognized until the subsequent quarter, with the motive of making cash holdings more appealing to investors, which violated ASC 606, GAAP principles, and the FASB principle of neutrality.

234.    The Registration Statement disclosed the following amount of revenue the three months ended March 31, 2020 to March 31, 2021, explaining that "Behavior and Commerce revenue increased by $2.4 million, or 212%, from March 31, 2020 to March 31, 2021, primarily due to large sales of media campaigns with several national brands in the three months ended March 31, 2021":

| | Three Months Ended March 31, | | Variance | |
|---|---|---|---|---|
| | 2021 | 2020 | $ | % |
| **Revenues** | | | | |
| Behavior and Commerce | $  3,529,646 | $  1,132,684 | $  2,396,962 | 212% |
| Network Development | 1,000,740 | 2,305,464 | $ (1,304,724) | (57)% |
| Charging Network Operations | — | 464,189 | (464,189) | (100)% |
| Network Intelligence | 210,000 | — | 210,000 | —% |
| **Total revenue** | $  4,740,386 | $  3,902,337 | $  838,049 | 21% |

235.    The Registration Statement described the "Behavior and Commerce" category of revenue as follows:

> Behavior and Commerce revenue is generated by displaying paid media content on the Company's network of media-enabled charging stations. National and regional businesses pay for content either directly or through their relationships with advertising agencies, based on the number of impressions delivered over the contract term, which is typically less than one year. Behavior and Commerce revenue is recognized ratably over time as the impressions are displayed on media-enabled charging stations over the contract term. The Company typically bills customers in advance on a monthly basis, and payments are typically due within one month after content delivery. Behavior and Commerce revenue is recorded in service revenue in the consolidated statements of operations and comprehensive loss.

236.    The Registration Statement contained a section titled "Revenue Recognition," describing how Volta's revenue recognition policies comply with ASC 606:

> **Revenue recognition**
>
> *ASC 606*
>
> Revenue is recognized when promised goods or services are transferred to customers in an amount that reflects the consideration to which the Company expects to be entitled in exchange for those goods or services by following a five-step process, (i) identify the contract with a customer, (ii) identify the performance obligations in the contract, (iii) determine the transaction price, (iv) allocate the transaction price, and (v) recognize revenue when or as the Company satisfies a performance obligation.

The Company generally considers a sales contract and/or agreement with an approved purchase order as a customer contract provided that collection is considered probable, which is assessed based on the creditworthiness of the customer. The Company combines contracts with a customer if contracts are entered into at or near the same time with the same customer and are negotiated with a single commercial substance or contain price dependencies. As it enters contracts with customers, the Company evaluates distinct goods and services promised in the contract to identify the appropriate performance obligations. The performance obligations include advertising services, charging stations, which include Level 2 (L2) or Direct Current Fast Charging ("DCFC") stations, installation services, operation and maintenance services, installed infrastructure, regulatory credits and Software-as-a-Service ("SaaS"). The Company generally contracts with customers at fixed amounts and has not experienced significant returns or price concessions and discounts. To the extent the Company is entitled to variable consideration on the sale of goods or services, it will estimate the amount it expects to collect as part of the transaction price provided it is probable that a significant reversal of revenue will not occur when the uncertainty related to variable consideration is resolved.

When a contract contains multiple performance obligations, the Company allocates the transaction price to each performance obligation using the relative standalone selling price ("SSP") method. The determination of SSP is judgmental and is based on the price the Company would charge for the same good or service if it were sold separately in a standalone sale to similar customers in similar circumstances. As the charging stations, installation and operation and maintenance services are never sold separately, the Company utilizes an expected cost plus a margin approach to determine the SSP of each of the separate performance obligations. Revenue is recognized upon transfer of control of promised products or services to customers in an amount that reflects the consideration to which the Company expects to be entitled in exchange for promised goods or services.

237.    The Registration Statement also disclosed the following revenue figures (with Behavior and Commerce revenue recorded as Service Revenue):

**Statement of Operations Data**

|  | Three Months Ended March 31, | | Year Ended December 31, | |
|---|---|---|---|---|
|  | 2021 | 2020 | 2020 | 2019 |
| **REVENUES** | | | | |
| Service revenue | $ 4,231,349 | $ 3,100,866 | $ 15,719,852 | $ 13,434,486 |
| Product revenue | 299,037 | 337,282 | 2,891,854 | 1,492,345 |
| Other revenue | 210,000 | 464,189 | 838,719 | 338,778 |
| Total revenues | 4,740,386 | 3,902,337 | 19,450,425 | 15,265,609 |

238.    The statements in ¶¶ 234-37 were materially false and misleading because: (1) as alleged in more detail by CWs 1 and 4, Volta had been, since some time several years before the

SPAC Merger, improperly recognizing revenue by pulling revenue into earlier quarters when it should not have been recognized until the subsequent quarter, with the motive of making cash holdings more appealing to investors; (2) Volta's revenue recognition practices violated ASC 606, GAAP principles, and the FASB principle of neutrality.

239.    When describing "Key Factors Affecting Operational Results," the Registration Statement stated:

*Relationships with Real Estate and Retail Partners*

In order to build its charging network, ***Volta will need to continue to establish and maintain relationships with real estate partners, retail partners and site partners with national, multi-state and local portfolios of commercial and retail properties***. Site hosts can span a diverse array of industries and locations, and if such hosts believe the benefits offered by Volta's competitors exceed the benefits of partnering with Volta, Volta may lose access to high quality property owners that it needs to achieve profitability.

240.    The statements in ¶ 239 were materially false and misleading because: (1) as alleged in more detail by CWs 3 and 9, many of Volta's potential customers would not make deals with Volta until its charging network grew to scale, a point which Volta had not reached at the time the Registration Statements was filed; and (2) as alleged in more detail by CWs 3, 4, 5, and 6, Volta routinely did not pay its contractual obligations on time in order to delay accounting for its liabilities and to keep cash on hand, which soured relationships with larger customers.

241.    The Registration Statement explained under the heading "Contractual Obligations" that "In the normal course of business, Volta enters into obligations and commitments that require future contractual payments. The commitments result primarily from operating leases and long-term debt." The following table showed that Volta owed over $78 million in Operating Leases:

| | Total | Less than 1 year | 1 to 3 years | 3 to 5 years | More than 5 years |
|---|---|---|---|---|---|
| Operating Leases | $ 78,716,954 | $ 7,954,690 | $ 21,213,894 | $ 19,493,172 | $ 30,055,198 |
| Long Term Debt | 52,193,300 | 9,784,021 | 34,242,612 | 8,166,667 | — |
| Financing Obligations | 5,716,752 | 886,599 | 2,682,289 | 1,928,429 | 219,435 |
| Total | $ 136,627,006 | $ 18,625,310 | $ 58,138,795 | $ 29,588,268 | $ 30,274,633 |

240

242.    Volta also discussed its leases by stating that "***Volta maintains multiple lease***

*arrangements depending on negotiating contracts with customers relating to installed charging stations*. . . . Volta uses significant estimates in accounting for lease liabilities and ROU assets, which are recognized at the lease commencement date based on the present value of the future minimum lease payments over the lease term. The lease interest rate used to determine the present value of future lease payments is based on Volta's incremental borrowing rate. *Volta's leases are all long term, extending beyond a twelve-month period, and include periods under options to extend or terminate the lease when it is reasonably certain Volta will exercise such options.*"

243.    The statements in ¶¶ 241-42 were materially false and misleading because: (1) as alleged in more detail by CWs 3 and 9, many of Volta's potential customers would not make deals with Volta until its charging network grew to scale, a point which Volta had not reached at the time the Registration Statement was filed; and (2) as alleged in more detail by CWs 3, 4, 5, and 6, Volta routinely did not pay its contractual obligations on time in order to delay accounting for its liabilities and to keep cash on hand, which soured relationships with larger customers.

244.    The Registration Statement summarized Volta's "*EV Charging-Related Services*" with the following description of Volta's relationship with the hosts of its charging stations:

> *Volta installs its chargers in premium parking spaces owned or leased by commercial or public-entity site hosts that desire to provide EV charging services at their respective locations. Volta's site hosts include retail centers, grocery stores, pharmacies, movie theaters, parking lots, healthcare/medical facilities, municipalities, sport and entertainment venues, parks and recreation areas, restaurants, schools and universities, certain transit and fueling locations and office buildings and other locations.* Under both its master services agreements and negotiated agreements for specific sites, Volta typically targets agreements for the installation of its charging stations at host sites with *an initial term of ten years, with the option to extend the lease for up to two five year terms*. Such agreements address both Volta rental payments and access to and payment for electricity at host sites. In addition, Volta has sold EV charging stations to select business partners and site hosts under contractual arrangements pursuant to which Volta performs related installation, operation and maintenance services, while retaining the exclusive right to sell media display time on the charging stations for the duration of the contract term, commonly ten years.

245.    The Registration Statement also described the last category by stating that "Volta also sells content-driven EV charging stations to select business partners and continues to perform the

related installation, operation and maintenance services, generating recurring revenue while retaining

the exclusive right to sell media display time on the charging stations for the duration of the contract

term."

246.    The statements in ¶¶ 244-45 were materially false and misleading because: (1) as

alleged in more detail by CWs 3 and 9, many of Volta's potential customers would not make deals

with Volta until its charging network grew to scale, a point which Volta had not reached at the time

the Registration Statements was filed; and (2) as alleged in more detail by CWs 3, 4, 5, and 6, Volta

routinely did not pay its contractual obligations on time in order to delay accounting for its liabilities

and to keep cash on hand, which soured relationships with larger customers.

247.    The Registration Statement described projected installations as a "**Competitive

Strength**" by highlighting that its "**Visible site pipeline creates predictable growth**":

> *As of March 31, 2021, Volta's contracted backlog includes more than 2,000
> additional screens, more than 1,000 additional charging stations and more than 450
> additional sites, as well as a pipeline of more than 5,000 potential sites under master
> service agreements with national partners, which provide the framework for
> deploying Volta charging stations to such national partners' sites* by establishing a
> mutual agreement with such partners to work with Volta to agree upon such national
> partner's sites for installation of Volta charging stations with the execution of a
> specific further agreement governed by the terms of the master service agreement.
> Volta currently has more than 20 of these master service agreements in place (see also
> "Partnerships and Strategic Relationships" in the table on page 259 for a
> representative sample of partners with which Volta has master services agreements).
> This expected pipeline of more than 5,000 potential sites reflects management's good
> faith estimate, based on their experience and industry knowledge, of the prospective
> additional target sites under master service agreements that Volta has the opportunity
> to contract for, and there can be no assurances that the 5,000 potential sites currently
> under master services agreements will be developed due to permitting, constructing or
> other factors or a determination that any such sites may not be of commercial value to
> Volta's business model. *In addition, Volta's pipeline expectations do not include
> opportunities for negotiated agreements for specific sites that are not under master
> services agreements*, given the differences in contracting for such sites described
> above, or any opportunities outside of the United States. *Volta continues to pursue
> commercial relationships under both master service agreements and site-specific
> agreements as part of its ordinary course of business and believes these
> opportunities will lead to predictable growth as Volta deploys additional capital to
> scale its network.*

248.    The statements in ¶ 247 were materially false and misleading because: (1) as alleged

in more detail by CWs 1, 2, 3, 4, 6, and 7, Volta's projected ability to meet its projections for installing charging stations was unrealistic because (i) Volta did not account for regulatory, logistical, and bureaucratic difficulties inherent in installing its charging stations; (ii) Volta already had a history of missing projections for installing charging stations at the time of the Registration Statement; (iii) Volta was frequently not in compliance with local laws and ordinances applicable to its charging stations; (iv) Volta's products were not developed enough at the time it went public; (v) Volta did not account for competition in the market slowing its growth; and (vi) Volta did not have enough cash on hand to install the number of requisite stations; and (2) as alleged in more detail by CWs 1, 4, 5, and 6, Volta would not have enough cash on hand to fund its expansion because at the time the Registration Statement was filed, Volta was already inflating metrics to investors and not paying contractual obligations in order to keep cash on hand.

249.    The Registration Statement also described Volta's "**Experienced management team**" as a "**Competitive Strength**," stating "Volta's expertise in EV charging is *driven by the vision of its [CEO], Scott Mercer*, who has been at the forefront of the EV charging movement since launching Volta's first pilot site in Hawaii in 2011, and *its President, Christopher Wendel, together who are among the last founding teams in the EV charging market to still run their business*."

250.    The statements in ¶ 249 were materially false and misleading because: (1) as alleged in more detail by CW 1, 4, and 5, Volta's management ignored or overrode internal controls, used "Wendelian math," and knowingly inflated metrics to impress investors; and (2) as alleged in more detail by CW 3, Volta already had a history of missing projections for installing charging stations at the time of the Registration Statement.

251.    The Registration Statement highlighted "**Volta's Partnerships and Strategic Relationships**" as follows:

> *Volta is focused on establishing and maintaining strong long-term relationships with real estate and retail partners and site hosts with national and regional multi-site portfolios of commercial properties to build out its charging network*. Such site hosts can span a wide array of industries and locations and currently include retail centers, grocery stores, pharmacies, movie theaters, parking lots, healthcare/medical facilities, municipalities, sport and entertainment venues, parks and recreation areas,

restaurants, schools and universities, certain transit and fueling locations and office buildings and other locations. For Volta's partners with multi-site portfolios, Volta executes master service agreements with site hosts that help facilitate conversion of prospect sites into developable locations by standardizing terms and conditions for site leasing and access. ***Volta's management believes the benefits offered to site hosts by its business model will continue to provide Volta with access to the highest quality property owners and site hosts. Such access and continued premier placement of Volta's stations will in turn allow it to continue demonstrating the benefits of its content display offerings to its partners, leveraging the expansion of its EV charging network to grow its relationships with key national and regional content partners as the Volta network scales.***

252.    The Registration Statement went on to provide a table listing the parties with which Volta does business. It explained that "the site partners listed under 'Stores' below are representative of the types of top national brands with which Volta has a master services agreement or specific marquee site agreements. The site partners listed under 'REITS' below are representative of additional site partners with whom Volta has contractual relationships with and who control important national or regional portfolios of properties that Volta believes would add value to its network. . . . In the 'Behavior & Commerce' category below, each of the OEMs and national brands listed paid for advertising content on Volta's media-enabled charging stations and are representative of the type of household names that we believe perceive value in Volta's advertising network."

253.    The Registration Statement provided the following table to support these statements:



254.    The statements in ¶¶ 251-53 were materially false and misleading because: (1) as alleged in more detail by CWs 3 and 9, many of Volta's potential customers would not make deals with Volta until its charging network grew to scale, a point which Volta had not reached at the time the Registration Statements was filed; (2) as alleged in more detail by CWs 3, 4, 5, and 6, Volta routinely did not pay its contractual obligations on time in order to delay accounting for its liabilities and to keep cash on hand, which soured relationships with larger customers.

255.    The Registration Statement incorporated by reference the Investor Presentation that Volta filed with the SEC on February 8, 2021, referencing it several times in describing the background of the Merger and noting that on February 5, 2021, just before the Merger agreement was reached and disclosed to the public, the Investor Presentation was posted "to the Private Placement Financing virtual data room."

256.    This Investor Presentation highlighted Volta's projections for station installations and revenue growth as its network scales, and compared Volta to companies such as Netflix, Amazon, and Airbnb:







257.    The statements in ¶ 256 were materially false and misleading because: (1) as alleged in more detail by CWs 3 and 9, many of Volta's potential customers would not make deals with Volta until its charging network grew to scale, a point which Volta had not reached at the time the

Registration Statement was filed; (2) as alleged in more detail by CWs 3, 4, 5, and 6, Volta routinely did not pay its contractual obligations on time in order to delay accounting for its liabilities and to keep cash on hand, which soured relationships with larger customers; (3) as alleged in more detail by CWs 1, 2, 3, 4, 6, and 7, Volta's projected ability to scale its network was unrealistic because (i) it did not account for regulatory, logistical, and bureaucratic difficulties inherent in installing its charging stations; (ii) Volta already had a history of missing projections at the time of the Registration Statement; (iii) Volta was frequently not in compliance with local laws and ordinances applicable to its charging stations; (iv) Volta's products were not developed enough at the time it went public; (v) Volta did not account for competition in the market slowing its growth; and (vi) Volta did not have enough cash on hand to install the number of requisite stations; (4) as alleged in more detail by CWs 1, 4, 5, and 6, Volta would not have enough cash on hand to fund its expansion because at the time the Registration Statement was filed, Volta was already inflating metrics to investors and not paying contractual obligations in order to keep cash on hand; (5) as alleged in more detail by CWs 1 and 4, Volta had been, since some time several years before the SPAC Merger, improperly recognizing revenue by pulling revenue into earlier quarters when it should not have been recognized until the subsequent quarter, with the motive of making cash holdings more appealing to investors; and (6) Volta's revenue recognition practices violated ASC 606, GAAP principles, and the FASB principle of neutrality.

258.    The Registration Statement on Form S-4 was subsequently amended on June 25, 2021, July 15, 2021, and July 29, 2021, with each subsequent amendment containing the same false and misleading statements described above in this Section.

**COUNT I: FOR VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT OF 1933 (AGAINST DEFENDANTS TORTOISE, CUBBAGE, PANG, DABOUB, LEIDEL, TASSIN, VOLTA, MERCER, CHADWICK, AND WENDEL (THE "SECURITIES ACT DEFENDANTS"))**

259.    Plaintiffs repeat and incorporate each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct. Plaintiffs expressly disavow reliance on, or incorporation of, any allegation of fraud, recklessness or

intentional misconduct for purposes of claims under the Securities Act. These Securities Act claims expressly do not make any allegations of fraud or scienter.

260.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against the Securities Act Defendants.

261.    The Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

262.    Defendant Tortoise is the registrant for the Offering. Defendants Cubbage, Pang, Daboub, Leidel, and Tassin, who signed the Registration Statement on behalf of Tortoise, were responsible for the contents and dissemination of the Registration Statement.

263.    Defendants Volta, Mercer, Chadwick, and Wendel are responsible for the statements in the Registration Statement described above, to the full extent permitted by law, due to their role in preparing and disseminating the statements in the Registration Statement about Volta.

264.    Volta is additionally liable for the statements in the Registration Statement because following the Merger, Volta is the same entity as Tortoise or, in the alternative, Volta is the successor in interest to Tortoise.

265.    Defendants Mercer, Chadwick, and Wendel are further responsible for the statements in the Registration Statement to the full extent permitted by law, due to their role as control persons of Volta.

266.    As issuer of the shares, the Securities Act Defendants are strictly liable to Plaintiffs and the Class for the misstatements and omissions.

267.    The Securities Act Defendants possessed the power and authority to control the contents of the Registration Statement. These Defendants were provided with copies of the Registration Statement prior to or shortly after its issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. These Defendants are liable for the false statements and omissions in the Registration Statement pleaded herein.

268.    None of the Securities Act Defendants named herein made a reasonable investigation

or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

269.    By reasons of the conduct herein alleged, each of the Securities Act Defendants violated, and/or controlled a person who violated Section 11 of the Securities Act.

270.    Plaintiffs and the Class purchased or otherwise acquired Volta securities pursuant and/or traceable to the Registration Statement.

271.    Plaintiffs and the Class have sustained damages. The value of Volta securities has declined substantially subsequent to the Securities Act Defendants' violations.

### COUNT II:  FOR VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT OF 1933 (AGAINST DEFENDANTS CUBBAGE, PANG, DABOUB, LEIDEL, TASSIN, MERCER, CHADWICK, AND WENDEL ("THE SECURITIES ACT INDIVIDUAL DEFENDANTS"))

272.    Plaintiffs repeat and incorporate each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct. Plaintiffs expressly disavow reliance on, or incorporation of, any allegation of fraud, recklessness or intentional misconduct for purposes of claims under the Securities Act. These Securities Act claims expressly do not make any allegations of fraud or scienter.

273.    This count is asserted against the Securities Act Individual Defendants and is based upon Section 15 of the Securities Act.

274.    The Securities Act Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Tortoise and/or Volta within the meaning of Section 15 of the Securities Act. The Securities Act Individual Defendants had the power and influence and exercised the same to cause Volta to engage in the acts described herein.

275.    The Securities Act Individual Defendants were each culpable participants in the violation of Section 11 of the Securities Act alleged in Count One above, based on their having signed or authorized the signing of the Registration Statement, their role in preparing and disseminating the statements in the Registration Statement about Volta, and having otherwise

participated in the process that allowed the Merger to be successfully completed.

276.    By virtue of the conduct alleged herein, the Securities Act Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiffs and the Class for damages suffered.

## VI.    VIOLATIONS OF SECTION 14(a) AND 20(a) OF THE EXCHANGE ACT

277.    The claims in Counts Three and Four below are brought under Sections 14(a) and 20(a) of the Exchange Act (the "Proxy Claims"). The Proxy Claims are brought on behalf of investors who beneficially owned and/or held Tortoise Class A common stock as of the Record Date of July 15, 2021 and were eligible to vote at Tortoise's extraordinary general meeting on August 25, 2021. The Proxy Claims are based solely on negligence. They are not based on any knowing or reckless conduct by or on behalf of Defendants, and Plaintiffs specifically disclaim any allegations of fraud, scienter or recklessness in these non-fraud claims.

278.    These Proxy Claims incorporate, and are based on, the same substantive allegations described in Section V above in connection with the Securities Act.

279.    Defendants' proxy solicitations included all statements which served to color the market's view of the Merger and encourage Tortoise Class A common stockholders to vote in favor of the Merger. These statements were made in the following proxy solicitations, including statements that these documents incorporated by reference (collectively, the "Proxy Solicitations"):

(a)    the Form S-4 Registration Statement filed on May 14, 2021, which included a Preliminary Proxy Statement Subject to Completion dated May 14, 2021, as set forth above in ¶¶ 68 and 258;

(b)    Amendment No. 1 to Form S-4 Registration Statement filed on June 25, 2021, which included a Preliminary Proxy Statement Subject to Completion dated June 25, 2021, as set forth above in ¶¶ 68 and 258;

(c)    Amendment No. 2 to Form S-4 Registration Statement filed on July 15, 2021, which included a Preliminary Proxy Statement Subject to Completion, dated July 15, 2021, as set forth above in ¶¶ 68 and 258;

(d)     Amendment No. 3 to Form S-4 Registration Statement filed on July 29, 2021, which included a Preliminary Proxy Statement Subject to Completion, dated July 29, 2021, as set forth above in ¶¶ 68 and 258; and

(e)     the Proxy Statement on Form 424(b)(3) filed on August 2, 2021, as set forth above in ¶ 70.

280.    All of the Proxy Solicitations were materially false and misleading.

281.    Among other things, the Proxy Solicitations included statements misrepresenting Volta's revenue from its customers that purchased advertisements on the media screens on Volta's charging stations, Volta's relationship with its customers that hosted Volta's charging stations, Volta's liabilities to those customers, Vola's cash balances, and Volta's projections for the number of charging stations it would install and for revenue growth. These statements are the same as those described in Section V.C above in connection with the Securities Act, because the preliminary Proxy Statements were included in the Registration Statement and all of the statements alleged to be false and misleading from the Registration Statement (including statements that were incorporated by reference, such as the those made in the Investor Presentation) were included in the Proxy Solicitations.

**A.      The Truth Begins to Emerge**

282.    The materially false and misleading statements and omissions set forth above directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

283.    Throughout the Class Period, the price of Volta securities was artificially inflated and/or maintained at an artificially high level as a result of Defendants' materially false and misleading statements and omissions identified herein.

284.    The price of the Company's securities declined significantly when the misrepresentations made to the market, and/or the information and risks alleged herein to have been concealed from the market, and/or the effects thereof, materialized and/or were revealed, causing investors' losses. As a result of Defendants' wrongful acts and omissions, and the precipitous decline

in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

285. On March 28, 2022, before the market opened, Volta announced that its founders, Defendants Mercer and Wendel, were resigning from their positions as CEO and President, respectively, and from Volta's Board of Directors. In a Form 8-K filed that day, Volta stated:

> Mr. Wendel's resignation is effective immediately, while Mr. Mercer will continue as Chief Executive Officer for a transition period ending on the earlier of (i) the date on which the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2021 is filed with the Securities and Exchange Commission and (ii) April 29, 2022. Mr. Mercer will serve as an independent advisor to the Company's board of directors (the "Board") through March 31, 2023. In connection with their resignations, each of Mr. Mercer and Mr. Wendel (the "Executives") has resigned as a member of the Board, effective immediately, Vincent T. Cubbage and Katherine J. Savitt have been appointed as Co-Chairpersons of the Board and Ms. Savitt has ceased to be Lead Independent Director.

286. On this news, the Company's share price fell $0.76, or 18%, to close at $3.37 per share on March 28, 2022, on unusually heavy trading volume that was over three times the average trading volume of the prior 20 trading days.

287. The departures of Defendants Mercer and Wendel from the Company that were announced on March 28, 2022, revealed to the public, or were the manifestation of the concealed risk of, the severe problems and improper practices in the Volta's operations described above.

288. But Volta hid the true nature of Mercer and Wendel's departures, characterizing them as voluntary and mutual, rather than revealing the truth that Mercer and Wendel were ousted from the Company as a result of Volta's improper practices.

289. On June 10, 2022, after the market closed, Volta announced that Defendant Chadwick would be resigning from his position as CFO "to pursue another professional opportunity" and that other senior executives were also resigning, including Julie Rogers, Chief People Officer of the Company, Praveen Mandal, Chief Technology Officer of the Company, and James DeGraw, General Counsel, Secretary, and Chief Administrative Officer of the Company. Then, before the market opened on June 13, 2022 (the next trading day), Volta announced that Defendant Cubbage was

appointed as Volta's new Interim CEO, replacing Brandt Hastings, who was the Interim CEO for just the two months, since Mercer's resignation upon the filing of Volta's 2021 Annual Report.

290.    On this news, Volta's share price fell $0.72 per share, or 25.34%, to close at $1.65 per share on unusually heavy trading volume that was over three times the average trading volume of the prior 20 trading days.

291.    The departures of Chadwick as CFO and Hastings as Interim CEO, as well as the Company's inability to find a permanent CEO, which made the Company resort to appointing Cubbage yet again as Interim CEO when he did not have any experience running a company in Volta's industry, further revealed to the public, or were the manifestation of the concealed risk of, the severe problems and improper practices in Volta's operations described above. As multiple confidential witnesses noted, the string of departures of senior executives from Volta and the Company's inability to find a permanent CEO, are the result of the many deep-seated problems in Volta's operations. (*See supra* ¶¶ 95-112).

292.    Analysts viewed the string of executive departures from Volta with extreme negativity. For example, on June 13, 2022, D.A. Davidson downgraded its price target on Volta from $3.50 to $2.50, noting that "[w]ithin the last three days, VLTA has announced a number of changes in its executive leadership team, including another round of departures of top managers. . . . We remain on the sidelines with a NEUTRAL rating and $2.50 PT (lowered from $3.50) on VLTA, with a high degree of caution over its ability to assemble a cohesive, long-term-oriented team of leaders."

293.    Similarly, Cantor Fitzgerald downgraded Volta to Neutral and lowered its price target from $6 per share to $4 per share, in a June 13, 2022 note, explaining that it had "become more conservative" about the Company after this new round of executive departures that "was unexpected and follows the announcement earlier this year that the co-founders were also stepping down."

294.    On September 26, 2022, before the market opened, Volta announced that it entered into an agreement with Cantor Fitzgerald that would allow Volta to sell up to $150 million in common stock to the public. This would be highly dilutive to existing shareholders, particularly considering that Volta's market cap was only approximately $232 million at the time. The need for

this financing was a result of Volta's low cash balance, overdue liabilities to site hosts, and inability to meet its projected number of station installations and revenue, all of which Volta had misrepresented to investors.

295.    On this news, Volta's share price fell $0.34 per share, or 17.62%, on September 26, 2022, to close at $1.59 per share on unusually heavy trading volume that was over 1.5 times the average trading volume of the prior 20 trading days.

296.    On September 28, 2022, after the market closed, Volta announced that it was firing approximately 10% of its full-time employees (which brought the reduction in its workforce since June 1, 2022, to approximately 18%), as part of "an organizational realignment to reduce costs and drive strategic priorities." Volta also announced in this same release that it was lowering its guidance for the Company's performance, stating that it "is revising its Q3 revenue guidance to between $13.5 million and $14.5 million. Furthermore, the company is withdrawing its full year 2022 revenue and install guidance until further notice."

297.    On this news, Volta's share price fell $0.24 per share, or 15.29%, on September 29, 2022, to close at $1.33 per share on unusually heavy trading volume that was over 1.5 times the average trading volume of the prior 20 trading days.

298.    Market analysts lowered their assessments of Volta again in response to these announcements on September 26 and 28, 2022. Cantor Fitzgerald published a note on September 29, 2022 in which it lowered its price target on Volta from $4 per share to $3 per share, noting that "the withdrawing of guidance and revision of Q3 guidance add further uncertainty in our view. We remain conservative on [Volta] in the short term, given the company's uncertainty around its financing need to raise $250-300M in 2022, and the company's search for a new permanent CEO and CFO. Recall in June, the company's CFO stepped down unexpectedly, following the dismissal of the company's Co-founders earlier in March."

299.    Similarly, on September 30, 2022, Roth Capital Partners published a note in which it lowered its price target on Volta from $2.50 per share to $1.50 per share, noting that the Company's $105 million in cash at the end of the second quarter of 2022 "leaves little room for mgmt. to

operate, so we see elevated risk in the company's equity given a weakening outlook and the recently announced $150m at-the-market offering. Lowering price target to $1.50."

300.    On October 3, 2022, D.A. Davidson published a note in which it reduced its price target on Volta to $2 per share, from $2.50 per share, based on Volta's announcement that it "reduced top-line guidance for 3Q21, withdrew full-year 2022 guidance, and announced an org. realignment, inclusive of a 10% reduction in force. . . . VLTA now expects 3Q22 revenue to be in a range of $13.5M-$14.5M, down from a prior range of $17M-$18M. As mentioned, full-year guidance, which was inclusive of $70M-$80M in revenue and 1,700-2,000 of incremental stalls added, was also withdrawn." D.A. Davidson also noted that "the challenges being experienced by the company. In short, VLTA's execution thus far, relative to SPAC-related projections, has been underwhelming . . . . All considered, and in the absence of a permanent CEO/CFO, and during a time VLTA is seemingly looking to secure incremental, long-term capital ($500M mixed shelf announced; $150M ATM offering as a subset also potentially in motion per a recent SEC filing), we believe it remains prudent to maintain more of a 'wait-and-see' approach for the time being." Moreover, D.A. Davidson also noted that "[a]bsent better visibility into potential capital raise(s) activity, permanent leadership, and stabilization in expectations, we are maintaining our NEUTRAL rating and reducing our PT from $2.50 to $2.00."

301.    The negative developments that Volta announced on September 28, 2022 were a result of Volta's low cash balance, overdue liabilities to site hosts, and inability to meet its projected number of station installations and revenue, all of which Volta had misrepresented to investors. But because Volta had never disclosed the underlying reasons for those poor results — including its improper accounting and business practices — and instead continued to mislead the market with positive descriptions of its business, investors continued to believe that Volta's poor results were fully accounted for with this particular disclosure. In truth, however, Volta's prospects would diminish even further as a result of the Company's underlying improper business practices.

302.    After the market closed on November 14, 2022, Volta announced its results for the third quarter of 2022. Volta's revenue for the quarter was $14.4 million ($12.2 million of which was

from media revenue) and it had installed just "173 stalls, bringing Volta's installed base of total stalls connected as of September 30, 2022 to 3,093." Defendant Cubbage stated that "Volta's short-term challenges have been significant." Volta also disclosed in this release that its "[c]ash and marketable securities were $15.6 million as of September 30, 2022."

303.    On this news, Volta's share price fell $0.25 per share, or 25.67%, on November 15, 2022, to close at $0.72 per share on unusually heavy trading volume that was over four times the average trading volume of the prior 20 trading days.

304.    Analysts lowered their assessments of Volta even further in response to the Company's report for the third quarter of 2022, based on the poor performance that resulted from problems in Volta's business.

305.    Barclays published a note on November 15, 2022 in which it lowered its price target of Volta by 75%, from $2 per share to $0.50 per share, noting that the Company's "cash burn was materially more than expected during the quarter" and that its "[c]ontinuous need for external funding beyond current needs puts company in tough spot." Volta's need for additional funding made it unable "to support charger installation growth while media revenue growth is also challenged in the current backdrop." Doubt about Volta's "ability to continue as a going concern" was "especially acute today as the higher than anticipated cash burn during 3Q doesn't position the company well to finish out the year." Volta's cash burn "resulted in an increase in the construction in progress line item on the balance sheet while lowering the number of chargers that are available to generate media revenues."

306.    Similarly, on November 15, 2022, D.A. Davidson lowered its price target from $2 per share to $1 per share, noting the Company's "immediate need for capital" and the "reduced capital outlays associated with new stall builds due to balance sheet constraints." In particular, D.A. Davidson explained, "[t]he changes to our longer-term modeling assumptions reflect a materially reduced rate of capital deployment associated with new stall builds, particularly in the near-term and a more subdued capex expectation vs. its original business plan over the next few years. Given how revenue builds over a multi-year period post stall deployment, nearer-term dial backs in builds will

impact longer-term model projections." This report also noted that "It is clear that VLTA is in need of an executive with a strong background in operational execution."

307.    Cantor Fitzgerald, in a note published on November 15, 2022, also lowered its price target, from $3 per share to $2 per share "as we lower our FY22 sales estimate to $63.1M (from $68.5M."

308.    A November 15, 2022 note from Roth Capital Partners described Volta as facing a "clearly distressed situation" and lowered its price target from $1.50 per share to $1 per share. This note stated that "Volta reported weak 3Q22 revenue" and that "Mgmt is slowing network growth to preserve capital." In addition, the Company's meager $15.6 million in cash was "leaving tight room for mgmt to execute on the turnaround plan, and substantial dilution likely from the $150m ATM line."

309.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

### B.    No Safe Harbor

310.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint under Section 14 of the Exchange Act. In addition, the statements alleged to be false and misleading herein all relate to then-existing facts and conditions. Furthermore, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false

or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Volta who knew that the statement was false when made.

### COUNT III: FOR VIOLATIONS OF SECTION 14(a) OF THE SECURITIES EXCHANGE ACT OF 1934 AND SEC RULE 14a–9 (AGAINST DEFENDANTS TORTOISE, CUBBAGE, PANG, DABOUB, LEIDEL, TASSIN, VOLTA, MERCER, CHADWICK, AND WENDEL)

311.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein, and expressly exclude any allegations specified to relate solely to Plaintiffs' claims under Section 10(b) and 20(a) of the Exchange Act.

312.    This claim does not sound in fraud. For the purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct. This claim is based solely on negligence.

313.    This claim is brought against all Defendants pursuant to Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a 9 promulgated thereunder (17 C.F.R. § 240.14a 9), on behalf of all former shareholders of Tortoise who held SNPR shares of Tortoise Class A common stock as of the Record Date and were entitled to vote at the Tortoise extraordinary general meeting on August 25, 2021 with respect to the Merger.

314.    Defendants' statements issued to solicit shareholder approval of the Merger, including the Proxy Solicitations, and the documents incorporated therein, and other proxy solicitation materials, contained statements that, at the time and in light of the circumstances under which they were made, were false and misleading with respect to material facts, and omitted to state material facts necessary in order to make the statements therein not false or misleading.

315.    Moreover, Defendants were under a continuing duty to update and/or correct these material misrepresentations and omissions, between dissemination of these documents and the shareholder vote on August 25, 2021, by disclosing the relevant facts, as well as update and/or correct any false or misleading statements regarding Volta. In violation of these duties, Defendants never disclosed any of the omitted facts or corrected the misleading statements before the shareholder vote on the Merger that was held on August 25, 2021. Significantly, Defendants updated

and/or supplemented the Proxy multiple times, including on June 24, 2021, July 15, 2021, and July 29, 2021, and then filed the final Proxy on August 2, 2021, without correcting their misrepresentations or disclosing any of the material facts originally omitted.

316.    Defendants named in this Count, jointly and severally, solicited and/or permitted use of their names in solicitations contained in the Proxy Statement and other proxy solicitation materials.

317.    Volta is additionally liable for these statements because following the Merger, Volta is the same entity as Tortoise or, in the alternative, Volta is the successor in interest to Tortoise.

318.    By means of the Proxy Solicitations and documents attached thereto or incorporated by reference therein and other proxy solicitation materials, Defendants sought to secure Plaintiffs' and other Class members' approval of the Merger and solicited proxies from Plaintiffs and other members of the Class.

319.    Each Defendant named in this Count acted negligently in making inaccurate statements of material facts, and/or omitting material facts required to be stated in order to make those statements not misleading, as well as in failing to update these statements. Defendants were required to ensure that the Proxy Solicitations and all other proxy solicitation materials fully and fairly disclosed all material facts to allow an investor to make an informed investment decision.

320.    The solicitations described herein were essential links in the accomplishment of the Merger.

321.    In the alternative, Plaintiff and the Class's reliance may established through the presumptions of reliance established under the fraud-on-the-market doctrine or *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

322.    Plaintiff Padget, and other members of the Class eligible to vote on the Merger, were misled by Defendants' false and misleading statements and omissions, were denied the opportunity to make a fully informed decision in voting on the Merger, and were damaged as a direct and proximate result of the untrue statements and omissions set forth herein.

323.    The false and misleading statements and omissions in the Proxy Solicitations and

other proxy solicitation materials are material in that a reasonable stockholder would consider them important in deciding how to vote on the Merger and/or whether to exercise their conversion right to receive $10.00 in cash per share of Tortoise stock. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy Solicitations, additional proxy solicitation materials, and in other information reasonably available to stockholders.

324.    The untrue statements and omissions as set forth above proximately caused foreseeable losses to Plaintiffs and other members of the Class.

325.    By reason of the foregoing, the Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a 9 promulgated thereunder, 17 C.F.R. § 240.14a 9.

**COUNT IV: FOR VIOLATIONS OF SECTION 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934 IN CONNECTION WITH THE PROXY CLAIMS (AGAINST DEFENDANTS CUBBAGE, PANG, DABOUB, LEIDEL, TASSIN, MERCER, CHADWICK, AND WENDEL)**

326.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein, and expressly exclude any allegations specified to relate solely to Plaintiffs' claims under Section 10(b) and 20(a) of the Exchange Act.

327.    This claim does not sound in fraud. For the purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct. This claim is based solely on negligence.

328.    This Count is asserted against Defendants Cubbage, Pang, Daboub, Leidel, Tassin, Mercer, Chadwick, and Wendel, and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

329.    These Defendants acted as controlling persons of Tortoise and/or Volta within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Tortoise and/or Volta's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, these Defendants had the

power to influence and control and did influence and control, directly or indirectly, the decision-making of the Tortoise and/or Volta, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. These Defendants were provided with or had unlimited access to copies of Volta's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

330.    In particular, these Defendants had direct and supervisory involvement in the day-to-day operations of Tortoise and/or Volta and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. These Defendants also reviewed the Merger Agreement between Tortoise and Volta and voted to approve the Merger, signed the Proxy Solicitations, and solicited approval of the Merger.

331.    As set forth above, these Defendants each violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of Tortoise's securities during the Class Period.

332.    By reason of the foregoing, these Defendants named in this Count violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

**VII.    VIOLATIONS OF SECTION 10(b) AND 20(a) OF THE EXCHANGE ACT**

333.    Plaintiffs bring Counts V and VI, addressed in this Section, under Sections 10(b) and 20(a) of the Exchange Act.

**A.    Additional Substantive Allegations**

334.    These claims for violations of Sections 10(b) and 20(a) of the Exchange Act incorporate, and are based on, the same substantive allegations described in Section V above in

connection with the Securities Act.

335.    In addition, Plaintiffs add the following allegations concerning Volta's restatement related to Defendants Mercer and Wendel's stock-based compensation specifically for their claims under Sections 10(b) and 20(a) of the Exchange Act, as well as the additional scienter allegations described below.

336.    The Registration Statement and Proxy Statement made clear that Mercer and Wendel would receive substantial compensation from the Merger. One of the most significant forms of compensation they received was from the Founder Incentive Plan. The Founder Incentive Plan ("Founder Plan") was "intended to (a) retain Christopher Wendel and Scott Mercer (together, the 'Founders') to ensure New Volta success and accomplish its goals, (b) incentivize the Founders with equity-based compensation to align their interests with stockholders' and (c) promote the success of New Volta's business."

337.    The Founder Plan granted Mercer and Wendel restricted stock units ("RSUs") for 10.5 million shares of Volta Class B common stock, or 5.25 million shares each.

338.    The Tortoise Board approved the Founder Incentive Plan on July 28, 2021, subject to stockholder approval at the August 25, 2021, extraordinary general meeting at which Tortoise shareholders would also vote on whether to approve the Merger. The Founder Plan was then approved at the August 25, 2021, extraordinary general meeting.

339.    Volta and Mercer thus announced on September 1, 2020, in the same disclosure that announced the approval of the Merger, that "[t]he Founder Plan became effective immediately upon the Closing" of the Merger.

340.    Mercer and Wendel's shares were set to vest under the Founder Plan upon the earliest, for each of them individually, of: (i) January 1, 2022, provided that they continued to be employed at the Company as of that date; (ii) their termination of service by the Company was

without "Cause"; or (iii) their "resignation from service for Good Reason," among other conditions that could trigger the vesting of their shares under the Founder Plan.[9]

341.    Despite the fact that Mercer and Wendel's RSUs under the Founder Plan were set to take effect upon the closing of the Merger on August 26, 2021, when Volta reported its financial results for the third quarter of 2021 on November 12, 2021, the Company erroneously assessed the grant date for these RSUs to be November 8, 2021 instead of August 26, 2021. While November 8, 2021 was the date on which Volta's Board formally approved the issuance of the shares that corresponded to the RSUs, that was a mere formality because, as described above, the RSUs were already approved and the Founder Plan became effective immediately upon the closing of the Merger. Moreover, the Registration Statement expressly registered the "10,500,000 shares of Volta Class B common stock reserved for issuance upon the settlement of certain restricted stock units to be issued pursuant to Volta's 2021 Founder Incentive Plan."

342.    Based on consultation with an accounting expert, there was absolutely no reason for Volta to record the grant date for Mercer and Wendel's RSUs under the Founder Plan as November 8, 2021, rather than August 26, 2021, except that doing so made Volta appear to have a smaller net loss in the third quarter of 2021 (its first quarter as a public company) than it actually did. Delaying the recording of the grant date resulted in a smaller net loss because the stock-based compensation at issue had to be recorded as an expense for the Company. By delaying its recording from the third quarter to the fourth quarter of 2021, Volta lowered its net loss in the third quarter.

343.    On February 25, 2022, Volta revealed that its Audit Committee determined that the Company's third quarter 2021 financial statements would have to be restated because of this accounting error. The Company stated that on February 24, 2022, the Audit Committee of its Board of Directors determined that the Company's unaudited condensed consolidated financial statements

---

[9] These conditions are set out in Form 4s for Mercer and Wendel that were filed with the SEC on August 30, 2021. The definitions of the defined terms in these conditions were set out in each of Mercer and Wendel's employment agreements with Volta. Other conditions that would trigger the vesting of their shares under the Founder Plan included each of their "termination of service as a result of . . . death or Disability," a Change in Control of the Company, or as otherwise provided in each of their employment agreements.

and related disclosures for the third quarter of 2021 (including the three and nine months ending September 30, 2021, the "Relevant Periods") "*contained an understatement of stock-based compensation resulting in an understatement of the Company's net loss.*" This mistake occurred because Volta "*improperly assessed the accounting grant date of certain of the Company's restricted stock units ('RSUs') to be November 8, 2021, resulting in an understatement of stock-based compensation in the Relevant Periods.*"

344.    Volta explained in this disclosure on February 25, 2022 that "[u]pon further review, the Company determined the correct grant date under Audit Standard Codification 718 for these RSUs was August 26, 2021. *The impact of correcting the accounting grant date is to shift the reporting periods in which stock-based compensation expense is recognized, and the Company expects that the preliminary, unaudited adjustments to stock-based compensation will increase net loss by approximately $26.7 million for the three and nine months ended September 30, 2021.*" Volta disclosed that overall, "[t]he estimated financial impact of this adjustment is an approximately $26.7 million increase to stock-based compensation and corresponding increase to paid-in capital, resulting in an approximate net loss for the three and nine months ended September 30, 2021 of $14.5 million and $69.7 million, respectively."

345.    Volta also disclosed that "[t]he understatements during the Relevant Periods *relate to stock-based compensation expense for certain of the Company's RSUs granted pursuant to the Company's Founder Incentive Plan.*"

346.    As a result of this error, Volta told investors "that (i) the unaudited condensed consolidated financial statements and similar communications by the Company relating to the Relevant Period should no longer be relied upon and (ii) it is appropriate to correct the error resulting in the understatements for the Relevant Periods by restating such unaudited condensed consolidated financial statements because *the understatements are material to the Company's previously issued unaudited condensed consolidated financial statements.*"

347.    Then, on March 2, 2022, Volta revealed that the financial impact of the restatement was greater than previously disclosed. It stated that "[t]he estimated financial impact of this

adjustment is an approximately $26.7 million increase to stock-based compensation and corresponding increase to paid-in capital, resulting in an approximate net loss for the three and nine months ended September 30, 2021 of $69.7 million and $155.5 million, respectively." This net loss is much greater than the $14.5 million and $69.7 million in net loss for the three and nine months ended September 30, 2021, that Volta had initially disclosed on February 25, 2022.

348.    On March 22, 2022, Volta released its amended Form 10-Q for the third quarter of 2021 to correct this accounting error. The amended 10-Q explained that the error was that Volta:

> [I]mproperly assessed the accounting grant date of the 10,500,000 RSUs granted under the Founders Incentive Plan ('FIP') to be November 8, 2021 and disclosed the grants as a subsequent event in the original form 10-Q, resulting in no associated stock-based compensation expense recognized for these awards in the period ended September 30, 2021. The correct grant date, as subsequently determined under ASC 718, was August 26, 2021. The impact of correcting the accounting grant date is to shift the reporting periods in which stock-based compensation expense is recognized for the three and nine months ended September 30, 2021 and include a missing disclosure relating to the Company's RSUs.

349.    The amended Form 10-Q explained further that "[u]nder ASC 718, the fair value of stock-based compensation is measured utilizing the closing price for the Company's common stock on the grant date and recognized over the employee's requisite service period. These grants vest on the earlier of January 1, 2022 or a qualified termination as defined in the FIP." Because the "weighted-average grant-date fair value of RSUs granted during the nine months ended September 30, 2021 was $9.30 per share" and no shares were forfeited during the nine months ended September 30, 2021, "[t]he RSU expense recognized for the three and nine months ended September 30, 2021 was $26.7 million."

350.    The amended 10-Q also explained that Volta's Board "adopted the FIP [the Founder Plan]" upon the Merger's closing date of August 26, 2021. This explanation leaves no doubt that Mercer and Wendel's shares under the Founder Plan should have been assessed as of August 26, 2021, not November 8, 2021.

351.    CW 6 described Defendant Chadwick, Volta's CFO, as "blowing the whistle" on Volta's accounting improprieties, and that Mercer and Wendel were on the hook because "they were

either asleep at the wheel or turned a blind eye" to those problems. This witness noted that "[i]t seemed weird to me that [Chadwick] stayed on" as CFO when the CEO and President (Mercer and Wendel) left Volta shortly after a financial restatement that "was directly on [Chadwick] as a public CFO." This "all seemed a little corrupt" to CW 6. (CW 5 corroborated this account by also describing Chadwick as blowing the whistle on Volta's improper accounting practices. (*See supra* ¶ 166)).

352.    CW 6 also stated that when Volta made this accounting error, employees "were all wondering" how it had happened because "[i]t seemed like a glaring omission and a big f*** up." As this witness explained, "[t]he ***stock units were greater than the revenue for the quarter***. That's either sloppy or fraudulent."

353.    Indeed, as explained by an accounting expert, the GAAP rules that apply to this issue are crystal clear. Throughout the Class Period, ASC 718, *Compensation – Stock Compensation*, was the prevailing GAAP guidance governing accounting for stock-based compensation such as restricted stock units. This standard applied to all of Volta's financial statements during the Class Period that were filed with the SEC on Forms 10-Q and 10-K, as well as the financial statements that were included in the Registration and Proxy Statements for the Merger.

354.    ASC 718 addresses various forms of stock-based compensation, as well as various conditions that might dictate how such compensation is valued and when and how portions of the determined fair value of such stock awards should be recorded as compensation expense (and impact additional paid-in capital on the balance sheet) in an entity's income statements.

355.    ASC 718 sets out the following guiding principle: "[t]he objective of accounting for transactions under **share-based payment arrangements** is to recognize in the financial statements the goods or services received in exchange for equity instruments granted or liabilities incurred and the related cost to the entity as those goods or services are received." (ASC 718-10-10-1). It requires that "[t]he cost resulting from all **share-based payment transactions** be recognized in the financial statements." (ASC 718-10-10-2).

356.    Similarly, ASC 718-10-15-3 affirms that it "applies to all share-based payment transactions in which a grantor acquires goods or services to be used or consumed in the grantor's own operations or provides consideration payable to a customer by issuing (or offering to issue) its shares, share options, or other equity instruments" that meet **either** of the following conditions:

    a.    The amounts are based, at least in part, on the price of the entity's shares or other equity instruments.

    b.    The awards require or may require settlement by issuing the entity's equity shares or other equity instruments.

357.    Mercer and Wendel's RSUs under the Founder Plan qualified for treatment under ASC 718, as Volta acknowledged when it restated its financials for the third quarter of 2021. Similar to restricted stock, an RSU is an incentive-based compensation tool to reward an employee with employer stock provided that a specific vesting condition is met.[10]

358.    ASC 718 defines the "grant date," as referenced in Volta's Restatement, as follows:

**Grant Date**

The date at which a grantor and a grantee reach a mutual understanding of the key terms and conditions of a share-based payment award. The grantor becomes contingently obligated on the grant date to issue equity instruments or transfer assets to a grantee who delivers goods or renders services or purchases goods or services as a customer. Awards made under an arrangement that is subject to shareholder approval are not deemed to be granted until that approval is obtained **unless approval is essentially a formality (or perfunctory)**, for example, if management and the members of the board of directors control enough votes to approve the arrangement. Similarly, individual awards that are subject to approval by the board of directors, management, or both are not deemed to be granted until all such approvals are obtained. **The grant date for an award of equity instruments is the date that a grantee begins to benefit from, or be adversely affected by, subsequent changes in the price of the grantor's equity shares.** Paragraph 718-10-25-5 provides guidance on determining the grant date.

---

[10] Unlike restricted stock, RSUs are promises to deliver stock at a point in the future that is defined by the terms of the award. On the grant date of the RSU, there is no transfer of shares, nor is there an asset for employees to establish either legal or economic ownership of during the vesting period. To that end, employees who have been awarded RSUs generally do not have voting or dividend rights until the shares are ultimately delivered. Once an RSU becomes vested, the vested shares are transferred to the employee after the fixed date or a fixed event set out in the RSU.

359.     This guidance *confirms that the grant date for Mercer and Wendel's RSUs under the Founder Plan was August 26, 2021, because that is when the RSUs were approved by the Tortoise shareholders that voted on the Merger and Volta's Board (after already having been approved by Tortoise's Board on July 28, 2021),* and the date from which the recipient would begin to benefit from the issuance of the RSUs. In fact, this provision of ASC 718 expressly acknowledges that "[t]he grantor becomes contingently obligated on the grant date to issue equity instruments or transfer assets to a grantee" at some point in the future. In other words, *the grant date occurs before the equity instruments are actually issued*.

360.     Similarly, ASC 718-10-25-5 explains, under the heading "Determining the Grant Date," that "[a]s a practical accommodation, in determining the grant date of an award subject to [ASC 718], assuming all other criteria in the grant date definition have been met, **a mutual understanding of the key terms and conditions of an award to an individual grantee shall be presumed to exist at the date the award is approved in accordance with the relevant corporate governance requirements (that is, by the Board or management with the relevant authority**)," as long as the award is unilateral from the grantor to the recipient and "[t]he key terms and conditions of the award are expected to be communicated to an individual recipient within a relatively short time period from the date of approval."

361.     This guidance also makes clear that the proper grant date to be used in accounting for Mercer's and Wendel's RSUs to be issued under the Founder Plan was the date on which the plan was adopted and effective — August 26, 2021 — which, again, Volta acknowledged in its Restatement.

362.     Under ASC 718, in combination with the fact that Mercer and Wendel's RSUs under the Founder Plan were plainly approved by Tortoise's and Volta's Boards and shareholders by August 26, 2021 (*see supra* ¶¶ 338, 350, 359), and were known to Mercer and Wendel as of that time because those approvals were disclosed publicly and were key terms for Mercer and Wendel, the "grant date" for the RSUs was unambiguously no later than August 26, 2021. While Volta finally acknowledged this when it announced its restatement of its financial results for the third quarter of

2021, it is completely inexplicable how it made this error in its initial financial statements for that quarter.

363.    In its initial Form 10-Q for the third quarter of 2021, Volta stated that "[o]n November 8, 2021, the Board of Directors approved the issuance of restricted stock units ('RSU's') under the Founder Plan covering 5,250,000 RSU's each to the Chief Executive Officer and President" and that "[e]ach RSU represents the right to receive one share of the Company's Class B common stock." But this is entirely irrelevant to the timing of their accounting under ASC 718.

364.    These misleading statements are all-the-more inexplicable because the original Form 10-Q for the third quarter of 2021 noted that the 2021 Equity Incentive Plan (which was a different stock-based compensation plan that applied to Volta employees more broadly than the Founder Plan specific to Mercer and Wendel) was "adopted" and "effective as of August 26, 2021." This was exactly the same situation for the Founder Plan, but Volta failed to mention that fact.

365.    Indeed, Mercer and Wendel's Form 4s that were filed on August 30, 2021, already noted that they were the beneficial owners of the 5.25 million shares each that were underlying these RSUs.[11]

366.    In addition to being clear that the "grant date" for Mercer and Wendel's RSUs under the Founder Plan was August 26, 2021, ASC 718 makes it clear that the expense associated with those grants needed to be accounted for by the third quarter of 2021.

367.    When Volta finally issued its restated Form 10-Q, it explained:

Under ASC 718, the fair value of stock-based compensation is measured utilizing the closing price for the Company's common stock on the grant date and recognized over the employee's requisite service period. These grants vest on the earlier of January 1, 2022 or a qualified termination as defined in the FIP. The weighted-average grant-date fair value of RSUs granted during the nine months ended September 30, 2021 was $9.30 per share. There were no shares forfeited during the nine months ended September 30, 2021. The RSU expense recognized for the three and nine months ended September 30, 2021 was $26.7 million." Furthermore, "[a]s a result, management has noted adjustments to stock-based compensation of $26.7 million with the offset recorded to additional paid-in capital. In connection with the

---

[11]    These Form 4s erroneously described that stock as Class A common stock and had to be subsequently corrected to note that the stock underlying these RSUs was Class B common stock.

change in stock-based compensation, the Company also restated its net loss and net loss per share for Class A and Class B common stock, basic and diluted.

368.    Similarly, the Restatement disclosed:

**Stock-based compensation (Restated)**

The Company accounts for all share-based payment awards granted to employees and non-employees based on the fair value of the awards on the date of the grant. For service-based awards, stock-based compensation is recognized in the consolidated statements of operations and comprehensive loss over the period during which the employee is required to perform service in exchange for the award (generally the vesting period of the award). The Company estimates the fair value of stock options **on the date of grant** using the Black-Scholes option pricing model. . . . Compensation cost is recognized over the vesting period of the applicable award using the straight-line method. **For service and performance-based restricted stock units and awards, the fair value is based on the closing price for the Company's common stock on the date of the grant**. **Compensation cost for service-based awards is recognized on a straight-line basis over the requisite service period.** . . . The requisite service period is also determined through the use of a BLM [i.e., Binomial Lattice Valuation Model].

369.    This approach to accounting for the cost of stock-based compensation such as Mercer and Wendel's RSUs under the Founder Plan — which were service-based (*see supra* ¶ 340) — is consistent with ASC 718. But Volta did not follow this GAAP rule until it restated its financial results.

370.    ASC 718 defines "requisite service period" as follows:

The period or periods during which an employee is required to provide service in exchange for an award under a share-based payment arrangement. The service that an employee is required to render during that period is referred to as the requisite service. The requisite service period for an award that has only a service condition is presumed to be the vesting period, unless there is clear evidence to the contrary. If an award requires future service for vesting, the entity cannot define a prior period as the requisite service period. Requisite service periods may be explicit, implicit, or derived, depending on the terms of the share-based payment award.

371.    Under this standard, the requisite service period for instruments such as the RSUs at issue here is the timeframe over which the associated compensation expense is recorded to the entity's income statement, through proportional amortization. Such amortization of the value of the

instrument over the requisite service period is referred to as the "attribution of expense." In essence, as ASC 718-10-25-2A provides, "[a]s the services are consumed, the entity shall recognize the related cost," and "[a]n entity shall makes its initial best estimate of the requisite service period at the grant date (or at the service inception date, if that date precedes the grant date) and shall base accruals of compensation cost on that period." (ASC 718-10-3-25). The amount to be amortized through attribution is the determined fair value of the equity instrument at the grant date, which can be impacted by various factors or restrictions. (ASC 718-10-30-6; ASC 718-10-30-10 to -19).

372.    Mercer and Wendel's RSUs under the Founder Plan were set to vest by January 1, 2022, if not earlier. (*See supra* ¶ 340). A substantial portion of their expense therefore had to be accounted for by the end of the third quarter of 2021 (as of September 30, 2021). But Volta failed entirely to account for this expense in its originally issued financial statements for that quarter.

373.    Then, even on February 25, 2022, when Volta acknowledged its failure to account for these RSUs as of the third quarter of 2021, it continued to misstate the full impact of this issue. It stated that the "estimated financial impact of this adjustment is an approximately $26.7 million increase to stock-based compensation and corresponding increase to paid-in capital," which Volta mistakenly described as resulting in a net loss "for the three and nine months ended September 30, 2021 of $14.5 million and $69.7 million, respectively."

374.    Less than a week later, on March 3, 2022, Volta disclosed that its error actually "result[ed] in an approximate net loss for the three and nine months ended September 30, 2021 of $69.7 million and $155.5 million, respectively." This revision made a substantial difference in Volta's performance, resulting in an added $55.2 million in net loss for the third quarter and an added $85.8 million in net loss for the first nine months of 2021. It is unfathomable how Volta could have made such a large error in determining how its accounting mistake affected its bottom line.

375.    CW 5 stated that based on their experience at Volta, they did not believe the inaccurate reporting of restricted stock units was an honest mistake. The witness stated that "[i]t had to be something else. You can only be ignorant for so long. But based on their past practices – this is

what they know [*i.e.*, falsifying numbers]. They're going to do what they know." This issue was part of a consistent practice concerning how executives at Volta handled financial reporting.

376.    Similarly, CW 4, could clearly see how the misstatement of restricted stock units could happen based on their experience at Volta described above. The witness explained that Wendel "is a smart numbers guy" and "Mercer has a background in finance. They would not need handholding on what to report and when." In addition, the witness explained that Crow, Volta's CFO before Chadwick, would "do what Chris and Scott say." But given Mercer and Wendel's backgrounds, they should have known the requirements for booking the RSUs. The witness added that, in their experience, this was too big of a transaction that would have materially affected the Company's financials to go unchecked, and concluded that "I have a really hard time believing that it would have slipped by the controller, the CFO, the CEO and president and the auditor."

377.    Similarly, CW 1 described Volta's misstatements related to stock-based compensation as part of its larger overall pattern of accounting issues that the witness observed. This witness stated that they believed Volta's accounting mistakes were more malfeasance than incompetence – in other words, intentional. The witness stated that "[a]ll they've ever done is lie about everything. Once they got slapped and got in trouble for the Q3 [financial misstatements around stock compensation] they chalked it up to error. They were cooking the books and then they got caught! You can't do that as a public company!"

378.    Other confidential witnesses described Volta's severe internal control deficiencies. CW 4 discussed how Volta was not ready to go public when it did, because of its severe internal control deficiencies and improper accounting practices. (*See supra* ¶¶ 184-85).

379.    Similarly, CW 5 stated that internal controls that the Company's Controller developed were often ignored or overridden by Mercer, Wendel, and Crow. This witness also described how the Controller hired this witness to address Volta's internal control deficiencies, including "to tear it all down and rebuild it so we followed the letter of the contract." While this witness and the Controller worked to put internal controls in place, they were pushed out of the Company because their supervisors did not agree with their approach. The witness also stated that any issues related to

internal control deficiencies would have been known all along by Mercer, Wendel, and the CFO at the time.

380.    While Volta disclosed material weaknesses in its internal controls over financial reporting, it did not disclose that these material weaknesses extended to this issue of accounting for stock-based compensation. When Volta issued its amended Form 10-Q for the third quarter of 2021, on March 22, 2022, the amended 10-Q explained, in the description of Volta's Controls and Procedures (Restated), that "we determined that our previously reported material weaknesses, namely that our *review control over the completeness and accuracy of our stock-based compensation reporting* and program change management controls to ensure that information technology program and data changes affecting financial IT applications and underlying accounting records are identified, tested, authorized and implemented appropriately during migration did not operate effectively, resulting in a material error in the financial statements." This was the first time that Volta disclosed that its material weaknesses in its internal controls extended to the review and reporting of its stock-based compensation. Volta's prior descriptions of its internal control deficiencies, including in its filings in connection with its SPAC merger and its prior 10-Q, did not reference internal controls over "stock-based compensation reporting." Investors therefore did not know that Volta's internal control deficiencies applied to this area.

381.    Moreover, Volta's prior discussion of its internal control deficiencies did not mention the deliberate nature of these practices, as described by the consistent descriptions by multiple witnesses noted above, including that Volta's executives actively overruled recommendations from the Company's accounting team that they follow proper practices, instructed employees to violate revenue recognition rules, deliberately withheld large payments owed to key clients in order to misleadingly make Volta's cash balances look better to inventors, and put forth completely unfounded projections for the Company's number of charging stations and revenue. There is a vast difference between having inadequate processes in place and Volta's most senior executives knowingly going against the advice of the accounting team and taking intentional steps to misrepresent the Company's finances. That is how such glaring errors as the misstatement of

stock-based compensation and the Company's associated net loss — as well as Defendants' misstatements of many other financial metrics described in this Complaint — were able to occur.

382.    Defendants were particularly motivated to misstate the financial impact of Mercer and Wendel's stock-based compensation because this error made Volta's financial performance look more favorable in the third quarter of 2021, which was Volta's first quarter as a public company. This misstatement allowed Volta to understate its net loss in that quarter by $26.7 million. For example, CW 1 explained that Volta's executives were especially motivated to accelerate the Company's revenue in the third quarter of 2021 to look better to investors in Volta's first quarter as a public company because, as the Sales team was told, "[w]e can't post we're short in our first public reporting." (*See supra* ¶ 178). That same motive is equally applicable to Volta's substantial understatement of stock-based compensation and its net loss in that quarter.

### B.    False and Misleading Statements

383.    All of Defendants' false and misleading statements in the Registration Statement and Proxy Solicitations, described in Sections V.C and VI above in connection with Plaintiffs' claims under the Securities Act and Section 14(a), respectively, are also false and misleading under Section 10(b).

384.    Defendants also made the following additional statements that are alleged to be false and misleading solely under Section 10(b), and Plaintiffs' associated claim under Section 20(a), of the Exchange Act.

385.    On September 1, 2021, Volta filed a Current Report on Form 8-K with the SEC that was signed by Defendant Mercer as Volta's CEO.

386.    This September 1, 2021 report contained certain of the same, or substantially similar, descriptions of Volta's business and of its accounting policies that were in the Registration and Proxy Statements. (*See supra* ¶¶ 235, 236, 239, 241, 242).

387.    The statements in ¶ 386 were materially false and misleading for the same reasons that those statements were materially false and misleading when described in the Registration and Proxy Statements.

388.    This September 1, 2021 report also contained updated financial figures in Volta's unaudited consolidated financial statements for the six months ended June 30, 2021, including the following statements of Volta's revenue for the three and six months ended June 30, 2020 and 2021:

**Volta Industries, Inc. and Subsidiaries**

**Unaudited Consolidated Statements of Operations and Comprehensive Loss**

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2021 | | 2020 | | 2021 | | 2020 | |
| REVENUES | | | | | | | | |
| Service revenue | $ | 6,825,167 | $ | 1,763,262 | $ | 11,056,516 | $ | 4,864,128 |
| Product revenue | | — | | 373,343 | | 299,037 | | 710,625 |
| Other revenue | | 117,000 | | 241,530 | | 327,000 | | 705,719 |
| Total revenues | | 6,942,167 | | 2,378,135 | | 11,682,553 | | 6,280,472 |

389.    This report also stated Volta's revenue broken down by category:

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2021 | | 2020 | | 2021 | | 2020 | |
| Revenues | | | | | | | | |
| Behavior and Commerce | $ | 6,484,155 | $ | 834,931 | $ | 10,013,800 | $ | 1,967,615 |
| Network Development | | 340,370 | | 1,301,674 | | 1,341,111 | | 3,607,138 |
| Charging Network Operations | | 642 | | 241,530 | | 642 | | 705,719 |
| Network Intelligence | | 117,000 | | — | | 327,000 | | — |
| Total revenues | $ | 6,942,167 | $ | 2,378,135 | $ | 11,682,553 | $ | 6,280,472 |

390.    Under this chart, the report gave the following explanation for Volta's "Behavior and Commerce" category of revenue:

> Behavior and Commerce revenue increased by $5.6 million, or 677%, from June 30, 2020 to June 30, 2021, primarily due to large sales of media campaigns with several national brands in the three months ended June 30, 2021.

391.    The statements in ¶¶ 388-90 were materially false and misleading because: (1) as alleged in more detail by CWs 1 and 4, Volta had been, since some time several years before the SPAC Merger, improperly recognizing revenue by pulling revenue into earlier quarters when it should not have been recognized until the subsequent quarter, with the motive of making cash holdings more appealing to investors; and (2) Volta's revenue recognition practices violated ASC 606, GAAP principles, and the FASB principle of neutrality.

392.　This September 1, 2021 report also noted Volta's liabilities for operating leases, which included "noncancellable operating leases, primarily for office space and the use of spaces for the installation of its electric vehicle charging stations ('site leases')," as follows:

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
| | 2021 | | 2020 | | 2021 | | 2020 | |
|---|---|---|---|---|---|---|---|---|
| **Operating lease** costs | | | | | | | | |
| Fixed lease cost | $ | 2,806,857 | $ | 1,654,602 | $ | 5,442,923 | $ | 3,192,685 |
| Variable lease cost | | 129,153 | | (59,970) | | 197,647 | | (35,364) |
| **Total operating lease** costs | $ | 2,936,010 | $ | 1,594,632 | $ | 5,640,570 | $ | 3,157,321 |

393.　This report also noted the following operating lease liabilities as of June 30, 2021 and December 31, 2020, respectively (from left to right):

| Operating lease liability - current portion | 8,465,597 | 7,483,528 |
|---|---|---|
| Operating lease liability - non-current portion | 42,172,215 | 37,146,055 |

394.　The statements in ¶¶ 392-93 were materially false and misleading because, as alleged in more detail by CWs 3, 4, 5, and 6, Volta routinely did not pay its contractual obligations on time in order to delay accounting for its liabilities and to keep cash on hand, thus skewing the liabilities it reported.

395.　On November 10, 2021, Volta announced its financial results for the third quarter of 2021. Its press release quoted Defendant Mercer as stating that "[s]ince announcing our business combination with Tortoise in February, we have continued growing our Network Development partner relationships across multiple sectors and flagship community locations, while further strengthening our Behavior and Commerce customer base. I couldn't be more excited about Volta's future. Our significant pipeline provides a strong foundation for future growth that will further compound the value of our network."

396.　This announcement also disclosed the following results for the third quarter of 2021:

**Results for Third Quarter 2021**

Revenue grew 77% YoY to $8.5 million, compared to $4.8 million in the prior-year period, largely attributable to strong growth within Behavior and Commerce. **Behavior and Commerce revenue grew to $7.4 million from $2.2 million in the prior-year period, primarily due to increased sales of media campaigns with national brands.** Network Development revenue decreased YoY due to a decrease in customer-owned installations.

\* \* \*

Selling, general and administrative expenses were **$29.0 million**, compared to $9.0 million in the prior-year period. This was primarily due to planned growth initiatives that resulted in increased costs, including bonuses and commissions of $2.2 million and additional insurance costs of $1.2 million, **with one-time expenses related to non-cash stock-based compensation of $4.2 million** and professional services fees of $3.2 million incurred related to the de-SPAC process.

**Net loss was $43.1 million**, compared to a loss of $14.5 million in the prior-year period, and earnings before interest, taxes, depreciation and amortization (EBITDA) was a loss of $38.3 million compared to a loss of $9.5 million in the prior-year period.

\* \* \*

In the quarter, Volta completed its business combination with Tortoise Acquisition Corp. II, resulting in net proceeds of $350 million. **The Company had a cash and marketable securities balance of $331 million as of September 30, 2021.**

Shares outstanding as of September 30, 2021 were 161.9 million.

Results Nine Months Ended September 30, 2021

**Revenues increased 82% to $20.2 million, compared to $11.1 million in the prior-year period, largely attributable to strong growth within Behavior and Commerce.**

Revenues by Category

| | Nine Months Ended September 30, | | | |
|---|---|---|---|---|
| (in thousands) | 2021 | | 2020 | |
| **Revenues** | | | | |
| Behavior and Commerce | $ | 17,373 | $ | 4,181 |
| Network Development | | 2,412 | | 6,189 |
| Charging Network Operations | | — | | 706 |
| Network Intelligence | | 387 | | — |
| **Total revenue** | **$** | **20,172** | **$** | **11,076** |

**Total Stalls Connected, including Site Partners**

Total stalls connected at September 30, 2021, were 2,137, representing a 50% YoY increase. The company added 168 stalls in the quarter and now has sites in 23 states. Volta's stalls generated over 238,000 estimated charging sessions per month, 24% utilization per 24-hour period, with a total 3.5 GWh Network Throughput in the quarter.

The following table sets forth total stalls connected, together with total revenue, for the Nine months ended September 30, 2021 and September 30, 2020:

| (in thousands) | Nine Months Ended September 30, | |
|---|---|---|
| | **2021** | **2020** |
| Total revenue | $  20,172 | $  11,076 |
| Total stalls connected, including site partners | 2,137 | 1,427 |

397.    The November 10, 2021 release announcing Volta's third quarter 2021 also disclosed that Volta's "Operating lease liability - current portion" was 9.267 million and 7.484 million as of September 30, 2021 and December 31, 2020, respectively, and its "Operating lease liability - non-current portion" was $47.844 million and $37.146 million for those same time periods.

398.    In addition, the November 10, 2021 release announcing Volta's third quarter 2021 results announced the following full-year guidance:

**Full Year 2021 Outlook**

Based on current business conditions, business trends and other factors, for the full year ending December 31, 2021, the Company expects:

- Revenue in the range of $32 million to $36 million
- Total signings to be in the range of 600 sites to 700 sites
- Total operational stalls in the range of 2,300 to 2,500, with 1,300 plus stalls in our construction queue.

399.    The statements in ¶¶ 395-98 were materially false and misleading because: (1) these statements failed to account for the RSUs granted to Mercer and Wendel under the Founder Plan, even though they took effect upon the closing of the Merger on August 26, 2021; (2) as alleged in more detail by CWs 1 and 4, Volta had been, since some time several years before the SPAC Merger, improperly recognizing revenue by pulling revenue into earlier quarters when it should not have been recognized until the subsequent quarter, with the motive of making cash holdings more

appealing to investors; (3) Volta's revenue recognition practices violated ASC 606, GAAP principles, and the FASB principle of neutrality; (4) as alleged in more detail by CWs 1, 2, 3, 4, 6, and 7, Volta's projected ability to meet its projections for installing charging stations was unrealistic because (i) Volta did not account for regulatory, logistical, and bureaucratic difficulties inherent in installing its charging stations; (ii) Volta already had a history of missing projections for installing charging stations at the time of the Registration Statement; (iii) Volta was frequently not in compliance with local laws and ordinances applicable to its charging stations; (iv) Volta's products were not developed enough at the time it went public; (v) Volta did not account for competition in the market slowing its growth; and (vi) Volta did not have enough cash on hand to install the number of requisite stations; and (5) as alleged in more detail by CWs 1, 4, 5, and 6, Volta would not have enough cash on hand to fund its expansion because at the time the Registration Statement was filed, Volta was already inflating metrics to investors and not paying contractual obligations in order to keep cash on hand.

400.    Also on November 10, 2021, Volta held its earnings call to discuss its results for the third quarter of 2021. Defendants Mercer, Wendel, and Chadwick participated in this call.

401.    On this call, Defendant Wendel stated that Volta's Behavior and Commerce category of operations "initially sells media display time to advertisers, which provides us with a potentially high value revenue stream that we believe will compound over time, with the increased growth and utilization of our network. We think this revenue stream is a critical differentiating factor that will provide a long-term competitive advantage."

402.    In addition, Wendel described Volta's relationship with advertisers as follows:

> [W]e've signed up national brand advertisers, other media channel partners, programmatic platforms and our site partners as they start to look towards marketing their businesses to consumers, and how to drive product sales in store. In Q3, we welcomed new brand partners Visa, DHL and discover to the platform. We also saw Comcast, Dunkin, FedEx and Hulu come back for additional campaigns. And we finally saw continued growth in our programmatic business. We view this flywheel of providing value to consumers, property partners and advertisers as positioning as well to monetize our network on day one, create a deeper connection with the community and increase the total value of our network.

403.    Defendant Chadwick then stated that "Third quarter revenues were $8.5 million, compared to $4.8 million in the prior year period, largely attributable to strong growth within behavior and commerce. Behavior and commerce revenue grew to $7.4 million from 2.2 million in the prior year period, primarily due to increased sales of media campaigns, with several national brands."

404.    Chadwick also described the "three simple reasons that we are so excited about where Volta is today and what its future holds," including "[a] differentiated business model enables us to monetize our infrastructure from day one and compound our returns as our network scales with EV growth. Finally, our industry leading utilization and using unit economics allow us to attract valuable partners that will help scale and expand our overall network, which ultimately compounds our returns over the longer term."

405.    When asked whether Volta would meet its revenue guidance for the fourth quarter that implied sequential growth of around 75%, and whether that would include "continued very strong performance in behavior and commerce," Wendel responded, "Yes, we were looking to and we strongly believe and expect that continued strong growth in the behavior and commerce, media the advertising. And as we look at the network development, there's obviously, only a few months left in it, we do still believe we've got a very, very strong pipeline. Timing on the permits could be a slight issue for us, but we don't expect that to be a big detrimental hit to the quarter as we round out the year end."

406.    The statements in ¶¶ 400-05 were materially false and misleading because: (1) as alleged in more detail by CWs 1 and 4, Volta had been, since some time several years before the SPAC Merger, improperly recognizing revenue by pulling revenue into earlier quarters when it should not have been recognized until the subsequent quarter, with the motive of making cash holdings more appealing to investors; (2) Volta's revenue recognition practices violated ASC 606, GAAP principles, and the FASB principle of neutrality; (3) as alleged more fully by CW 3, the number of stations did not accurately represent the revenue that would be generated by a stall, because not all stations had two media screens per station, and in certain markets, the stalls were

installed with no screens at all; (4) as alleged more fully by CWs 3 and 9, many of Volta's potential customers would not make deals with Volta until its charging network grew to scale, a point which Volta had not reached at the time the Registration Statements was filed; (5) as alleged in more detail by CWs 3, 4, 5, and 6, Volta routinely did not pay its contractual obligations on time in order to delay accounting for its liabilities and to keep cash on hand, which soured relationships with larger customers, and thus limited its prospects for growth; and (6) as alleged in more detail by CWs 1, 2, 3, 4, 6, and 7, Volta's projected ability to scale its network was unrealistic because (i) it did not account for regulatory, logistical, and bureaucratic difficulties inherent in installing its charging stations; (ii) Volta already had a history of missing projections at the time of the Registration Statement; (iii) Volta was frequently not in compliance with local laws and ordinances applicable to its charging stations; (iv) Volta's products were not developed enough at the time it went public; (v) Volta did not account for competition in the market slowing its growth; and (vi) Volta did not have enough cash on hand to install the number of requisite stations.

407.     Also on this call, an analyst asked how Volta would explain the "gap between" the 2,400 stations that Volta was projecting to have installed at the end of the year, as compared to the approximately 3,100 in Volta's "SPAC-related projection." In response, Wendel said "the delta is really reasonably simple. We have, as Francois mentioned, 1300 stations in the construction queue. And it's mostly down to permit time." Wendel also stated that "we are installing in areas that are not yet as experienced with this infrastructure. And sometimes your teaching permit authorities what to do, you might be the first time anybody's asked for a permit for charter literally happens. So the expectation on how long that takes has been slightly longer than we thought when we made that prediction now nearly 12 months ago"—even though Volta had reiterated that estimate of over 3,100 stations by the end of 2021 in the Investor Presentation that it updated in June 2021, and which it incorporated into the Registration and Proxy Statements as recently as July 29 and August 2, 2021, respectively.

408.    Mercer attributed the gap to "a COVID driven thing for us that the permitting processes are moving in different jurisdictions"—even though the higher estimates were made well into the pandemic.

409.    The statements in ¶¶ 407-08 were materially false and misleading because: (1) as alleged in more detail by CWs 1, 2, 3, 4, 6, and 7, Volta's projected ability to expand its network was unrealistic because (i) it did not account for regulatory, logistical, and bureaucratic difficulties inherent in installing its charging stations; (ii) Volta had a history of falling short of projections due to these difficulties and other factors; (iii) Volta was frequently not in compliance with local laws and ordinances applicable to its charging stations; (iv) Volta's products were not developed enough at the time it went public; (v) Volta did not account for competition in the market slowing its growth; and (vi) Volta did not have enough cash on hand to install the number of requisite stations; (2) as alleged in more detail by CWs 1, 4, 5, and 6, Volta did not have enough cash on hand to fund its expansion; and (3) as alleged more fully by CWs 3, 4, 5, 6, and 9, many of Volta's potential customers would not make deals with Volta until its charging network grew to scale, and Volta's practice of shirking its contractual obligations to delay accounting for its liabilities and to keep cash on hand soured relationships with customers and thus limited its prospects for growth.

410.    On November 12, 2021, Volta filed with the SEC its report on Form 10-Q for the third quarter of 2021 ("Q3 2021 10-Q"). The Q3 2021 10-Q was signed by Defendants Mercer (as Volta's CEO and Principal Executive Officer) and Chadwick (as CFO and Volta's Principal Financial Officer and Principal Accounting Officer).

411.    Mercer and Chadwick each signed certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX") attesting that, based on their knowledge, the Q3 2021 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the

financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

412.    These SOX certifications also attested to Mercer and Chadwick's responsibility for Volta's internal controls over financial reporting, their having disclosed "any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting" and that Mercer and Chadwick had disclosed to Volta's auditors and Audit Committee of the Board "[a]ll significant deficiencies" in internal controls and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

413.    Mercer and Chadwick also signed certifications pursuant to Section 906 of SOX, attesting to that Q3 2021 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, and that information contained in such Quarterly Report on Form 10-Q fairly presents in all material respects the financial condition and results of operations of the Company."

414.    Mercer and Chadwick's SOX certifications described in ¶¶ 411-13 were materially false and misleading because: (1) the SOX certifications did not account for the fact that Volta's internal deficiencies reached the ability to properly recognize the RSUs granted under the Founder Plan; (2) as alleged in more detail by CWs 1, 4, 5, and 6, these statements failed to account for the losses due to the RSUs granted to Mercer and Wendel under the Founder Plan, even though they were took effect upon the closing of the Merger on August 26, 2021; (3) as alleged in more detail by CWs 1 and 4, Volta had been, since some time several years before the SPAC Merger, improperly recognizing revenue by pulling revenue into earlier quarters when it should not have been recognized until the subsequent quarter, with the motive of making cash holdings more appealing to investors; and (4) Volta's revenue recognition practices violated ASC 606, GAAP principles, and the FASB principle of neutrality.

415.    The Q3 2021 10-Q contained certain of the same, or substantially similar, descriptions of Volta's business and of its accounting policies that were in the Registration and Proxy Statements. (*See supra* ¶¶ 228, 235, 236, 239, 241, 242).

416.    The statements in ¶ 415 were materially false and misleading for the same reasons that those statements were materially false and misleading when described in the Registration and Proxy Statements.

417.    In addition, the Q3 2021 10-Q repeated the historical financial figures from the November 10, 2021 press release referenced in ¶¶ 395-98.

418.    The statements in ¶ 417 were materially false and misleading for the same reasons that those statements were materially false and misleading when described in the November 10, 2021 press release.

419.    The Q3 2021 10-Q also contained the following statement of Volta's stock-based compensation:

> Compensation expense related to stock-based awards was recorded in selling, general and administrative in the condensed consolidated statements of operations and comprehensive loss for $4.6 million and $0.3 million for the three months ended September 30, 2021 and 2020, respectively, and $51.4 million and $0.8 million for the nine months ended September 30, 2021, and 2020 respectively.

420.    In addition, the Q3 2021 10-Q stated that Volta's net loss for the three months ended September 30, 2021, was $43.048 million and its net loss for the nine months ended September 30, 2021 was $128.804 million.

421.    The Q3 2021 10-Q also stated that "[o]n November 8, 2021, the Board of Directors approved the issuance of restricted stock units ('RSU's') under the Founder Plan covering 5,250,000 RSU's each to the Chief Executive Officer and President" and that "[e]ach RSU represents the right to receive one share of the Company's Class B common stock."

422.    The statements in ¶¶ 419-21 were materially false and misleading because these statements violated ASC 718 by failing to account for the losses due to the RSUs granted to Mercer and Wendel under the Founder Plan, even though they took effect upon the closing of the Merger on August 26, 2021. Moreover, the description in these statements of the Board of Directors approving

the RSUs on November 8, 2021 is entirely irrelevant to the timing of their accounting under ASC 718.

423.    The Q3 2021 10-Q also reiterated the following material weaknesses in Volta's financial controls that were previously disclosed in the Registration and Proxy Statements:

> As disclosed in our prospectus filed pursuant to Rule 424(b)(3) of the Securities Act on September 29, 2021, in connection with the preparation of Volta's condensed consolidated financial statements as of and for the years ended December 31, 2020 and 2019, certain material weaknesses were identified in Volta's internal control over financial reporting. A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of Volta's interim or annual condensed consolidated financial statements will not be prevented or detected on a timely basis. The material weaknesses were as follows:
>
> • Volta did not design and maintain formal accounting policies, procedures and controls over significant accounts and disclosures to appropriately analyze, record and disclose complex technical accounting matters, including equity transactions and asset retirement obligations, commensurate with its accounting and reporting requirements.
>
> • Volta did not maintain a sufficient complement of personnel to ensure appropriate segregation of duties to ensure that all journal entries and reconciliations were reviewed by an individual other than the preparer. Additionally, the Chief Financial Officer had inappropriate access rights in the general ledger system.
>
> • Volta did not design and maintain formal accounting policies, procedures and controls over significant accounts and disclosures to appropriately prevent, detect or correct material misstatements which resulted in a high volume of correcting journal entries recorded subsequent to year-end; and
>
> • Volta did not design and maintain effective controls over certain information technology general controls for information systems that are relevant to the preparation of its condensed consolidated financial statements. Specifically, Volta did not design and maintain program change management controls to ensure that information technology program and data changes affecting financial IT applications and underlying accounting records are identified, tested, authorized and implemented appropriately during migration.

424.    Under "Risk Factors," the Q3 2021 10-Q stated:

***If Volta is unable to attract and retain key employees and hire qualified management, technical, engineering and sales personnel, its ability to compete and successfully grow its business would be harmed.***

Volta's success depends on the continuing services of key employees, including members of its management team. The loss of any of these individuals could have a material adverse effect on Volta's business, financial condition and results of operations. Volta's success also depends, in part, on its continuing ability to identify, hire, attract, train and develop and retain highly qualified personnel. The inability to do so effectively would adversely affect its business. Competition for employees can be intense, particularly in the San Francisco Bay Area where Volta is headquartered, and the ability to attract, hire and retain them depends on Volta's ability to provide competitive compensation. In addition, Volta competes for qualified personnel with its other competitors in the EV charging industry, who may seek to hire Volta's employees from time to time due to their industry expertise. Volta may not be able to attract, assimilate, develop or retain qualified personnel in the future, and failure to do so could adversely affect its business, including its growth prospects and ability to expand into new markets and geographies.

425.    The statements in ¶¶ 423-24 were materially false and misleading because: (1) they did not account for the fact that Volta's internal deficiencies reached the ability to properly recognize the RSUs granted under the Founder Plan; (2) as alleged in more detail by CWs 1 and 4, Volta had been, since some time several years before the SPAC Merger, improperly recognizing revenue by pulling revenue into earlier quarters when it should not have been recognized until the subsequent quarter, with the motive of making cash holdings more appealing to investors; and (3) Volta's revenue recognition practices violated ASC 606, GAAP principles, and the FASB principle of neutrality.

426.    On February 15, 2022, Volta filed a Form 8-K with the SEC, signed by Defendant Chadwick, that attached an investor presentation for investor meetings in February 2022. This presentation highlighted how "Volta sites compound in value as EV penetration increases," with individual sites showing "41% [compound annual growth rate] over 10 years."

427.    This presentation also promoted Volta's relationships with the property owners that host its charging stations and with the companies that provide its main source of revenue (Behavior & Commerce revenue) by placing ads on its stations, as follows:



428.    The statements in ¶¶ 426-27 were materially false and misleading because: (1) as alleged in more detail by CWs 3 and 9, many of Volta's potential customers would not make deals with Volta until its charging network grew to scale; (2) as alleged in more detail by CWs 3, 4, 5, and 6, Volta routinely did not pay its contractual obligations on time in order to delay accounting for its liabilities and to keep cash on hand, which soured relationships with larger customers; and (3) as alleged in more detail by CWs 1, 2, 3, 4, 6, and 7, Volta's projected ability to scale its network was unrealistic because (i) it did not account for regulatory, logistical, and bureaucratic difficulties inherent in installing its charging stations; (ii) Volta already had a history of missing projections at the time of the Registration Statement; (iii) Volta was frequently not in compliance with local laws and ordinances applicable to its charging stations; (iv) Volta's products were not developed enough at the time it went public; (v) Volta did not account for competition in the market slowing its growth; and (vi) Volta did not have enough cash on hand to install the number of requisite stations.

429.    On February 25, 2022, Volta filed a Form 8-K with the SEC, signed by Defendant Chadwick, stating that the Company's Audit Committee determined that its third quarter 2021 financial statements would be restated. The Company stated, in relevant part:

On February 24, 2022, the Audit Committee of the Board of Directors (the "Audit Committee") of Volta Inc. (the "Company" or "Volta") reached a determination that the Company's unaudited condensed consolidated financial statements and related disclosures included in its Quarterly Report on Form 10-Q for *the three and nine months ended September 30, 2021 (the "Relevant Periods") contained an understatement of stock-based compensation resulting in an understatement of the Company's net loss. The Company improperly assessed the accounting grant date of certain of the Company's restricted stock units ("RSUs") to be November 8, 2021, resulting in an understatement of stock-based compensation in the Relevant Periods.* Upon further review, the Company determined the correct grant date under Audit Standard Codification 718 for these RSUs was August 26, 2021. The impact of correcting the accounting grant date is to shift the reporting periods in which stock-based compensation expense is recognized, and the Company expects that the preliminary, unaudited adjustments to stock-based compensation will increase net loss by approximately $26.7 million for the three and nine months ended September 30, 2021.

The understatements during the Relevant Periods relate to stock-based compensation expense for certain of the Company's RSUs granted pursuant to the Company's Founder Incentive Plan, which was approved in connection with the Company's business combination with our predecessor entity, Tortoise Acquisition Corp. II, pursuant to the Business Combination Agreement and Plan of Reorganization, dated as of February 7, 2021, by and among Volta, SNPR Merger Sub I, Inc., SNPR Merger Sub II, LLC, and Volta Industries, Inc.

The Company, in consultation with the Audit Committee, has determined that (i) the unaudited condensed consolidated financial statements and similar communications by the Company relating to the Relevant Period should no longer be relied upon and (ii) *it is appropriate to correct the error resulting in the understatements for the Relevant Periods by restating such unaudited condensed consolidated financial statements because the understatements are material to the Company's previously issued unaudited condensed consolidated financial statements.* The Company notes that:

- The adjustments do not impact revenue as presented on the consolidated statements of operations and comprehensive loss for the Relevant Period.
- The adjustments do not affect the total cash flows from operating, investing or financing activities as presented on the condensed consolidated statements of cash flows for the Relevant Period.
- While the understatements impact the timing of recognizing stock-based compensation expense, they do not impact the number of shares awarded, the

timing of issuance of shares, or the aggregate amount of equity-based compensation expense to be recognized from the awards.

- The Company's management and the Audit Committee have determined the understatements were unintentional and were not the result of fraud or any other attempt to deceive.

*Preliminary Estimated Impact of Understatements*

The Company intends to restate its financial statements for the Relevant Periods, which will be addressed in an amendment to the Form 10-Q for the quarter ended September 30, 2021, to record the understatements. The estimated financial impact of this adjustment is an approximately $26.7 million increase to stock-based compensation and corresponding increase to paid-in capital, ***resulting in an approximate net loss for the three and nine months ended September 30, 2021 of $14.5 million and $69.7 million, respectively.***

430.     The statements in ¶ 429 were materially false and misleading because: (1) these statements violated ASC 718 by failing to account for the losses due to the RSUs granted to Mercer and Wendel under the Founder Plan because they continued to misstate the amount of net losses that Volta suffered as a result of Mercer and Wendel's stock-based compensation; (2) they omitted that, as alleged in more detail by CWs 1 and 4, that Volta had been, since some time several years before the SPAC Merger, improperly recognizing revenue by pulling revenue into earlier quarters when it should not have been recognized until the subsequent quarter, with the motive of making cash holdings more appealing to investors; and (3) Volta's revenue recognition practices violated ASC 606, GAAP principles, and the FASB principle of neutrality.

431.     On March 2, 2022, Volta filed a Form 8-K with the SEC that revealed that the financial impact of the restatement was greater than previously disclosed, stating:

The estimated financial impact of this adjustment is an approximately $26.7 million increase to stock-based compensation and corresponding increase to paid-in capital, resulting in an approximate net loss for the three and nine months ended September 30, 2021 of $69.7 million and $155.5 million, respectively.

432.     The statements in ¶ 431 were materially false and misleading because: (1) they omitted that, as alleged in more detail by CWs 1 and 4, Volta had been, since some time several years before the SPAC Merger, improperly recognizing revenue by pulling revenue into earlier quarters when it should not have been recognized until the subsequent quarter, with the motive of

making cash holdings more appealing to investors; and (2) Volta's revenue recognition practices violated ASC 606, GAAP principles, and the FASB principle of neutrality.

433.    On March 22, 2022, Volta filed its amended Q3 2021 10-Q, signed by Defendants Mercer and Chadwick and containing the same SOX certifications from them that are referenced in ¶¶ 411-13 from the original Q3 2021 10-Q.

434.    Mercer and Chadwick's SOX certifications described in ¶ 433 were materially false and misleading because: (1) they omitted that, as alleged in more detail by CWs 1 and 4 Volta had been, since some time several years before the SPAC Merger, improperly recognizing revenue by pulling revenue into earlier quarters when it should not have been recognized until the subsequent quarter, with the motive of making cash holdings more appealing to investors; and (2) Volta's revenue recognition practices violated ASC 606, GAAP principles, and the FASB principle of neutrality.

435.    This amended 10-Q contained the following explanatory note that the restatement was to correct the accounting for the Company's understated stock-based compensation:

> In connection with the preparation of the Company's financial statements for the year ended December 31, 2021, the Company reviewed its grant agreements for equity-based awards to determine stock-based compensation expense. Based on this review, the Company determined that it improperly assessed the accounting grant date of certain of the Company's restricted stock units ("RSUs"), resulting in an understatement of stock-based compensation for the three and nine months ended September 30, 2021. Stock-based compensation expense for these RSUs should have been recognized during the reporting period ending September 30, 2021 as the accounting grant date for these grants occurred during that period. The impact of correcting the error is to shift the reporting period in which stock-based compensation is recognized, resulting in an increase of previously reported net loss by $26.7 million for the quarter ended September 30, 2021. As previously disclosed in the Company's unaudited condensed consolidated financial statements for the quarter ended September 30, 2021, the Company's management and the Audit Committee of the Company's Board of Directors determined that material weaknesses existed in the Company's internal control over financial reporting due to the lack of formal accounting policies, procedures and controls over significant accounts and disclosures to appropriately analyze, record and disclose complex technical accounting matters, including equity transactions, commensurate with its accounting and reporting requirements, and due to the lack of effective controls over certain information technology general controls for information systems that are relevant to the

preparation of its condensed consolidated financial statements, specifically program change management controls to ensure that information technology program and data changes affecting financial IT applications and underlying accounting records are identified, tested, authorized and implemented appropriately during migration. These material weaknesses in the Company's internal control over financial reporting that resulted in the understatement of stock-based compensation.

436.    The amended Q3 2021 10-Q also restated the evaluation of the Company's internal controls to disclose that material weaknesses in Volta's internal controls led to the material error in its financial statements:

As discussed in the Explanatory Note to this Amendment No. 1 and in connection with the Restatement of our unaudited condensed financial statements as of, and for the three and nine months ended, September 30, 2021, we determined that our previously reported material weaknesses, namely that our review control over the completeness and accuracy of our stock-based compensation reporting and program change management controls to ensure that information technology program and data changes affecting financial IT applications and underlying accounting records are identified, tested, authorized and implemented appropriately during migration did not operate effectively, resulting in a material error in the financial statements.

437.    The statements in ¶¶ 435-36 were materially false and misleading because: (1) they omitted that, as alleged in more detail by CWs 1 and 4, Volta had been, since some time several years before the SPAC Merger, improperly recognizing revenue by pulling revenue into earlier quarters when it should not have been recognized until the subsequent quarter, with the motive of making cash holdings more appealing to investors; and (2) Volta's revenue recognition practices violated ASC 606, GAAP principles, and the FASB principle of neutrality.

438.    On March 28, 2022, Volta filed a Form 8-K with the SEC signed by James DeGraw (as General Counsel and Chief Administrative Officer), announcing that its founders, Mercer and Wendel, were resigning from their positions as CEO and President, respectively, and from the Board of Directors. This disclosure represented that "Wendel's resignation is effective immediately, while Mr. Mercer will continue as Chief Executive Officer for a transition period ending on the earlier of (i) the date on which the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2021 is filed with the Securities and Exchange Commission and (ii) April 29, 2022" and that "Mr. Mercer will serve as an independent advisor to the Company's board of directors (the

'Board') through March 31, 2023. . . . In addition, under his Separation Agreement, Mr. Mercer agrees to serve as an independent advisor to the Board through March 31, 2023 in exchange for a $375,000 consulting fee."

439.    This Form 8-K contained an accompanying press release in which Defendant Cubbage represented these departures as mutual, stating that "'Since Volta was founded 12 years ago, it has created an entirely new industry as well as an unparalleled experience for both customers and drivers,' said Vince Cubbage, Co-Chair of the Board. 'With Volta's listing as a public company last August, the Board and Founders mutually determined that now is the right time to identify new leadership with experience in managing public companies to serve the best interests of stakeholders and unlock the company's full value potential."

440.    This press release also quoted Defendant Mercer stating, "I am incredibly proud of Volta and what this team has achieved so far, and I am truly excited for its next phase of growth as the industry accelerates and matures. Volta was started with the ambition to be the best business model in the EV charging space, and now the company's focus needs to turn to scaled, public-market-facing growth."

441.    The statements in ¶¶ 438-40 were materially false and misleading because: (1) Mercer and Wendel did not resign "voluntarily," and their departure from the Company was not "mutual[]"; and (2) rather than serving as an independent advisor to the Board, Mercer had no further involvement with the Company.

442.    On March 31, 2022, Volta filed a Form 8-K with the SEC, signed by Defendant Chadwick, that contained a press release announcing the Company's fourth quarter and fully year 2021 results, as well as guidance for the 2022. In this press release, Volta "announced preliminary revenues of approximately $12 million for its fourth quarter 2021, up 45% year-over-year, and revenues of $32 million for the full year ended December 31, 2021, up 66% year-over-year. Total stalls connected as of December 31, 2021 was 2,330."

443.    Volta also announced in this press release for its fourth quarter and full year 2021 results that it "expects first quarter 2022 revenues to range from $8 million to $8.5 million. For full

year 2022, the Company anticipates revenues to range from $70 million to $80 million. Volta expects 2022 revenue to be greater in the second half of the year, as a reflection of the growing scale of our network and accompanying seasonal media revenue patterns." Lastly, this press release announced that "[f]or 2022, the Company expects total incremental, connected stalls in the range of 1,700 to 2,000."

444.    The statements in ¶¶ 442-43 were materially false and misleading because: (1) as alleged in more detail by CWs 1 and 4, Volta had been, since some time several years before the SPAC Merger, improperly recognizing revenue by pulling revenue into earlier quarters when it should not have been recognized until the subsequent quarter, with the motive of making cash holdings more appealing to investors; and (2) Volta's revenue recognition practices violated ASC 606, GAAP principles, and the FASB principle of neutrality.

445.    On April 15, 2022, Volta filed its Form 10-K for the year 2021 ("2021 10-K") with the SEC, signed by Defendants Mercer (as CEO and Principal Executive Officer), Chadwick (as CFO, Principal Financial Officer and Principal Accounting Officer), Cubbage (as a Director), and the Company's other Directors. The 2021 10-K was accompanied by SOX certifications signed by Mercer and Cubbage that were substantially similar to the ones that accompanied to Q3 2021 10-Q described in ¶¶ 411-13 above.

446.    Mercer and Chadwick's SOX certifications described in ¶ 445 were materially false and misleading because: (1) as alleged in more detail by CWs 1 and 4, Volta had been, since some time several years before the SPAC Merger, improperly recognizing revenue by pulling revenue into earlier quarters when it should not have been recognized until the subsequent quarter, with the motive of making cash holdings more appealing to investors; and (2) Volta's revenue recognition practices violated ASC 606, GAAP principles, and the FASB principle of neutrality.

447.    The 2021 10-K contained certain of the same, or substantially similar, descriptions of Volta's business and of its accounting policies that were in the Registration and Proxy Statements. (*See supra* ¶¶ 228, 235, 236, 239, 241, 242, 244, 245).

448.    The statements in ¶ 447 were materially false and misleading for the same reasons that those statements were false and misleading when stated in the Registration and Proxy Statements.

449.    Also on April 15, 2021, Volta filed a Form 8-K signed by Defendant Chadwick containing a press release with its fourth quarter and full year 2021 results, as follows (with the historical financial figures in this press release also contained in the 2021 10-K):

**Fourth Quarter 2021 Financial Highlights**

- Revenues increased 45% year-over-year to $12.1 million, compared to $8.4 million in the prior-year period.

*Revenues by Category*

| | | Three Months Ended December 31, | | |
|---|---|---|---|---|
| *(in thousands)* | | 2021 | | 2020 |
| **Revenues** | | | | |
| Behavior and Commerce (Media and Advertising) | $ | 8,587 | $ | 3,832 |
| Network Development | | 2,812 | | 4,400 |
| Charging Network Operations | | 676 | | |
| Network Intelligence | | 63 | | 133 |
| **Total Revenues** | $ | 12,139 | $ | 8,375 |

- Selling, general and administrative expenses excluding stock-based compensation and one-time expenses were $32.2 million, compared to $13.1 million, also excluding stock-based compensation and one-time expenses, in the prior-year period.
- Net loss was $121.1 million, compared to a loss of $31.5 million in the prior-year period.
- Adjusted EBITDA was $30.7 million loss, compared to $12.9 million loss in the prior-year period.
- Cash and marketable securities were $262.3 million as of December 31, 2021.
- Weighted average shares outstanding for the three months ended December 31, 2021, were 160.4 million.

**Full Year 2021 Financial Highlights**

Revenues increased 66% year-over-year to $32.3 million, compared to $19.5 million in the prior-year.

*Revenues by Category*

| | | Year ended December 31, | | |
|---|---|---|---|---|
| *(in thousands)* | | 2021 | | 2020 |
| **Revenues** | | | | |
| Behavior and Commerce (Media and Advertising) | | $ 23,961 | | $ 8,014 |
| Network Development | | 5,224 | | 10,598 |
| Charging Network Operations | | 676 | | 706 |
| Network Intelligence | | 450 | | 133 |
| **Total Revenues** | | $ 32,311 | | $ 19,451 |

- Net loss was $276.6 million, compared to a loss of $70.6 million in the prior-year period.

- Adjusted EBITDA was $83.8 million loss for the full year 2021, compared to $40.1 million loss in 2020.

*    *    *

**Total Stalls Connected, including Site Partners**

Total stalls connected as of December 31, 2021, was 2,330, representing a 44% year-over-year increase. A stall is attributed to a station based on the number of vehicles that can charge concurrently and there are certain configurations of Volta sites where one station is capable of charging more than one vehicle at a time. The Company added 193 stalls in the quarter and ended 2021 in 23 states.

450.    This press release also disclosed Volta's outlook for 2022 as follows:

**Full Year 2022 Outlook**

Based on current business conditions, business trends and other factors, for the full year ending December 31, 2022, the Company reiterates guidance of:

- Full year 2022 Revenue in the range of $70 million to $80 million
- Total incremental, connected stalls in the range of 1,700 to 2,000

In addition, the Company is now guiding to:

- Total incremental, connected sites to be in the range of 650 to 750 sites

**First Quarter Outlook**

Based on current business conditions, business trends and other factors, for the three months ended March 31, 2022, the Company reiterates guidance of:

- First quarter Revenue in the range of $8 million to $8.5 million

451.    The statements in ¶¶ 449-50 were materially false and misleading because: (1) as alleged in more detail by CWs 1 and 4, Volta had been, since some time several years before the SPAC Merger, improperly recognizing revenue by pulling revenue into earlier quarters when it should not have been recognized until the subsequent quarter, with the motive of making cash holdings more appealing to investors; (2) Volta's revenue recognition practices violated ASC 606,

GAAP principles, and the FASB principle of neutrality; and (3) as alleged in more detail by CWs 1, 2, 3, 4, 6, and 7, Volta's projected ability to scale its network was unrealistic because (i) it did not account for regulatory, logistical, and bureaucratic difficulties inherent in installing its charging stations; (ii) Volta already had a history of missing projections at the time of the Registration Statement; (iii) Volta was frequently not in compliance with local laws and ordinances applicable to its charging stations; (iv) Volta's products were not developed enough at the time it went public; (v) Volta did not account for competition in the market slowing its growth; and (vi) Volta did not have enough cash on hand to install the number of requisite stations.

452.    On April 18, 2022, Volta held its earnings call to discuss its results from the fourth quarter and full year 2021.

453.    On this call, Defendant Chadwick stated that "[o]n March 28, 2022, Volta announced that the company's Chief Executive Officer, Scott Mercer; and the company's President, Christopher Wendel, agreed to the resignation of each as an officer and employee of the company. Mr. Wendel's resignation was effective immediately, while Mr. Mercer continued for a transition period, ending on the filing of the company's annual report on Form 10-K for the fiscal year ended December 31, 2021 as filed on Friday 15th of April 2022. Mr. Mercer will serve as an independent adviser to the company's Board of Directors through March 31, 2023."

454.    The statements in ¶ 453 were materially false and misleading because Mercer and Wendel did not "agree[]" to resign, but were instead ousted from their own Company and Mercer would not be serving as an independent advisor to the Board.

455.    Also on this call, Defendant Brandt Hastings, the Interim CEO replacing Mercer, stated that "Our partners keep coming back to us because they see the impact that Volta Charging has on their properties over time. Ahold Delhaize USA, the largest grocery retailer group on the East Coast, which includes the Stop & Shop, Food Lion, Giant Foods, Giant Martin's and Hannaford brands, has been a wonderful partner to grow with. . . . As mentioned, the value of a site is not only in the initial footprint, but also in the growth in stalls, energy delivery and purchasing influence that we can drive alongside the shift to electric mobility."

456.    The statements in ¶ 455 were materially false and misleading because: (1) as alleged in more detail by CWs 3 and 9, many of Volta's potential customers would not make deals with Volta until its charging network grew to scale; and (2) as alleged in more detail by CWs 3, 4, 5, and 6, Volta routinely did not pay its contractual obligations on time in order to delay accounting for its liabilities and to keep cash on hand, which soured relationships with larger customers.

457.    In addition, on this call, Chadwick emphasized that Volta's "priorities [for 2022] remain very much the same. It's all about hitting the revenue guidance, which we've mentioned the guidance for the year is $70 million to $80 million, and hitting the site locations and the stall installation cadence, we mentioned 1,700 to 2,000 stalls for 2022. I think that's the real focus." Chadwick also emphasized later on the call that "we are going to hit our store installation guidance" and "revenue guidance for 2022."

458.    Hastings then "underscore[d] Francois' comments around, we are extremely focused on executing our business plan at Volta. And as we stated, including on this call, that falls into two very important categories. The first is revenue in that range of $70 million to $80 million in 2022. And second is a focus on continuing to put stalls in the ground, with incremental connected stalls in the range of 1,700 to 2,000 stalls in 2022."

459.    In response to a question about "permitting being a material bottleneck around new installations," Chadwick stated that "it's similar to what we were seeing in the past in certain places, in certain locations where the sort of the decarbonization and electrification has been advancing over time, though getting those permits is just an easier and a quicker process. As we go to locations where installing new stores or where a state or a city or a municipality, it doesn't have any stalls to date. That takes a little bit longer. I would say, no different than what we've seen in the past. We've very same. We're facing the same issues the whole industry is facing. And we have continued to build out our permitting team, so that we are as efficient and effective as possible to make sure that permitting doesn't slow us down."

460.    Later in the call, an analyst asked why Volta's guidance for the number stations it would install was "dramatically below" and "more than 2,000 units" below the 2022 year-end target

that was presented in connection with the SPAC Merger and whether Chadwick could "give us some more complete understanding of why the install rates are expected to be so much lower than the guidance that was given at the time of your SPAC merger. I think a lot of investors feel that understanding is essential to move beyond the volatility in your stock where there's been quite dramatic losses for equity investors."

461.    Chadwick responded that "I don't want anybody to feel that the permits are the things that slow things down. As I mentioned before, in states where – in places and locations where there is already a permitting process, we're moving through those things very quickly. Some of the places that don't have a sort of a fully laid out process, that's where it's taking some additional time." Chadwick also emphasized that "As it relates to the actual stall installs, I just want to point to once again our guidance and that I feel very robust, I feel very comfortable, I feel very confident having been at the company now for a year, having built out a strong financial team and built out many other teams in the supply chain management area and in our sales teams both for the stalls – our stalls sales team and our media sales team that the focus is on the guidance that I've just given."

462.    The statements in ¶¶ 457-61 were materially false and misleading because, as alleged in more detail by CWs 1, 2, 3, 4, 6, and 7, Volta's projected ability to scale its network was unrealistic because (i) it did not account for regulatory, logistical, and bureaucratic difficulties inherent in installing its charging stations; (ii) Volta already had a history of missing projections of stall installations; (iii) Volta was frequently not in compliance with local laws and ordinances applicable to its charging stations; (iv) Volta's products were not developed enough at the time it went public; (v) Volta did not account for competition in the market slowing its growth; and (vi) Volta did not have enough cash on hand to install the number of requisite stations.

463.    In response to a question about Volta's "cash burn trajectory versus your liquidity," Chadwick responded:

> When I look at the cash burn, I look at the operating expenses and the burn through the OpEx and also then through the CapEx side of things. As I mentioned, with respect to the capital side of things, we have put in place this capital committee that does look at every project and it does look at that spend as

it relates to the timeline for the return on that spend. So, feeling very good about that. As it relates to our operating expenses, what I do is I look at this – been looking at this very, very carefully. We have mapped out what those operating expenses are anticipated to be through 2022 and beyond. And I've installed a significant amount of discipline, financial discipline in matching the actual spend to the budgets. So I feel very, very good that we have in place those controls and those procedures to make sure that the burn, the liquidity burn is well controlled.

464.    The statements in ¶ 463 were materially false and misleading because: (1) as alleged in more detail by CWs 1 and 4, Volta had been, since some time several years before the SPAC Merger, improperly recognizing revenue by pulling revenue into earlier quarters when it should not have been recognized until the subsequent quarter, with the motive of making cash holdings more appealing to investors; (2) Volta's revenue recognition practices violated ASC 606, GAAP principles, and the FASB principle of neutrality; and (3) Volta had been burning cash at an unsustainable rate since its inception as a public company.

465.    On April 15, 2022, Volta filed a Form 8-K with the SEC, signed by Defendant Chadwick, that contained a press release announcing the appointment of Brandt Hastings as Interim CEO and noting that "This appointment follows **Scott Mercer's decision to step down as Chairman and CEO of Volta last month**." This release also stated that "[w]e want to thank Scott Mercer, who built this company with an incredible vision. As the Board conducts a complete and formal search for a permanent CEO, we are confident that Brandt will lead Volta's teams to realize the company's significant potential."

466.    The statements in ¶ 465 were materially false and misleading because Mercer did not "deci[de] to step down," but rather, was ousted from his own company.

467.    On May 13, 2022, Volta filed with the SEC its Form 10-Q for the first quarter of 2022 ("Q1 2022 10-Q"), which was signed by Defendants Hastings (as CEO and Principal Executive Officer) and Chadwick (as CFO, Principal Financial Officer and Principal Accounting Officer). The Q1 2022 10-Q was accompanied by SOX certifications signed by Hastings and Chadwick that were substantially similar to the ones that accompanied to Q3 2021 10-Q described in ¶¶ 411-13 above (except that one was now signed by Hastings instead of Mercer).

468.     Hastings and Chadwick's SOX certifications described in ¶ 467 were materially false and misleading because: (1) as alleged in more detail by CWs 1 and 4, Volta had been, since some time several years before the SPAC Merger, improperly recognizing revenue by pulling revenue into earlier quarters when it should not have been recognized until the subsequent quarter, with the motive of making cash holdings more appealing to investors; (2) Volta's revenue recognition practices violated ASC 606, GAAP principles, and the FASB principle of neutrality.

469.     Also on May 13, 2022, Volta filed a Form 8-K signed by Defendant Chadwick containing the Company's financial results for the quarter as follows (with historical financial figures also contained in the Q1 2022 10-Q):

**First Quarter 2022 Financial Highlights**

- Revenues increased 77% year-over-year to $8.4 million, compared to $4.7 million in the prior-year period.

*Revenue by Category*

|  | Three months ended March 31, | |
| --- | --- | --- |
|  | 2022 | 2021 |
|  | *(in thousands)* | |
| **Revenues** | | |
| Media Revenue (formerly Behavior & Commerce) | $ 6,118 | $ 3,529 |
| Network Development | 2,214 | 1,001 |
| Charging Network Operations | 1 | — |
| Network Intelligence | 53 | 210 |
| **Total Revenue** | $ 8,386 | $ 4,740 |

- Selling, general and administrative expenses excluding stock-based compensation were $39.7 million, compared to $15.3 million in the prior period.
- Net loss was $48.1 million, compared to a loss of $65.2 million in the prior-quarter period.
- Adjusted EBITDA was $41.4 million loss, compared to $15.9 million loss in the prior-year period.
- Cash and marketable securities were $205.4 million as of March 31, 2022.
- Weighted average shares outstanding for the three months ended March 31, 2022 were 172.0 million.

470.     Volta's press release for the first quarter of 2022, dated May 13, 2022, also contained the following guidance:

**Full Year 2022 Outlook**

Based on current business conditions, business trends and other factors, for the full year ending December 31, 2022, the Company reiterates guidance of:

- Full year 2022 Revenue in the range of $70 million to $80 million

- Total incremental, connected stalls in the range of 1,700 to 2,000

- Total incremental, connected sites to be in the range of 650 to 750 sites

**Second Quarter Outlook**

Based on current business conditions, business trends and other factors, for the three months ending June 30, 2022, the Company provides guidance of:

- Second quarter Revenue in the range of $13 million to $14 million

471.    This press release announcing Volta's results for the first quarter of 2022 also promoted the Company's performance by stating: "'We made continued progress against our strategy with total revenue growing 77%, media revenue up 73%, and total installed stalls growing 39% year-over-year,' said Brandt Hastings, Interim CEO, CRO at Volta. 'New and expanded partnerships with top retail locations like Tanger Outlets and Six Flags, national advertisers such as T-Mobile and PepsiCo, as well as enhancements to our AI and data-science offerings, position us to further accelerate growth and ownership of the rapidly expanding electric mobility marketplace.'"

472.    The statements in ¶¶ 469-71 were materially false and misleading because: (1) as alleged in more detail by CWs 1 and 4, Volta had been, since some time several years before the SPAC Merger, improperly recognizing revenue by pulling revenue into earlier quarters when it should not have been recognized until the subsequent quarter, with the motive of making cash holdings more appealing to investors; (2) Volta's revenue recognition practices violated ASC 606, GAAP principles, and the FASB principle of neutrality; and (3) as alleged in more detail by CWs 1, 2, 3, 4, 6, and 7, Volta's projected ability to scale its network was unrealistic because (i) it did not account for regulatory, logistical, and bureaucratic difficulties inherent in installing its charging stations; (ii) Volta already had a history of missing projections of stall installations; (iii) Volta was frequently not in compliance with local laws and ordinances applicable to its charging stations; (iv) Volta's products were not developed enough at the time it went public; (v) Volta did not account for competition in the market slowing its growth; and (vi) Volta did not have enough cash on hand to install the number of requisite stations.

473.    Volta also attached its presentation from its Q1 2022 earnings call to the Form 8-K that it filed with the SEC on May 1, 2022, which noted that the presenters included Defendants Hastings and Chadwick. This earnings presentation continued to promote Volta's relationships with the sites that hosted its charging stations and with the companies that provided it advertising revenue, as well as its plans to install new stations, including in the following slides:







474.    The statements in ¶ 473 were materially false and misleading because: (1) as alleged in more detail by CWs 1 and 4, Volta had been, since some time several years before the SPAC Merger, improperly recognizing revenue by pulling revenue into earlier quarters when it should not

have been recognized until the subsequent quarter, with the motive of making cash holdings more appealing to investors; (2) Volta's revenue recognition practices violated ASC 606, GAAP principles, and the FASB principle of neutrality; (3) as alleged in more detail by CWs 1, 2, 3, 4, 6, and 7, Volta's projected ability to scale its network was unrealistic because (i) it did not account for regulatory, logistical, and bureaucratic difficulties inherent in installing its charging stations; (ii) Volta already had a history of missing projections of stall installations; (iii) Volta was frequently not in compliance with local laws and ordinances applicable to its charging stations; (iv) Volta's products were not developed enough at the time it went public; (v) Volta did not account for competition in the market slowing its growth; and (vi) Volta did not have enough cash on hand to install the number of requisite stations; and (4) Volta did not have a good relationship with its customers because, as alleged in more detail by CWs 3 and 9, many of Volta's potential customers would not make deals with Volta until its charging network grew to scale and Volta routinely did not pay its contractual obligations on time in order to delay accounting for its liabilities and to keep cash on hand, which soured relationships with larger customers.

475.    On August 11, 2022, Volta filed with the SEC its Form 10-Q for the second quarter of 2022 ("Q2 2022 10-Q"), which was signed by Defendants Cubbage (as Interim CEO and Principal Executive Officer) and Chadwick (as CFO and Principal Financial Officer). The Q2 2022 10-Q was accompanied by SOX certifications signed by Cubbage and Chadwick that were substantially similar to the ones that accompanied to Q3 2021 10-Q described in ¶¶ 411-13 above (except that one was now signed by Cubbage instead of Mercer).

476.    Cubbage and Chadwick's SOX certifications described in ¶ 475 were materially false and misleading because: (1) as alleged in more detail by CWs 1 and 4, Volta had been, since some time several years before the SPAC Merger, improperly recognizing revenue by pulling revenue into earlier quarters when it should not have been recognized until the subsequent quarter, with the motive of making cash holdings more appealing to investors; and (2) Volta's revenue recognition practices violated ASC 606, GAAP principles, and the FASB principle of neutrality.

477.    Also on August 11, 2022, Volta filed a Form 8-K containing its financial results for the quarter as follows (with historical financial figures also contained in the Q3 2022 10-Q):

**Second Quarter 2022 Financial Highlights**

- Revenues increased 121% year-over-year to $15.3 million, compared to $6.9 million in the three months ended June 30, 2021.

*Revenue by Category*

| | Three months ended June 30, | | | |
|---|---|---|---|---|
| | 2022 | | 2021 | |
| Revenues | (In thousands) | | | |
| Media Revenue (formerly Behavior & Commerce) | $ | 11,221 | $ | 6,485 |
| Network Development | | 3,577 | | 340 |
| Charging Network Operations | | 370 | | 1 |
| Network Intelligence | | 176 | | 117 |
| Total Revenues | $ | 15,344 | $ | 6,943 |

- Selling, general and administrative expenses excluding stock-based compensation were $37.6 million, compared to $16.1 million in the prior-year period.
- Net loss was $37.4 million, compared to a loss of $20.6 million in the prior-year period.
- Adjusted EBITDA was $33.4 million loss, compared to $15.1 million loss in the prior-year period.
- Cash and marketable securities were $105.3 million as of June 30, 2022.
- Weighted average shares outstanding for the three months ended June 30, 2022 were 167.4 million.

**Total Stalls Connected, including Site Partners**

In the second quarter Volta's installed base increased by a record 372 stalls, bringing Volta's installed base of total stalls connected as of June 30, 2022 to 2,920, representing a 48% year-over-year increase. A stall is attributed to a station based on the number of vehicles that can charge concurrently from that station and there are certain configurations of Volta sites where one station is capable of charging more than one vehicle at a time. The Company now has stalls in 28 states and territories.

478.    Volta's press release for the second quarter of 2022, dated August 11, 2022, also contained the following guidance:

**Full Year 2022 Outlook**

Based on current business conditions, business trends and other factors, for the full year ending December 31, 2022, the Company reiterates guidance of:

- Full year 2022 Revenue in the range of $70 million to $80 million

- Total incremental, connected stalls in the range of 1,700 to 2,000

- Total incremental, connected sites to be in the range of 650 to 750 sites

**Third Quarter Outlook**

Based on current business conditions, business trends and other factors, for the three months ending September 30, 2022, the Company provides guidance of:

- Third quarter Revenue in the range of $17 million to $18 million

479.    The press release announcing Volta's results for the second quarter of 2022 also promoted the Company's performance by quoting Defendant Cubbage as stating:

> Volta had a record quarter, and these results demonstrate the power of our differentiated business model," said Vince Cubbage, Interim CEO. "By building not just a network of chargers, but a dual energy and digital advertising platform, we believe Volta can scale revenue even faster than the EV adoption curve – offering the quickest path to profitability and the highest revenue per station. I've been impressed by the exceptional work being done across Volta's business and see tremendous opportunity ahead as the Company moves through its next stage of growth.

480.    The statements in ¶¶ 477-79 were materially false and misleading because: (1) as alleged in more detail by CWs 1 and 4, Volta had been, since some time several years before the SPAC Merger, improperly recognizing revenue by pulling revenue into earlier quarters when it should not have been recognized until the subsequent quarter, with the motive of making cash holdings more appealing to investors; (2) Volta's revenue recognition practices violated ASC 606, GAAP principles, and the FASB principle of neutrality; and (3) as alleged in more detail by CWs 1, 2, 3, 4, 6, and 7, Volta's projected ability to scale its network was unrealistic because (i) it did not account for regulatory, logistical, and bureaucratic difficulties inherent in installing its charging stations; (ii) Volta already had a history of missing projections of stall installations; (iii) Volta was frequently not in compliance with local laws and ordinances applicable to its charging stations; (iv) Volta's products were not developed enough at the time it went public; (v) Volta did not account for

competition in the market slowing its growth; and (vi) Volta did not have enough cash on hand to install the number of requisite stations.

481. Volta also included its presentation from its Q2 2022 earnings call with its Form 8-K that it filed on August 11, 2022. This presentation noted that the presenters on the call included Defendants Cubbage and Hastings, and continued to promote Volta's relationships with the sites that hosted its charging stations and with the companies that provided it advertising revenue, as well as its plans to install new stations, including in the following slides:







**Repeat Business with Media Customers**

**+73% YOY**
Q2 Media Revenue Growth

**+54%**
of Q2 Media revenue from repeat advertisers

Q2 New Media Customers

**16 of Volta's Top 20**
Customers bought across multiple of the last 6 Quarters

**7 of Volta's Top 20**
Customers bought across ALL 6 of the last 6 Quarters

10





**Q2 2022 Financial Highlights**

Total Revenue +83% QoQ
8.4m (Q1 22) — 15.3m (Q2 22)

Media Revenue +83% QoQ
6.1m (Q1 22) — 11.2m (Q2 22)

Installed Base Stalls +15% QoQ
2,548 (Q1 22) — 2,920 (Q2 22)

Stall Pipeline +6% QoQ
3,727 (Q1 22) — 3,942 (Q2 22)

15

## Key Financial Highlights

in millions $

| | Q1 2022 | Q2 2022 |
|---|---|---|
| Property and Equipment Charging Stations and digital media screens | $92.5 | $114.8 |
| Construction in progress Stations | 47.8 | 67.9 |
| Revenue | 8.4 | 15.3 |
| Operating Loss | (61.5) | (44.4) |
| Net Loss | (48.1) | (37.4) |
| EBITDA [1] | (43.1) | (31.6) |
| Adj EBITDA [1] | (41.4) | (33.4) |

[1] Please refer to the disclosure on page 16 for a reconciliation of the identified non-GAAP measures to net loss, the most comparable financial measure prepared in accordance with GAAP

16

## Guidance

**1** Full year 2022 Revenue in the range of $70 million to $80 million

**2** Total incremental, connected stalls in the range of 1,700 to 2,000

**3** Total incremental, connected sites to be in the range of 650 to 750 sites

**4** Third quarter Revenue in the range of $17 million to $18 million

18

482.   The statements in ¶ 481 were materially false and misleading because: (1) as alleged in more detail by CWs 1 and 4, Volta had been, since some time several years before the SPAC

Merger, improperly recognizing revenue by pulling revenue into earlier quarters when it should not have been recognized until the subsequent quarter, with the motive of making cash holdings more appealing to investors; (2) Volta's revenue recognition practices violated ASC 606, GAAP principles, and the FASB principle of neutrality; (3) as alleged in more detail by CWs 1, 2, 3, 4, 6, and 7, Volta's projected ability to scale its network was unrealistic because (i) it did not account for regulatory, logistical, and bureaucratic difficulties inherent in installing its charging stations; (ii) Volta already had a history of missing projections of stall installations; (iii) Volta was frequently not in compliance with local laws and ordinances applicable to its charging stations; (iv) Volta's products were not developed enough at the time it went public; (v) Volta did not account for competition in the market slowing its growth; and (vi) Volta did not have enough cash on hand to install the number of requisite stations; and (4) Volta did not have a good relationship with its customers because, as alleged in more detail by CWs 3 and 9, many of Volta's potential customers would not make deals with Volta until its charging network grew to scale and Volta routinely did not pay its contractual obligations on time in order to delay accounting for its liabilities and to keep cash on hand, which soured relationships with larger customers.

## C.   Additional Scienter Allegations

### 1.   Defendants Knew of Facts Critical to Volta's Core Operations and Spoke About Them in Detail, Showing Their Awareness of These Issues

483.   Defendants Mercer, Chadwick, Wendel, Hastings, and Cubbage were, the CEO, CFO, President, and interim CEOs (respectively) of Volta. They were responsible for, and remained well informed of, issues critical to the Company's success. These Defendants repeatedly identified Volta's Behavior and Commerce revenue channel, Volta's ability to scale its business, and Volta's relationships with its partners and customers as such critical issues.

484.   Throughout the Class Period, these Defendants highlighted Volta's ability to generate revenue from advertisements through its stalls, touted Volta's purported "unit economics," and its relationships with its partners. (*See supra* ¶ 404 (Chadwick on November 10, 2021 Earnings Call)).

In fact, Defendant Chadwick, when describing "three simple reasons that we are so excited about where Volta is today and what its future holds," listed (1) "'[a] differentiated business model [which] enables us to monetize our infrastructure from day one;'" and (2) "'our industry leading utilization and using unit economics allow us to attract valuable partners that will help scale and expand our overall network, which ultimately compounds our returns over the longer term.'" *Id.*

485.    On that same call, Defendant Wendel stated that "sell[ing] media display time to advertisers, . . . provides us with a potentially high value revenue stream that we believe will compound over time, with the increased growth and utilization of our network. We think this revenue stream is a ***critical differentiating factor*** that will provide a long-term competitive advantage." (*See supra* ¶ 401 (November 10, 2021 Earnings Call)). On this call, Wendel also highlighted Volta's relationship with advertisers, stating "[w]e view this flywheel of providing value to consumers, property partners and advertisers as positioning as well to monetize our network on day one, create a deeper connection with the community and increase the total value of our network." (*Id.*).

486.    Other Defendants also specifically discussed these issues. *See, e.g.*, Volta's April 18, 2022 earnings call (Defendant Hastings stating "Our partners ***keep coming back to us*** because they see the impact that Volta Charging has on their properties over time . . . . As mentioned, the value of a site is not only in ***the initial footprint***, but also in the growth in stalls, energy delivery and purchasing influence that we can drive alongside the shift to electric mobility."); *id.* (Hastings focusing on "two very important categories. The first is revenue in that range of $70 million to $80 million in 2022. And second is a focus on continuing to put stalls in the ground, with incremental connected stalls in the range of 1,700 to 2,000 stalls in 2022."); Volta's August 11, 2022 press release accompanying its quarterly earnings (quoting Defendant Cubbage as stating "[b]y building not just a network of chargers, but a dual energy and digital advertising platform, we believe Volta can scale revenue even faster than the EV adoption curve – offering the quickest path to profitability and the highest revenue per station.").

487.    Given their admission that revenue and Volta's number of charging stalls were "very

important categories," these Defendants, Volta's most senior executives, can be presumed to have knowledge of adverse facts impacting the Company's revenue and number of charging stalls. The Company's practice of pulling advertising revenue from later quarters into earlier quarters skewed their revenue metrics. Volta's financial position was further undermined by its late payments to its site hosts, which made its cash balance worse than Defendants represented. In addition, Volta's scaling strategy was undermined by the Company's practice of not paying its partners and customers, by customers not signing up with Volta until it had sufficiently scaled its business, and by Volta's inability to install as many charging stations and stalls as it projected. These Defendants repeatedly made specific statements to the investing public regarding their focus on these issues demonstrates their knowledge of these adverse facts. Indeed, in light of the fact that Defendants described the importance of advertising revenue as a "critical differentiating factor," it would be absurd to suggest these Defendants were not aware that revenue was actually misrepresented and decreasing throughout the Class Period.

### 2.    Statements by CWs Support an Inference of Scienter for Mercer, Wendel, and Chadwick

488.    Statements by the CWs show that Mercer, Wendel, and Chadwick had knowledge of Volta's inability to scale its business and Volta's improper accounting practices. For example, CW 5 stated that despite the witness's efforts to revamp Volta's internal controls for handling contract payments and proper accounting practices, the witness's team was often overridden by Mercer and Wendel to "do whatever it took to keep the lights on." (*See supra* ¶¶ 161-65). Also, CW 5 and CW 6 described Chadwick as having blown the whistle on Volta's improper accounting practices, confirming his scienter as to these issues. (*See supra* ¶¶ 166, 351).

489.    Additionally, CW 4 stated that internally, Volta employees referred to the Company's improper accounting practices as "Wendelian math" because of Wendel's pattern and practice of fudging numbers to make the Company's finances more appealing to investors. (*See supra* ¶ 186). According to CW 4, Mercer and Wendel were too savvy to be unaware of Volta's improper

accounting practices. The witness described Wendel as "a smart numbers guy" and Mercer as having "a background in finance." (*See supra* ¶ 376). Indeed, the witness "ha[d] a really hard time believing that [Volta's improper accounting practices] would have slipped by the controller, the CFO, the CEO and president and the auditor." (*Id.*)

490.    Furthermore, CW 1 confirmed Chadwick's scienter regarding Volta's improper practice of pulling sales into earlier quarters because the witness stated that after the third quarter of 2021, Chadwick told the Sales team to stop this practice because Volta could not engage in such conduct as a public company. (*See supra* ¶ 181). This statement confirms that Chadwick was aware of the practice. Even though he told the Sales team to cease the practice, Chadwick continued to make, and allow others to issue, misstatements that repeated — and failed to restate — Volta's false past revenue figures, gave unsupported projections of future revenue, and falsely described Volta's revenue practices as in compliance with GAAP, while failing to correct Volta's past violations. CW 1 also confirmed Mercer and Wendel's scienter regarding these revenue recognition practices. (*Id.*)

491.    CW 1 also confirmed Mercer's scienter as to Volta's inability to scale its business. According to the witness, whenever Mercer was informed that one of Volta's charging stations was not in compliance with local laws or regulations, "[Mercer's] mentality was 'F*** that' — he said that every other day — 'Put them in anyway.'" (*See supra* ¶ 136). Thus, despite his knowledge that Volta's charging stations ran afoul of local laws and regulations, Mercer made and allowed to be made misstatements that Volta was on target to meet its projections for installing stalls and scaling its business.

### 3.    The Departure of Key Executives Supports an Inference of Scienter

492.    The departure of several key executives from Volta during the Class Period is indicative of scienter. Defendants Mercer and Wendel were forced from their positions of CEO and President on March 28, 2022, one week after Volta announced it would be restating its 3Q21

financials.

493.    Analysts and other media were shocked by these departures (*see supra* ¶ 113), and attributed the departures to the Company's financial struggles. In addition, D.A. Davison noted "we have some concern that today's announcement could signal that at least in the immediate-term, the company may have fallen behind where it was expected to be at this juncture." And *SeekingAlpha* published an article on April 4, 2022, noting "[t]he surprise news of the founders leaving the company wasn't a good indication that the business was doing well."[12]

494.    Not long after, on June 10, 2022, Volta filed a Form 8-K with the SEC that Defendant Chadwick had notified the Company on June 6, 2022, that he would resign as CFO. The announcement also stated that Julie Rogers, Chief People Officer of the Company, Praveen Mandal, Chief Technology Officer of the Company, and James DeGraw, General Counsel, Secretary, and Chief Administrative Officer of the Company, had also "recently departed from the Company."

495.    Analysts and other media were again surprised by these departures, (especially Chadwick's), and, viewing these departures in conjunction with those of Mercer and Wendel, took an even more negative outlook of the Company. For example, D A Davidson stated on June 13, 2022, that "it clearly appeared that Mercer and Wendel['s] [resignations] were not voluntary," and questioned who else would be leaving Volta "at this critical time in VLTA's development as a publicly-traded company." That same day, the *Motley Fool* also noted that "Cubbage's appointment now makes it clear that the company hasn't been able to find a suitable candidate to take the helm yet."[13] Moreover, CW 6 described Chadwick as having blown the whistle on Volta's improper accounting practices, which led to the firings of Mercer and Wendel. (*See supra* ¶ 351). CWs 1, 2, 3, 6, 7, and 8 also viewed the Volta's string of executive departures as a result of the Company's improper accounting and financial practices. (*See supra* ¶¶ 95-112).

---

[12]   https://seekingalpha.com/article/4499595-volta-other-shoe-just-dropped.

[13]   https://www.fool.com/investing/2022/06/13/volta-stock-plunges-on-c-suite-shuffle-and-delisti/.

1
2

**4.  Defendants Had Motive to Continue their Fraudulent Conduct to Promote Volta When it Went Public and to Maintain an Artificially High Stock Price to Obtain Additional Financing**

3
4
5

496.    Defendants were motivated to maintain their fraudulent scheme to promote Volta as it went public through the SPAC Merger. They also were motivated throughout the Class Period to keep Volta's stock price high to attract additional financing.

6
7
8
9
10

497.    As CW 1 explained, Volta's executives were especially motivated to accelerate the Company's revenue in the third quarter of 2021 to look better to investors in Volta's first quarter as a public company because, as the Sales team was told, "[w]e can't post we're short in our first public reporting." (*See supra* ¶ 178). This same motive also applies to Volta's other misconduct in connection with the Merger.

11
12
13

498.    Moreover, following the completion of the Merger, Volta's cash balance dropped precipitously in each of Volta's successive quarterly reports as a public company.  (*See supra* ¶¶ 148-59).

14
15
16
17
18
19

499.    On Volta's earnings call for the first quarter of 2022, held on May 13, 2022, Defendant Chadwick discussed Volta's need for additional capital. This statement substantially understated the extent of Volta's need for, and access to, additional capital given the Company's underlying financial misconduct that Defendants misrepresented and failed to disclose, but shows that Chadwick and Volta's other senior executives were motivated to keep Volta's stock price artificially inflated.

20
21
22
23
24
25
26
27
28

500.    Analysts also regularly commented on Volta's need for additional funding. By June 13, 2022, Cantor Fitzgerald stated that the firm "[became] more conservative in the short term given the company's uncertainty around management and liquidity needs." Likewise, on November 15, 2022, Barclays noted "the company's business model requires continuous funding, which creates a negative loop - the stock price is pressured due to the continuous need and dilution concerns, which then makes it more difficult to raise capital, and so on. We estimate the company needs ~$150 million (which is approximately the market cap of the company) to get through the next year, but this would only address cash burn and would do little to support charger installation growth while

media revenue growth is also challenged in the current backdrop." That same day, Roth Capital Partners lowered its target price for Volta's stock, describing a "clearly distressed situation."

501.    The full extent of Volta's insufficient cash balance was known internally much earlier. CWs confirm that Defendants did not pay contractual obligations on time because the Company had to maintain certain cash levels to remain attractive to investors. For example, CW 4 stated that Volta did not pay its contractual obligations on time "[b]ecause we needed ending cash to look" better. (*See supra* ¶ 171; see *also supra* ¶ 149 CW 3 (confirming that "[t]here was no path forward because there was no money."); ¶ 164 CW 5 ("Mercer and Wendel at times would do whatever it took to keep the lights on")).

502.    Thus, throughout the Class Period, Defendants Mercer, Chadwick, Wendel, Hastings, and Cubbage were motivated to misrepresent Volta's revenues, avoid paying its liabilities, and misrepresent its ability to grow and scale its charging network, all in order to make Volta appear more attractive to investors. This was particularly important so that Defendants could prop up Volta's stock price, which Barclays cited as key to Volta's ability "to raise capital."

503.    Lastly, CW 4 described Mercer as being motivated by wanting to put Big Oil out of business, and Wendel as willing to embellish to be the big shot.

**D.    The Truth Begins to Emerge**

504.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

505.    Throughout the Class Period, the price of Volta securities was artificially inflated and/or maintained at an artificially high level as a result of Defendants' materially false and misleading statements and omissions identified herein.

506.    The price of the Company's securities declined significantly when the misrepresentations made to the market, and/or the information and risks alleged herein to have been concealed from the market, and/or the effects thereof, materialized and/or were revealed, causing investors' losses. As a result of Defendants' wrongful acts and omissions, and the precipitous decline

in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

507.   The specific disclosures that led to Plaintiffs' and the Class's losses that are described above in connection with Plaintiffs' claims under Section 14(a) of the Exchange Act also apply to their claims under Section 10(b) of the Exchange Act. (*See supra* Section VI.A). The only additional substantive allegations that apply to Plaintiffs' claims under Section 10(b) but not their claims under Section 14(a) related to Volta's misstatement of financial information related to stock-based compensation. These misstatements are a symptom of the more fundamental improper practices described in connection with Plaintiffs' other claims.

508.   In addition, Plaintiffs and the Class suffered additional losses based on the following disclosures related to their claims under Section 10(b).

509.   On March 2, 2022, after the market closed, Volta revealed that the financial impact of the restatement related to its stock-based compensation was greater than previously disclosed. The Company filed an amended Form 8-K with the SEC noting:

> The estimated financial impact of this adjustment is an approximately $26.7 million increase to stock-based compensation and corresponding increase to paid-in capital, resulting in an approximate net loss for the three and nine months ended September 30, 2021 of $69.7 million and $155.5 million, respectively.

510.   On this news, the Company's share price fell $0.11, or 2.6%, to close at $4.01 per share on March 3, 2022, on unusually heavy trading volume.

511.   Then, on March 21, 2022, Volta announced that it would reschedule the announcement of its fourth quarter and full year 2021 financial results, which had been expected to be released that day. In a press release, Volta stated that it:

> [T]oday announced that it will be rescheduling its fourth quarter and year end 2021 conference call once it completes the necessary review of its financial results. Today, the Company will file an amendment to its quarterly report on form 10-Q for the quarter ended September 30, 2021.

512.   On this news, the Company's share price fell $0.38, or 8.4% to close at $4.12 per share on March 21, 2022, on unusually heavy trading volume that was over 1.7 times the average

trading volume of the prior 20 trading days.

513.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

### E.    The Presumption of Reliance Applies

514.    To the extent Plaintiffs allege that Defendants made affirmative misstatements, Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine, in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material to a reasonable investor;

(c)    Volta's securities traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

(e)    Plaintiffs and other members of the Class purchased the Company's securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts;

(f)    the Company's common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

(g)    as a regulated issuer, the Company filed periodic public reports with the SEC and the NYSE;

(h)    the Company regularly communicated with public investors via established market communication mechanisms, including, inter alia, regular dissemination of press releases on the national circuits of major newswire services and other wide ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(i)    the Company was followed by numerous securities analysts employed by major brokerage firms including, but not limited to, Barclays, Cantor Fitzgerald, D.A. Davidson, Roth Capital Partners, and other outlets, all of which wrote reports that were distributed to the public or to the sales force and certain customers of their

respective brokerage firm(s) and that were publicly available and entered the public marketplace.

515.    As a result of the foregoing, the markets for the Company's securities were open, well-developed, and efficient at all relevant times, and promptly digested current information regarding the Company from publicly available sources and reflected such information in the Company's securities price(s). Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of the Company's securities and market information relating to the Company. Under these circumstances, all persons and entities who or which purchased or otherwise acquired the Company's securities during the Class Period suffered similar injuries through their purchase of the Company's securities at artificially inflated prices and thus, the presumption of reliance applies.

516.    During the Class Period, the artificial inflation of the Company's securities was caused by the material misrepresentations and/or omissions particularized herein, causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about the Company's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of the Company and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated and maintained at artificially inflated levels at all relevant times, and when disclosed, negatively affected the value of the Company's shares.

517.    The material misrepresentations and omissions alleged herein would tend to induce, and did induce, reasonable investors to misjudge the value of the Company's securities. The material misrepresentations and omissions alleged herein would tend to induce, and did induce, reasonable investors to purchase the Company's securities at artificially inflated prices.

518.    Without knowledge of the misrepresented or omitted material facts alleged herein, Plaintiffs and other members of the Class purchased shares of the Company's securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were

disclosed.

519.    To the extent Defendants concealed or improperly failed to disclose material facts with respect to the Company's business, Plaintiffs are entitled to a presumption of reliance in accordance with the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972). Defendants were obligated to disclose, but failed to disclose, material facts with respect to the Company's business operations and financial prospects, so that "positive proof of reliance is not a prerequisite to recovery." *Id.*

### F.    No Safe Harbor

520.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint under Section 10(b) of the Exchange Act. In addition, the statements alleged to be false and misleading herein all relate to then-existing facts and conditions. Furthermore, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Volta who knew that the statement was false when made.

### COUNT V: FOR VIOLATIONS OF SECTION 10(b) OF THE SECURITIES EXCHANGE ACT OF 1934 AND SEC RULE 10b-5 (AGAINST DEFENDANTS VOLTA, MERCER, CHADWICK, WENDEL, CUBBAGE, AND HASTINGS)

521.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

522.    This Count is asserted against Defendants Volta, Mercer, Chadwick, Wendel,

Cubbage, and Hastings (the "Section 10(b) Defendants"), and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

523.    During the Class Period, the Section 10(b) Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Volta's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each Defendant, took the actions set forth herein.

524.    The Section 10(b) Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Volta's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

525.    The Section 10(b) Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Volta's financial well-being and prospects, as specified herein.

526.    The Section 10(b) Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Volta's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Volta and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit

1    upon the purchasers of the Company's securities during the Class Period.

2    527.    Each of Defendants Mercer, Chadwick, Wendel, Cubbage, and Hastings' primary

3    liability and controlling person liability arises from the following facts: (i) these Defendants were

4    high-level executives and/or Directors at the Company during the Class Period and members of the

5    Company's management team or had control thereof; (ii) each of these Defendants, by virtue of their

6    responsibilities and activities as a senior officer and/or director of the Company, was privy to and

7    participated in the creation, development and reporting of the Company's internal budgets, plans,

8    projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and

9    familiarity with the other Defendants and was advised of, and had access to, other members of the

10   Company's management team, internal reports and other data and information about the Company's

11   finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of

12   the Company's dissemination of information to the investing public which they knew and/or

13   recklessly disregarded was materially false and misleading.

14   528.    The Section 10(b) Defendants had actual knowledge of the misrepresentations and/or

15   omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they

16   failed to ascertain and to disclose such facts, even though such facts were available to them. Such

17   Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and

18   for the purpose and effect of concealing Volta's financial well-being and prospects from the

19   investing public and supporting the artificially inflated price of its securities. As demonstrated by

20   Defendants' overstatements and/or misstatements of the Company's business, operations, financial

21   well-being, and prospects throughout the Class Period, the Section 10(b) Defendants, if they did not

22   have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to

23   obtain such knowledge by deliberately refraining from taking those steps necessary to discover

24   whether those statements were false or misleading.

25   529.    As a result of the dissemination of the materially false and/or misleading information

26   and/or failure to disclose material facts, as set forth above, the market price of Volta's securities was

27   artificially inflated during the Class Period. In ignorance of the fact that market prices of the

Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Section 10(b) Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by these Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Volta's securities during the Class Period at artificially high prices and were damaged thereby.

530.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Volta was experiencing, which were not disclosed by the Section 10(b) Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Volta securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

531.    By virtue of the foregoing, the Section 10(b) Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

532.    As a direct and proximate result of the Section 10(b) Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases and sales of the Company's securities during the Class Period.

**COUNT VI:   FOR VIOLATIONS OF SECTION 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934 (AGAINST DEFENDANTS MERCER, CHADWICK, WENDEL, CUBBAGE, AND HASTINGS ("THE SECTION 10(b) INDIVIDUAL DEFENDANTS")**

533.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

534.    This Count is asserted against Defendants Mercer, Chadwick, Wendel, Cubbage, and Hastings (the "Section 10(b) Individual Defendants") and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

535.    The Section 10(b) Individual Defendants acted as controlling persons of Volta within

the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Section 10(b) Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Section 10(b) Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

536.    In particular, the Section 10(b) Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

537.    As set forth above, the Section 10(b) Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Section 10(b) Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

538.    As a direct and proximate result of the Section 10(b) Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases and sales of the Company's securities during the Class Period.

## VIII.    CLASS ACTION ALLEGATIONS

539.    Plaintiffs bring this action as a class action on behalf of Classes under (1) the Securities Act (the "Securities Act Class"); (2) Sections 14(a) and 20(a) of the Exchange Act (the "Section 14(a) Class"); and (3) Sections 10(b) and 20(a) of the Exchange Act (the "Section 10(b)

Class") (collectively, the "Classes"). Excluded from the Classes are Defendants and their families, the officers and directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

540. The Securities Act Class is brought on behalf of Class members that purchased or otherwise acquired Volta securities pursuant and/or traceable to the Registration Statement.

541. The Section 14(a) Class is brought on behalf of Class members that beneficially owned and/or held SNPR Class A common stock as of July 15, 2021 and were eligible to vote at Tortoise's August 25, 2021 extraordinary general meeting.

542. The Section 10(b) Class is brought on behalf of class members that purchased or otherwise acquired Volta securities between August 2, 2021 and November 14, 2022, both dates inclusive (the "Class Period").

543. The members of the Classes are so numerous that joinder of all members is impracticable. While the exact number of Class members of each Class is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least thousands of members in each of the proposed Classes. Record owners and other members of the Classes may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

544. For each Class, Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Classes are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

545. Plaintiffs will fairly and adequately protect the interests of the members of the Classes and have retained counsel competent and experienced in class and securities litigation.

546. Common questions of law and fact exist as to all members of the Classes and predominate over any questions solely affecting individual members of the Classes. Among the questions of law and fact common to the Classes, or for each Class, are:

a.      whether Defendants violated Sections 11 and 15 of the Securities Act;

b.      whether Defendants violated Section 14(a) and 20(a) of the Exchange Act;

c.      whether Defendants violated Section 10(b) and 20(a) of the Exchange Act;

d.      whether Defendants' statements contained false or misleading statements of material fact or omitted material information required to be stated therein; and

e.      to what extent the members of the Classes have sustained damages and the proper measure of damages.

547.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Classes to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.      Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class Representatives;

B.      Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in investigating, bringing, and maintaining this action, including counsel fees and expert fees; and

D.      Awarding such other and further legal or equitable relief as the Court deems just and proper.

## X.    DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable in this Action

Dated: January 27, 2023

Respectfully submitted,

**POMERANTZ LLP**

By: *s/ Michael Grunfeld*

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

**POMERANTZ, LLP**
Jeremy A. Lieberman (*pro hac vice*)
Michael Grunfeld (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile:  (212) 661-8665
jalieberman@pomlaw.com
mgrunfeld@pomlaw.com

*Lead Counsel for Plaintiffs and the Class*

**BRONSTEIN, GEWIRTZ &
GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Additional Counsel for Lead Plaintiff
Steve Padget*

ROBBINS GELLER RUDMAN
   & DOWD LLP
DAVID W. MITCHELL
JOSEPH J. TULL
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
davidm@rgrdlaw.com
jtull@rgrdlaw.com

*Additional Counsel for Plaintiff Eric M. Walden*