1

2

3

4                        UNITED STATES DISTRICT COURT

5                    FOR THE NORTHERN DISTRICT OF CALIFORNIA

6

7    KAROLINE KAMPE, et al.,                  Case No. 4:22-cv-2055-JST

8                   Plaintiffs,               **ORDER GRANTING IN PART AND
                                              DENYING IN PART MOTION TO**
9          v.                                 **DISMISS**

10   VOLTA INC., et al.,                      Re: ECF No. 81

11                  Defendants.

12

13         Before the Court is Defendants' motion to dismiss the consolidated amended class action

14   complaint ("CAC").  ECF No. 81.  The Court will grant the motion in part and deny it in part.

15   **I.      BACKGROUND**

16         **A.      Overview of Facts Alleged in the CAC**

17         For the purpose of resolving the present motion, the Court accepts as true the factual

18   allegations in the CAC, ECF No. 64-1.

19         Defendant Volta is a public company that partners with real estate and retail businesses to

20   deploy charging stations for electric vehicles at retail locations.  *Id.* ¶¶ 1-2, 84.  The Company

21   generates revenue primarily from selling advertisements that are displayed on media screens on its

22   charging stations.  *Id.*  It also generates revenue from installing and maintaining the charging

23   stations and delivering electricity at the charging stations.  *Id.* ¶ 79.  Volta enters into contracts

24   with property owners pursuant to which Volta pays the property owners ("site hosts") for the

25   ability to place its charging stations on their property.  *Id.* ¶ 79.

26         Volta was formed through a merger (hereinafter, "the Merger") between Volta Industries,

27   Inc., a private entity, and Tortoise Acquisition Corp. II ("Tortoise"), a special purpose acquisition

28   company ("SPAC") that had completed its initial public offering about a year before the Merger

*United States District Court*
*Northern District of California*

and whose shares were traded on the New York Stock Exchange ("NYSE") at the time of the Merger. *Id.* ¶¶ 60-61. Tortoise held an extraordinary general meeting on August 25, 2021, during which most of its shareholders voted to approve the Merger. *Id.* ¶ 77. The Merger was completed on August 26, 2021. *Id.* ¶ 2. After the Merger, the shares of the new combined entity, Volta, began trading on the NYSE. *Id.* ¶ 78.

Lead Plaintiff Steve Padget and additional plaintiffs Eric M. Walden and Jason Eckert ("Plaintiffs") bring this action, in which they assert, on their own behalf and on behalf of three proposed classes,[1] claims against Volta and several of its officers, as well as Tortoise and several of its officers and directors (collectively, "Defendants"), under (1) Sections 11 and 15 of the Securities Act; (2) Sections 14(a) and 20(a) of the Securities Exchange Act of 1934; and (3) Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and U.S. Securities and Exchange Commission Rule 10b-5. The claims are premised on dozens of statements made before and after the Merger, which Plaintiffs allege were false or misleading when made because Defendants "failed to disclose substantial flaws in [Volta's] business" and because Defendants "covered up" those flaws by "engaging in serious accounting violations and other financial improprieties" before and after the Merger. *Id.* ¶ 4. These allegedly undisclosed "flaws," "serious accounting violations," and "financial improprieties," which are described in more detail below, were allegedly part of Volta's "deep-seated culture of deception used to cover-up its poor financial performance." *See id.* ¶ 7.

The Section 11 claim, and the Section 15 claim (which is derivative of the Section 11 claim), are premised on allegedly false or misleading statements in the Registration Statement for

---

[1] Plaintiffs seek to represent (1) a proposed class of all persons who purchased or otherwise owned Volta securities pursuant to the Registration Statement for the Merger ("Securities Act Class"); (2) a proposed class of persons who purchased or owned Volta securities during the Class Period, which is between August 2, 2021, and November 14, 2022 ("Section 10(b) Class"); and (3) a proposed class of persons who owned Tortoise's common stock as of July 15, 2021, and were eligible to vote on the Merger at Tortoise's August 25, 2021, extraordinary general meeting ("Section 14(a) Class"). CAC ¶ 3.

United States District Court
Northern District of California

the Merger, which was filed with the SEC prior to the Merger.[2]  *See id.* ¶¶ 68, 258.  Plaintiffs assert the Section 11 claim against (1) Defendant Tortoise, the registrant for the offering in connection with the Merger; (2) various officers and directors of Tortoise who signed the Registration Statement on behalf of Tortoise (Defendants Vincent T. Cubbage, Tortoise's Chief Executive Officer ("CEO"); Stephen Pang, Tortoise's Chief Financial Officer ("CFO"); and Juan J. Daboub, Karin M. Leidel, and Sidney L. Tassin, members of Tortoise's board of directors); and (3) Defendant Volta and some of Volta's officers (Defendants Scott Mercer, Volta's CEO until April 15, 2022; Christopher Wendel, Volta's President until March 28, 2022; and Francois P. Chadwick, Volta's CFO until August 22, 2022), who allegedly prepared and disseminated the Registration Statement.  Plaintiffs assert the Section 15 derivative claim against the same defendants, except for Tortoise and Volta.

The Section 14(a) claim, and the derivative Section 20(a) claim, are premised on allegations that the Proxy Statements for the Merger, which were a part of the Registration Statement, *see id.* ¶¶ 70, 279-81, contained statements that colored the market's view of the Merger and encouraged Tortoise shareholders to vote in favor of it, *see id.* ¶ 279.  The statements that Plaintiffs challenge under Section 14(a) are the same statements in the Registration Statement that they challenge under Section 11.  *Id.* ¶ 281.  Plaintiffs assert the Section 14(a) claim against (1) Defendant Tortoise and some of its officers and directors (Defendants Cubbage, Pang, Daboub, Leidel, and Tassin); and (2) Defendant Volta and some of its officers (Defendants Mercer, Wendel, and Chadwick).  Plaintiffs assert the derivative Section 20(a) claim against the same defendants, except for Tortoise and Volta.

The Section 10(b) and Rule 10b-5 claim (hereinafter, the "Section 10(b) claim"), and the Section 20(a) derivative claim, arise out of (1) the same statements in the Registration Statement that Plaintiffs allege were false or misleading under Sections 11 and 14; and (2) statements made after the Merger in some of Volta's quarterly and annual reports, earnings calls and presentations,

---

[2] The Registration Statement was amended several times, on June 25, July 15, and July 29, 2021.  The final version was filed on July 29, 2021.  CAC ¶ 68.  Plaintiffs allege that each version contained the same false or misleading statements they challenge in this action.

United States District Court
Northern District of California

press releases, and other SEC filings.  *See id.* ¶¶ 383-84.  Plaintiffs assert the Section 10(b) claim against Defendant Volta and some of its officers (Defendants Mercer; Wendel; Chadwick; Brandt Hastings (Volta's interim CEO from April 15, 2022, to June 12, 2022, and Chief Commercial Officer of Volta since June 13, 2022); and Cubbage (CEO of Tortoise and Volta's Interim CEO since June 13, 2022)).  Plaintiffs assert the derivative Section 20(a) claim against the same defendants, except for Volta.

Plaintiffs allege that Volta's "serious accounting violations and other financial improprieties" began to be revealed on March 2, 2022, when Volta disclosed to investors that it had failed to properly account for the stock-based compensation it had granted as part of the Merger to Defendants Mercer and Wendel.  *Id.* ¶ 6.

Volta's alleged "improper practices" were further revealed when Defendants Mercer and Wendel "were fired from the Company" on March 28, 2022.[3]  *Id.* ¶¶ 5, 285.  "Volta's stock price fell 18% on this news alone."  *Id.* ¶ 5.  "But Defendants did not at that time disclose the Company's underlying problems, or even the true nature of Mercer and Wendel's departures."  *Id.* ¶ 5.  Volta allegedly falsely represented in a press release and a Form 8-K that Mercer and Wendel's departures had been amicable even though both were fired.  *See id.* ¶¶ 92-113.

Volta's stock price continued to decline as Volta missed its revenue projections and as the risks associated with the "improper practices" that Defendants allegedly failed to disclose to investors materialized.  Volta's valuation dropped so much that, on January 18, 2023, "Volta announced that it was being acquired by Shell in a deal that valued Volta at just $169 million—a mere fraction of the $1.4 billion that the Registration Statement valued Volta at—destroying well over $1.2 billion in shareholder value."  *Id.* ¶ 223.

Plaintiffs allegedly suffered damages "upon revelation of the alleged corrective disclosures or materialization of undisclosed risk."  *Id.* ¶ 30.

---

[3] Plaintiffs allege in paragraph 5 of the CAC that Wendel and Mercer's departures from Volta were announced on March 28, 2021.  Elsewhere in the CAC, Plaintiffs allege that the departures were announced on March 28, 2022.  *See e.g.*, CAC ¶¶ 38, 80.  March 28, 2022, appears to be the correct date based on the totality of the allegations in the CAC.

The following is an overview of Plaintiffs' allegations in connection with Volta's alleged "deep-seated culture of deception" and "improper accounting and financial practices."  *Id.* ¶¶ 4, 7.

### 1.      Unfounded pre-Merger projections to "impress" investors

Volta and Tortoise disclosed projections to investors in the Registration Statement for the Merger and in a pre-Merger investor presentation that Plaintiffs allege was incorporated by reference into the Registration Statement ("Investor Presentation").[4]  Those projections were for the number of charging stations that Volta expected to install after the Merger, through 2025, as well as for the revenue that Volta expected to generate after the Merger, also through 2025.  *See, e.g.*, *id.* ¶¶ 120, 219-25, 255-56.

The revenue projections were based on the projections for the number of charging stations that Volta expected to install.  *See id.*  This is because Volta's revenue depended on the number of charging stations in its network, given that Volta derived revenue from advertisements displayed on screens on its charging stations.  *Id.* ¶¶ 1, 123-24.  The number of charging stations impacted not only the number of screens on which Volta could display ads, but also the value of the ads to advertising customers.  *Id.* ¶¶ 123-24.  Accordingly, Volta used the number of charging stations in its network as a performance measure and for revenue forecasting purposes.

Plaintiffs allege, based on the alleged reports of confidential witnesses[5], that the

---

[4] Defendants dispute that this presentation was incorporated into the Registration Statement.  This issue is discussed in more detail in section V.A.1.f.ii. of this order.

[5] Plaintiffs allege the following identifying information with respect to each of the confidential witnesses ("CW") they mention in the CAC:

- CW1 was a Vice President of Media Sales at Volta "from several years before the SPAC Merger to the time in 2022 around when many other employees left the Company."  CAC ¶ 50.

- CW2 worked at Volta from May 2021 to December 2021 as an Enterprise Program Manager.  *Id.* ¶ 51.

- CW3 "worked at Volta from October 2018 to October 2022 and was Vice President of Enterprise Sales and Director of Charging Stations since early 2021."  *Id.* ¶ 52.

- CW4 was Volta's Controller from mid-2017 to early 2020.  *Id.* ¶ 53.

- CW5 "was Assistant Controller at Volta from January 2019 to June 2020."  *Id.* ¶ 54.

installation and revenue projections that Volta disclosed to investors prior to the Merger were unfounded or not realistic because the projections failed to take into account (1) the complicated regulatory approval process for installing stations, *id.* ¶ 125; (2) Volta's lack of financial capacity to install or manufacture the number of projected stations, *id.* ¶ 129; (3) the time it takes to negotiate with "large retailers," *id.* ¶¶ 130-32; and (4) competition from other companies, *see id.* CW1 allegedly stated that Volta's "pre-Merger guidance for its charging station projections was unrealistically ambitious," *id.* ¶ 137, and "noted that the number of stations that Volta stated it planned to install was deceptive" and was "knowingly inflated to impress the Street," *id.* ¶ 135.

Plaintiffs allege that, "[d]espite Volta's lofty statements, the Company utterly failed to meet its [pre-Merger] projections for the number of charging stations it would install." *Id.* ¶ 140. Without meeting its installation projections, Volta was unable to meet its revenue projections. This resulted in a steady decline in the price of Volta's stock over time and, ultimately, in its acquisition by Shell in January 2023 for a fraction of its pre-Merger value. *Id.* ¶¶ 141-47, 233.

### 2.    Premature revenue recognition to artificially inflate revenue

Volta allegedly recognized advertising revenue prematurely in violation of Generally Accepted Accounting Principles ("GAAP"), Accounting Standards Codifications ("ASC") 606, and it allegedly did so prior to the Merger and after the Merger, through the third quarter of 2021. *Id.* ¶¶ 176-215.  Volta represented to investors in the Registration Statement that it recognized ad revenue pursuant to ASC 606 "when promised goods or services are transferred to customers" and "when or as the Company satisfies a performance obligation."  *See id.* ¶ 236.  However, according to a confidential witness, CW1, Volta engaged in a practice whereby it would book

---

- CW6 "was a Senior Product manager who worked at Volta from August 2019 to April 2022." *Id.* ¶ 55.

- CW7 "was a Senior Director of Product Marketing at Volta from February 2019 to October 2022." *Id.* ¶ 56.

- CW8 was "Vice President of Data and Insights at Volta from April 2018 to September 2022." *Id.* ¶ 57.

- CW9 was "a General Manager of Media Sales for Volta in Hawaii from May 2018 to April 2021." *Id.* ¶ 58.

revenue in the current quarter for ads that had been purchased for delivery in the following quarter. *Id.* ¶¶ 176-215.  This would occur if the purchaser of the advertisement for the following quarter agreed to receive a free ad from Volta for the current quarter.  *See id.*  Plaintiffs aver that Defendants engaged in this practice "to make its revenues look larger than they actually were." *Id.* ¶ 14.  Plaintiffs do not specify the amount by which any of Volta's reported revenues were allegedly inflated or otherwise impacted by this alleged practice.

### 3. Delayed accounting of payments to site hosts to artificially inflate cash balances

Volta allegedly artificially inflated its cash balances by "shirking on its liabilities" to its site hosts (i.e., by delaying payments owed to site hosts) and delaying its accounting of those liabilities.  *See id.* ¶¶ 216-17, 394.  Volta's payment delays negatively impacted its relationships with site hosts or otherwise put the relationships at risk.  *See id.*  Volta allegedly failed to disclose any of this to investors.  *See id.*  Plaintiffs do not identify in the CAC any cash balances or liabilities that Volta reported to investors that they claim were rendered inaccurate as a result of this alleged practice or otherwise estimate the amounts by which any of Volta's reported liabilities or cash balances were impacted by this practice.

### 4. Failure to properly account for stock-based compensation granted to Mercer and Wendel

As part of the Merger, Volta granted stock-based compensation in the form of restricted stock units ("RSUs") to Mercer and Wendel.  *See id.* ¶¶ 358-59, 368-72.  The value of the RSUs are expenses to Volta and Volta was required to account for them as such.  *See id.*  Under GAAP, ASC 718, Volta had to account for a substantial portion of the cost of the RSUs by the end of the third quarter of 2021 given that the grant date for the RSUs was the date when the Merger closed, August 26, 2021.  *See id.*  Volta allegedly failed to do so.  In its quarterly report for the third quarter of 2021 of November 12, 2021, which was its first quarterly report as a public company, Volta erroneously stated that the grant date for the RSUs was November 8, 2021, instead of August 26, 2021.  *Id.*  Volta accounted for the cost of the RSUs based on the erroneous grant date of November 12, 2021, and, as a result, Volta reported lower net losses for the third quarter of

United States District Court
Northern District of California

1   2021 than it actually incurred for that quarter.  *See id.*  In other words, had Volta accounted for the

2   cost of the RSUs based on the correct grant date (August 26, 2021), its reported net losses for the

3   third quarter of 2021 would have been greater than what it reported for that quarter.

4   Plaintiffs allege that Volta *partially* corrected the error in a Form 8-K issued on February

5   25, 2022, which stated that Volta's Audit Committee had determined that the quarterly report for

6   the third quarter 2021 would need to be restated to provide that the correct grant date for the RSUs

7   was August 26, 2021.  *Id.* ¶¶ 344, 429.  The Form 8-K also stated that the "estimated financial

8   impact "of the RSU grant through the third quarter of 2021 was "approximately $26.7 million . . .

9   resulting in an approximate net loss for the three and nine months ended September 30, 2021 of

10  $14.6 million and $69.7 million, respectively."  *Id.* ¶¶ 344, 429.

11  However, the February 25, 2022, Form 8-K allegedly did not reveal the true financial

12  impact of the cost of the RSUs in question.  *Id.* ¶ 373.  On March 2, 2022, Volta issued a Form 8-

13  K/A in which it revealed that the cost of the RSUs to Volta through the third quarter of 2021 "was

14  greater than previously disclosed," and that the cost of the RSUs resulted in "an approximate net

15  loss for the three and nine months ended September 30, 2021 of $69.7 million and $155.5 million,

16  respectively."  CAC ¶ 347.  The net loss disclosed in the March 2, 2022, Form 8-K/A of "$69.7

17  million and 155.5 million" was much greater than the "$14.5 million and $69.7 million in net loss

18  for the three and nine months ended September 30, 2021, that Volta had initially disclosed on

19  February 25, 2022."  *Id.* ¶ 347.  Plaintiffs aver that "[t]his revision made a substantial difference in

20  Volta's performance, resulting in an added $55.2 million in net loss for the third quarter and an

21  added $85.8 million in net loss for the first nine months of 2021."  *Id.* ¶ 374.

22          **5.      Misrepresentation of Mercer and Wendel's departures from Volta as
                    voluntary and amicable**

24  On March 28, 2021, Volta announced Mercer and Wendel's departure from the company.

25  *Id.* ¶¶ 438-40.  A few weeks later, on April 18, 2022, Defendant Chadwick (Volta's then-CFO)

26  stated that, "[o]n March 28, 2022, Volta announced that the company's Chief Executive Officer,

27  Scott Mercer, and the company's President, Christopher Wendel, agreed to the resignation of each

28  as an officer and employee of the company.  Mr. Wendel's resignation was effective immediately,

United States District Court
Northern District of California

United States District Court
Northern District of California

1    while Mr. Mercer continued for a transition period, ending on the filing of the company's annual

2    report on Form 10-K for the fiscal year ended December 31, 2021 as filed on Friday 15th of April

3    2022.  Mr. Mercer will serve as an independent adviser to the company's Board of Directors

4    through March 31, 2023." *Id.* ¶ 453.

5        Based on the alleged statements of several confidential witnesses, Plaintiffs aver that

6    Wendel and Mercer's resignations were not "voluntary."  CW1 allegedly stated that Mercer and

7    Wendel's departures were "suspicious" because Mercer sent his farewell email between 4:00 a.m.

8    and 5:00 a.m. *Id.* ¶ 99.  Other confidential witnesses corroborated the early-morning email and

9    allegedly stated that they believed the email indicated that Wendel and Mercer had been fired.

10   *See, e.g.*, *id.* ¶¶ 101-10.  CW3 allegedly reported that, based on "a short conversation with

11   Wendel" in 2022, Wendel "implied this was an unfortunate set of series of events that 'I wish

12   would have ended differently.'"  *Id.* ¶ 110.  CW1 also allegedly reported that, a few weeks after

13   Mercer and Wendel's departure, Defendant Cubbage stated during a Zoom meeting that Mercer

14   and Wendel "are not able to execute and get the company to the next level," which CW1

15   interpreted as indicating that Mercer and Wendel "got kicked to the curb." *Id.* ¶ 101.  CW8

16   allegedly stated that he "believed that it was a Board decision to push Mercer out because they did

17   not have confidence in Mercer to move Volta forward following the SPAC merger." *Id.* ¶ 106.

18       A few months after Mercer and Wendel's departures, on June 10, 2022, Volta announced

19   that several other senior executives, namely Chadwick (Volta's CFO), Volta's Chief Technology

20   Officer, Volta's General Counsel, Volta's "Chief People Officer," and Volta's Chief

21   Administrative Officer, had also left Volta. *Id.* ¶¶ 103, 289.

22       **B.    Procedural History**

23       This consolidated action began as two separate actions: (1) *Kampe v. Volta*, No. 22-cv-

24   2055, which was filed on March 31, 2022; and (2) *Alvarez v. Volta*, No. 22-cv-02730-JST, which

25

26

27

28

9

1   was filed on May 6, 2022.  On November 25, 2022, the Court granted a motion to consolidate the

2   two actions brought by Lead Plaintiff Steve Padget.  ECF No. 59.

3        Plaintiffs thereafter filed the CAC.  ECF No. 64-1.  The present motion, which seeks the

4   dismissal of the CAC in its entirety, followed.  ECF No. 81.

5   ## II.   REQUEST FOR JUDICIAL NOTICE

6        Federal Rule of Evidence 201 permits a court to notice an adjudicative fact if it is "not

7   subject to reasonable dispute."  Fed. R. Evid. 201(b).  A fact is "not subject to reasonable dispute"

8   if it is "generally known," or "can be accurately and readily determined from sources whose

9   accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(1)-(2).  "Accordingly, '[a] court

10   may take judicial notice of matters of public record without converting a motion to dismiss into a

11   motion for summary judgment[,]" but a "court cannot take judicial notice of disputed facts

12   contained in such public records."  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th

13   Cir. 2018) (citation omitted).

14        Defendants request that the Court take judicial notice, or consider under the incorporation-

15   by-reference doctrine, twenty-nine documents, namely:

16       (1)  a copy of the final version of the Registration Statement, filed on July 29, 2021
17             (Exhibit 1), ECF No. 82-2;

18       (2)  a copy of Volta Inc.'s Form 8-K filed with the SEC on September 1, 2021 (Exhibit 2),
          ECF No. 82-3;

19
20       (3)  a copy of Volta Inc.'s Form 10-K filed with the SEC on April 15, 2022 (Exhibit 3),
          ECF No. 82-4;

21
22       (4)  a copy of a press release announcing Volta Inc.'s third quarter 2021 financial results,
          published on November 10, 2021 (Exhibit 4), ECF No. 82-5;

23       (5)  a copy of Volta Inc.'s Form 8-K filed with the SEC on March 31, 2022 (Exhibit 5),
24             ECF No. 82-6;

25       (6)  a copy of Volta Inc.'s Form 10-Q filed with the SEC on May 13, 2022 (Exhibit 6),
          ECF No. 82-7;

26       (7)  a copy of Volta Inc.'s Form 8-K filed with the SEC on May 13, 2022 (Exhibit 7),
27             ECF No. 82-8;

28       (8)  a copy of Volta Inc.'s Form 10-Q filed with the SEC on August 12, 2022 (Exhibit 8),
          ECF No. 82-9;

United States District Court
Northern District of California

(9)     a copy of Volta Inc.'s Form 8-K filed with the SEC on September 29, 2022 (Exhibit 9), ECF No. 82-10;

(10)   a copy of Volta Inc.'s Form 10-Q filed with the SEC on November 14, 2022 (Exhibit 10), ECF No. 82-11;

(11)   a copy of a transcript of Volta Inc.'s Q3 2022 earnings call held on November 14, 2022, and available from S&P Global (Exhibit 11), ECF No. 82-12;

(12)   a copy of Volta Inc.'s Form 10-Q/A Amendment No. 1 filed with the SEC on March 22, 2022 (Exhibit 12), ECF No. 82-13;

(13)   a copy of a transcript of Volta Inc.'s Q4 2021 earnings call held on April 18, 2022 and available from S&P Global (Exhibit 13), ECF No. 82-14;

(14)   a copy of an article published in the Wall Street Journal on July 16, 2022 (Exhibit 14), ECF No. 82-15;

(15)   a copy of Volta Inc.'s Form 8-K filed with the SEC on February 25, 2022 (Exhibit 15), ECF No. 82-16;

(16)   a copy of Volta Inc.'s Form 10-Q filed with the SEC on November 12, 2021 (Exhibit 16), ECF No. 82-17;

(17)   a chart representing Volta Inc.'s stock price between August 26, 2021, and January 27, 2023 (Exhibit 17), ECF No. 82-18;

(18)   a copy of an article published in the Wall Street Journal on November 10, 2022 (Exhibit 18), ECF No. 82-19;

(19)   a copy of Volta Inc.'s Form 8-K filed with the SEC on March 28, 2022 (Exhibit 19), ECF No. 82-20;

(20)   a copy of Volta Inc.'s Form 8-K filed with the SEC on June 10, 2022 (Exhibit 20), ECF No. 82-21;

(21)   a copy of Volta Inc.'s Form 8-K/A filed with the SEC on March 2, 2022 (Exhibit 21), ECF No. 82-22;

(22)   a copy of Volta Inc.'s Form 8-K filed with the SEC on February 14, 2022 (Exhibit 22), ECF No. 82-23;

(23)   a copy of Tortoise Acquisition Corp. II's Form 8-K filed with the SEC on February 8, 2021 (Exhibit 23), ECF No. 82-24;

(24)   a copy of Volta Inc.'s Form 8-K filed with the SEC on April 15, 2022 (Exhibit 24), ECF No. 82-25;

(25)   a copy of a transcript of Volta Inc.'s Q3 2021 earnings call held on November 10, 2021 and available from Bloomberg (Exhibit 25), ECF No. 82-26;

(26)  a copy of Volta Inc.'s Form 8-K filed with the SEC on August 11, 2022 (Exhibit 26), ECF No. 82-27;

(27)  a copy of Meta Platforms Inc.'s Form 8-K filed with the SEC on July 27, 2022 (Exhibit 27), ECF No. 82-28;

(28)  a copy of Snap Inc.'s Form 8-K filed with the SEC on July 21 2022, (Exhibit 28), ECF No. 82-29; and

(29)  a copy of Volta Inc.'s Form 8-K filed with the SEC on April 18, 2022, attaching as exhibit 99.1 a press release issued on April 15, 2022 (Exhibit 29), ECF No. 82-30.

*See* ECF No. 93.

Plaintiffs oppose the Court's consideration of the documents at issue for the truth of the matters asserted therein or to resolve factual disputes in a manner adverse to the allegations in the CAC. *See* ECF No. 94. Plaintiffs also oppose the Court's consideration of Exhibits 27 and 28, which are SEC filings that pertain to other companies that are not related to Volta, and Exhibits 14 and 18, which are news articles that do not discuss Volta. *See id.* at 13-14.

Because Plaintiffs do not dispute their authenticity and accuracy, the Court grants Defendants' request for judicial notice of Exhibits 1-13, 15-17, 19-26, and 29, which are: SEC filings pertaining to Volta and Tortoise; transcripts of calls with, or presentations to, analysts and investors; press releases; and historical price data for Volta's stock. It is routine for a Court to take judicial notice of those types of documents for the purpose of determining what information was available to the market. *See, e.g.*, *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008) (holding that the district court properly took judicial notice of publicly available financial documents and SEC filings); *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2009) (holding that courts "may take judicial notice of publications introduced to indicate what was in the public realm at the time, not whether the contents of those articles were in fact true") (citation and internal quotation marks omitted); *Wochos v. Tesla, Inc.*, No. 17-CV-05828-CRB, 2018 WL 4076437, at *2 (N.D. Cal. Aug. 27, 2018) (taking judicial notice of earnings call transcript "for the sole purpose of determining what representations [defendants] made to the market"); *In re Facebook, Inc. Sec. Litig.*, 405 F. Supp. 3d 809, 828 (N.D. Cal. 2019) (taking judicial notice of historical stock prices). The Court will

1    take judicial notice of the statements in these documents for the purpose of determining what

2    information was available to the market, but not for the truth of the matters asserted therein or for

3    the purpose of resolving factual disputes.  *See Khoja*, 899 F.3d at 999-1001.

4         The Court, however, declines to take judicial notice of Exhibits 27 and 28, which are SEC

5    filings of other companies not involved in this litigation, and Exhibits 14 and 18, which are news

6    articles that do not discuss Volta.  The Court finds that those documents, which are not referenced

7    in the CAC, are not relevant to the resolution of the present motion.  *See Pac. Gas & Elec. Co. v.*

8    *Lynch*, 216 F. Supp. 2d 1016, 1025 (N.D. Cal. 2002) ("A judicially noticed fact may not be subject

9    to reasonable dispute and must be relevant.").

10   **III.    JURISDICTION**

11        The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

12   **IV.    LEGAL STANDARD**

13        To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual

14   matter that, when accepted as true, states a claim that is plausible on its face.  *Ashcroft v. Iqbal*,

15   556 U.S. 662, 678 (2009).  "A claim has facial plausibility when the plaintiff pleads factual

16   content that allows the court to draw the reasonable inference that the defendant is liable for the

17   misconduct alleged."  *Id.*  While this standard is not a probability requirement, "[w]here a

18   complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the

19   line between possibility and plausibility of entitlement to relief."  *Id.* (internal quotation marks and

20   citation omitted).  In determining whether a plaintiff has met this plausibility standard, the Court

21   must "accept all factual allegations in the complaint as true and construe the pleadings in the light

22   most favorable" to the plaintiff.  *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).

23        A complaint that sounds in fraud must satisfy the requirements of Rule 9(b).  Rule 9(b)

24   provides that, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or

25   mistake shall be stated with particularity."  *See* Fed. R. Civ. P. 9(b).  "To comply with Rule 9(b),

26   allegations of fraud must be specific enough to give defendants notice of the particular misconduct

27   which is alleged to constitute the fraud charged so that they can defend against the charge and not

28   just deny that they have done anything wrong."  *Glazer Cap. Mgmt., L.P. v. Forescout Techs.,*

United States District Court
Northern District of California

13

*Inc.*, 63 F.4th 747, 765 (9th Cir. 2023) (citation and internal quotation marks omitted). "The complaint must specify such facts as the times, dates, places, benefits received, and other details of the alleged fraudulent activity." *Id.* (citation and internal quotation marks omitted).

"If a claim alleges securities fraud, the Private Securities Litigation Reform Act ('PSLRA'), 15 U.S.C. § 78u-4, also applies." *Khoja*, 899 F.3d at 1008.

## V.    DISCUSSION

### A.    Claims under Section 10(b) and Section 20(a) of the Exchange Act

Section 10(b) of the Securities Exchange Act of 1934 declares it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary." 15 U.S.C. § 78j(b). "SEC Rule 10b-5 implements [Section 10(b)] by making it unlawful to . . . 'make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011) (quoting 17 C.F.R. § 240.10b–5). "Thus, to prevail on a claim for violations of either Section 10(b) or Rule 10b-5, a plaintiff must prove six elements: (1) a material misrepresentation or omission by the defendant [falsity]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1051-52 (9th Cir. 2014) (citation and internal quotation marks omitted). "Rule 9(b) applies to all elements of a securities fraud action, including loss causation." *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014).

Under Section 20(a) of the Exchange Act, "a defendant employee of a corporation who has violated the securities laws will be jointly and severally liable to the plaintiff, as long as the plaintiff demonstrates 'a primary violation of federal securities law' and that 'the defendant exercised actual power or control over the primary violator.'" *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 623 (9th Cir. 2017) (citation omitted).

1    A claim under Section 20(a) fails if the plaintiff does not plead a primary violation of federal

2    securities law.  *See id.*

3        As noted, Plaintiffs assert a claim under Section 10(b) and a derivative claim under Section

4    20(a) premised on allegedly false or misleading statements made in the Registration Statement for

5    the Merger, and made after the Merger in Volta's SEC filings, press releases, investor

6    presentations, and earnings calls.  CAC ¶¶ 521-538.

7        Defendants move to dismiss the Section 10(b) claim and derivative Section 20(a) claim,

8    arguing that Plaintiffs have not pleaded facts to support the elements of falsity, scienter, and loss

9    causation.

10                    **1.        Material Misrepresentation or Omission (Falsity)**

11        The first element of a claim under Section 10(b) and Rule 10b-5 requires a plaintiff to

12    show that the defendant made a statement that was false or misleading as to a material fact.  *Basic*

13    *Inc. v. Levinson*, 485 U.S. 224, 238 (1988).  This requires, in relevant part, "specify[ing] each

14    statement alleged to have been misleading [and] the reason or reasons why the statement is

15    misleading[.]"  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 321 (2007) (quoting 15

16    U.S.C. § 78u–4(b)(1)).  "In setting forth the reasons why they contend that each challenged

17    statement is misleading, securities plaintiffs may rely on either an affirmative misrepresentation

18    theory or an omission theory."  *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1188 (9th Cir. 2021)

19    (citation omitted).  "[A]n affirmative misrepresentation is an 'untrue statement of a material fact,'

20    and a fraudulent omission is a failure to 'state a material fact necessary in order to make the

21    statements made, in the light of the circumstances under which they were made, not misleading.'"

22    *Id.* (citation omitted).

23        "Falsity is alleged when a plaintiff points to defendant's statements that directly contradict

24    what the defendant knew at that time."  *Khoja*, 899 F.3d at 1008 (citation omitted).  "Even if a

25    statement is not false, it may be misleading if it omits material information."  *Id.* at 1008-09

26    (citation omitted).  Information is material if "a reasonable investor would have acted differently if

27    the misrepresentation had not been made or the truth had been disclosed."  *Livid Holdings Ltd. v.*

28    *Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005).  "[T]o be actionable under the

United States District Court
Northern District of California

15

1    securities laws, an omission must be misleading . . . it must affirmatively create an impression of a

2    state of affairs that differs in a material way from the one that actually exists." *Police Ret. Sys. of*

3    *St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014) (citation and internal

4    quotation marks omitted).  "Disclosure [of omitted information] is required . . . only when

5    necessary 'to make . . . statements made, in the light of the circumstances under which they were

6    made, not misleading.'"  *Matrixx Initiatives*, 563 U.S. at 44 (quoting 17 C.F.R. § 240.10b-5(b)).

    a.    **Whether Plaintiffs have alleged materially false or misleading**
7          **statements based on Volta's failure to disclose premature**
8          **revenue recognition accounting violations**

9         Plaintiffs allege that dozens of statements were false or misleading because Defendants

10   failed to disclose that Volta recognized advertising revenue prematurely in violation of GAAP

11   ASC 606 while giving the impression that it was complying with ASC 606.  Volta stated in the

12   Registration Statement that it recognized revenue pursuant to ASC 606 and that it did so "when

13   promised goods or services are transferred to customers" and "when or as the Company satisfies a

14   performance obligation."  CAC ¶ 236.  Volta allegedly failed to comply with ASC 606 because it

15   recognized revenue in the current quarter for ads that had been purchased for delivery in the next

16   quarter.  *See id.* ¶¶ 176-87.  This practice allegedly began at least two years before the Merger and

17   lasted through the third quarter of 2021, until "around October 2021."  *Id.* ¶ 181.  Plaintiffs aver

18   that Volta engaged in this practice "to make its revenues look larger than they actually were."  *See*

19   *id.* ¶ 14.

20        Defendants move to dismiss Plaintiffs' Section 10(b) claim and derivative Section 20(a)

21   claim to the extent that they are premised certain statements that Plaintiffs allege were false or

22   misleading because of Volta's alleged undisclosed practice of recognizing ad revenue prematurely

23   in violation of ASC 606.  ECF No. 81 at 18.  The statements at issue (hereinafter, "challenged

24   revenue recognition statements")[6] include:

25   _____

26   [6] The challenged revenue recognition statements are Statements 4-10, 20, 21, 22, 24, 25, 26-32,
     35-37, 42-50, 53-58, 65, 67-69, 70, and 71-75 in Exhibit A to Defendants' motion, ECF No. 82-1.
27   Those statements can be found in the following paragraphs of the CAC: 230-32, 234-37, 256, 386,
     388-90, 395-98, 401-05, 411-13, 423-24, 426-27, 429, 431, 433, 435, 436, 442-43, 445, 447, 449-
28   50, 463, 467, 469-70, 471, 473, 475, 477-79, and 481.

United States District Court
Northern District of California

- Registration Statement: "Behavior and Commerce revenue increased by $2.4 million, or 212%, from March 31, 2020 to March 31, 2021, primarily due to large sales of media campaigns with several national brands in the three months ended March 31, 2021." CAC ¶ 234.

- Form 8-K of September 1, 2021: "Behavior and Commerce revenue increased by $5.6 million, or 677%, from June 30, 2020 to June 30, 2021, primarily due to large sales of media campaigns with several national brands in the three months ended June 30, 2021." CAC ¶ 390.

- Press Release (November 10, 2021): "Revenue grew 77% YoY to $8.5 million, compared to $4.8 million in the prior-year period, largely attributable to strong growth within Behavior and Commerce. Behavior and Commerce revenue grew to $7.4 million from $2.2 million in the prior-year period, primarily due to increased sales of media." CAC ¶ 396.

- Press Release (May 13, 2022): "We made continued progress against our strategy with total revenue growing 77%, media revenue up 73%, and total installed stalls growing 39% year-over-year . . .'" CAC ¶ 471.

Defendants contend that Plaintiffs have not plausibly pleaded that the challenged revenue recognition statements were false or misleading for failure to disclose Volta's alleged practice of recognizing ad revenue prematurely, because Plaintiffs have not averred facts specifying the amount by which Volta's revenue was overstated at any point as a result of the alleged practice, or facts describing the details of transactions that were impacted by the alleged practice. ECF No. 81 at 18; ECF No. 95 at 21. Defendants contend that Plaintiffs' averments regarding the alleged practice are insufficient for the additional reason that they are based on the alleged statements of CW1, "who was not a senior executive and admittedly had no involvement in Volta's accounting," and CW4, who left Volta about a year before the first of the statements at issue was made. ECF No. 81 at 20-21.

Plaintiffs respond that the challenged revenue recognition statements were false or misleading when made for two reasons: (1) because the revenues reported or discussed therein were inflated, as they were based on ad revenue that was recognized prematurely in violation of GAAP ASC 606; and (2) because "Volta's premature booking of ad revenue through Q3 2021 was also improper because it was the digital equivalent of 'channel stuffing,'" and "[m]aterial undisclosed channel stuffing may cause reported results to be misleading[.]" ECF No. 93 at 20. Plaintiffs contend that they have alleged sufficient facts in the CAC to raise the inference that the challenged revenue recognition statements were false or misleading under both theories.

United States District Court
Northern District of California

1    The Court first turns to the question of whether Plaintiffs have plausibly alleged that the

2    challenged revenue recognition statements were false or misleading because the revenues reported

3    or discussed therein were inflated as a result of premature ad revenue recognition in violation of

4    GAAP ASC 606.

5    Both parties cite *In re Daou Sys.*, 411 F.3d 1006 (9th Cir. 2005*), abrogated in part on*

6    *other grounds as recognized by Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747,

7    766 (9th Cir. 2023), as setting forth the standards for pleading an accounting fraud claim based on

8    violations of GAAP.  *See* ECF No. 93 at 21; ECF No. 95 at 10.  The Court agrees that *Daou* is

9    instructive.  There, the Ninth Circuit held:

10   > If properly pled, overstating of revenues may state a claim for
     > securities fraud, as under GAAP, revenue must be earned before it
11   > can be recognized.  To properly state a claim for accounting fraud,
     > plaintiffs must plead facts sufficient to support a conclusion that
12   > defendant prepared the fraudulent financial statements and that the
     > alleged financial fraud was material. . . .
13
     > When pleading irregularities in revenue recognition, plaintiffs
14   > should allege (1) such basic details as the approximate amount by
     > which revenues and earnings were overstated; (2) the products
15   > involved in the contingent transaction; (3) the dates of any of the
     > transactions; or (4) the identities of any of the customers or
16   > [company] employees involved in the transactions.  Plaintiffs need
     > not allege each of those particular details, but they must allege
17   > enough information so that a court can discern whether the alleged
     > GAAP violations were minor or technical in nature, or whether
18   > they constituted widespread and significant inflation of revenue.

19   *See id.* at 1016-17 (internal citation, quotation marks, and alterations omitted, cleaned up).

20   The plaintiffs in *In re Daou* asserted a claim for accounting fraud under Section 10(b)

21   based on allegations that the defendants recognized revenue before it was earned in violation of

22   GAAP, and that the practice rendered their reported revenues false or misleading.  *Id.* at 1017.

23   The Ninth Circuit held that the plaintiffs had alleged sufficient facts to raise the inference that

24   GAAP violations had occurred and that they had materially impacted the company's financial

25   statements.  They included allegations showing "the approximate amount by which revenues and

26   earnings were overstated" and "the dates of some of the related transactions and the identities of

27   the customers and the company employees involved in the transactions."  *See id.* at 1019.  The

28   plaintiffs also alleged at least one example of "defendants recognizing revenue before a contract

was even signed" and they specified how that example of premature revenue recognition "affected [the company's] financial bottom line[.]"  *See id.* (noting that the plaintiffs had alleged that, in the absence of the alleged GAAP violations, "revenue for 3Q97 would have been only $5.9 million, 48% less than publicly reported ($11.3 million)").  The Ninth Circuit held that those allegations were sufficient to plausibly allege irregularities in revenue recognition and that such irregularities were material because the allegations indicated that the revenue recognition practices "occurred systematically throughout the class period" and that they resulted in the premature recognition of "millions of dollars in revenue."  *Id.* at 1020.  The allegations thus "provided enough information for a court [to] discern whether the alleged GAAP violations were minor or technical in nature, or whether they constituted widespread and significant inflation of revenue."  *Id.* (citation and internal quotation marks omitted).

Here, Plaintiffs have not alleged facts to permit the Court to discern whether the alleged revenue recognition violations were "minor or technical in nature" and thus not material, or whether the alleged revenue recognition violations "constituted widespread and significant inflation of revenue" and were thus material and actionable.  *See id.*  Plaintiffs have not averred *any* of types of facts the Ninth Circuit in *In re Daou* held "should" be alleged when pleading irregularities in revenue recognition, *see* 411 F.3d at 1016-17, such as facts that would allow this Court to infer the approximate amount by which revenues and earnings were overstated (or inflated) as a result of the alleged premature revenue recognition; details of the transactions for which Volta allegedly recognized ad revenue prematurely; or the identifies of customers that were involved in the transactions.  *See generally* CAC.

Plaintiffs' averments regarding Volta's alleged practice of recognizing ad revenue prematurely are based primarily on the alleged statements of CW1, "a Vice President of Media Sales at Volta from several years before the SPAC Merger to the time in 2022 around when many other employees left the Company."  *See* CAC ¶¶ 176-87, 194-211.  Plaintiffs allege:

> CW1 explained that *if* Volta was short on its projected revenue
> goal toward the end of a quarter, the Sales team was told to
> approach their advertisers who had already committed to running
> ads in the subsequent quarter, to see if the ads could be run in the
> current quarter so that Volta could book the revenue for those ads

United States District Court
Northern District of California

> in the current quarter.  The Sales team was told to incentivize the advertisers to run ads when the advertisers did not plan to or want to by giving them bonus ads for free.  The advertisers did not have to pay for the ads until the later quarter in which they actually wanted their ads to run.  *Advertisers generally agreed to this* because it was free extra advertising for them in the earlier, intervening quarter.  *They would only not agree if their ads were not ready yet in the earlier quarter or if the ads were tailored to the later time such as for a seasonal promotion.*  The Media Sales team was given this instruction in meetings by the EVP of Sales that the witness reported to and who reported to Mercer and Wendel.  The witness stated, "To me, that's not honest."

CAC ¶ 177 (emphasis added).  CW1 did not identify any advertisers who received free ads pursuant to this practice, or revenue amounts that were affected by the practice.

The Court cannot reasonably infer, based on CW1's alleged statements, that premature revenue recognition occurred at Volta on a company-wide basis or that it had a material impact on Volta's reported revenues.  First, CW1 was one of four regional sales managers at Volta.  *See* CAC ¶ 7.  Plaintiffs do not identify the region that CW1 managed.  They also do not aver any facts that would permit the Court to infer the actual or potential impact of ad sales in CW1's region relative to Volta's total ad revenues or revenues generally.  Accordingly, the Court cannot reasonably infer that the sales practices CW1 allegedly observed in his region had a material impact on Volta's reported revenues, or that the sales practices in that region were representative of what occurred in the other three regions.

Second, as shown in italics in the excerpted portion of the CAC, above, CW1's alleged statements suggest that free ads were run in the current quarter to facilitate premature revenue recognition *if* Volta was "short" on its projected revenue for a quarter *and* advertisers that had purchased ads for a later quarter *agreed* to permit Volta to run free ads for them in an earlier quarter.  CW1 allegedly stated that advertisers sometimes would not agree to allow Volta to run ads earlier.  *See* CAC ¶ 177.  That suggests that the alleged practice did not impact every ad sale in the region that CW1 managed.  Plaintiffs do not aver what percentage of the sales in CW1's region were impacted by the alleged sales practice or how impacted sales in CW1's region affected Volta's overall revenue.  Without that information, the CAC does not raise the inference that the alleged sales practice had a material impact on Volta's reported revenues at any point in time.

Third, CW1 allegedly worked in sales.  Plaintiffs do not allege that CW1 performed an

20

1    accounting function or aver any facts that would permit the Court to reasonably infer that CW1

2    was in a position to have reliable information about Volta's accounting practices and, specifically,

3    about whether Volta recognized revenue for ads prematurely in violation of ASC 606.[7]  *See Zucco*

4    *Partners, LLC v. Digimarc Corp*., 552 F.3d 981, 996 (9th Cir. 2009), *as amended* (Feb. 10, 2009)

5    (finding that an employee who worked in human resources was not positioned to have reliable

6    information about the finance department's workings).

7           Plaintiffs also rely on CW4, "Volta's former Controller" who "reported to Volta's CFO

8    and Wendel, and had contact with Mercer and Wendel and the Board[.]"  CAC ¶¶ 13, 183-84.

9    CW 4 allegedly "stated that he or she saw shady accounting practices at Volta, such as how the

10   Company would handle revenue recognition.  The witness observed, "'[i]f you recognize revenue

11   too soon,' that is when there are problems."  *Id.* ¶ 183.  "This witness stated that employees

12   referred to the improper accounting practices of Volta's senior executives as 'Wendelian math

13   [referencing Defendant Wendel]: take our numbers and add some extra ingredients' and 'creative

14   accounting.'"  *Id.* ¶ 17.

15          CW4's alleged statements also do not raise the inference that Volta recognized ad revenue

16   prematurely in violation of ASC 606.  First, CW4's alleged descriptions of the "shady" accounting

17   practices he observed at Volta are too bare and conclusory to raise the inference that premature

18   revenue recognition in violation of ASC 606 occurred at the company, with respect to ads or

19   otherwise.  CW's alleged statements are not accompanied by any specifics as to the alleged

20   practices or the revenue that was impacted by them.  Second, CW4's only alleged statement about

21   *premature* revenue recognition is worded as a hypothetical and thus cannot support a reasonable

22   inference that Volta engaged in early revenue recognition.  *See id.* ¶ 183 (CW allegedly stating

23   that, "'[i]f you recognize revenue too soon,' that is when there are problems.").  Third, CW4

24   allegedly left the company in early 2020.  *See id.* ¶ 53.  The reported revenues that Plaintiffs

25

─────────────────────

26   [7] CW1 allegedly stated that, while he or she was not an accountant, unidentified "employees
     talked about order matching when recording revenue, in terms of what Volta actually sold and
27   delivered, and 'we didn't do that – and I think it was a bit more creative.'"  CAC ¶ 180.  Those
     allegations are too vague to raise the reasonable inference that CW1 had reliable information about
28   Volta's accounting practices.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  challenge as false or misleading based on the alleged ASC 606 violations were disseminated

2  starting in May 2021.  The CAC lacks allegations that raise the inference that the "shady"

3  accounting practices that CW4 observed prior to his departure from the company in early 2020

4  could have materially impacted the revenues that the company reported or discussed in the

5  challenged statements more than a year later.  *See Zucco*, 552 F.3d at 996 (finding that

6  confidential witnesses who did not work at the company during the class period were not

7  positioned to have reliable information about the company's accounting practices during that time

8  period).

9        Plaintiffs argue that CW4's statements corroborate those of CW1 and support a reasonable

10  inference that premature revenue recognition for ads occurred at Volta and rendered the

11  challenged revenue recognition statements false or misleading.  ECF No. 93 at 11.  The Court is

12  not persuaded.  As discussed above, CW1's alleged statements were about Volta's *sales* practices

13  for ads in one of Volta's four sales regions.  CW4 did not connect the "shady" *accounting*

14  practices he allegedly observed to Volta's sales practices for ads.

15        In light of the above, the Court finds that Plaintiffs have not plausibly alleged that the

16  challenged revenue recognition statements were materially false or misleading on the basis that

17  Volta engaged in premature ad-revenue recognition in violation of ASC 606 and failed to disclose

18  it.  Plaintiffs' theory of falsity in connection with Volta's alleged premature revenue recognition

19  amounts to nothing more than a "general allegation that the practices at issue resulted in a false

20  report of company earnings," which is not sufficient to state a claim for accounting fraud.  *See In*

21  *re Daou*, 411 F.3d at 1016-17.

22        Plaintiffs have not pointed to any authority that compels a different conclusion.  The

23  authorities that Plaintiffs rely upon for the proposition that they have stated a claim for accounting

24  fraud based on Volta's alleged practice of premature revenue recognition are distinguishable.[8]

25  _____

26  [8] In *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1010 (N.D. Cal. 2020), the plaintiffs alleged
that the defendant admitted in disclosures to investors that it had committed accounting violations

27  with respect to revenue recognition and that the company would need to issue restatements to
correct (and lower) the company's previously-reported revenues as a result of the accounting

28  violations.  Similarly, in *In re Connetics Corp. Sec. Litig.*, No. C 07-02940 SI, 2008 WL 3842938,

The Court now turns to the question of whether Plaintiffs have plausibly alleged that the challenged revenue recognition statements were false or misleading on the ground that "Volta's premature booking of ad revenue through Q3 2021 . . . was the digital equivalent of 'channel stuffing,'" and "[m]aterial undisclosed channel stuffing may cause reported results to be misleading," ECF No. 93 at 20.  Plaintiffs argue that the challenged statements were false or misleading because they led investors to mistakenly believe that Volta's reported revenues and revenue growth were the result of the strength of its advertising business when, in reality, the revenues discussed in the challenged statements were the result of the undisclosed alleged practice of booking ad revenue prematurely by giving away free ads.  *See id.* at 22.  Plaintiffs rely heavily

---

at *10 (N.D. Cal. Aug. 14, 2008), there was "no dispute between the parties that defendants' financial statements were misstated" as a result of accounting errors caused by alleged channel stuffing and, accordingly, "only scienter" was "at issue."  Here, Plaintiffs do not allege that Volta ever admitted accounting errors related to revenue recognition, either in revenue restatements or otherwise.

In *Pub. Employees' Ret. Sys. of Mississippi v. Mohawk Indus.*, Inc., 564 F. Supp. 3d 1272, 1299 (N.D. Ga. 2021), the plaintiff alleged "in detail the means by which the [the improper revenue recognition scheme] was purportedly implemented, enforced, and concealed," including details about the customers and products (including the amount of products) affected by the scheme, and the plaintiff also alleged facts showing that the defendant's own executives "confirmed the [scheme's] materiality[.]"  *See id.* at 1298-99.  Here, as discussed above, Plaintiffs have not alleged facts about the customers affected by the alleged premature revenue recognition practice or allege facts that raise the inference that the practice had a material impact on Volta's revenues at any time.

In *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 769-70 (9th Cir. 2023), the Ninth Circuit found that the plaintiffs had plausibly alleged that the defendant's statements were misleading for failure to disclose that it "had a widespread practice of classifying illusory deals as 'committed' and including these deals in their forecasts."  The plaintiffs' allegations included facts indicating the degree to which the defendant's revenue forecasts had been impacted by the alleged "illusory" deals.  *See id.* (noting that plaintiffs had alleged that approximately "one out of every five deals in the global sales pipeline was miscategorized as 'committed' and one out of every three seven-or eight-figure deals was miscategorized as 'committed'").  Here, as discussed above, Plaintiffs aver no facts that suggest that any premature revenue recognition at Volta had a material impact on the company's revenues at any point.

In *In re Vocera Commc'ns, Inc. Sec. Litig.*, No. C-13-3567 EMC, 2015 WL 603208, at *1 (N.D. Cal. Feb. 11, 2015), the court denied a motion to dismiss a Section 10(b) claim premised on an alleged scheme to artificially inflate sales revenues.  This opinion is not helpful because the denial was based on "the reasons stated on the record" during a hearing on the motion; those reasons are not set forth in full in the opinion that Plaintiffs cite.  *See id.*

on *In re Plantronics, Inc. Sec. Litig.*, No. 19-CV-07481-JST, 2022 WL 3653333 (N.D. Cal. Aug. 17, 2022) (Tigar, J.) for the proposition that they have adequately alleged that the challenged statements were false or misleading on that basis.

In *Plantronics*, this Court explained that:

> "[C]hannel stuffing is the oversupply of distributors in one quarter to artificially inflate sales, which will then drop in the next quarter as the distributors no longer make orders while they deplete their excess supply." *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th Cir. 1998). The Supreme Court has recognized that channel stuffing may be of "the illegitimate kind (e.g., writing orders for products customers had not requested) or the legitimate kind (e.g., offering customers discounts as an incentive to buy)." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 325 (2007). Channel stuffing of "the illegitimate kind" involves recognizing sales in a manner that typically results in improper revenue recognition or inaccurate financial reporting. . . . Accordingly, a plaintiff asserting a securities fraud claim premised on illicit channel stuffing typically is required to support it with facts identifying the specific transactions that gave rise to improper revenue recognition or inaccurate financial reporting.

*See id.* at *7. The Court found that the Section 10(b) claim in that case was *not* premised on "illicit" or "illegitimate" channel stuffing because the claim was not based on allegations of improper revenue recognition or inaccurate financial reporting. *See id.* at *7-8. The claim was based, instead, on allegations that the defendants' statements about positive revenue results and organic revenue growth were misleading because they were based on an undisclosed sales practice that resulted in excess sales to distributors that "were proper from an accounting standpoint" but were unsustainable. *See id.* at *8. The practice involved offering discounts to distributors so that they would purchase more product than they would normally purchase. *See id.* The practice was allegedly unsustainable in the long term because it led distributors to accumulate more inventory than they could sell to end users and that accumulation would impact their willingness or ability to purchase additional product in the future. *See id.* at *1-3. The Court found that the plaintiffs' allegations raised the inference that the defendants' failure to disclose the practice rendered certain of their statements about positive revenue results and organic revenue growth misleading because the plaintiffs adequately alleged that the practice had had a material impact on the revenue results that the defendants touted. *See id.* at *10-12.

United States District Court
Northern District of California

Plaintiffs' reliance on *Plantronics* is misplaced for two reasons.  First, Plaintiffs allege that the alleged channel stuffing that occurred at Volta was of the "illegitimate" kind because it involved giving advertising customers free ads that they "not requested or wanted" so that Volta could engage in improper revenue recognition.[9]  ECF No. 93 at 20 (arguing that "illegitimate" channel stuffing occurred at Volta because "Volta simply gave free ads that the 'customers had not requested or wanted'" to "boost revenue in the earlier quarter").  That distinguishes the Section 10(b) claim here from that in *Plantronics*, where the alleged sales practice at issue did *not* involve improper revenue recognition or other accounting improprieties.  As the Court held in *Plantronics*, a plaintiff asserting a Section 10(b) claim premised on channel stuffing involving improper revenue recognition or other accounting improprieties is required to support it with facts identifying specific transactions that were impacted by the practice.  *See id.* at *7.  Plaintiffs have not done so here, as discussed above.

Second, in *Plantronics*, the plaintiffs alleged sufficient facts to raise the inference that the undisclosed sales practice was company-wide and resulted in the material artificial inflation of the defendants' reported revenues during the class period.  *See id.* at *11-12 (discussing allegations supporting the inference that the undisclosed sales practice was company-wide and caused channel inventory accumulation of $65 million during the class period and that the accumulation had a material impact on the company's reported revenues).  Here, for the reasons discussed above, Plaintiffs have not averred facts that raise the inference that Volta's alleged practice of giving away free ads to recognize ad revenue prematurely was company-wide or that it had a material impact on any of the company's reported revenues.

Accordingly, the Court finds that Plaintiffs have not plausibly alleged that the challenged revenue recognition statements were false or misleading because of Volta's failure to disclose its alleged sales practice of giving away free ads to recognize ad revenue prematurely.

---

[9] Plaintiffs' description of the sales practice in their opposition is inconsistent with how the practice is described in the CAC.  As discussed above, CW1 allegedly described the practice as involving giving free ads to customers in the current quarter only when the customers *agreed* to receive them.  *See* CAC ¶ 177 (alleging that "[a]dvertisers generally *agreed* to this because it was free extra advertising for them in the earlier, intervening quarter") (emphasis added).

Because Plaintiffs have not plausibly averred that the challenged revenue recognition statements were false or misleading based on either of the two theories they advance, Plaintiffs' Section 10(b) claim and derivative Section 20(a) claim are dismissed, with leave to amend, to the extent that they are premised on allegations that those statements were false or misleading based on the theories and allegations discussed above.

**b.**   **Whether Plaintiffs have alleged materially false or misleading statements based on Volta's failure to disclose its alleged payment delinquencies to site hosts**

Plaintiffs allege that dozens of statements that Defendants made before and after the Merger were misleading because Defendants allegedly failed to disclose that "Volta routinely did not pay its contractual obligations" to site hosts on time.  *See, e.g.*, CAC ¶¶ 225-26.  Plaintiffs aver that Volta delayed its payments to site hosts because this "allowed it to delay accounting for its liabilities and to keep cash on hand[.]"  *See id.*  Relying on the alleged statements of CW3, CW4, CW5, and CW6, Plaintiffs allege that "Volta did not tell investors that its payments owed to its key site owners [i.e., site hosts] were long overdue and led to contentious discussions with the site owners that put Volta's relationships with the site owners at risk.  The Company was behind on these contracts specifically because its senior executives wanted to make the Company's cash balance look better."  *Id.* ¶¶ 216-28.

Defendants move to dismiss Plaintiffs' Section 10(b) claim and derivative Section 20(a) claim to the extent that they are premised on statements that Plaintiffs allege were false or misleading because of Volta's alleged undisclosed failure to timely "pay its contractual obligations" to site hosts to make its "cash balance look better."  ECF No. 81 at 31.  The statements at issue (hereinafter, "challenged contractual obligation statements") include the following[10]:

- Registration Statement: "Volta is focused on establishing and maintaining strong long-term relationships with real estate and retail partners and site hosts with national and regional multisite

---

[10] The challenged contractual obligation statements are Statements 1, 11-15, 18-20, 23, 28-32, 44-45, 60, 71, 75 in Exhibit A, ECF No. 82-1, which can be found in paragraphs 225, 239-245, 251-53, 256, 392-93, 401-05, 426-27, 455, 473, 481 of the CAC.

United States District Court
Northern District of California

portfolios of commercial properties to build out its charging network." CAC ¶ 251.

- Form 8-K (September 1, 2021): setting forth Volta's "liabilities for operating leases," which included "noncancellable operating leases, primarily for office space and the use of spaces for the installation of its electric vehicle charging stations ('site leases')." CAC ¶ 392.

- November 10, 2021, earnings call during which Wendel stated "We view this flywheel of providing value to consumers, property partners and advertisers as positioning as well to monetize our network on day one, create a deeper connection with the community and increase the total value of our network." CAC ¶ 402.

- April 18, 2022, earnings call: Defendant Brandt Hastings, the Interim CEO replacing Mercer, stated: "Our partners keep coming back to us because they see the impact that Volta Charging has on their properties over time." CAC ¶ 455.

Defendants contend that Plaintiffs' allegations fail to raise the inference that Volta failed to pay its contractual obligations to site hosts on time, as they do not allege any details as to any amounts that Volta allegedly failed to pay on time, or to whom those amounts were owed, or when, or why. ECF No. 81 at 29-30. Defendants also argue that, even if Plaintiffs had plausibly alleged that Volta failed to pay contractual obligations to site hosts on time, Plaintiffs have not averred facts to show that any such delayed payments had a material impact on Volta's reported cash balances, liabilities, or financial statements generally. Defendants contend that Plaintiffs do not allege that any of the cash balances or liabilities that Volta reported were inaccurate, which indicates that nothing was hidden from investors that needed to be disclosed.[11] ECF No. 95 at 17-19.

Plaintiffs respond that the challenged contractual obligation statements were misleading because they "gave the false impression that Volta's relationship with site hosts was a positive part of its business and there was nothing misleading about Volta's stated liabilities or operating expenses." ECF No. 93 at 25. Plaintiffs argue that,"[i]n reality, Volta was long overdue on these

---

[11] Defendants also argue that some of the challenged contractual obligation statements, namely Statements 1(a), 11, 14, 15, 18, 19, 28-32, and 60, are not actionable because they are "vague, optimistic statements" or "puffery." ECF No. 81 at 32. The Court need not reach that question at this time because the Court will dismiss the Section 10(b) and Section 20(a) claims to the extent that they are premised on these statements for the other reasons that Defendants advance, as discussed below.

liabilities to make its cash balance look better, putting such a strain on its relationships that property owners sent Volta to collections and Brookfield [a site host] cut back its dealings with Volta." *See id.* Plaintiffs contend that "it was misleading to promote Volta's strong relationship with site hosts when those relationships were severely strained by substantial overdue debts." *Id.* at 27.

After carefully reviewing the CAC, the Court finds that Plaintiffs have failed to plausibly allege that the challenged contractual obligation statements are misleading on the ground that they advance.

Plaintiffs allege that "Volta routinely did not pay its contractual obligations on time, which allowed it to *delay accounting for its liabilities* and to keep cash on hand, but soured relationships with larger customers[.]" *See, e.g.*, CAC ¶¶ 225-26 (emphasis added). Plaintiffs further allege that "Volta's executives allowed it to become delinquent in its payments to important business partners in order *to make the Company's cash balances appear much larger than they actually were*, at the risk of losing substantial business with Volta's key site hosts." *Id.* ¶ 12, 216-18 (emphasis added). Those allegations are not plausible.

First, the allegations imply that Volta's "delay" in accounting for its liabilities to site hosts to make its "cash balances appear much larger than they actually were" resulted in *inaccurate* reported cash balances or liabilities. However, as Defendants point out, Plaintiffs do not identify any reported cash balances or liabilities that were allegedly inaccurate. Plaintiffs do not explain, either in the CAC or in their opposition, how it could be possible for Volta's reported cash balances to have been artificially inflated for the purpose of making the cash balances appear "much larger than they actually were" if the lease liabilities and cash balances that Volta reported to investors were both accurate.

Second, Plaintiffs allegations do not raise the inference that there was a "delay" in "accounting" for lease liabilities to site hosts. As Defendants point out, Plaintiffs allege that Volta's lease liabilities to site hosts "are recognized at the lease commencement date based on the present value of the future minimum lease payments over the lease term." *See* CAC ¶ 242. Defendants argue, and Plaintiffs do not dispute, that the fact that Volta recognized its lease

28

liabilities at the time the lease was signed suggests that the accounting for the lease liabilities was not "delayed." Plaintiffs have not explained how, if the liabilities were recognized at the start of the lease, delaying payments pursuant to the lease could have allowed Volta to "delay" the "accounting" for the lease liabilities or to report cash balances that were "much larger than they actually were." Plaintiffs' failure to explain the mechanics of the accounting "delays" they allege is sufficient to grant Defendants' motion as to the challenged statements.

Third, Plaintiffs rely on the alleged statements of CW3, CW6, CW4, and CW5 to support their allegations that Volta delayed payments to site hosts to make its "cash balances look better than they actually were." *See* CAC ¶¶ 216-28. However, the alleged statements of those confidential witnesses are too bare and conclusory to plausibly suggest that Volta delayed in making payments to site hosts to an extent that materially impacted the cash balances or liabilities that Volta reported to investors.[12] At best, the statements of those confidential witnesses suggest

---

[12] Plaintiffs rely primarily on CW3, who allegedly reported that there were "dozens of companies to which Volta owned [sic] sums of approximately $500,000." CAC ¶ 173. CW3 did not name any of those companies or provide any details as to why Volta allegedly owed the sums in question, or when. Plaintiffs do not allege any facts that indicate that any of those owed sums had any impact on Volta's reported cash balances or liabilities at any point or on Volta's relationships with site hosts generally. CW3 also allegedly stated that Volta "was often late paying rent to Brookfield," one of Volta's site hosts, and in paying local taxes in connection with Brookfield's properties. *See id.* ¶¶ 172, 262. CW3 allegedly stated that Volta "paid Brookfield back in 2022[.] *see id.* Plaintiffs allege that these the alleged payment to Brookfield in 2022 is "consistent with Volta's unexpected and unexplained large expense" in the third quarter of 2022 that Barclays noted on November 15, 2022, was "incurred largely in observance of some sort of contractual agreements from what we can tell." *See id.* These allegations regarding Brookfield are too bare and conclusory and do not raise the inference that the alleged Brookfield payment delay impacted Volta's reported cash balances or liabilities. They also do not raise the inference that Volta delayed in making payments to site hosts generally to a degree that materially impacted Volta's reported cash balances or liabilities.

Plaintiffs also rely on CW6, who allegedly stated that "Volta was notoriously slow at paying its vendors, which this witness attributed to a general lack of financial accounting preparedness." *Id.* ¶ 174. Plaintiffs do not allege the who, what, when, or why as to the vendors that Volta allegedly was slow at paying. Plaintiffs also do not aver any facts indicating that payments to "vendors" that CW6 described have anything to do with the allegedly delayed payments to *site hosts* that Plaintiffs contend should have been disclosed by Volta.

The other two confidential witnesses that Plaintiffs rely upon, CW5 and CW4, left Volta at least ten months before any of the challenged statements were made, the earliest of which was disseminated in May 2021. For this reason, the Court finds that the alleged statements of these

that, an unspecified time, Volta may have developed a negative relationship with *one* site host, Brookfield, because of Volta's alleged payment delays to that company. Plaintiffs do not aver non-conclusory facts that raise the inference that Volta's dealings with Brookfield had a material impact on Volta's reported cash balances or liabilities. Plaintiffs also do not allege non-conclusory facts that would permit the Court to reasonably infer that any Brookfield payment delays were representative of Volta's dealings with other site hosts or that any such payment delays had a material impact at any point on Volta's relationships with site hosts generally.

Accordingly, the Court dismisses Plaintiffs' Section 10(b) claim and Section 20(a) claim, with leave to amend, to the extent that they are premised on the challenged contractual obligation statements being false or misleading for the reasons discussed above.

### c. Whether Plaintiffs have alleged materially false or misleading statements based on allegations that advertising customers would not make deals with Volta until its charging network grew to scale

Volta's ability to sell advertising displayed on its charging stations allegedly depended at least in part on the number of charging stations in its network and the scale of its network. *See* CAC ¶ 123. Plaintiffs allege that dozens of statements that Volta made before and after the

---

confidential witnesses are minimally probative, if at all, as to whether the challenged statements were misleading when made.

CW5 allegedly stated that, at an unspecified time, Volta was "flubbing numbers here and there, especially with big contracts like Brookfield/GGP." *Id.* ¶ 162. CW5 allegedly stated "[w]e had gotten letters on behalf of Brookfield/GGP that we were not in compliance [with the contract]. Hundreds of thousands [of dollars] past due." *Id.* ¶ 165. Plaintiffs allege no details as to the "numbers" that Volta allegedly "flubbed" or as to what it meant for Volta to "flub" numbers. Plaintiffs also do not aver any details as to the "past due" amounts in connection with Brookfield. CW's alleged statements, therefore, do not raise the inference that those "past due" amounts had a material impact on Volta's reported cash balances or liabilities.

CW4 allegedly "confirmed the observations of CW5 that Volta did not pay its contractual obligations on time. The witness also referenced the large real estate contract with Brookfield/GGP under which Volta would owe large amounts, such as $50,000 or $200,000 on certain dates, which was booked on a large, detailed schedule." *Id.* ¶ 171. "The witness recalled some properties sending Volta to collections." *See id.* ¶ 171. Plaintiffs allege no dates or details as to the purported amounts that Volta owed to Brookfield or facts that raise the inference that any such amounts materially impacted Volta's reported cash balances or liabilities. Plaintiffs also aver no details as to the properties that allegedly sent Volta "to collections" or facts that raise the inference that those events had a material impact on the financials that Volta reported.

30

Merger were false or misleading because "many of Volta's potential customers would not make deals with Volta until its charging network grew to scale[.]"  *See, e.g.*, CAC ¶ 225, 231-32, 252-53.  Plaintiffs do not explain in the CAC whether they allege that the statements in question were false and misleading because Volta failed to disclose that some potential advertising customers would not make deals with it until its charging network grew to scale, or because Volta falsely represented that it had already reached a particular scale, or some other reason.

Defendants move to dismiss Plaintiffs' Section 10(b) claim and derivative Section 20(a) claim to the extent that they are premised on statements that Plaintiffs allege were false or misleading because Volta's potential advertising customers would not make deals with it until its charging network grew to scale.  ECF No. 82 at 38-39.  Those statements (hereinafter, "challenged network scale statements") include the following[13]:

- November 10, 2021, earnings call: Wendel stated "[W]e've signed up national brand advertisers, other media channel partners, programmatic platforms and our site partners as they start to look towards marketing their businesses to consumers, and how to drive product sales in store.  In Q3, we welcomed new brand partners Visa, DHL and discover to the platform.  We also saw Comcast, Dunkin, FedEx and Hulu come back for additional campaigns.  And we finally saw continued growth in our programmatic business.  We view this flywheel of providing value to consumers, property partners and advertisers as positioning as well to monetize our network on day one, create a deeper connection with the community and increase the total value of our network."  CAC ¶ 402.

Defendants argue that Plaintiffs have not plausibly alleged that the challenged network scale statements were false or misleading.  Defendants contend that, because Plaintiffs do not allege that Volta falsely represented that it had reached sufficient scale or that it failed to disclose to investors that it would have difficulties contracting with some advertisers until it had sufficient scale, the statements cannot be false or misleading for those reasons.  ECF No. 81 at 38-29.  Defendants further contend that the offering documents "repeatedly made clear that Volta could

---

[13] The challenged network scale statements are Statements 1, 4-6, 11-15, 18-20, 28-34, 44-45, 60, 71, and 73 in Exhibit A, ECF No. 82-1, which can be found in paragraphs 225, 230-32, 239, 241-42, 244-45, 251-53, 256, 401-05, 407-08, 426-27, 455, 473, and 477 of the CAC.

United States District Court
Northern District of California

1   have difficulty contracting with certain advertisers until it had scaled, and that its post-merger

2   success was dependent on its ability to 'aggressively' and 'effectively' do so."  ECF No. 81 at 39;

3   *see also* Registration Statement, ECF No. 82-2 at 74 ("until Volta has achieved sufficient scale of

4   its content-driven charging stations in a given market . . . Volta may have difficulties in securing

5   content contracts for that market, which may also lead to fluctuations in its content revenues or an

6   inability to meet its projections of anticipated content revenue.").

7          In their opposition, Plaintiffs do not dispute Defendants' assertion that the CAC lacks

8   allegations that the challenged network scale statements were false or misleading because Volta

9   failed to disclose that it could have difficulties in securing contracts with some advertisers until its

10  network had reached a certain scale, or because Volta falsely represented that it had reached a

11  particular scale.  Plaintiffs' only argument with respect to the challenged network scale statements

12  is that "Defendants' statements promoting Volta's strong relationships with advertising customers

13  are actionable" for two reasons: (1) because of "Volta's revenue recognition violations," and (2)

14  because of "Volta's inability to install more charging stations posed a problem for key customers,

15  like Kroger and Coca Cola, who required a certain level of market penetration[.]"  ECF No. 93 at

16  32.

17         After carefully reviewing the CAC, the Court finds that Plaintiffs have failed to plead that

18  the challenged network scale statements were false or misleading on the grounds that they advance

19  in their opposition, which are not pleaded in the CAC.

20         Most of the challenged network scale statements do not "promote" Volta's "strong

21  relationships with *advertising customers*"; instead, they list or discuss Volta's alleged *site hosts* or

22  lease agreements with *site hosts*, *see, e.g.*, CAC ¶¶ 225, 239, 241, 244-45, 251, 455; discuss

23  Volta's revenue and installation projections, *see id.* ¶¶ 230-32, 256, 407, 426; or discuss Volta's

24  historical revenues, *id.* ¶¶ 403, 477.  Because these statements do not "promote" Volta's "strong

25  relationships" with advertising customers, they are not false or misleading on the basis that

26  Plaintiffs' advance.

27         The remaining statements list or describe companies that paid Volta for advertisements on

28  its charging stations, CAC ¶¶ 252-53, 401-02, 427, 473.  Assuming, without deciding, that those

1    statements can be construed as "promoting" Volta's "strong relationships" with advertising

2    customers, the statements nevertheless are not plausibly false or misleading either because of

3    "Volta's revenue recognition violations" or because "Volta's inability to install more charging

4    stations posed a problem for key customers, like Kroger and Coca Cola, who required a certain

5    level of market penetration," as Plaintiffs contend.

6           First, as discussed above, Plaintiffs have not plausibly pleaded that Volta engaged in

7    premature revenue recognition for ads on a company-wide basis or to a degree that could have

8    materially impacted Volta's reported revenue.  Even if they had, it is not clear how revenue

9    recognition violations by Volta would render statements promoting its "strong relationships" with

10   advertising customers false or misleading.

11          Second, Plaintiffs' allegations do not raise the inference that "Volta's inability to install

12   more charging stations posed a problem for key customers, like Kroger and Coca Cola, who

13   required a certain level of market penetration."  Plaintiffs do not identify the "key customers" for

14   whom Volta's alleged inability to install an adequate number of charging stations "posed a

15   problem."  While Plaintiffs mention Kroger and Coca Cola in their opposition, they do not allege

16   in the CAC that either of those companies was an *advertising* customer of Volta at any time.[14]

17          The Court grants Defendants' motion to dismiss Plaintiffs' Section 10(b) claim and

18   derivative Section 20(a) claim, with leave to amend, to the extent that they are premised on the

19   theory that the challenged network scale statements were false or misleading for the reasons

20   discussed above.

21

22

23

24   ────────────────────

25   [14] Plaintiffs aver that Kroger was one of Volta's site hosts on whose property Volta had charging
     stations, CAC ¶¶ 225, 124, and that, as of December 2021, Volta had not sold advertising on the
26   stations located at Kroger stores to anyone, *see id.* ¶ 124.  Those allegations do not raise the
     inference that Kroger was an advertising customer of Volta.  As for Coca Cola, Plaintiffs aver that
27   Volta's network needed to reach a certain scale before it "*could attract* large advertisers (such as
     Coca Cola)," *see id.* ¶ 133 (emphasis added), suggesting that Coca Cola was not yet an advertising
28   customer of Volta.

United States District Court
Northern District of California

#### d.   Whether Plaintiffs have alleged materially false or misleading statements based on an accounting error regarding stock-based compensation

Plaintiffs allege that some statements by Volta were false or misleading because they misrepresented the grant date and cost to Volta of the stock-based compensation (RSUs) that the company granted to Mercer and Wendel as part of the Merger. *See, e.g.*, CAC ¶¶ 395-98, 419-21, 429. As discussed above, under GAAP, ASC 718, the grant date for the RSUs in question was the date when the Merger closed, August 26, 2021, and that meant that a substantial portion of the cost of the RSUs to had to be "accounted for" by Volta by the end of the third quarter of 2021. *See id.* ¶¶ 358-59, 368-72. However, in its quarterly report for the third quarter of 2021 of November 12, 2021, which was its first quarterly report as a public company, Volta erroneously stated that the grant date for the RSUs was November 8, 2021, and Volta failed to "account for" the cost of the RSUs in the third quarter of 2021 in accordance with ASC 718. *See id.* ¶¶ 338, 341, 368-72. Plaintiffs allege that, as a result of that error, Volta reported lower net losses for the third quarter of 2021 than it actually incurred for that quarter. *See id.* Plaintiffs further aver that Volta did not reveal the actual financial impact of the cost of the RSUs until months later, on March 2, 2022, when it disclosed that the cost of the RSUs resulted in "an approximate net loss for the three and nine months ended September 30, 2021 of $69.7 million and $155.5 million, respectively." *Id.* ¶ 347. Plaintiffs aver that "[t]his revision made a substantial difference in Volta's performance, resulting in an added $55.2 million in net loss for the third quarter and an added $85.8 million in net loss for the first nine months of 2021." *Id.* ¶ 374.

In their motion, Defendants do not dispute that Volta committed an "accounting error" with respect to the RSUs that Volta granted to Wendel and Mercer (hereinafter, "RSU accounting error"). ECF No. 81 at 24.

Defendants move to dismiss Plaintiffs' Section 10(b) claim and derivative Section 20(a) claim to the extent that they are predicated on statements "premised on alleged misstatements or omissions concerning RSU-accounting" (hereinafter, the "RSU challenged statements").[15] ECF

---

[15] The RSU challenged statements are Statements 24-27, 35-37, 40-43, and 46 in Exhibit A, ECF No. 82-1, which can be found in paragraphs 395-398, 419-24, and 429 of the CAC.

No. 81 at 24.  Defendants argue that Plaintiffs have not pleaded facts giving rise to a strong inference that Defendants intentionally understated the cost to Volta of the RSUs granted to Wendel and Mercer to deceive, manipulate, or defraud investors.  *See id.*  The Court addresses those arguments in the scienter section of this order.

e.      **Whether Plaintiffs have pleaded materially false or misleading statements in connection with Volta's executive team**

Defendants move to dismiss Plaintiffs' Section 10(b) claim and derivative Section 20(a) claim to the extent that they are premised on certain allegedly false or misleading statements that pertain to Volta's management team.[16]  The Court addresses Defendants' arguments with respect to these statements, in turn.

i.      **Statements 3 and 43, CAC ¶¶ 228, 424**

Statements 3 and 43 set forth a risk factor that Volta disclosed in the Registration Statement and in its Form 10-Q for the third quarter of 2021, respectively, namely: "If Volta is unable to attract and retain key employees and hire qualified management, technical, engineering and sales personnel, its ability to compete and successfully grow its business would be harmed." *See* CAC ¶¶ 228, 424.

Defendants move to dismiss Plaintiffs' Section 10(b) and Section 20(a) claims to the extent that they are premised on this risk factor being false or misleading, arguing that "courts regularly dismiss claims premised on nearly identical vague and routine statements concerning the retention of executives."  ECF No. 81 at 40.  Defendants cite *Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*, 964 F. Supp. 2d 1128, 1141 (N.D. Cal. 2013) (Tigar, J.) ("*Cement*"), where this Court held that a risk statement similar to the one at issue here (namely, "The failure to hire executives and key employees or the loss of executives and key employees

---

[16] The statements at issue are Statements 3, 17, 43, 51, 52, 59, and 66 in Exhibit A, ECF No. 82-1, which can be found in paragraphs 225, 228, 249, 424, 438, 439-40, 453, and 465 of the CAC.

Defendants argue that Statement 1(d), CAC ¶ 225, is a statement that Plaintiffs challenge as false or misleading because of reasons pertaining to Volta's management team.  However, Plaintiffs did not identify Volta's management team or matters related thereto as one of the reasons why that statement is allegedly false and misleading.  *See* CAC ¶ 226.

1    could have a significant impact on our operations") was "insufficiently specific to render it

2    material and actionable[.]"  *See id.*

3         In their opposition, Plaintiffs concede that, under *Cement*, statements setting forth risk

4    factors "concerning the retention of executives in general" are "not actionable[.]"  *See* ECF No. 93

5    at 34.

6         Accordingly, the Court dismisses Plaintiffs' Section 10(b) claim, and derivative Section

7    20(a) claim, to the extent that they are premised on Statements 3 and 43, CAC ¶¶ 228 and 424.  In

8    light of Plaintiffs' concession that the statements in question are not actionable, the dismissal is

9    without leave to amend.

10                          **ii.    Statement 17, CAC ¶ 249**

11        Statement 17 is a statement that Plaintiffs aver was included in the Registration Statement,

12   which described Volta's "Experienced management team" as a "Competitive Strength," and stated

13   that "Volta's expertise in EV charging is driven by the vision of its [CEO], Scott Mercer, who has

14   been at the forefront of the EV charging movement since launching Volta's first pilot site in

15   Hawaii in 2011, and its President, Christopher Wendel, together who are among the last founding

16   teams in the EV charging market to still run their business."  *See* CAC ¶ 249.

17        Defendants contend that Plaintiffs have not identified the reason why they claim this

18   statement was false or misleading.  ECF No. 81 at 40.

19        In their opposition, Plaintiffs respond that the statement was misleading for "failure to

20   disclose the possibility or inevitability that the employment of [Mercer and Wendel] might well be

21   terminated" based on "the events described above," which appears to be a reference to the alleged

22   accounting violations and other alleged improprieties discussed in prior sections of this order.

23   ECF No. 93 at 32.

24        Plaintiffs failed to allege in the CAC that the statement in question is misleading for failure

25   to disclose that Mercer and Wendel could be terminated for alleged accounting violations and

26   other alleged improprieties.  *See* CAC ¶¶ 249 -50.  Plaintiffs' failure to specify in the complaint

27   the reason why they claim the statement at issue is misleading is sufficient to dismiss Plaintiffs'

28   Section 10(b) claim to the extent that it is premised on the alleged falsity of that statement.  *See* 15

United States District Court
Northern District of California

U.S.C. § 78u-4(b)(1)(B) (providing that a plaintiff alleging securities fraud must "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading"); *id.* § 78u-4(b)(3)(A) (providing that the complaint must be dismissed, in relevant part, if the requirements of 78u-4(b)(1)(B) are not met).

Accordingly, the Court dismisses Plaintiffs' Section 10(b) claim and derivative Section 20(a) claim, with leave to amend, to the extent that they are premised on Statement 17, CAC ¶ 249.

iii.     **Statements 51, 52, 59, 66, CAC ¶¶ 438-40, 453, 465**

Defendants move to dismiss Plaintiffs' Section 10(b) claim and Section 20(a) claim to the extent that they are premised on the four statements described below, on the ground that Plaintiffs have not adequately pleaded why the statements were false or misleading.  Defendants also contend that statements announcing executives' resignations, such as the ones at issue, are not material to investors.

**Statements 51 and 52, CAC ¶¶ 438-40**, are statements made in a press release by Volta issued on March 28, 2022, and a Form 8-K that Volta filed on March 28, 2022, in which Volta announced Mercer and Wendel's departure from the company.  *See* CAC ¶¶ 438-40.

**Statement 59, CAC ¶ 453**, is a statement that Defendant Chadwick made during an earnings call held on April 18, 2022, a few weeks after Mercer and Wendel's departure from Volta was announced.  On this call, Defendant Chadwick stated that, "[o]n March 28, 2022, Volta announced that the company's Chief Executive Officer, Scott Mercer, and the company's President, Christopher Wendel, agreed to the resignation of each as an officer and employee of the company. . . ."  *See* CAC ¶ 453.

**Statement 66, CAC ¶ 465**, is a Form 8-K that Volta filed on April 15, 2022, signed by Defendant Chadwick.  The Form 8-K contained a press release announcing the appointment of Brandt Hastings as Interim CEO and providing: "This appointment follows Scott Mercer's decision to step down as Chairman and CEO of Volta last month. . . . We want to thank Scott Mercer, who built this company with an incredible vision.  As the Board conducts a complete and

formal search for a permanent CEO, we are confident that Brandt will lead Volta's teams to realize the company's significant potential."  CAC ¶ 465.

Plaintiffs argue that the statements were false or misleading because they suggested that Mercer and Wendel's departures from Volta were voluntary when, in reality, Mercer and Wendel were fired because they "oversaw and directed Volta's financial problems and accounting improprieties."  ECF No. 93 at 33.

In the CAC, Plaintiffs do not allege that the statements at issue were false or misleading for failure to disclose that Mercer and Wendel were "fired because they oversaw and directed Volta's financial problems and accounting improprieties."  *See* CAC ¶¶ 438-40, 453-54, 465-66. Plaintiffs' failure to specify in the CAC the reason why they claim the statements at issue were false or misleading is sufficient to dismiss Plaintiffs' Section 10(b) claim to the extent that it is premised on the falsity of those statements.  *See* 15 U.S.C. § 78u-4(b)(1)(B); *id.* § 78u-4(b)(3)(A).

Accordingly, the Court dismisses Plaintiffs' Section 10(b) claim and derivative Section 20(a) claim, with leave to amend, to the extent that they are premised on Statements 51, 52, 59, and 66, CAC ¶¶ 438-40, 453, 465.

### f.    Safe Harbor

Defendants argue that certain statements that Plaintiffs challenge as false or misleading are not actionable, namely (1) financial projections in the Registration Statement; (2) projections that were included in the Investor Presentation that Plaintiffs allege was incorporated into the Registration Statement; and (3) Volta's post-Merger revenue and installation guidance or statements discussing it.  ECF No. 81 at 35-38.

"Even where a plaintiff has properly pleaded all six elements of a Section 10(b) violation, the allegedly false or misleading statement may still be shielded from liability by the 'safe harbor' provision of the PSLRA."  *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1141 (9th Cir. 2017). The PSLRA's "safe harbor" provision "is designed to protect companies and their officials from suit when optimistic projections of growth in revenues and earnings are not borne out by events." *Id.* at 1142.  The safe harbor applies only to "forward-looking statements," which include:

(A) a statement containing a projection of revenues, income

United States District Court
Northern District of California

(including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

[subsections (E) and (F) omitted]

15 U.S.C. § 78u-5(i)(1).

"[A] defendant will not be liable for a false or misleading statement if it is forward-looking and either is accompanied by cautionary language or is made without actual knowledge that it is false or misleading."  *In re Quality Sys.*, 865 F.3d at 1141.  Cautionary language must identify "important factors that could cause actual results to differ materially from those in the forward-looking statement."  *See* 15 U.S.C. § 78u-5(c)(1)(A)(i).

### i.        Financial projections in the Registration Statement

Defendants contend that three statements in the Registration Statement that Plaintiffs challenge as false or misleading are protected under the PSLRA's safe harbor because they are forward-looking financial projections or assumptions underlying those projections and were accompanied by cautionary language.  The statements in question are the following.

Statement 4 in Exhibit A to Defendants' motion, ECF No. 82-1, which is located in paragraph 230 of the CAC, sets forth Volta's projected yearly revenue, gross profit, and total operating expenses from 2021 through 2025.  *See* CAC ¶ 230.

Statement 5, which is located in paragraph 231 of the CAC, sets forth Volta's assumptions for the projected yearly revenue and gross profits set forth in Statement 4.  *See id.* ¶ 231.

Statement 6, which is located in paragraph 232 of the CAC, is an explanation that Volta offered for its projected revenue, which was that the projected revenue was based on Volta

1  "scaling with accelerating deployment of its station network.  Network effects are driven by

2  completion of national coverage of key media markets, growing EV penetration and full build out

3  of its technological capabilities."  *See id.* ¶ 232.

4         Plaintiffs argue that the statements at issue are exempt from the safe harbor and, even if

5  they are not exempt, they are not protected by the safe harbor because the cautionary language that

6  accompanied them was not sufficient.  ECF No. 93 at 29-30.  Plaintiffs further contend that the

7  statements are false or misleading because Defendants knew that the projections they contain were

8  unfounded, as Volta never had enough engineers, bandwidth, or money to meet the projections

9  and because the projections "did not account for: (1) regulatory approval processes, including

10  local bureaucracies and laws; (2) its employees' lack of experience; (3) how to deal with large

11  retail chains; (4) the need to deal with multiple hosts per site; (5) work delays; and (6)

12  competition."  ECF No. 93 at 15.

13         The Court finds that each of the three statements described above are protected under the

14  safe harbor, because they fall within the definition of forward-looking statements (as they are

15  projections or assumptions underlying those projections), were identified as such, and were

16  accompanied by cautionary language that identified important factors that could cause the

17  company's results to differ materially from the projections or their underlying assumptions.  *See*

18  Registration Statement, ECF No. 82-2 at 61-63, 69-127, 185-88.

19         The cautionary language that accompanied the statements meaningfully and exhaustively

20  set forth the factors that could cause Volta's results to differ materially from the projections and

21  assumptions at issue, including those that Plaintiffs contend that Volta failed to "account for,"

22  such as (1) risks associated with the installation of charging stations, including possible

23  construction delays caused by state and local laws relating to building codes or other necessary

24  governmental approvals required to install charging stations, *see, e.g.*, *id.* at 76, 259-60; (2) risks

25  associated with competition from Volta's competitors, *see id.* at 184, 70-72; (3) risks associated

26  with Volta being an early-stage company with a history of losses that may need to raise additional

27  funds to operate, *see id.* 83, 267-68, 184; (4) risks associated with not hiring or retaining

28  "qualified management" or employees, *see id.* at 79; (5) risk associated with Volta's management

United States District Court  
Northern District of California

having "limited experience" in operating a public company, *id.* at 52, 80; and (6) risks associated with Volta's ability to achieve revenue growth and profitability if it does not achieve scale, *see, e.g.*, *id.* at 70 ("Volta's ability to achieve significant revenue growth and profitability in the future will depend, in large part, on its success in expanding its business both within its existing markets and to additional markets and geographies and building scalable and robust processes to manage its business and operations"); *id.* at 74 ("until Volta has achieved sufficient scale of its content-driven charging stations in a given market . . . Volta may have difficulties in securing content contracts for that market, which may also lead to fluctuations in its content revenues or an inability to meet its projections of anticipated content revenue").

Plaintiffs' arguments to the contrary are not persuasive.  First, Plaintiffs contend, in a footnote, that the safe harbor does not apply to statements made in in the Registration Statement because they fall within an exclusion to the PSLRA's safe harbor for initial public offerings ("IPO").  ECF No. 93 at 29 n.7.  Plaintiffs' argument assumes that the Merger constituted an initial public offering.  The Court is not persuaded.  The statements in the Registration Statement were made in connection with the Merger, which was between Tortoise (a SPAC that had had its IPO about a year prior to the Merger) and Volta (its target, a private company).  At least one court in this district has held that a SPAC merger, such as the one here, does not qualify as an IPO and is therefore not excluded from the PSLRA safe harbor on that basis.  *See Moradpour v. Velodyne Lidar, Inc.*, No. 21-CV-01486-SI, 2022 WL 2391004, at *15 n.5 (N.D. Cal. July 1, 2022) (Illston, J.) (holding that a merger between a SPAC and its target company "was not an IPO" and statements made in connection with the merger were, therefore, not excluded from the PSLRA's safe harbor on the basis that the merger was an IPO).  Plaintiffs have not distinguished *Moradpour*.

Second, Plaintiffs argue that the cautionary language was not "adequate" because the language used was "boilerplate."  ECF No. 93 at 30.  However, the case that Plaintiffs cite to support their argument is distinguishable.  There, and unlike here, the cautionary language did "not appear to provide any especially useful information" because it "simply rehashed a constant reality of most product driven businesses: demand can change in the context of evolving product

1    lines." *See In re Illumina, Inc. Sec. Litig.*, No. 3:16-CV-3044-L-KSC, 2018 WL 500990, at *4

2    (S.D. Cal. Jan. 22, 2018).  Here, as discussed above, the cautionary language meaningfully and

3    systematically addressed important risk factors that could cause the Volta's results to differ

4    materially from the projections and assumptions at issue, including the factors that Plaintiffs argue

5    Volta failed to take into account and that allegedly rendered the projections and assumptions

6    misleading.  The Court finds that the cautionary language that accompanied the statements was

7    sufficient.

8         Third, Plaintiffs contend that the cautionary language was insufficient because it failed to

9    warn of the "risks" that "had already transpired on a persistent basis."  ECF No. 93 at 30.

10   Plaintiffs do not identify the risks that they claim had already transpired on a persistent basis.

11   Further, Plaintiffs cite no authority holding that cautionary language can be deemed to be

12   insufficient for the reason they advance.  The authorities that Plaintiffs cite are inapposite.  In

13   *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 990 (9th Cir. 2008), the Ninth Circuit held that

14   statements about backlog were not protected by the safe harbor because they were not forward-

15   looking.  That holding had nothing to do with the adequacy of the cautionary language that

16   accompanied the statements.  Plaintiffs' other case, *Siracusano v. Matrixx Initiatives, Inc.*, 585

17   F.3d 1167, 1181 (9th Cir. 2009), *aff'd*, 563 U.S. 27 (2011), did not involve any statements that the

18   defendant claimed were protected under the PSLRA's safe harbor.

19        Finally, Plaintiffs argue that the projections are not protected because Defendants knew

20   they were unfounded.  They point to allegations that confidential witnesses "viewed" the

21   projections "as unfounded because of the many obstacles to installing charging stations."  *See* ECF

22   No. 93 at 30.  Plaintiffs cite no authority for the proposition that the "views" of confidential

23   witnesses about the projections can be imputed to Defendants.  Even if they could be so imputed,

24   the "views" of Defendants would not matter.  Where, as here, the statements are forward-looking

25   and accompanied by sufficient cautionary language, the statements are protected by the safe

26   harbor, even if the plaintiff avers that the defendant knew that they were lacking in factual support.

27   *See In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010) ("Under subsection (A)(i),

28   however, if a forward-looking statement is identified as such and accompanied by meaningful

United States District Court
Northern District of California

1    cautionary statements, then the state of mind of the individual making the statement is irrelevant,

2    and the statement is not actionable regardless of the plaintiff's showing of scienter."); *Wochos v.*

3    *Tesla, Inc.*, 985 F.3d 1180, 1190 (9th Cir. 2021) ("[W]here a defendant has made a sufficient

4    showing that a challenged forward-looking statement was accompanied by meaningful cautionary

5    statements, *see* 15 U.S.C. § 78u-5(e), a plaintiff cannot defeat that invocation of § 21E's safe

6    harbor merely by alleging, for example, that the company knew that the announced forward-

7    looking objective was unlikely to be achieved.").

8         Plaintiffs' Section 10(b) claim, and derivative Section 20(a) claim, are dismissed, with

9    leave to amend, to the extent that they are premised on the three statements discussed above.

10                            **ii.      Investor presentation**

11        Plaintiffs allege that Volta and Tortoise gave an investor presentation prior to the Merger,

12   which Tortoise filed with the SEC on February 8, 2021, several months prior to the Merger; it

13   contained projections through 2025 for Volta's charger-station installations and revenue ("Investor

14   Presentation"). *See* CAC ¶ 116-18, 256. Plaintiffs allege that the projections in the presentation

15   were false or misleading because the projections were not realistic and because Volta failed to

16   account for the factors discussed above in connection with the projections in the Registration

17   Statement. *See id.* ¶¶ 256-57.

18        Defendants contend that the station installation and revenue projections in the Investor

19   Presentation are protected under the PSLRA's safe harbor because they are forward-looking

20   financial projections and were accompanied by the cautionary language set forth in Tortoise's

21   Form 8-K of February 8, 2021. *See* ECF No. 82-24. Defendants further contend that statements

22   in the Investor Presentation are not actionable in any event because the presentation was not

23   incorporated by reference into the Registration Statement.

24        Plaintiffs argue that the Investor Presentation was "impliedly" incorporated by reference

25   into the Registration Statement because the Registration Statement mentioned it several times and

26   the Registration Statement did not expressly "exclude" it. *See* ECF No. 93 at 31-32. Plaintiffs do

27   not address the question of whether the projections in the Investor Presentation are protected by

28   the safe harbor on the basis that they are forward-looking statements and were accompanied by

1    cautionary language.  *See id.*

2         The Court cannot find, on this record, that the Investor Presentation was incorporated by

3    reference into the Registration Statement.  Plaintiffs contend that the Investor Presentation was

4    "impliedly" incorporated by reference into the Registration Statement, but the case they cite to

5    support that proposition is inapposite, because it applies ERISA law for the purpose of

6    determining whether certain documents can be deemed to be incorporated into an ERISA benefits

7    plan.  *See In re Schering-Plough Corp. ERISA Litig.*, No. CIV.A. 03-1204 (KSH), 2007 WL

8    2374989, at *4 (D.N.J. Aug. 15, 2007).

9         But even if the Investor Presentation had been incorporated by reference into the

10   Registration Statement, as Plaintiffs contend, their Section 10(b) claim would nevertheless fail to

11   the extent that it is premised on the revenue and installation projections in the Investor

12   Presentation.  Those projections were identified as forward-looking statements and were

13   accompanied by cautionary language set forth in the Form 8-K that Tortoise filed on February 8,

14   2021, *see* ECF No. 82-24 at 11, 294, as well as the cautionary language in the Registration

15   Statement itself, which the Court discussed at length above in connection with Statements 4-6,

16   CAC ¶¶ 230-32.  As such, those projections are protected by the safe harbor.

17        Accordingly, the Court grants Defendants' motion to dismiss the Section 10(b) claim and

18   derivative Section 20(a) claim, with leave to amend, to the extent that they are premised on the

19   revenue and installation projections in the Investor Presentation, CAC ¶ 256.

20              **iii.     Post-Merger revenue and installation
                           guidance**

21

22        Defendants argue that dozens of statements Defendants made after the Merger, which

23   Plaintiffs challenge as false or misleading, are protected by the PSLRA safe harbor.  The

24   statements in question were made in post-Merger press releases, quarterly earnings calls and

25   presentations, and SEC filings.[17]  Defendants contend that the statements in question are protected

26

27   [17] They are Statements 24, 27-32, 54, 58(a)-(b), 61-66, 69(a)-(b), 70-71, 74(a)-(b), and 75 in
     Exhibit A, ECF No. 82-1, which can be found in paragraphs 395, 398, 401-05, 443, 450, 457-59,
28   461, 463, 465, 470, 471, 473, 478-79, and 481 of the CAC.

United States District Court
Northern District of California

by the safe harbor because they are forward-looking and were accompanied by cautionary language.  ECF No. 81 at 38.

Plaintiffs respond that some of the statements that Defendants contend are protected by the safe harbor were based on Volta's "present business conditions" and were, therefore, not forward-looking.  *See* ECF No. 93 at 29.  Plaintiffs also contend that Volta's "projections" are not protected because "Defendants knew they were false."  *See id.* at 31.

The Court has reviewed the statements that Defendants contend are protected by the safe harbor and finds that some of them are *not* forward-looking because they discuss circumstances that have already occurred.  *See Wochos*, 985 F.3d at 1192 (holding that "a concrete factual assertion about a specific present or past circumstance" is not forward-looking).  The statements that are not forward-looking are:

- Statement 24, CAC ¶ 395 ("Our significant pipeline provides a strong foundation. . ."); 

- Statement 29, CAC ¶ 402 ("[W]e've signed up national brand advertisers . . . we welcomed new brand partners Visa, DHL and discover to the platform");

- Statement 30, CAC ¶ 403 ("Third quarter revenues were . . . ");

- Statement 31, CAC ¶ 404 ("differentiated business model enables us to monetize . . .");

- Statement 32, CAC ¶ 405 ("we've got a very, very strong pipeline");

- Statement 63, CAC ¶ 459 ("it's similar to what we were seeing in the past in certain places");

- Statement 64, CAC ¶ 461 ("we're moving through those things very quickly");

- Statement 65, CAC ¶ 463 ("we have put in place this capital committee . . .");

- Statement 66, CAC ¶ 465 ("This appointment follows Scott Mercer's decision to step down as Chairman and CEO of Volta last month.'");

- Statement 70, CAC ¶ 471 ("We made continued progress against our strategy with total revenue growing . . .");

- Statement 71, CAC ¶ 473 (discussion of previous quarter's performance is not forward-looking);

- Statement 74(b), CAC ¶ 479 ("We had a record quarter . . .");

- Statement 75, CAC ¶ 481 (discussion of previous quarter's performance is not forward-looking).

The statements listed above are not protected by the safe harbor and the Court denies Defendants' motion with respect to those statements.

The following statements *are* forward-looking and were accompanied by cautionary language; accordingly, the Court finds that those statements are protected by the safe harbor.

- Statement 27, CAC ¶ 398 (projections made in November 10, 2021, press release); cautionary language set forth in ECF No. 82-5 at 5-6.

- Statement 28, CAC ¶ 401 (statement of future economic performance in November 10, 2021, earnings call); cautionary language set forth in ECF No. 85-26 at 2.

- Statement 54, CAC ¶ 443 (projections and assumptions made in March 31, 2022, press release); cautionary language set forth in ECF No. 82-6 at 4-5.

- Statement 58(a) and 58(b), CAC ¶ 450 (projections in April 15, 2022, press release); cautionary language set forth in ECF No. 82-25 at 7-8.

- Statement 61, CAC ¶ 457 (projections in April 18, 2022, earnings call); cautionary language set forth ECF No. 82-14 at 5.

- Statement 68, CAC ¶ 458 (plans and objectives, and projections in April 18, 2022, earnings call); cautionary language set forth in ECF No. 82-14 at 5.

- Statements 69(a) and 69(b), CAC ¶ 470 (projections in May 13, 2022, press release); cautionary language set forth in ECF No. 82-8 at 8.

- Statement 71, CAC ¶ 473 (projections included in presentation of May 13, 2022, are forward-looking); cautionary language set forth in ECF No. 82-8 at 8.

- Statement 74(a), CAC ¶ 478 (projections in August 11, 2022, press release); cautionary language set forth in ECF No. 82-27 at 27.

- Statement 75, CAC ¶ 481 (projections included in presentation of August 11, 2022, are forward-looking); cautionary language set forth in ECF No. 82-27 at 5.

The Court is not persuaded by Plaintiffs' argument that the forward-looking statements listed above are not protected by the safe harbor on the basis that Defendants "knew they were false." ECF No. 93. at 31.  As discussed above, where, as here, the statements in question are forward-looking and were accompanied by cautionary language, the defendant's state of mind is irrelevant.  *See In re Cutera Sec. Litig.*, 610 F.3d at 1112.

Accordingly, the Court dismisses Plaintiffs' Section 10(b) claim and derivative Section 20(a) claim, with leave to amend, to the extent that they are premised on the protected statements listed above.

g.      **Whether Plaintiffs have failed to plead a false or misleading statement for other reasons**

Defendants move to dismiss Plaintiffs' Section 10(b) claim and derivative Section 20(a) claim to the extent that they are premised on the statements discussed below on the basis that Plaintiffs have not specified which portion of the statements was false or misleading or why the statements are allegedly false or misleading.  ECF No. 81 at 41-42.

**Statement 16, CAC ¶ 247**.  This is a statement in the Registration Statement:  "As of March 31, 2021, Volta's contracted backlog includes more than 2,000 additional screens, more than 1,000 additional charging stations and more than 450 additional sites, as well as a pipeline of more than 5,000 potential sites under master service agreements with national partners, which provide the framework for deploying Volta charging stations to such national partners' sites . . . "

Defendants contend that Plaintiffs have not identified the portion of this statement that they claim was false or misleading.  Defendants further argue that, because Plaintiffs do not allege that any of the historical figures mentioned in the statement relating to Volta's "pipeline" or "contracted backlog" are false, the statement is not actionable on that basis.  In their opposition, Plaintiffs do not respond to Defendants' argument.

The Court agrees with Defendants.  Plaintiffs do not identify the portion of this statement that they allege was false or misleading.  To the extent that Plaintiffs claim that the figures reported with respect to "contracted backlog" or "pipeline" were false or misleading, they must state so in the complaint and must also identify the reasons why they believe those figures were false or misleading.  The CAC does not contain facts that suggest that those figures were inaccurate.  Accordingly, Plaintiffs' Section 10(b) claim and Section 20(a) claim are dismissed, with leave to amend, to the extent that they are premised on the alleged falsity of the statement in paragraph 247 of the CAC.  *See* 15 U.S.C. § 78u-4(b)(1)(B) (providing that a plaintiff alleging securities fraud must "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading"); *id.* § 78u-4(b)(3)(A) (providing that the complaint must be dismissed, in relevant part, if the requirements of 78u-4(b)(1)(B) are not met).

**Statements 33 and 34, CAC ¶¶ 407-08**.  These are statements that were made during an earnings call held on November 10, 2021.  An analyst asked how Volta would explain the "gap

47

between" the 2,400 stations that Volta was projecting to have installed at the end of the year, as compared to the approximately 3,100 in Volta's "SPAC-related projection" (i.e., the projection in the Registration Statement).  CAC ¶ 407.  In response, Wendel allegedly responded, in relevant part, that "the delta is really reasonably simple.  We have, as Francois [Chadwick] mentioned, 1300 stations in the construction queue.  And it's mostly down to permit time."  *See id.*  Mercer then allegedly attributed the gap to "a COVID driven thing for us that the permitting processes are moving in different jurisdictions[.]"  *Id.* ¶ 408.

Defendants contend these statements are not actionable because Plaintiffs have not pleaded facts suggesting that anything in the statements was false or misleading.  In their opposition, Plaintiffs do not respond to this argument.

The Court agrees with Defendants.  The CAC does not contain allegations that raise the inference that the reasons that Mercer and Wendel provided during this call to explain the gap between the number of installations it projected in the Registration Statement and the installations it projected to have installed at the end of the year (2021) were false or misleading.  Accordingly, Plaintiffs' Section 10(b) and Section 20(a) claims are dismissed, with leave to amend, to the extent that they are premised on the alleged falsity of the statements at issue.  *See* 15 U.S.C. § 78u-4(b)(1)(B); *id.* § 78u-4(b)(3)(A).

**Statement 65, CAC ¶ 463**.  This is a statement made during an earnings call held on April 8, 2022.  In response to a question about Volta's "cash burn trajectory versus your liquidity," Chadwick responded:

> When I look at the cash burn, I look at the operating expenses and the burn through the OpEx and also then through the CapEx side of things.  As I mentioned, with respect to the capital side of things, we have put in place this capital committee that does look at every project and it does look at that spend as it relates to the timeline for the return on that spend.  So, feeling very good about that.  As it relates to our operating expenses, what I do is I look at this – been looking at this very, very carefully.  We have mapped out what those operating expenses are anticipated to be through 2022 and beyond.  And I've installed a significant amount of discipline, financial discipline in matching the actual spend to the budgets.  So I feel very, very good that we have in place those controls and those procedures to make sure that the burn, the liquidity burn is well controlled.

1    CAC ¶ 463.

2         Defendants argue that this statement is not actionable because Plaintiffs do not identify any

3    specific portion of this statement as being false or misleading.  Plaintiffs do not respond to this

4    argument in their opposition.

5         The Court once again agrees with Defendants.  Plaintiffs failed to specify which portions

6    of Chadwick's response in paragraph 463 are allegedly false or misleading and why.  Plaintiffs'

7    Section 10(b) and Section 20(a) claims are dismissed, with leave to amend, to the extent that they

8    are premised on the alleged falsity of Chadwick's response as set forth in paragraph 463.  *See* 15

9    U.S.C. § 78u-4(b)(1)(B); *id.* § 78u-4(b)(3)(A).

10        **Statements 71 and 75, CAC ¶¶ 473, 481**.  These are slides used in quarterly earnings

11   presentations of May 13, 2022, and August 11, 2022, respectively.  Some of those slides discuss

12   Volta's performance and metrics for the prior quarter.[18]

13        Defendants contend that the slides are not actionable because Plaintiffs do not identify

14   which specific portions of the slides are false or misleading, or specify the reasons why any

15   particular portion of any slide is false or misleading.  Plaintiffs do not respond to these arguments.

16        The Court agrees with Defendants.   Plaintiffs failed to specify which statements in the

17   slides are allegedly false or misleading and why.  Plaintiffs' Section 10(b) and Section 20(a)

18   claims are dismissed, with leave to amend, to the extent that they are premised on the statements at

19   issue.  *See* 15 U.S.C. § 78u-4(b)(1)(B); *id.* § 78u-4(b)(3)(A).

20                                    **2.    Scienter**

21        "To establish liability under § 10(b) and Rule 10b-5, a private plaintiff must prove that the

22   defendant acted with scienter[.]"  *Matrixx Initiatives*, 563 U.S. at 48 (citation and internal

23   quotation marks omitted).  Scienter is "a mental state that not only covers 'intent to deceive,

24   manipulate, or defraud,' but also 'deliberate recklessness[.]'"  *Schueneman v. Arena Pharms., Inc.*,

25   840 F.3d 698, 705 (9th Cir. 2016) (internal citations omitted).  "[D]eliberate recklessness is an

26

27   _____

28   [18] Some of those slides contain forward-looking projections.  The Court has found, in the previous
     section of this order, that those portions of the slides are protected under the PSLRA's safe harbor.

United States District Court
Northern District of California

1    extreme departure from the standards of ordinary care . . . which presents a danger of misleading

2    buyers or sellers that is either known to the defendant or is so obvious that the actor must have

3    been aware of it." *Id.* (citation and internal quotation marks omitted).  In evaluating scienter,

4    courts must "consider plausible, nonculpable explanations for the defendant's conduct, as well as

5    inferences favoring the plaintiff." *Tellabs*, 551 U.S. at 323-24.  In performing this inquiry, courts

6    should determine whether "all of the facts alleged, taken collectively, give rise to a strong

7    inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that

8    standard." *Id.*  "A complaint will survive . . . only if a reasonable person would deem the

9    inference of scienter cogent and at least as compelling as any opposing inference one could draw

10   from the facts alleged." *Id.* at 324.

11       Here, the Court has granted Defendants' motion to dismiss Plaintiffs' Section 10(b) claim

12   and Section 20(a) claim, with leave to amend, to the extent that they are premised on dozens of

13   challenged statements that the Court has concluded are not plausibly false or misleading based on

14   the allegations in the CAC.

15       The only accounting violation or "impropriety" alleged in the CAC that is plausible, and

16   that resulted in plausibly false or misleading statements by Defendants, is the RSU accounting

17   error discussed in section V.A.1.d. of this order, which Defendants admit occurred.  The RSU

18   accounting error resulted in Volta's reporting of an incorrect grant date for the RSUs that it

19   granted to Mercer and Wendel as part of the Merger and in its reporting of inaccurate net losses

20   for the third quarter of 2021 (i.e., the net losses that Volta reported for that quarter were lower than

21   they actually were).  However, the "mere publication of inaccurate accounting figures, or a failure

22   to follow GAAP, without more, does not establish scienter." *DSAM Glob. Value Fund v. Altris*

23   *Software, Inc.*, 288 F.3d 385, 390 (9th Cir. 2002) (citation and internal quotation marks omitted).

24       Defendants contend that Plaintiffs have not pleaded facts giving rise to a "strong

25   inference" that any Defendant intentionally understated the cost to Volta of the RSUs to deceive,

26   manipulate, or defraud investors.  ECF No. 81 at 26.  Defendants move to dismiss the Section

27   10(b) and Section 20(a) claims to the extent that they are premised on alleged misstatements or

28

United States District Court
Northern District of California

omissions related to the RSU accounting error ("RSU challenged statements")[19] on the ground that Plaintiffs have failed to plead scienter with respect to the RSU accounting error.  *See id.* at 24. Defendants argue that the more compelling inference is that Volta was still adapting to "more rigorous public company reporting requirements and made an honest, if embarrassing, mistake" with respect to the RSU grant date and the RSUs' impact on Volta's results for its first quarter as a public company.  *Id.* at 26.  Defendants contend that Volta expressly warned investors in the Registration Statement before the Merger that its management had limited experience in operating a public company and that this could affect its ability to report its operating results accurately or timely.  *See id.* (citing Registration Statement at 52, ECF No. 82-2 at 80).

Plaintiffs respond that an inference of scienter "is at least as plausible as Defendants' competing one, because the Complaint amply alleges Volta's improper revenue recognition practices that were specifically intended to make Volta look better (and thus inflate its stock price) in its first public reporting period and were part of Volta's more general culture of improper accounting."  ECF No. 93 at 35-41.  Plaintiffs point to the same allegations that the Court considered and found to be insufficient to raise the inference that Defendants made false or misleading statements based on improper revenue recognition, payment delinquencies, and other theories discussed above.

The Court has carefully reviewed the 155-page CAC in its entirety and finds that the allegations in the CAC, when viewed holistically, do not give rise to a strong inference of scienter in connection with the RSU accounting error, or with respect to any allegedly false or misleading statements that Plaintiffs challenge under Section 10(b).  Plaintiffs' theory of scienter is premised on the existence of improper revenue recognition and other improprieties at Volta, as well as a "deep-seated culture of deception" at Volta, of which they claim the RSU accounting error and the allegedly false or misleading statements challenged in the CAC were a part.  However, as discussed above, the Court has found that Plaintiffs have not plausibly alleged (1) that Volta engaged in any improper premature revenue recognition practice, or in any undisclosed ad sales

---

[19] The RSU challenged statements are Statements 24-27, 35-37, 40-43, and 46 in Exhibit A, ECF No. 82-1, which can be found in paragraphs 395-398, 419-24, and 429 of the CAC.

practice, that materially impacted and inflated Volta's revenues; (2) that Volta reported any inaccurate cash balances, liabilities, or revenues to investors; (3) that Volta delayed its accounting of lease liabilities to site hosts to make its cash balances look better than they actually were; or (4) that Volta misleadingly promoted its "strong" relationships with advertising customers. Additionally, the Court has concluded that the pre-Merger revenue and installation projections that Plaintiffs allege were unrealistic and intentionally inflated to impress investors are protected by the PSLRA's safe harbor, because they were accompanied by cautionary language about the very issues that, according to Plaintiffs, rendered the projections unrealistic or unlikely to be achieved. These findings render implausible Plaintiffs' allegations that Volta had a "deep-seated culture of deception" and "improprieties" that was the root of the statements they allege were false or misleading.  Against that backdrop, and the benign explanation for the RSU accounting error that Defendants advance is more compelling than an inference that Defendants acted with scienter. Based on the totality of the allegations in the CAC, the RSU accounting error, which occurred during Volta's first quarter as a public company, could have been the result of the company's adjustment process to the reporting requirements for public companies, as Defendants contend.

Plaintiffs point to the departures from Volta of Defendants Mercer, Wendel, Chadwick, and other Volta executives in late March 2022 and June 2022, as indicative of scienter on the ground that the departures occurred a few weeks or months, respectively, after the RSU accounting error was disclosed to investors.  The Court finds, however, that given the absence of plausible allegations that Volta had a "deep-seated culture of deception" and "improper" practices, the more compelling inference is that those executives left Volta for business reasons or other benign reasons.  Plaintiffs allege that, around the time of the departures at issue, Volta significantly reduced its workforce. *See, e.g.,* CAC ¶ 144.  Those allegations are consistent with the departures in question being the result of business-related causes. *See Zucco*, 552 F.3d at 1002 ("[A] plaintiff must allege sufficient information to differentiate between a suspicious change in personnel and a benign one.  Mere conclusory allegations that a financial manager resigns or retires during the class period or shortly before the corporation issues its restatement, without more, cannot support a strong inference of scienter. . . . Absent allegations that the resignation at

issue was uncharacteristic when compared to the defendant's typical hiring and termination patterns or was accompanied by suspicious circumstances, the inference that the defendant corporation forced certain employees to resign because of its knowledge of the employee's role in the fraudulent representations will never be as cogent or as compelling as the inference that the employees resigned or were terminated for unrelated personal or business reasons.").

Plaintiffs argue in their opposition that "multiple CWs attributed Mercer and Wendel's departures to their involvement in improper practices, and Chadwick's to his blowing the whistle" on Volta's alleged improper accounting practices, but the allegations to which Plaintiffs point, whether considered individually or collectively, do not support the inference that the departures were connected to the RSU accounting error or any other "improper practices."  Plaintiffs rely on CW5's alleged statements for the proposition that Chadwick (Volta's CFO) blew the whistle on Volta's "dishonest accounting" and that led to Chadwick's resignation, *see* CAC ¶ 166, but CW5 left Volta in mid-2020, about a year before the Merger was finalized, more than a year before the RSU accounting error occurred, and about two years before Chadwick left Volta.  That confidential witness was, therefore, not positioned to reliably report on the causes for Chadwick's resignation or Volta's accounting practices after the Merger.  *See Zucco*, 552 F.3d at 996 (finding that confidential witnesses who did not work at the company during the class period were not positioned to have reliable information about the company's accounting practices during that time period).  Plaintiffs also rely on CW6, who allegedly "described Defendant Chadwick, Volta's CFO, as 'blowing the whistle' on Volta's accounting improprieties, and that Mercer and Wendel were on the hook because 'they were either asleep at the wheel or turned a blind eye' to those problems."  *Id.* ¶ 351.  But that witness was a Senior Product Manager who did not report to any of the Defendants, *see id.* ¶ 55, and Plaintiffs do not aver any facts that would permit the Court to infer that he had access to reliable information about the mental state of Defendants Chadwick, Mercer, or Wendel, or about Volta's accounting practices, at any point.  *See Zucco*, 552 F.3d at 996 (finding that an employee who worked in human resources was not positioned to have reliable information about the finance department's workings).

The alleged statements of other confidential witnesses suggest that Mercer and Wendel

might have been fired, but they do not raise the inference that they were fired because of their involvement in "improper practices," as Plaintiffs contend. The alleged statements of these witnesses are consistent with the departures having been the result of business-related motivations. *See, e.g.*, CAC ¶ 101 (CW1 allegedly reported that, a few weeks after Mercer and Wendel's departure, Defendant Cubbage stated on a Zoom meeting that Mercer and Wendel "are not able to execute and get the company to the next level," which CW interpreted as indicating that Mercer and Wendel "got kicked to the curb"); *id.* ¶ 110 (CW3 allegedly reported that, based on "a short conversation with Wendel" in early May 2022, Wendel "implied this was an unfortunate set of series of events that 'I wish would have ended differently'"); *id.* ¶ 106 (CW8 allegedly stated that he "believed that it was a Board decision to push Mercer out because they did not have confidence in Mercer to move Volta forward following the SPAC merger"); *id.* ¶ 112 (CW3 allegedly stated that another employee told him: "you know this wasn't their choice").

Plaintiffs also argue that Mercer and Wendel had a motive for committing fraud because Mercer allegedly wanted to put "Big Oil" out of business and Wendel wanted to be a "big shot." *See* ECF No. 93 at 35. But the allegations to which Plaintiffs point to support that argument are based on purported statements by CW4, who left Volta in early 2020, more than a year before the Merger was finalized and about a year and a half before the RSU accounting error occurred. *See* CAC ¶¶ 186, 503. Plaintiffs allege no facts that raise the inference that that witness was positioned to reliably report on Mercer and Wendel's mental state after he left the company.

In light of the foregoing, the Court finds that the CAC as a whole does not give rise to a strong inference of scienter with respect to any statements challenged therein under Section 10(b), including the RSU challenged statements. The Court grants Defendants' motion to dismiss the Section 10(b) and Section 20(a) claims for failure to plead scienter.

Given this ruling, the Court need not reach Defendants' argument that Plaintiffs have not plausibly alleged loss causation.

**B.     Claims under Section 11 and Section 15 of the Securities Act**

"Section 11 of the Securities Act contains a private right of action for purchasers of a security if the issuer publishes a registration statement in connection with that security that

'contain[s] an untrue statement of a material fact or omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" *Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1161 (9th Cir. 2009) (quoting 15 U.S.C. § 77k(a)).  "To prevail in such an action, a plaintiff must prove (1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment.'" *Id.* (citation and internal quotation marks omitted).  "No scienter is required for liability under § 11; defendants will be liable for innocent or negligent material misstatements or omissions." *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1403-04 (9th Cir. 1996).  The heightened pleading requirements of the PSLRA do not apply to claims under Section 11.  *See Rubke*, 551 F.3d at 1161.  However, if the complaint sounds in fraud, a claim under Section 11 must be pleaded with particularity under Rule 9(b).  *See id.*; *see also In re Stac Elecs. Sec. Litig.*, 89 F.3d at 1404 (same).

"Section 15(a) of the 1933 Securities Act imposes joint and several liability upon every person who controls any person liable under sections 11 or 12." *In re Daou*, 411 F.3d at 1029 (citation omitted).  A claim under Section 15 fails if there is no underlying violation of Section 11. *See id.*

Plaintiffs assert claims under Sections 11 and 15 of the Securities Act.  *See* CAC ¶¶ 79-276.  The Section 11 claim, and the Section 15 claim, which is derivative of the Section 11 claim, are premised on allegations that the Registration Statement contained materially false or misleading statements.  The statements in the Registration Statement that Plaintiffs challenge under Section 11 and Section 15 claims are statements that Plaintiffs also challenge under Section 10(b).[20]

Defendants argue that the CAC sounds in fraud, and that all of the claims asserted therein, including the claims under Section 11 and Section 15, must meet the heightened pleading requirements of Rule 9(b).  Defendants contend that, because all claims in the CAC are subject to

---

[20] The RSU challenged statements, which pertain to the RSU accounting error discussed above in the scienter section of this order, were made after the Merger and Plaintiffs do not challenge them under Section 11 or Section 14(a).

1    Rule 9(b), Plaintiffs fail to state a claim under Section 11 or Section 15 to the extent that Plaintiffs

2    have failed to plausibly allege that statements in the Registration Statement were materially false

3    or misleading in violation of Section 10(b).  Defendants further argue that the PSRLRA's safe

4    harbor protects forward-looking statements from liability under Section 11.

5         Plaintiffs disagree, arguing that their Section 11 and Section 15 claims are not subject to

6    Rule 9(b) because they disclaimed in the CAC any allegation of fraud or intentional misconduct

7    with respect those claims.  Plaintiffs contend that the claims at issue are "subject only to the

8    permissive notice pleading standard of Rule 8(a)" and the claims easily meet that standard based

9    on the averments in the CAC.  *See* ECF No. 93 at 18.

10        After carefully reviewing the CAC in its entirety, the Court agrees with Defendants that it

11   sounds in fraud.  The gravamen of the CAC is that Defendants engaged in a uniform course of

12   fraudulent conduct and each of the claims asserted in the CAC partakes of that theme.  Plaintiffs

13   allege that Volta had a "deep-seated culture of deception used to cover-up its poor financial

14   performance" to make the company look more attractive to investors than it actually was, CAC ¶

15   7, and that this culture was in place both before and after the Merger, *see id.* ¶¶ 1-258, 383-520.

16   Plaintiffs' averments raise the inference that every statement that they allege was false or

17   misleading in the CAC, whether it was made before or after the Merger, flowed from, and was a

18   part of, that alleged culture of deception.  Accordingly, every claim in the CAC must satisfy the

19   pleading requirements of Rule 9(b).  *See Rubke*, 551 F.3d at 1161; *In re Daou Sys., Inc.*, 411 F.3d

20   at 1028.

21        Plaintiffs' arguments to the contrary are not persuasive.  Plaintiffs contend that their

22   Section 11 and Section 15 claims do not sound in fraud, and they point to allegations in the CAC

23   that purport to disclaim any alleged fraud, recklessness, or intentional conduct in connection with

24   those claims.  *See, e.g.*, CAC ¶¶ 259, 272.  However, where, as here, a uniform course of

25   fraudulent conduct is the gravamen of the complaint, nominal efforts to disclaim allegations of

26   fraud are ineffective.  *See In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 885 (9th Cir. 2012)

27   (holding that "plaintiff's nominal efforts to disclaim allegations of fraud with respect to its Section

28   11 claims are unconvincing where the gravamen of the complaint is fraud").  Plaintiffs have not

United States District Court<br>Northern District of California

56

1    distinguished *In re Rigel* even though Defendants cited it in their motion.  The authorities that

2    Plaintiffs cite for the proposition that the CAC does not sound in fraud are distinguishable.[21]

3        Because the Section 11 and Section 15 claims are subject to Rule 9(b), "plaintiffs must

4    demonstrate, *with particularity*, (1) that the registration statement contained an omission or

5    misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would

6    have misled a reasonable investor about the nature of his or her investment."  *In re Daou*, 411 F.3d

7    at 1028 (citation and internal quotation marks omitted, emphasis added).  Plaintiffs have not done

8    so with respect to the statements in the Registration Statement that the Court has found are not

9    plausibly materially false or misleading under Section 10(b), and they cannot do so with respect to

10   the statements in the Registration Statement that the Court has found are protected under the

11   PSLRA's safe harbor.

12       Accordingly, the Court grants Defendants' motion to dismiss the Section 11 claim, and the

13   derivative claim under Section 15, with leave to amend, to the extent that they are premised (1) on

14   statements in the Registration Statement that the Court has found are not plausibly materially false

15   or misleading based on the theories and allegations discussed above in connection with the Section

16   10(b) claim; or (2) on statements in the Registration Statement that the Court has found are

17   protected under the PSLRA's safe harbor.

18       **C.        Claims under Section 14(a) and Section 20(a) of the Exchange Act**

19       Section 14(a) of the 1934 Act and SEC Rule 14a–9 "disallow the solicitation of a proxy by

20   a statement that contains either (1) a false or misleading declaration of material fact, or (2) an

21   omission of material fact that makes any portion of the statement misleading."  *Desaigoudar v.*

22   *Meyercord*, 223 F.3d 1020, 1022 (9th Cir. 2000).  "To state a claim under § 14(a) and Rule 14a–9,

23   a plaintiff must establish that (1) a proxy statement contained a material misrepresentation or

24

25   _____

     [21] Plaintiffs cite cases in which the plaintiff did not rely on a unified course of fraudulent conduct
26   or intentional concealment.  *See Knollenberg v. Harmonic, Inc*., 152 F. App'x 674, 684 (9th Cir.
     2005) ("[P]laintiffs do not rely on a unified course of fraudulent conduct"); *In Re Violin Memory*
27   *Sec. Litig*., No. 13-CV-5486 YGR, 2014 WL 5525946, at *8 (N.D. Cal. Oct. 31, 2014) ("[T]here is
     no allegation that defendants 'knowingly' or 'intentionally' concealed information or made
28   misrepresentations").

omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction.'" *N.Y.C. Emps.' Ret. Sys. v. Jobs*, 593 F.3d 1018, 1022 (9th Cir. 2010) (citation and internal quotation marks omitted), *overruled on other grounds by Lacey v. Maricopa County*, 693 F.3d 896 (9th Cir. 2012) (en banc). "In addition, private plaintiffs must meet the heightened pleading standards of the PSLRA, as well as its loss causation requirement." *See id.* (citation omitted). Further, where the complaint sounds in fraud, the heightened pleading requirements of Rule 9(b) also apply to a claim under Section 14(a). *See Desaigoudar*, 223 F.3d at 1022.

Plaintiffs assert a claim under Section 14(a), as well as a derivative claim under Section 20(a), based on the same allegedly false or misleading statements in the Registration Statement[22] that Plaintiffs challenge under Section 11 and Section 10(b).[23]

Defendants move to dismiss the Section 14(a) claim and derivative claim under Section 20(a), arguing that Plaintiffs have failed to plead materially false or misleading statements under Section 14(a) for the same reasons that they failed to plead materially false or misleading statements under Section 10(b). Defendants contend that the Section 14(a) claim and derivative Section 20(a) claim must satisfy the heightened pleading requirements of Rule 9(b) because the complaint sounds in fraud. Defendants further argue that the PSRLRA's safe harbor protects forward-looking statements from liability under Section 14(a).

In their opposition, Plaintiffs argue that their Section 14(a) and derivative Section 20(a) claims are not subject to Rule 9(b) because Plaintiffs disclaimed allegations of fraud in connection with those claims, and the claims are therefore "subject only to the permissive notice pleading standard of Rule 8(a)," which the CAC satisfies. ECF. No. 93 at 18. Plaintiffs further contend that the state of mind required to plead a claim under Section 14(a) is less stringent than that

---

[22] As noted above, the Proxy Statements for the Merger were a part of the Registration Statement. CAC ¶ 70.

[23] The RSU challenged statements, which pertain to the RSU accounting error discussed above in the scienter section of this order, were made after the Merger and Plaintiffs do not challenge them under Section 11 or Section 14(a).

required for a Section 10(b) claim, as Section 14(a) requires only a showing of negligence as opposed to deliberate recklessness.  ECF No. 93 at 18.

For the reasons discussed above, the CAC sounds in fraud.  Accordingly, the Section 14(a) claim and derivative Section 20(a) claim must satisfy the heightened pleading requirements of Rule 9(b).  Plaintiffs' nominal efforts to disclaim allegations of fraud in connection with their Section 14(a) and Section 20(a) claims, *see* CAC ¶¶ 312, 327, are unavailing given that the gravamen of the complaint is a uniform course of fraudulent conduct.  *See In re Rigel Pharms.,* 697 F.3d at 885.

The Court grants Defendants' motion to dismiss the Section 14(a) claim, and the derivative claim under Section 20(a), with leave to amend, to the extent that they are premised (1) on statements in the Registration Statement that the Court has found are not plausibly materially false or misleading based on the theories and allegations discussed above in connection with the Section 10(b) claim; or (2) on statements in the Registration Statement that the Court has found, above, are protected under the PSLRA's safe harbor.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motion to dismiss Plaintiffs' claim under Section 10(b) and derivative claim under Section 20(a).  The Court also GRANTS Defendants' motion to dismiss Plaintiffs' claims under Section 11 and Section 14(a), as well as the derivative claims under Section 15 and Section 20(a), respectively, to the extent that they are premised on (1) the statements that the Court has found are not plausibly materially false or misleading based on the theories and allegations discussed above in connection with Plaintiffs' Section 10(b) claim; or (2) the statements that the Court has found are protected by the PSLRA's safe harbor.  The dismissal is WITH LEAVE TO AMEND, except with respect to Statements 3 and 43, CAC ¶¶ 228 and 424, which Plaintiffs concede are not actionable, as discussed above.

The Court DENIES Defendants' motion to dismiss to the extent that the Court has concluded that certain challenged statements are not protected by the PSLRA's safe harbor.

Plaintiffs may file an amended complaint within 30 days of the date this order is filed to cure the deficiencies discussed herein, to the extent that Plaintiffs can do so without contradicting

United States District Court
Northern District of California

the allegations in their prior pleadings.  A failure to file an amended complaint will result in dismissal with prejudice of the claims dismissed herein.

The case management conference scheduled for January 30, 2024 is continued to March 26, 2024 at 2:00 p.m.  An updated joint case management statement is due March 19, 2024.

**IT IS SO ORDERED.**

Dated:  January 26, 2024

_____
JON S. TIGAR
United States District Judge