POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Telephone: 310-405-7190
jpafiti@pomlaw.com

*Lead Counsel for Plaintiffs
and the Class*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| KAROLINE KAMPE, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>VOLTA INC., SCOTT MERCER, FRANCOIS P. CHADWICK, CHRISTOPHER WENDEL, BRANDT HASTINGS, TORTOISE ACQUISITION CORP. II, VINCENT T. CUBBAGE, STEPHEN PANG, JUAN J. DABOUB, KARIN M. LEIDEL, and SIDNEY L. TASSIN,<br><br>Defendants. | Case No.: 4:22-cv-02055-JST<br><br>**SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br><u>CLASS ACTION</u><br><br><u>JURY TRIAL DEMANDED</u><br><br>Judge: Hon. Jon S. Tigar |

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.   JURISDICTION AND VENUE ........................................................................... 5

III.  PARTIES ............................................................................................................. 6

      A.    Plaintiffs .................................................................................................. 6

      B.    Defendants ............................................................................................... 7

IV.   CONFIDENTIAL WITNESSES ......................................................................... 9

V.    VIOLATIONS OF THE SECURITIES ACT ..................................................... 11

      A.    Tortoise Acquisition Corp. II's "De-SPAC" Merger with Volta ............... 11

      B.    Substantive Allegations ........................................................................... 15

            1.    Volta's History and Business Model ................................................... 15

            2.    The Registration Statement's Projections for Revenue and Charging
                  Stall Installations were Unsupported and Unrealistic ......................... 17

            3.    Volta's Insufficient Internal Controls and Failure to Pay Site Hosts ..... 23

            4.    Volta's Improper Revenue Recognition Practices ................................ 27

            5.    Volta's False and Misleading Reporting of Financial Information .......... 30

                  a)    Volta Violated Revenue Recognition Rules ................................ 31

                  b)    Volta's Revenue Recognition Practices Violated the Principle
                        of Neutrality ............................................................................ 36

                  c)    Volta's Improper Revenue Recognition Practices were Material
                        to Volta's Financial Statements ................................................. 37

                        (1)    Volta's Revenue Recognition Practices were Qualitatively
                               Material ...................................................................... 39

                  d)    Volta's Reporting of its Liabilities and Cash Balances Was False
                        and Misleading ......................................................................... 41

                  e)    Volta's Projections of Station Installations Were False, Misleading,
                        and Unfounded ........................................................................ 42

i

C.      False and Misleading Statements for the Securities Act Claims .................................... 43

COUNT I: FOR VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT OF
1933 (AGAINST DEFENDANTS TORTOISE, CUBBAGE, PANG, DABOUB, LEIDEL,
TASSIN, VOLTA, MERCER, CHADWICK, AND WENDEL (THE "SECURITIES
ACT DEFENDANTS")) ........................................................................................................ 55

COUNT II:  FOR VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT OF 1933
 (AGAINST DEFENDANTS CUBBAGE, PANG, DABOUB, LEIDEL, TASSIN, MERCER,
CHADWICK, AND WENDEL ("THE SECURITIES ACT INDIVIDUAL DEFENDANTS")) ......... 56

VI.     VIOLATIONS OF SECTION 14(a) AND 20(a) OF THE EXCHANGE ACT ...................... 57

        A.      No Safe Harbor ............................................................................................ 59

COUNT III: FOR VIOLATIONS OF SECTION 14(a) OF THE SECURITIES EXCHANGE
ACT OF 1934 AND SEC RULE 14a–9 (AGAINST DEFENDANTS TORTOISE, CUBBAGE,
PANG, DABOUB, LEIDEL, TASSIN, VOLTA, MERCER, CHADWICK, AND WENDEL) .......... 59

COUNT IV: FOR VIOLATIONS OF SECTION 20(a) OF THE SECURITIES EXCHANGE
ACT OF 1934 IN CONNECTION WITH THE PROXY CLAIMS (AGAINST DEFENDANTS
CUBBAGE, PANG, DABOUB, LEIDEL, TASSIN, MERCER, CHADWICK, AND WENDEL) ..... 61

VII.    VIOLATIONS OF SECTION 10(b) AND 20(a) OF THE EXCHANGE ACT ...................... 63

        A.      Substantive Allegations ............................................................................ 63

                1.      Volta Began Exploring Methods to Raise Capital in Early 2022 ...................... 63

                2.      Volta's Unfounded Revenue Projections During the Class Period ................... 65

                3.      Volta Delayed and/or Failed to Pay Vendors and Site Hosts Due to
                        its Cash Burn ......................................................................................... 67

                4.      Mercer and Wendel's Unexpected "Resignations" ............................................ 72

        B.      False and Misleading Statements ................................................................ 76

        C.      The Truth Begins to Emerge in Several Partial Disclosures While Defendants
                Continued to Mislead Investors ................................................................. 85

                1.      March 2022 Partial Disclosures and False and/or Misleading Statements
                        and Omissions .......................................................................................... 85

                2.      April 2022 False and/or Misleading Statements and Omissions ....................... 88

3. May 2022 False and/or Misleading Statements and Omissions ........................ 97

4. June 2022 Partial Disclosures and False and/or Misleading Statements and Omissions ................................................................................ 102

5. August 2022 False and/or Misleading Statements and Omissions .................. 104

6. September 2022 Partial Disclosures and False and/or Misleading Statements and Omissions ................................................................ 110

7. November 14, 2022 Corrective Disclosure ...................................................... 112

D. Additional Scienter Allegations ............................................................................. 115

1. Defendants Knew of Facts Critical to Volta's Core Operations and Spoke About Them in Detail, Showing Their Awareness of These Issues ...... 115

2. Statements by CWs Support an Inference of Scienter for Mercer, Wendel, and Chadwick ................................................................................... 117

3. Management's January 2022 Board Presentation Supports an Inference of Scienter for Mercer, Wendel, Chadwick, and Cubbage ................................. 118

4. The Departure of Key Executives Supports an Inference of Scienter ............. 118

5. Defendants Had Motive to Continue their Fraudulent Conduct to Promote Volta When It Went Public and to Maintain an Artificially High Stock Price to Obtain Additional Financing ............................................................. 119

E. Loss Causation ....................................................................................................... 120

1. March 28, 2022 ............................................................................................... 121

2. June 13, 2022 .................................................................................................. 122

3. September 26, 2022 ......................................................................................... 123

4. September 28, 2022 ......................................................................................... 124

5. November 15, 2022 ......................................................................................... 125

F. The Presumption of Reliance Applies .................................................................... 126

G. No Safe Harbor ...................................................................................................... 128

iii

COUNT V: FOR VIOLATIONS OF SECTION 10(b) OF THE SECURITIES EXCHANGE ACT OF 1934 AND SEC RULE 10b-5 (AGAINST DEFENDANTS VOLTA, MERCER, CHADWICK, WENDEL, CUBBAGE, AND HASTINGS) ................................................................. 128

COUNT VI: FOR VIOLATIONS OF SECTION 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934 (AGAINST DEFENDANTS MERCER, CHADWICK, WENDEL, CUBBAGE, AND HASTINGS ("THE SECTION 10(b) INDIVIDUAL DEFENDANTS")................................. 131

VIII.    CLASS ACTION ALLEGATIONS ................................................................. 132

IX.    PRAYER FOR RELIEF ................................................................. 134

X.    DEMAND FOR JURY TRIAL ................................................................. 134

Lead Plaintiff Steve Padget and additional plaintiffs Eric M. Walden and Jason Eckert ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through Plaintiffs' attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, the investigation by Plaintiffs' counsel, which includes without limitation: (a) review and analysis of regulatory filings made by Volta Inc. ("Volta" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Volta; (c) interviews of former employees of Volta; (d) review of analyst reports of Volta; and (e) review of other publicly available information concerning Volta.[1]

## I.    INTRODUCTION

1.      Volta partners with real estate and retail businesses to deploy charging stations for electric vehicles at retail locations. The Company generates revenue primarily from selling advertising on media screens on its charging stations.

2.      Volta was formed through a merger, or de-SPAC transaction, between Volta Industries, Inc., a private entity, and Tortoise Acquisition Corp. II ("Tortoise"), a special purpose acquisition company (or SPAC), that was completed on August 26, 2021 (the "Merger").

3.      This is a class action on behalf of persons and entities that (i) purchased or otherwise acquired Volta securities pursuant and/or traceable to the Registration Statement for the Merger (the "Securities Act Class"); (ii) beneficially owned and/or held SNPR Class A common stock (i.e., Tortoise's common stock) as of July 15, 2021 and were eligible to vote on the Merger at Tortoise's August 25, 2021 extraordinary general meeting (the "Section 14(a) Class"); or (iii) purchased or otherwise acquired Volta securities between August 2, 2021 and November 14, 2022, both dates inclusive (the "Class Period" for the "Section 10(b) Class").

4.      From the time Volta went public through its SPAC Merger, it failed to disclose substantial flaws in its business that Defendants covered up by engaging in serious accounting

---

[1] Emphases in this Second Consolidated Amended Complaint are added, unless noted otherwise below.

violations and other financial improprieties, and by concealing the true state of the Company's business.

5.      One of Volta's key metrics was the size of its charging network, measured by the number of charging stations that it installed. This figure was particularly important because as Volta installed more charging stalls around the country, it created a larger "network effect" that made advertising across its network more valuable to its customers. Volta highlighted this aspect of its business throughout the Class Period, noting that "Chargers grow in value as the network scales"—and multiple former employees confirmed its importance to Volta's business model. Volta's ability to install charging stations was thus inseparable from Volta's ability to generate revenue. Fewer stations meant not only that Volta had fewer places to sell ads, but also that even the stations that it had available were worth less to its advertisers.

6.      Volta's projections for stall installations over the next few years following the Merger were unsupported because the Company failed to account for the many hurdles that it faced in installing new chargers, including regulatory issues, difficulties negotiating with property owners, and an inexperienced team. Multiple former Volta employees viewed the Company's projections for how many chargers it would install as unrealistic from the time it went public.

7.      Soon after Volta became a public company, management realized that the Company would need to raise significant funds to continue its growth strategy.  By January 2022, Volta's management team, including Defendant Mercer, privately told Volta's Board of Directors that the Company needed to raise between $300 million and $350 million of additional capital for Volta to pursue its growth strategy beyond June 30, 2022.  But, the Board concluded that Mercer's "proposed budget was unsustainable" and fired him and Wendel in March 2022, which took off the table a term sheet for that amount that Mercer had been negotiating with a venture capital firm. Defendants, however, concealed that Volta would be unable to continue its current strategy beyond June 2022 and that the Company's current strategy was so deeply flawed that the Board viewed it as unsustainable. Rather than reveal the dire state of Volta's business, Defendants continued to promote Volta's growth strategy to investors through the remainder of the Class Period, even though the Board had abandoned

that strategy in January 2022.

8.    By the second quarter of 2022, Volta's cash balance was so low that Volta's senior executives were instructing employees not to pay amounts owed to the property owners that hosted Volta's charging stations and to the vendors that built Volta's charging stations. Defendants engaged in this practice for the express purpose of making Volta's finances look better to investors, and concealed the fact that Volta's financial situation was so dire that it could not afford to make these payments on time, if at all. These delinquencies soured Volta's relationships with its site hosts and materially slowed progress on stall installations, preventing the Company from meeting its installation projections. Rather than having the positive relationship with site hosts that were important clients that Volta touted, Volta was actually engaged in tense discussions with them and was on the verge of losing their business, which was essential to Volta's bottom line. But, throughout the Class Period, as Volta consistently missed stall installation projections, Defendants continued to assure investors that Volta's business model was sound by doubling down on further projections, and failed to disclose the impact that Volta's dire financial situation had on stall installations and revenue.

9.    Volta also violated GAAP rules for revenue recognition to make its revenues look larger than they actually were. During every quarter from two years prior to the SPAC Merger through the third quarter of 2021 – Volta's first quarter as a public company – Volta's sales team would approach advertisers toward the end of each quarter to get the advertisers to agree to "pull" ads from a subsequent quarter forward to the current quarter so that Volta could book the revenue for those ads in the current quarter.

10.    This practice of pulling forward revenue to an earlier quarter was a clear violation of GAAP rules described in ASC 606, covering revenue recognition practices. It also set Volta up for failure because it made selling ads in subsequent quarters more difficult when the advertisers whose revenue Volta was pulling forward would not be paying for additional ads in the subsequent quarter.

11.    Because Volta never disclosed this accounting impropriety to the public, it gave investors an unwarranted, overly optimistic view of the Company's ability to earn revenue in the future. As discussed in more detail at ¶¶ 116-25, these improper accounting practices have been corroborated

by one of Volta's regional heads of advertising sales.

12.     Defendants' misconduct was revealed to the market through a series of partial corrective disclosures from March 28, 2022 to November 15, 2022. On March 28, 2022, Volta's founders, Defendants Scott Mercer and Christopher Wendel, were fired from the Company just six months after it went public, and only two months after they had informed Volta's Board of Directors (the "Board") that if Volta did not raise $300-350 million, its current growth strategy would not survive past June 2022. Volta's stock price fell 18% on this news alone, but Defendants did not at that time disclose the true extent of Volta's dire financial situation, and portrayed the Company's founders as having resigned on voluntary and amicable terms to maintain investor confidence. This account is contradicted by the descriptions of former employees who made clear that Mercer and Wendel "were ousted from their own company."

13.     Volta proceeded to announce extremely disappointing results over the course of 2022, including consistently failing to meet its previously stated goals for the number of chargers it would install and the amount of revenue it would earn; lowering, and then withdrawing entirely, its future guidance for these metrics; and eventually reporting a rapidly decreasing cash balance that prevented the Company from being able to grow its business at the rate Volta had promised. These negative developments were the direct and logical result of the fraud perpetrated by Defendants since Volta's inception as a public company, but Defendants continued to assure investors that Volta's business model was sound.

14.     For example, pulling forward revenue to earlier quarters made Volta less able to meet its revenue goals in subsequent quarters. Similarly, when Volta was finally forced to pay its overdue liabilities that Defendants papered over earlier, it expended an unexpected amount of cash, making it even less likely to meet its prior growth projections. Indeed, on November 15, 2022, after Volta reported its disappointing results for the third quarter of 2022, Barclays noted that Volta had unexpectedly spent $30 million that it "***incurred largely in observance of some sort of contractual agreements from what we can tell***." This increased "cash burn" hampered Volta's ability to grow and raised "doubt about the company's 'ability to continue as a going concern' with liquidity being an issue

in 4Q." Those types of expenses, however, were clear internally to Volta's management much earlier than November 15, 2022, because the Company had already stopped paying liabilities to site hosts and vendors by the second quarter of 2022.

15.    Volta's steep decline caused significant harm to its investors. The Company's stock traded at a closing price of $9.30 per share on August 26, 2021, the day that the Merger closed, and reached as high as $13.04 on September 17, 2021.  Volta's share price continued to drop over the course of 2022, as the truth about Defendants' misconduct and the Company's resulting financial situation were revealed through a series of partial corrective disclosures. The Company's valuation dropped so much that on January 18, 2023, Volta announced that it was being acquired by Shell in a deal that valued Volta at just $169 million—a mere 12% of the Registration Statement's valuation of $1.4 billion—destroying well over $1.2 billion in shareholder value. On March 31, 2023, Volta announced that Shell had completed its acquisition of the Company.

## II.    **JURISDICTION AND VENUE**

16.    Certain claims asserted herein arise under Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act," 15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

17.    Additional claims asserted herein arise under Section 11 and 15 of the Securities Act of 1933 (the "Securities Act," 15 U.S.C. §§ 77k and 77o).

18.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa).

19.    This Court also has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v).

20.    This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331.

21.    Venue lies in the Northern District of California pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because Defendants transact business in this District and because the Company's principal executive officers, are and at all relevant times were, located in this District. Venue is also

proper in this District pursuant to 28 U.S.C. §§ 1391(b)–(d) because many of the acts and transactions that constitute the violations of law complained of in this Amended Complaint, including the dissemination to the public of materially false or misleading statements, occurred or emanated from within this District.

22.    In connection with the acts, omissions, conduct, and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, the facilities of the national securities markets, and interstate telephonic and digital communications systems.

### III.    PARTIES

#### A.    Plaintiffs

23.    Lead Plaintiff Steve Padget ("Lead Plaintiff"), as set forth in his previously filed Certification (ECF No. 64-1), acquired Volta securities at artificially inflated prices during the Class Period and suffered damages upon revelation of the alleged corrective disclosures or materialization of undisclosed risk. Lead Plaintiff bought Tortoise securities prior to the Record Date and held those securities through the Merger, at which point Lead Plaintiff bought Volta securities through the conversion of Tortoise securities in the Merger.

24.    Plaintiff Eric M. Walden, as set forth in his previously filed Certification (ECF No. 64-2), acquired Volta securities at artificially inflated prices during the Class Period and suffered damages upon revelation of the alleged corrective disclosures or materialization of undisclosed risk.

25.    Plaintiff Jason Eckert, as set forth in his previously filed Certification (ECF No. 64-3), acquired Volta securities at artificially inflated prices during the Class Period and suffered damages upon revelation of the alleged corrective disclosures or materialization of undisclosed risk.

26.    Lead Plaintiff and the Plaintiffs referenced in ¶¶ 23-25 above are referred to collectively as "Plaintiffs."

27.    Plaintiffs purchased shares pursuant and/or traceable to the Registration Statement that was issued in connection with Volta's SPAC Merger that closed on or around August 26, 2021.

1

**B.    Defendants**

2

28.    During the Class Period, Defendant Volta was incorporated under the laws of Delaware

3

with its principal executive offices located in San Francisco, California. Volta's Class A common stock

4

traded on the New York Stock Exchange ("NYSE") under the symbol "VLTA," and its warrants traded

5

on the NYSE under the symbol "VLTA WS." Each whole redeemable warrant was exercisable for one

6

share of Class A common stock at an exercise price of $11.50 per share.

7

29.    Defendant Scott Mercer was Volta's CEO, Founder, and Chairman prior to the issuance

8

of the Registration Statement and from the beginning of the Class Period until his departure upon the

9

filing of the Company's Form 10-K for 2021 on April 15, 2022.

10

30.    Defendant Francois P. Chadwick was the Company's Chief Financial Officer ("CFO")

11

prior to the issuance of the Registration Statement and the beginning of the Class Period until his

12

departure from the Company on August 22, 2022.

13

31.    Defendant Christopher Wendel was the Company's President and Founder prior to the

14

issuance of the Registration Statement and from the beginning of the Class Period until his departure

15

from the Company on March 28, 2022. He also served as a Volta Director until his departure from the

16

Company.

17

32.    Defendant Brandt Hastings served as Volta's Chief Revenue Officer from November

18

2020 until his appointment as Chief Commercial Officer on June 13, 2022 Hastings served as Volta's

19

Interim CEO from April 15, 2022 until June 12, 2022, and has served as Volta's CEO and President

20

since March 2023.

21

33.    Defendant Tortoise Acquisition Corp. II ("Tortoise") was a special purpose acquisition

22

company ("SPAC") incorporated in the Cayman Islands for the purpose of effecting a merger, share

23

exchange, asset acquisition, share purchase, reorganization or similar business combination with one or

24

more businesses or assets. Tortoise's principal executive officers were in Overland Park, Kansas.

25

Tortoise underwent a domestication to the state of Delaware as part of its de-SPAC transaction with

26

Volta (the Merger). Prior to the Merger, Tortoise's common stock traded on the NYSE under the

27

symbol "SNPR," and its redeemable warrants, exercisable for shares of common stock at an exercise

28

price of $11.50 per share, traded on the NYSE under the symbol "SNPR WS."

34.    Defendant Vincent T. Cubbage was the CEO and President of Tortoise from its inception through the Merger, was a Volta Director at all relevant times, was Co-Chairperson of Volta from Mercer's resignation until Cubbage's appointment as Interim CEO of Volta on June 13, 2022, a role which he served until April 2023. Defendant Cubbage signed the Registration Statement.

35.    Defendant Stephen Pang was Tortoise's Chief Financial Officer from July 2020, and served on its Board of Directors since the completion of its IPO in September 2020, until the Merger. Defendant Pang signed the Registration Statement.

36.    Defendant Juan J. Daboub served on Tortoise's Board of Directors from the completion of its IPO in September 2020 until its merger with Volta. Defendant Daboub signed the Registration Statement.

37.    Defendant Karin M. Leidel served on Tortoise's Board of Directors from the completion of its IPO in September 2020 until its merger with Volta. Defendant Leidel signed the Registration Statement.

38.    Defendant Sidney L. Tassin served on Tortoise's Board of Directors from the completion of its IPO in September 2020 until its merger with Volta. Defendant Tassin signed the Registration Statement.

39.    Defendants Volta, Mercer, Chadwick, Wendel, Hastings, Tortoise, Cubbage, Pang, Daboub, Leidel, and Tassin are referred to collectively as "Defendants."

40.    Defendants Volta, Mercer, Chadwick, Wendel, Tortoise, Cubbage, Pang, Daboub, Leidel, and Tassin are Defendants in Plaintiffs' claims under Sections 11 and 15 of the Securities Act and in Plaintiffs' claim under Sections 14(a) and associated Section 20(a) claim under the Exchange Act.

41.    Defendants Volta, Mercer, Chadwick, Wendel, Hastings, and Cubbage are Defendants under Plaintiffs' claim under Section 10(b), and associated claim under Section 20(a), of the Exchange Act.

1

2

### IV.    CONFIDENTIAL WITNESSES

3

42.    Statements from interviews with the following confidential witnesses ("CWs") are

4

included throughout this Complaint. Additional statements from the CWs added in this Second

5

Consolidated Amended Class Action Complaint are based on follow-up interviews with these witnesses

6

and interviews with new witnesses that were conducted in January and February 2024.  As discussed

7

herein, certain witnesses clarified and/or provided additional detail regarding their statements that were

8

included in the initial Consolidated Amended Class Action Complaint.

9

43.    CW 1 was a Vice President of Media Sales at Volta from several years before the SPAC

10

Merger to the time in 2022 around when many other employees left the Company. Until the beginning

11

of 2022, CW 1 reported to Volta's Executive Vice President of Sales, who, in turn, reported to Wendel

12

and Mercer. Then, the witness reported to Volta's Senior Vice President of Media Sales. Starting in

13

2020, this witness was one of four regional sales managers, with several media seller reports.

14

44.    CW 2 worked at Volta from May 2021 to December 2021 as an Enterprise Program

15

Manager, and reported to the Company's Vice President of Strategic Programs and Customer Success,

16

who in turn reported to Defendant Brandt Hastings, the Chief Revenue Officer (and eventual Interim

17

CEO following Mercer's departure). CW 2's job was to work on renewing business with Volta's clients

18

on whose property it installed charging stations and to whom it sold ads, including tracking station

19

performance and installations and corresponding with Volta's clients.

20

45.    CW 3 worked at Volta from October 2018 to October 2022 and was Vice President of

21

Enterprise Sales and Director of Charging Stations since early 2021. CW 3 had frequent direct contact

22

with Wendel, and the witness's supervisor reported to Wendel. The witness also had contact with

23

Mercer during the first three years that the witness was at the Company and met with Board Chair

24

Cubbage four times. This witness's job was to acquire clients or site hosts (i.e., property owners) who

25

would host charging stations on their properties. This consisted of REITs (real estate investment trusts),

26

national retailers, and third-party property managers. CW 3 reported to the Senior Vice President of EV

27

Charging until October 2021, to Brandt Hastings from October 2021 to late February or early March

28

2022, and to the Executive Vice President of Sales until October 2022. CW 3 was furloughed from

Volta in October 2022 along with 54% of the Company's personnel – approximately 160 to 170 people.

46.     CW 4 was Volta's Controller, who worked in that role from mid-2017 to early 2020. CW 4 reported to Volta's CFO (including Debra Crow), who, in turn, reported to Wendel. CW 4 had regular contact with Mercer and Wendel, including reporting to Wendel at various times, having management meetings with Mercer, and being available as needed for Board meetings.

47.     CW 5 was an Assistant Controller at Volta from January 2019 to June 2020 and reported to the Company's Controller (CW 4) who, in turn, reported to the Company's Chief Financial Officer (including Debra Crow).

48.     CW 6 worked at Volta from August 2019 to April 2022 as a Senior Product Manager, who reported to the Company's Vice President of Product, who, in turn, reported to its Chief Technology Officer, Praveen Mandal.

49.     CW 7 was a Senior Director of Product Marketing at Volta from February 2019 to October 2022. This witness reported to Volta's Chief Marketing Officer, who in turn reported to Mercer (followed by Hastings and Cubbage).

50.     CW 8 was Vice President of Data and Insights at Volta from April 2018 to September 2022.

51.     CW 9 was a General Manager of Media Sales for Volta in Hawaii from May 2018 to April 2021. This witness was a sales executive whose job was to sell media space on Volta's screens on its charging stations.

52.     CW 10 was a Corporate FP&A (or Financial Planning & Analysis) Manager at Volta from January 2022 to June 2023. This witness was based in San Francisco and reported to the Director of Financial Strategy (in charge of FP&A), Michael Standifer, who reported to the Vice President of Finance, Garrett Little, who reported to Defendant Chadwick (Volta's CFO).

53.     CW 11 was a senior Volta employee from 2012 to October 2023 that worked on site development, including relationships with site hosts. During the Class Period, CW 11 reported to Senior Vice President of Sales Ted Fagenson until he left the Company in 2021; then to Vice President, Enterprise Portfolio Management, Christina Slayton until she left the Company in October 2022; and

then to Executive Vice President of Sales Rick Baker. All of these supervisors reported to Volta's President, Defendant Wendel, and then to Volta's CEO (Defendants Cubbage and then Hastings) after Wendel left the Company. In addition, CW 11 reported directly to Defendant Wendel early in CW 11's tenure at Volta and then, even when CW 11 reported to these other individuals, CW 11 continued to report directly to Wendel as well because the size of the deals that CW 11 worked on were so large that they needed to go straight to Wendel.

## V.    VIOLATIONS OF THE SECURITIES ACT

54.    This Section and Counts herein expressly do not incorporate any of the allegations in Sections VI and VII below. For purposes of this Section and the claims alleged herein, it is as though Sections VI and VII are not part of this Complaint. As stated herein, the allegations in this Section arise under strict liability and none of the allegations herein shall be interpreted as alleging intentional or reckless misconduct or alleging that any of the Defendants acted with scienter or fraudulent intent.

### A.    Tortoise Acquisition Corp. II's "De-SPAC" Merger with Volta

55.    Tortoise was a special purpose acquisition company incorporated in the Cayman Islands for the purpose of effectuating a merger, share exchange, asset acquisition, share purchase, reorganization or similar business combination with one or more businesses or assets.

56.    In September 2020, Tortoise completed its initial public offering ("IPO") in which it sold 34,500,000 units at a price of $10.00 per unit (including the exercise in full by the underwriters of their option to purchase up to an additional 4,500,000 units), generating gross proceeds of $345 million. The units were listed on the NYSE, with each unit consisting of one Class A ordinary share and one-fourth of one redeemable warrant, with each whole warrant entitling the holder thereof to purchase one Class A ordinary share at an exercise price of $11.50 per share.

57.    Simultaneously with the IPO, Tortoise completed the private sale of 5,933,333 warrants (the "Private Placement Warrants") at a purchase price of $1.50 per Private Placement Warrant to TortoiseEcofin Borrower (associated with the SPAC's sponsor), generating gross proceeds of $8,900,000. These warrants, like the warrants that were part of the units issued in the IPO, each entitled the holder to purchase one Class A ordinary share at an exercise price of $11.50 per share.

58.     Tortoise represented at the time of its IPO that it "intends to focus its search for a target business in the broad energy transition or sustainability arena targeting industries that require innovative solutions to decarbonize in order to meet critical emission reduction objectives."

59.     On February 7, 2021, Tortoise announced that it planned to merge with Volta Industries, Inc. ("Legacy Volta"), a private entity, in what is known as a "De-SPAC" transaction (the "Merger"). The new combined entity following the Merger would be named Volta Inc. ("Volta" or the "Company").

60.     On May 14, 2021, Tortoise filed with the SEC the initial Registration Statement on Form S-4 for the shares that would be issued in the Merger.[2] The Registration Statement was amended several times, including on June 25, July 15, and July 29, 2021. The version that was filed on July 29, 2021 was the final version of the Registration Statement that was filed prior to Volta's de-SPAC merger with Tortoise.

61.     Each version of the Registration Statement was signed by Defendants Cubbage, Tortoise's CEO, President, and Director (who was designated as its Principal Executive Officer); Pang, its CFO and Director (who was designated as its Principal Financial Officer and Principal Accounting Officer); and Directors Daboub, Leidel, and Tassin. The Registration Statement also included a preliminary Proxy Statement/Prospectus for the Merger.

62.     The Registration Statement was declared effective on August 2, 2021. That same day, the final Proxy Statement and Prospectus for the SPAC merger was filed with the SEC on Form 424(b)(3). The preliminary and final Proxy Statements/Prospectus (the "Proxy" or "Proxy Statement") stated that it was part of the Registration Statement. The Proxy Statement announced that the extraordinary general meeting at which Tortoise shareholders would vote on the Merger with Volta would be held on August 25, 2021, and that the Record Date for shareholders to be able to vote at the meeting required them to have held Tortoise SNPR shares as of July 15, 2021. The Proxy Statement was signed by Cubbage on behalf of Tortoise. It also included the Merger Agreement and Plan of

---

[2]     The Registration Statement states that it was filed with the SEC on May 14, 2021 and it was accepted by the SEC on that date, with a filing date noted by the SEC of May 17, 2021.

Reorganization between Tortoise and Legacy Volta, which was signed by Cubbage on behalf of Tortoise and by Mercer on behalf of Legacy Volta.

63.    The Registration Statement registered 165,078,050 shares of Volta Class A Common stock, 22,066,892 shares of Volta Class B common stock, and 8,625,000 warrants to purchase Volta Class A common stock. This covered to the 34.5 million shares of Class A common stock and 8,625,000 warrants that were issued in Tortoise's prior IPO, 8,625,000 shares that would be issuable upon the exercise of these warrants, and an additional 144,019,942 shares (including a combination of Volta Class A and Class B shares) that would be issued or reserved to be issued in connection with the Merger.

64.    The Registration Statement explained that "[i]mmediately prior to the consummation of the Business Combination," Tortoise, which was incorporated in the Cayman Islands, would "effect a deregistration under the Cayman Islands Companies Law (2020 Revision) and a domestication under Section 388 of the Delaware General Corporation Law, pursuant to which TortoiseCorp's jurisdiction of incorporation will be changed from the Cayman Islands to the State of Delaware." All of the securities being registered would then be issued by Tortoise, which would be called Volta Inc. following this transaction.

65.    Under this registration structure, all of Volta's registered shares and warrants following the Merger, including shares and warrants that were previously issued pursuant to Tortoise's IPO, were newly registered and issued under the Registration Statement for the Merger.

66.    The Volta shares that were registered in connection with the Merger included a substantial amount of shares that were being issued to Legacy Volta's prior shareholders (including Mercer and Wendel) and to investors in a private placement that would close concurrently with the Merger. The Registration Statement anticipated that "upon completion of the Business Combination, the ownership of New Volta will be as follows" (assuming that "that no public shareholders elect to have their public shares redeemed," which they had a right to do prior to the Merger for $10 per share):

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT; 4:22-cv-02055-JST

| | Shares of New Volta Class A Common Stock | % of Total New Volta Class A Common Stock | Shares of New Volta Class B Common Stock | % of Total New Volta Class B Common Stock | % of Total Voting Power |
|---|---|---|---|---|---|
| Historical Rollover Shareholders[1] | 88,728,871 | 50.9% | 1,907,872 | 16.7% | 37.3% |
| Public shareholders | 34,500,000 | 19.8% | — | | 12.0% |
| New Private Placement Investors | 30,000,000 | 17.2% | — | — | 10.4% |
| Initial shareholders | 8,625,000 | 4.9% | — | — | 3.0% |
| Scott Mercer[2] | 5,862,393 | 3.4% | 7,176,406 | 62.8% | 26.9% |
| Christopher Wendel[3] | 6,649,012 | 3.8% | 2,347,621 | 20.5% | 10.4% |
| **Total** | **174,365,276** | **100.0%** | **11,431,899** | **100.0%** | **100.0%** |

67.     Approval of the Merger, including required conditions for the closing to occur, required the votes of "the holders of at least two-thirds of the Class A Ordinary Shares and Class B Ordinary Shares entitled to vote and actually casting votes thereon at the extraordinary general meeting, voting as a single class."

68.     The Merger would pass under "an ordinary resolution under Cayman Islands law, being the affirmative vote (in person, online or by proxy) of the holders of a majority of the Class A Ordinary Shares and Class B Ordinary Shares entitled to vote and actually casting votes thereon at the extraordinary general meeting, voting as a single class."

69.     On August 25, 2021, Tortoise announced that "[a]pproximately 96% of the votes cast on the business combination proposal at the Extraordinary General Meeting were in favor of approving the business combination."

70.     The Merger closed the following day, on August 26, 2021, with the shares of the new combined company, Volta, trading on the NYSE.

**B.    Substantive Allegations**

    **1.    Volta's History and Business Model**

71.    Volta deploys electric vehicle charging stations by partnering with real estate and retail businesses to place charging stations at their locations. The Company generates revenue from advertising on its content-driven charging stations, installing and maintaining the charging stations, and delivering electricity at the charging stations. Volta also enters into contracts with property owners in which Volta pays the property owners for the ability to place the Company's charging stations on their property.

72.    Defendant Mercer founded Volta in 2010. Defendant Wendel subsequently joined Volta as a co-founder. Mercer served as Volta's CEO and Wendel as its President until their abrupt departures from the Company that were announced on March 28, 2022.

73.    The Registration and Proxy Statements promoted Volta by stating that it "primarily owns, operates and maintains EV charging stations and has expanded its network across the United States to include more than 1,700 chargers across 24 territories and states that have generated over 165,000 charging sessions per month on average for the three months ended March 31, 2021, forming one of the most utilized charging networks in the United States." These documents described the Company's prospects in glowing terms, stating that "[t]o take advantage of the expected growth opportunity presented by the EV market, Volta intends to rapidly expand its network of charging stations, using its proprietary data-driven planning tools to identify high-traffic, high visibility site partner locations that it believes would benefit most from its EV charging solutions and garner the highest usage from Volta's driving community, while delivering the most value for Volta's media and advertising partners."

74.    The Registration and Proxy Statements explained that Volta offers three types of charging options, Level 2 charging stations, Level 2 charging towers, and DC Fast Charging Stations, stating that "Volta's EV charging equipment consists of a managed network of Level 2 and DCFC chargers equipped with digital displays (which Volta refers to as its 'content-driven' charging stations) and Level 2 charging towers without digital displays."

75.     These documents also stated that "Volta deploys its EV charging platform network by either leasing space at host site locations for the installation of Volta-owned charging stations or by selling charging stations to select site hosts and performing related maintenance services. Volta also generates Behavior and Commerce revenue through the delivery of media partner content across both Volta-owned and site partner-owned charging stations equipped with digital displays."

76.     Volta's main source of revenue is "from the sale of media display time on its charging stations to its commercial partners, as well as to site hosts who wish to display additional media content on Volta's charging stations." These advertisements come from the property owners on whose property Volta places its charging stations and from third-party advertisers. According to the Registration and Proxy Statements, "Volta's primary business is focused on leasing premier space from real estate and retail partners and other site hosts to place its content-driven EV charging stations near site entrances, which are highly visible to both pedestrian and vehicular traffic, creating a desirable platform for brands and Volta's commercial partners to deliver their media content." Similarly, the Registration and Proxy Statements noted that Volta's "[r]evenue is derived primarily by selling paid content on the media-enabled charging station network and selling, installing and maintaining charging stations," with the selling of paid content on charging stations categorized as "Behavior and Commerce" revenue and the revenue from "installation services, operation and maintenance services" categorized as Network Development revenue. Volta's Behavior and Commerce revenue accounted for 74.5% of Volta's total revenue for the three months ended March 31, 2021 (as disclosed in the Registration Statement) and over 86% of Volta's total revenue for the three months ended September 30, 2021 (Volta's first quarterly report as a public company).

77.     The property owners that served as Volta's site hosts were also often Volta's advertising customers. As Volta explained in the Registration Statement, "Volta also derives revenue from the sale of media display time on its charging stations to its commercial partners, as well as to site hosts who wish to display additional media content on Volta's charging stations." Advertising on Volta's charging stations offered site hosts the ability "to display promotional content on the charging stations located at their sites" and "to display site host content on Volta charging stations with the goal of impacting the

full funnel of behavior from their customers: influencing store choice, extending dwell-time and affecting purchase decisions."

78.     The Registration and Proxy Statements stated that Tortoise's Board determined that Volta's fair market value exceeded $1.4 billion.

### 2.     The Registration Statement's Projections for Revenue and Charging Stall Installations were Unsupported and Unrealistic

79.     One of Volta's key metrics that it disclosed to investors was the number of charging stations that it installed, which was intertwined with Volta's revenue projections. The more charging stations and screens that Volta could install, the more advertisements it would be able to sell (with each charging station generally having two screens). Volta gave lofty predictions for the number of charging stations that it would install following the Merger.

80.     Volta's former employees state that at the time of the Registration Statement, Volta's projections for its revenue and charging stall installations were unrealistic.

81.     For example, CW 10 created financial forecasts for Volta's revenue projections. CW 10 described Volta's revenue projections as "totally unrealistic." This witness explained that when they started working at Volta in January 2022, they reviewed the Excel file that contained the projections that Volta used when it went public via the SPAC Merger to learn how Volta made its financial projections. This file was saved on the Company's drive and its title was something to the effect of "SPAC Model."

82.     CW 10 spent a week reviewing this model and explained that the projections from the SPAC Merger were "totally made up." Its formulas were very haphazard and were not coherent. CW 10 asked their superiors about this and was told the "past is the past" and not to talk about it. In particular, CW 10 stated that Defendant Chadwick and Garrett Little (who reported to Chadwick) were "wildly aware" that these projections were off. Behind closed doors, Chadwick and Little would scoff when this model was brought up. They knew it was not good, but said to no longer write emails about this file and that it should be discussed only in person.

83.     Volta included its revenue and charging stall installation projections in the Registration

Statement. (*See infra* ¶¶ 177-79).

84.    The Registration Statement also highlighted the relationship between stall installations and revenue, stating: "Volta's charging stations will grow in value as its network scales due to the impact of network effects" and Volta believed it would "continue to grow its business at even greater rates as the Volta network scales." Volta similarly stated in an investor presentation that Volta and Tortoise gave in connection with the proposed merger, filed with the SEC on February 8, 2021 (and a revised version that was filed on June 17, 2021) (the "Investor Presentation"), that existing stations "grow in value as the network scales."

85.    Volta's former employees confirmed this dynamic. CW 2 was an Enterprise Program Manager whose job was to work on renewing business with Volta's clients on whose property it installed charging stations and to whom it sold ads. The witness had two major accounts, Kroger and another large supermarket chain. CW 2 explained that the network of media screens had no value until there was enough penetration in the designated marketing area in all relevant states to actually sell advertising. The witness explained that "[w]e might be in 50 Kroger stores, but it was not enough for them to want to spend on advertising because we couldn't prove that we had market penetration." The witness stated that when they left Volta in December 2021, the Company had installed stations at only 50 or 60 Kroger stores (approximately 16% to 20% of stores), but Volta needed 60% of the 300 stores that Kroger had allowed for before they could sell advertising. This witness also stated that Volta did not "have enough engineers or bandwidth or money to spend" to meet the threshold needed and "[i]t's going to take forever to get there and it's a huge money suck." They described Volta's business model as "not ready for prime time" and "awful."

86.    CW 2 viewed the Company's projections on the number of stations it would install as clearly "bulls***". For example, the witness explained that Volta's projections did not account for the complicated regulatory approval process for its charging stations. The witness explained that "[y]ou could spend a year going to city council meeting[s] to get one station approved." This witness also noted other factors that made installations more costly than Volta had planned for, including having multiple property owners for a single location, separate from the client that Volta was dealing with,

who would all need to approve the installation; "blackout days" on which the location did not let work on installations take place; navigating local bureaucracies for items such as zoning issues; and dealing with local store managers even after a large company allowed Volta to install charging stations at its locations. Because of these difficulties, Volta's projections on the number of charger installations that it would complete by the end of 2021 and 2022 were "off from the beginning." To make matters worse, this witness observed Volta employees doing these tasks without the proper experience. This witness thought that the Company's projections "were never correct" and "they were throwing out a number to look good."

87.    Other employees confirmed these problems with Volta's business model. CW 9, a General Manager of Media Sales in Hawaii from May 2018 to April 2021, explained that Volta needed a certain number of screens installed before it could make deals to sell advertisements to certain customers. It was clear to this witness that Volta did not have enough station installations, and by extension enough screens, to attract big customers. The witness stated that "[t]here were a lot of team meetings on the digital sales side where we'd say we can't get enough deals because there were not enough screens. Big clients would say 'When you have three times the footprint, then we'll make a deal.' My team on the mainland was always hustling management to get more screens, stations, installs in the ground." But, this witness explained, the problem was that Volta was facing an uphill battle against real estate companies, bureaucracies, governments, and competition.

88.    Similarly, CW 4 also did not see it as possible for Volta to reach the installation projections that it disclosed in its Investor Presentation. As the witness explained, Volta "always had very lofty goals when it came to installs, and they were always behind and goals were always missed during my tenure."

89.    CW 3, who worked at Volta from October 2018 and was a Vice President of Enterprise Sales and Director of Charging Stations since early 2021, had frequent direct contact with Wendel, and the witness's supervisor reported to Wendel. The witness also had contact with Mercer during the first three years that the witness was at the Company and met with Board Chair Cubbage four times. This witness's job was to acquire clients or site hosts (*i.e.*, property owners) who would host charging

stations on their properties. This consisted of REITs (real estate investment trusts), national retailers, and third-party property managers. CW 3 reported to the Senior Vice President of EV Charging until October 2021, to Brandt Hastings from October 2021 to late February or early March 2022, and to the Executive Vice President of Sales until October 2022. CW 3 was furloughed from Volta in October 2022 along with 54% of personnel – approximately 160 to 170 people.

90.    CW 3 was very critical of Volta's projections for the number of charging stations and media screens that it would install, calling them not realistic because the Company never had the financial capacity to install or manufacture that many stations. The witness specifically cited the Company's goal of reaching 3,100 charger installations by the end of 2021 and 6,500 in 2022, which were prepared by Drew Bennett, Volta's executive who was in charge of network operations. (This is consistent with the Investor Presentation, where Volta projected 3,142 stations installed by the end of 2021 and 6,492 by the end of 2022.) The witness stated that at the time of the SPAC transaction, those projections were wildly overoptimistic, noting that "[w]e barely had 3,100 stations in the ground in 15 years of business, and they expected to double that in one year time? How obtainable does that sound to you? It was excruciatingly irresponsible and inaccurate."

91.    CW 3 also confirmed the logistical difficulties associated with installing charging stations that other witnesses noted. A major component of this was that every charging station location was unique, with different property owners, varying real estate and particular local laws and ordinances. "None of this happens easily or swiftly," the witness noted, adding that 30% of the deals done on the sales side are never installed because Volta could not get the requisite permits approved by local governing bodies. In other cases, Volta could get permits, but clients were not willing to commit.

92.    This witness also described other reasons why Volta's installation projections were unrealistic. For example, Volta was not realistic about the time it takes to negotiate a deal with large retailers like Kroger or Kohl's Department Stores. In addition, CW 3 explained that Volta was starting to see stiff competition enter the market. This competition increased "in 2019-2020, when, all of a sudden, competitors of ours – Tesla, EVGO – that had never offered rent to site hosts, paid $500,000 for a 20-year easement."

93.    CW 3 also explained that Volta's projections were unrealistic because not all stations had two media screens per station, some stations were deployed without any screens in some markets because of permitting issues, and in several instances, projects did not move forward even after a deal was signed.

94.    Furthermore, CW 3, explained that Volta's revenues were significantly diminished by the Company's inability to install the number of charging stations needed to reach the level of scale at which it could attract large advertisers (such as Coca-Cola). The witness explained that "[i]f Volta can get to 10,000 screens in 5,000 units, that's a game changer for ad revenue. Then you have scale." Otherwise, without achieving that level of scale, revenue projections were pie in the-sky numbers. "You have no metrics, no auditing, no way to justify that [your ad rates] are in line with the market. They had no[] proof of concept or efficacy [to show] advertisers." Coca-Cola was one of Volta's advertising customers that it featured in the Registration Statement. (*See infra* 198).

95.    Similarly, CW 1, a Vice President of Sales, recalled that Drew Bennett, Volta's Senior Vice President of Network Operations, who Volta hired in February 2021, reported in a meeting in New York in May 2022 that Volta's C-Suite executives attended, that the Company was not going to meet its goals for the number of stations that would be installed. The witness described this executive as saying "straight out" that "[w]e're not going to get there." In response to this report, "[t]he C-suite was pissed. But his audience – media leadership and sales people — appreciated his honesty." The Sales team appreciated this because if Volta had fewer stations installed than expected, that meant that they would be able to sell fewer ads. CW 1 noted the network effect whereby big companies that Volta wanted to sell ads to (including large national brands) would only be interested if Volta had a sufficient number of stations installed. This witness explained that Volta's revenue projections were assuming that big companies such as these would come onboard to sell ads, but they were not going to do so until Volta reached a certain number of stations. This witness also described the Sales team's reaction to Bennet's statement that Volta would not meet its installation goal as "good for him. Someone's being honest, because it was always lies, lies, lies."

96.    CW 1 also noted that the number of charging stations that Volta stated it planned to

install was deceptive. The witness described, based on communications with the Site Sales team, these metrics as "knowingly inflated to impress the Street. Everyone was told to keep their mouth shut."

97.    In addition, CW 1 described how Volta was frequently not in compliance with local laws or ordinances applicable to its charging stations. "I was told 99% of all stations in a major city in the U.S. that was a big market for Volta are in some type of violation, like signage code. Scott's [Mercer] mentality was 'F*** that' — he said that every other day — 'Put them in anyway.'" This problem led to a few charging stations needing to be taken out, and costing Volta "more than $1 million to correct, if they were even correctable." This witness learned this information from Volta's General Manager at the end of December 2021, as well as from another executive, the Vice President of Enterprise Solutions.

98.    CW 1 also noted, consistent with the descriptions of other witnesses, that it took a long time to complete installations because of permitting and other logistical details. As such, Volta's pre-Merger guidance for its charging station projections was unrealistic. "I would call it wildly overly optimistic," this witness stated, adding that the overly inflated projections may have contributed to the resignations of Wendel and Mercer. This witness also described Volta's failure to perform despite knowing full well what it costs to install stations and the accompanying issues with installations, which led advertisers to become frustrated with Volta.

99.    Yet another witness confirmed these points. CW 7 was a Senior Director of Product Marketing at Volta from February 2019 to October 2022. This witness reported to Volta's Chief Marketing Officer, who in turn reported to Mercer (followed by Hastings and Cubbage). CW 7 described Volta's projections around station installations, including 6,500 at the end of 2022, as "fantasy land," especially considering bureaucratic and governmental challenges. The witness stated that "[t]o me it was completely bizarre." This witness also described Volta's projections for station installations as "wildly overoptimistic. I couldn't figure it out."

100.    In addition, CW 7 stated that a large number of Volta's stations are not fully permitted, and many agreements are ending or will soon end because unlike other charging companies, Volta offered five-year outs instead of ten years. And in many places, the Company can't generate ad revenue because of local laws that prohibit advertising on anything other than what is on the premises. For

example, Kroger can advertise for itself on stations on its property, but the companies that sell products at its stores cannot advertise.

101.    Despite Volta's lofty statements, the Company utterly failed to meet its projections for revenue and the number of charging stations it would install. When the Company announced its results for the fourth quarter and full year 2021, on March 21, 2022, it had just 2,330 stalls installed through the end of 2021, as compared to the 3,142 stations that it projected in the Investor Presentation, and revenues of just $32 million, as compared to $36 million that it had projected.

102.    Volta also lowered its projections for 2022 even more drastically when it announced its 2021 results on March 21, 2022. The Company estimated that it would install between 1,700 and 2,000 new charging stalls and have between $70 million and $80 in revenue in 2022. These figures were vastly lower than the 3,350 chargers and the $108 million in revenue that Volta projected in the Investor Presentation.

103.    Moreover, Volta's underwhelming numbers of installed chargers were even lower than they appeared because Volta differentiated between "stations" and "stalls." Volta stated that "[a] stall is attributed to a station based on the number of vehicles that can charge concurrently and there are certain configurations of Volta sites where one station is capable of charging more than one vehicle at a time." For example, Volta's Form 10-K for 2021 (which was not filed until April 15, 2022) showed that it had 2,330 total "stalls" installed as of the end of the year, but it had just 2,264 total "stations" installed. In other words, Volta would sometimes count a single "station" as multiple "stalls," even though it never made that distinction in the Registration or Proxy Statements, where the Company discussed just the total number of stations installed.

104.    Volta's revenue shortfall only got worse as time went on because as Volta failed to install the number of charging stations that it had planned on, the Company would not benefit from its promise that chargers "grow in value as the network scales." (*See infra* 172).

### 3.    Volta's Insufficient Internal Controls and Failure to Pay Site Hosts

105.    Volta's underwhelming number of charging stations and revenue immediately after it went public were a result of underlying problems that were present in the Company before the SPAC

Merger. Several former Volta employees confirmed the fundamental flaws in Volta's operations, accounting practices, and business model that Defendants misrepresented and that led to Mercer and Wendel's ouster and the Company's dire financial condition.

106.    An Assistant Controller at Volta from January 2019 to June 2020 (CW 5), who reported to CW 4 (who, in turn, reported to the Company's Chief Financial Officer (including Debra Crow)), described several problems with Volta's financial reporting and system of internal controls. This witness stated that internal controls developed by the Company's Controller were often ignored or overridden by Mercer, Wendel, and Crow. This witness recalled "bumping heads" with Crow "over the letter of [Volta's] contracts" with property owners for the rental of space for Volta's charging stations, because the witness raised questions regarding several of Volta's practices relating to its contracts and was viewed by Crow as a potential problem and a "squeaky wheel." The witness stated that there were things to be uncovered, which the witness suspected may have spurred the resignations of Volta's senior executives.

107.    For example, CW 5 stated that Volta was "flubbing numbers here and there, especially with big contracts like Brookfield/GGP. You do what you can to keep the wheels on the bus – to look attractive to investors." (Brookfield is one of the largest real estate investors in the world. Volta's Investor Presentation noted above listed Brookfield Properties as the first REIT (real estate investment trust) that Volta did business with as part of its "track record underwritten by established partners and client success." GGP is one of the largest shopping-mall operators in the United States and is owned by Brookfield.) As this witness explained, Brookfield/GGP owned properties attached to shopping malls, which Volta contracted with to install charging stations. Volta repeatedly failed to meet the deadlines for the payments owed under its contracts with Brookfield/GGP. The witness stated that "[w]e were never timely. We were always late. They would pick and choose who we would pay." The witness also stated that Volta was not compliance with System and Organization Control Compliance standards for internal controls "to prevent fraud."

108.    The witness stated that they and the Controller would try to adhere to the contracts that Volta signed, but there were times when Mercer and Wendel, aided by Crow, would override their

efforts. The witness and the Controller would provide accounting details and numbers to Crow, who would then present them to Mercer and Wendel. The Controller and Crow did not see eye to eye on these matters. Crow would come back and order the Controller to make changes to the accounting, which the Controller was not comfortable doing. The Controller would try to correct Crow, but Crow, as the CFO, had the final say. The witness believed that Wendel and Mercer directed Crow, based on how they wanted the numbers to look, and that Mercer and Wendel would have known all along about the questionable accounting practices that Volta engaged in. The witness explained that "[y]ou don't even have to be a forensic accountant [to see that]. Just a general accountant and [knowledge of] basic math."

109.    CW 5 also described how they were excluded from meetings that they expected to be included in as an Assistant Controller. In addition, the Controller, who this witness reported to, was overruled by Wendel and Crow as to when paying liabilities owed under contracts could be paid, especially on bigger contracts, with the witness noting one instance in particular where holding cash, in lieu of paying liabilities, was helping Volta survive. Volta would do what it could to keep collections letters at bay and not bring it to the attention of investors. The witness stated that "Mercer and Wendel at times would do whatever it took to keep the lights on" and make the Company's cash balance look better. The mentality was "whatever it took – do that."

110.    As the witness explained, "[w]e had gotten letters on behalf of Brookfield/GGP that we were not in compliance [with the contract]. Hundreds of thousands [of dollars] past due." The witness described this issue as having been the result of CFO Crow, acting on behalf of Wendel and Mercer, wanting to ensure that Volta's cash balance looked impressive to investors. In effect, the witness explained, Volta was reporting fraudulent numbers and was in breach of its contracts to paint a rosier picture and look more attractive financially. This witness described Volta as having a pattern and practice of not always paying its liabilities and other contractual obligations, in order to make its cash balance look better to investors than it really was. It was actions like this that led to Volta's poor or dishonest accounting and financial reporting practices. The witness also described Wendel reaching out to personal friends to borrow money to make payroll.

25

111.    Overall, CW 5 explained that, when it came to keeping books, Mercer and Wendel did what they had to do to keep relationships with clients and investors happy and they should have known better. The witness concluded that "[f]rom what was happening then under my umbrella at the time I was there, I'm not surprised that the end result is what it is."

112.    CW 4 confirmed the statements by CW 5. CW 4 reported to Volta's CFO, who, in turn, reported to Wendel. CW 4 had regular contact with Mercer and Wendel, including reporting to Wendel at various times, having management meetings with Mercer, and being available as needed for Board meetings.

113.    CW 4 stated that they were pushed out of Volta because they had daily disagreements with Crow, sometimes devolving into hostile shouting matches. The witness explained that they were not the "Yes Person" that Volta wanted. The witness made their disagreements known and explained that "[a]t some point you lose the battle, but at least you get to book the objection."

114.    CW 4 also stated that when the witness received the sales projections for the coming fiscal year, as a matter of practice, they would reduce them by 10% to 15% and use that figure in their projections for the amount of cash and runway that the Company would have available, affirming their view that those sales projections were inflated and cash balances were often limited.

115.    CW 4 also confirmed the observations of CW 5 that Volta did not pay its contractual obligations on time. The witness also referenced the large real estate contract with Brookfield/GGP under which Volta would owe large amounts, such as $50,000 or $200,000 on certain dates, which was booked on a large, detailed schedule. There were many unpleasant conversations with Brookfield/GGP. The witness recalled one quarter when a large payment was due and Volta's executives said, "We know. We're not paying it yet." Sometimes this witness could not obtain payment authorizations even after setting up a wire transfer and past due payments would get delayed by months. These practices took place "[b]ecause we needed ending cash to look" better. The witness explained that the Board looked at the two topline items, cash and revenue, "[b]ut we were in violation of the contract. We were not following our fiduciary duties." The witness recalled some properties sending Volta to collections.

1

### 4. Volta's Improper Revenue Recognition Practices

116.    CW 1 (a Vice President of Media Sales at Volta from several years before the SPAC Merger to the time in 2022 around when many other employees left the Company) described observing Volta's pattern and practice of improper accounting practices that the witness called "creative accounting," or "robbing Peter to pay Paul" in terms of "how they would book and record revenue" from media sales on Volta's balance sheet. The witness described how it was common to run media early to book the sale and claim, or "pull," the revenue into the earlier quarter as a way of boosting quarterly earnings, even if it meant the Company was already in the hole starting the next quarter.

117.    In particular, CW 1 explained that if Volta was short on its projected revenue goal toward the end of a quarter, the Sales team was told to approach their advertisers who had already committed to running ads in the subsequent quarter, to see if the ads could be run in the current quarter so that Volta could book the revenue for those ads in the current quarter. The Sales team was told to incentivize the advertisers to run ads when the advertisers did not plan to or want to by giving them bonus ads for free. The advertisers did not have to pay for the ads until the later quarter in which they actually wanted their ads to run. Advertisers generally agreed to this because it was free extra advertising for them in the earlier, intervening quarter. They would only not agree if their ads were not ready yet in the earlier quarter or if the ads were tailored to the later time such as for a seasonal promotion. CW 1 explained that even when customers did not agree to run ads early because of these reasons, Volta would run the ads early anyway and pull forward revenue without customers even knowing that the ads were run early.

118.    The Media Sales team was given this instruction in meetings by Mike Schott, the EVP of Sales that the witness reported to and who reported to Mercer and Wendel. The witness stated, "To me, that's not honest."

119.    CW 1 also explained that they started working at Volta in 2018 and this practice took place at Volta every quarter from 2019 through the third quarter of 2021, when Volta went public. This was a very common practice as a way to meet revenue goals. The witness recalled it taking place specifically in connection with the third quarter of 2021 because that was Volta's first quarter as a

public company. The witness stated that Volta was short on its revenue goals and the Sales team was told by Mike Schott, the EVP of Sales, that "you need to book as much revenue as possible. We can't post we're short in our first public reporting." CW 1 recalled specifically that Schott told the Sales team that Volta had to show a good quarter for its first quarter as a public company. The witness explained that Volta also did this before it was public to try to show its ability to obtain revenue, stand out from its competitors, and increase its valuation in the private market.

120.    CW 1 explained that this practice of reporting revenue early by running ads earlier than customers wanted them, came from Mike Schott, and that Francois Chadwick stopped the practice after Volta went public. The witness described Schott as instructing the Sales team every quarter to pull revenue forward through this practice of running ads early. CW 1 recalled stating to other Vice Presidents of Media Sales when this request was made, that it was "another fire drill" or "Schott special" and "let's pull it forward."

121.    CW 1 described a regular Zoom meeting for the Sales leadership team that took place at least every other Monday with Mike Schott and the Vice Presidents of Media Sales for each region. According to CW 1, at these meetings, Schott gave the direction to pull sales forward. CW 1 also made clear this this practice of pulling revenue forward in fact took place every quarter from 2019 through the third quarter of 2021 and that it had a significant impact on Volta's revenue. It enabled Volta to show that it had consistent, stable business from ad sales that was increasing each month. This was important to Volta because the Company did not want investors to think its revenue was very lumpy. CW 1 explained that even though he or she was in sales and not accounting, they understood that this practice was related to the revenue that Volta brought in to sway investors and show them Volta was worth investing in. CW 1 also described themselves as being responsible for Volta's revenue in his or her region and did not need to be an accountant to understand that this practice related to quarterly and annual revenue goals that Volta had.

122.    The witness explained further that by pulling ad runs forward, the advertiser would essentially get "two for the price of one." The witness questioned this practice because then Volta was "going to be in the same situation in the next quarter. We were robbing Peter to pay Paul." So for the

advertisers, part of the campaign would be free. The advertisers would get what they wanted in a later quarter. Volta was just booking the revenue in the earlier quarter so it could say it had the revenue then. This practice would allow Volta to say it realized revenue in one quarter, but it would then have a shortfall in the next quarter because it would not be booking any revenue in the next quarter for the advertisers for which the Company ran ads and booked revenue early. After this took place in the third quarter of 2021, the witness stated that "there was so much chatter that the numbers weren't correct."

123.    CW 1 also explained that before Volta went public, "we would account however the heck we wanted to." The witness stated that while he or she was not an accountant, employees talked about order matching when recording revenue, in terms of what Volta actually sold and delivered, and "we didn't do that – and I think it was a bit more creative." The witness also stated that "I don't think it's fair to investors who gave their money away when we say we have this much revenue coming in and we did this when often that wasn't accurate." The witness also stated that "[t]he rules are what they are, and we broke them. We used to run media, run it early — it could be free as far as anybody knew — so we could say we actualized revenue to book revenue early. It was lying."

124.    This witness was sure that Mercer and Wendel were aware of this practice of pushing sales into an earlier quarter to boost revenue reporting. The witness also confirmed that Chadwick knew about this practice because after the third quarter of 2021, Chadwick instructed the Sales team to stop it because Volta was now a public company. The witness thus described this practice as not only "dishonest" and "desperate," but also "stupid." In addition, the witness stated that this practice took place during the third quarter of 2021 and did not stop until around October 2021.

125.    Overall, CW 1 stated, after leaving Volta in 2022, that "[t]he last year has been [lie] after [lie] after lie." The witness described having seen a pattern of lying and deception among Volta executives as the Company ramped up its effort to go public, stating "I think investors were duped."

126.    CW 4 (who reported to Volta's CFO and Wendel, and had contact with Mercer and the Board), corroborated CW 1's description of improper revenue recognition practices. CW 4 stated that he or she saw shady accounting practices at Volta, such as how the Company would handle revenue recognition. The witness observed that "[i]f you recognize revenue too soon," that is when there are

problems.

127.    CW 4 explained that "[w]e used to jokingly refer to something in finance called "Wendelian math: take our numbers and add some extra ingredients. Don't have that invoice yet? Don't have that signed yet? It just takes 'creative accounting.'"

128.    As an example of the inadequacy of Volta's accounting practices, CW 4 noted that "We were still on QuickBooks. How you can ever take a company public on QuickBooks is crazy." (QuickBooks is an accounting software that is intended for small businesses, not purportedly billion dollar companies such as Volta.)

### 5.    Volta's False and Misleading Reporting of Financial Information

129.    Based on consultation with an accounting expert, Volta's revenue recognition practices described above by its former employees violated Generally Accepted Accounting Principles ("GAAP").

130.    The accounting profession and the SEC recognize GAAP as the uniform rules, conventions, and procedures necessary to define and reflect accepted accounting practices. GAAP rules are primarily promulgated by the Financial Accounting Standards Board ("FASB") and have been codified since 2009 in its Accounting Standards Codifications ("ASC"). These rules, referred to as ASCs, represent the source of authoritative GAAP for nongovernmental entities such as Volta. (ASC 105, *Generally Accepted Accounting Principles*, section 10-05-1).

131.    Separately, SEC Regulation S-X states that financial statements filed with the SEC that are not prepared and presented in accordance with GAAP "will be presumed to be misleading or inaccurate, despite footnote of other disclosures[.]" (17 C.F.R. § 210.4-01(a)(1).) Violations of GAAP, therefore, bear on whether SEC Regulations (for publicly-traded companies) have been properly followed and satisfied.

132.    The FASB has also issued guidance in the form of Statements of Financial Accounting Concepts ("FASCON"s), which set forth the conceptual framework underlying GAAP, as well as its objectives, qualitative characteristics, and other concepts used in the development of GAAP.

133.    As the FASB has explained, the "objective of general-purpose financial reporting is to

provide financial information about the reporting entity that is useful to existing and potential investors, lenders, and other creditors in making decisions about providing resources to the entity." (FASCON No. 8, *Conceptual Framework for Financial Reporting* ("FASCON No. 8") as amended in August 2018, OB2[1]). FASCON No. 8 continues in relevant part:

> Investors', lenders' and other creditors' expectations about returns depend on their assessment of the amount, timing and uncertainty of (the prospects for) future net cash inflows to the entity…. Consequently, existing and potential investors, lenders and other creditors need information to help them assess the prospects for future net cash inflows to an entity.

> To assess an entity's prospects for future net cash inflows, existing and potential investors, lenders, and other creditors need information about the resources of the entity, claims against the entity, and how efficiently and effectively the entity's management and governing board have discharged their responsibilities to use the entity's resources….

> Many existing and potential investors, lenders, and other creditors cannot require reporting entities to provide information directly to them and must rely on general purpose financial reports for much of the financial information they need. Consequently, they are the primary users to whom general purpose financial reports are directed. (FASCON No. 8, OB3–OB5).

134.    FASCON No. 8 also notes that for financial information to be useful "it must be relevant and faithfully represent what it purports to represent," and its usefulness "is enhanced if it is comparable, verifiable, timely, and understandable." (FASCON 8, QC4). It elaborates:

> Relevant financial information is capable of making a difference in the decisions made by users. Information may be capable of making a difference in a decision even if some users choose not to take advantage of it or already are aware of it from other sources.

> * * *

> Financial reports represent economic phenomena in words and numbers. To be useful, financial information not only must represent relevant phenomena, but it also must faithfully represent the phenomena that it purports to represent. To be a perfectly faithful representation, a depiction would have three characteristics. It would be complete, neutral, and free from error. (FASCON No. 8, QC6, QC12).

### a)    Volta Violated Revenue Recognition Rules

135.    Volta's practice of pulling forward revenue to an earlier quarter by giving advertisers free ads that were not what the advertisers signed up for or were actually paying for—as described by

CW 1 and CW 4 (*see supra* ¶¶ 116-27)—was a clear violation of revenue recognition principles.

136.    Even if Volta stopped this practice after the third quarter of 2021, it subsequently continued to misstate its revenue from earlier periods and did not issue a restatement that was required to correct its prior accounting violations. By maintaining these past false revenue figures, Defendants continued to give investors a false impression of Volta's finances. In fact, however, Volta's revenue recognition violations made it less able to attain future revenue because the advertisers whose revenue Volta improperly reported prematurely would not be buying additional ads in the subsequent quarter in which the advertiser had actually contracted for its ads to run.

137.    Revenue is a critical measure both for entities trying to earn a profit from their operations as well as users of financial statements trying to assess an entity's financial performance and position. Revenue measures, in the most basic sense, "the transfer of promised goods or services to customers in an amount that reflects the consideration" that the entity would expect to receive for providing those goods or services. (ASC 606-10-05-3[3]).

138.    The accrual-based financial reporting framework of GAAP is particularly concerned with the proper procedures for "recognition" of revenue. In accordance with the matching principle, revenue is measured and reflected in financial statements as the amount that qualifies for recognition, for goods sold or services provided, over (or throughout) a specific period of time. CW 1 noted that Volta was violating the matching principle. (*See supra* ¶ 123).

139.    Under GAAP, the first step in evaluating revenue recognition is to understand the economics of the transaction or arrangement. Developing this understanding would involve consideration of relevant contracts or agreements, including obtaining an understanding of the products and/or services to be delivered and the timing of when such delivery (and customer acceptance) shall occur.

140.    Under FASCON No. 5, *Recognition and Measurement in Financial Statements of*

---

[3]    FASB, ASC 606, *Revenue from Contracts with Customers* (May 2014), available at https://www.fasb.org/jsp/FASB/Document_C/DocumentPage?cid=1176164076069&acceptedDisclaimer=true.

*Business Enterprises* ("FASCON No. 5"), "[r]evenues are not recognized until earned" and "are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues." (FASCON No. 5, ¶ 83).

141.    In December 1999, the SEC published Staff Accounting Bulletin ("SAB") No. 101[4] ("SAB 101"), which provides interpretive guidance on how a public entity should apply the revenue recognition criteria set forth in FASCON No. 5. Under SAB 101, revenue should not be recognized until it is "realized or realizable and earned," and therefore an entity should not recognize revenue until "all of the following criteria are met" (SAB 101):

- Persuasive evidence of an arrangement exists,

- Delivery has occurred or services have been rendered,

- The seller's price to the buyer is fixed or determinable, and

- Collectability is reasonably assured.

142.    These concepts were subsumed by the FASB framework for accounting rules with ASC 605, *Revenue Recognition*. However, beginning January 1, 2018, public companies were required to adopt a new standard set forth in ASC 606. This standard not only includes identifiable changes to the way revenue is recognized, centered significantly on the recording of known offsets to revenue at the time transactions are recorded, but also affects prior industry-specific rules surrounding the recording of revenue and accounting for the collection of receivables.

143.    Under ASC 606, more specific criteria must be met for an entity to recognize revenue. As set forth in the Summary of ASC 606:

> The core principle of this Topic is that an entity recognizes revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services.

144.    To achieve that core principle, an entity should apply the following steps (ASC 606 at 2; *see also* ASC 606-10-05-2 to -4):

> Step 1: Identify the contract(s) with a customer.

---

[4]    SEC Staff Accounting Bulletin No. 101, *Revenue Recognition in Financial Statements*, 17 C.F.R. Part 211 (Dec. 3, 1999), available at http://www.sec.gov/interps/account/sab101.htm.

Step 2: Identify the performance obligations in the contract.

Step 3: Determine the transaction price.

Step 4: Allocate the transaction price to the performance obligations in the contract.

Step 5: Recognize revenue when (or as) the entity satisfies a performance obligation.

145.    ASC 606 also identifies additional conditions upon which each principle's criteria would be considered met. Specifically, "identifying a contract" for Step 1 requires that all the following criteria be satisfied (ASC 606-10-25-1.):

- The parties to the contract have approved the contract and are committed to perform their respective obligations.

- The entity can identify each party's rights regarding the goods or services to be transferred.

- The entity can identify the payment terms for the goods or services to be transferred.

- The contract has commercial substance.

- It is probable that the entity will collect substantially all of the consideration to which it will be entitled in exchange for the goods or services that will be transferred to the customer … [and] the amount of consideration to which the entity will be entitled may be less than the price stated in the contract if the consideration is variable because the entity may offer the customer a price concession.

146.    As for determining when "the entity satisfies a performance obligation" (for Step 5 above), ASC 606 explains that such performance obligation is satisfied when a "promised good or service (that is, an asset)" is transferred "to a customer" and that "[a]n asset is transferred when (or as) the customer obtains control of that asset." (ASC 606-10-25-23.)

147.    Volta's practice of booking revenue in an earlier quarter than advertisers wanted their ads run was a clear violation of these basic revenue recognition rules under ASC 606. Volta's attempts to paper over its revenue shortfalls in one period by giving advertisers free ads in that earlier quarter did not satisfy the principles set out in ASC 606 for proper revenue recognition in the earlier quarter, because advertisers still wanted, and were paying for, ads in the later quarter – a performance obligation

34

that Volta still needed to satisfy. The advertising customers would not be paying Volta any additional money in exchange for the free earlier ads, and the ads in the later period would still need to be run for the contract (and the performance obligation) to be satisfied. Furthermore, Volta would have less revenue in the subsequent quarter because the advertiser would not be paying again for the ads that were already expected to run in the subsequent quarter. (ASC 606 at 2; *see also* ASC 606-10-05-2 to -4).

148.    Volta's practice also violated ASC 606 because it did not properly "identify the payment terms for the goods or services to be transferred" and the earlier ads for which Volta booked revenue did not have any "commercial substance." (ASC 606-10-25-1).

149.    Volta also violated GAAP revenue recognition principles because, as described above, those rules require a consideration of the actual economics of the transaction.

150.    Volta's practice of booking revenue on free ads that ran earlier than the ads that customers actually contracted to pay for is the digital-advertising equivalent of "channel stuffing." The SEC explains that "'[c]hannel stuffing' denotes the pulling forward of revenue from future fiscal periods by inducing customers" -- as Volta did here "through price discounts, extended payment terms or other concessions -- to submit purchase orders in advance of when they would otherwise do so. Material undisclosed channel stuffing may cause a company's reported results of operations to be misleading." Furthermore, the SEC explains that "undisclosed or inadequately disclosed acceleration of sales through 'channel-stuffing' . . . materially distorted the Company's reported results of operations and contributed to the inaccurate picture of a successful turnaround."[5]

151.    Similarly, other sources explain that "[c]hannel stuffing is a deceptive business practice" that "typically would take place immediately prior to a reporting period such as quarter-end or year-end, so that management, fearful of bad consequences to their compensation, can 'make their numbers.'" As with what Volta did here, channel stuffing "is usually achieved by offering lucrative incentives, including deep discounts, rebates, and extended payment terms, to persuade distributors and

---

[5]    *In the Matter of Sunbeam Corp.*, Respondent., Release No. 1393 (May 15, 2001) (available at https://www.sec.gov/litigation/admin/33-7976.htm#P64_15318).

retailers to buy quantities in excess of their current needs." This practice "is frowned upon by [the SEC] as a practice used by companies to accelerate revenue recognition to reach short-term revenue and earnings targets, and as such, misleading to investors." Moreover, channel stuffing "always catches up with the company, because it cannot maintain sales at the rate it is stuffing. Channel stuffing is not confined to the wholesale and retail trade; it can take place in the industrial sector, high tech industry, and the pharmaceutical industry as well."[6]

152.    While Volta's accelerating of revenue took place in the context of its displaying digital advertising, as opposed to with the sales of physical goods, it has the same core characteristics of channel stuffing in that Volta gave its customers more product (here, ads) than the customer wanted or was willing to pay for so that Volta could book revenue earlier than the customer was willing to pay for the product, with the result being that Volta would eventually have to report less revenue for those customers in a subsequent quarter when they stopped this deceptive practice.

### b)    Volta's Revenue Recognition Practices Violated the Principle of Neutrality

153.    "According to the FASB, one of the fundamental qualitative characteristics of useful financial information contained in financial statements that purport to be in accordance with GAAP that is 'likely to be most useful to the existing and potential investors…for making decisions about the reporting entity on the basis of' financial information" is **faithful representation**. ((FASCON No. 8, ¶¶ QC1, QC5.)). Faithful representation with respect to financial reporting according to the FASB in FASCON 8, if it is to "be useful," refers to financial information that "not only must represent relevant phenomena, but it *also must faithfully represent the phenomena that it purports to represent*. To be a perfectly faithful representation, a depiction would have three characteristics.  It would be *complete, neutral, and free from error*." (FASCON 8, QC12 (emphasis added in bold)).

154.    A complete depiction of an entity's financial position and the results of its operations includes all information necessary for a user to understand the phenomenon being depicted, including

---

[6]    All quotations in this paragraph are from:
https://www.investopedia.com/terms/c/channelstuffing.asp.

all necessary descriptions and explanations. In certain instances, "a complete depiction also may entail explanations of significant facts about the quality and nature of the items, factors and circumstances that might affect their quality and nature, and the process used to determine the numerical depiction." (FASCON 8, ¶ QC13).

155.    "To be neutral, the financial information must be without bias in the selection or presentation of financial information. (FASCON 8, ¶ QC14)."

156.    Volta's revenue recognition practices plainly violated this basic GAAP principle of "neutrality" because, in addition to violating revenue recognition principles, they did not "faithfully represent" Volta's revenue from media sales, were not "complete, neutral, and free from error," and did not provide a "complete depiction" of the source or proper timing of the revenue. They also were not neutral and free from bias and were not "useful" to investors "for making decisions about" Volta. Instead, Volta's reporting of revenue figures gave investors a false impression of Volta's financial performance and prospects because the reported figures were incorrect and were biased toward inflating revenue in the current quarter at the expense of revenue in future quarters, a practice that would inevitably lead to revenue shortfalls in subsequent periods — to the detriment of investors.

### c)    Volta's Improper Revenue Recognition Practices were Material to Volta's Financial Statements

157.    As alleged herein, Volta engaged in significant undisclosed quarter-end pull-in sales transactions to artificially inflate its publicly reported quarterly revenue from ad sales (which it categorized as Behavior and Commerce revenue (or Media revenue later in the Class Period)) and overstate its actual customer demand. (*See supra* ¶¶ 116-27). This was Volta's "primary" source of revenue, accounting for over 86% of Volta's revenue in the first quarter that it reported as a public company. (*See supra* ¶ 76). These pull-in transactions included:

    a.    transactions that unquestionably violated GAAP, namely ASC 606, by failing to satisfy the terms necessary for revenue recognition, such as a signed agreement with the customer. These transactions were orchestrated by Volta for the sole purpose of pulling forward revenue (*See* ¶ 117); and,

b.   additional quarter-end pull-in sales transactions in which the Company approached certain customers and obtained their agreement to accept free ads in exchange for running the ads earlier than anticipated.  These transactions, which were arranged by Volta, rather than the Customer, lacked economic substance and were for the sole purpose of pulling forward revenue. (*See* ¶ 117).

158.   The pull-in transactions resulted in material misstatements and omissions during the Class Period ***regardless*** of whether they constituted technical GAAP violations.[7]

159.   SEC Staff Accounting Bulletin No. 99, Materiality ("SAB 99"[8]), sets forth the generally accepted methods to evaluate materiality as it relates to the financial results of SEC registrants.  SAB 99 states that: "The omission . . . of an item in a financial report is material if, in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion . . . of the item."  SAB 99 states that both "quantitative" and "qualitative" factors must be considered in assessing materiality.  While CW 1 did not recall the specific amounts of Volta's pull-in transactions, SAB 99 states that qualitative considerations alone, including those detailed herein, "may well render material a quantitatively small misstatement."

---

[7]   In numerous recent enforcement actions, the SEC has alleged that misleading statements and omissions resulting from undisclosed pull-in sales, even in the absence of a technical GAAP violation, were material to investors.  For example, in the Marvell proceeding, the SEC did not allege Marvell's revenue was misstated in violation of GAAP, but concluded that "Marvell's misleading statements were material" because "[a] reasonable investor, in considering whether to purchase or sell Marvell securities, would have found it important that Marvell was using pull-ins to generate sales for the purpose of meeting publicly-disclosed revenue targets and mask a significant downturn in sales, and that the pull-ins would adversely impact future revenue." Order Instituting Cease-and-[Desist] Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order, in *In the Matter of Marvell Technology Group, Ltd.*, S.E.C. Release No. 4076, Securities Act Release No. 10684, Securities Exchange Act Release No. 86971, 2019 WL 4447393 (Sept. 16, 2019).

[8]   SAB 99 is included in the SEC Codification of Staff Accounting Bulletins at Topic 1: *Financial Statements*; subsection M. *Materiality*.

1

(1)    **Volta's Revenue Recognition Practices were Qualitatively Material**

160.    The SAB 99 framework specifies numerous factors that confirm Volta's disclosure violations and omissions surrounding the impact of pull-in sales on Volta's current period and future financial results, as described herein, were qualitatively material.

161.    The Misstatements Were Intentional.  The SEC has unequivocally stated the intent of management may provide significant evidence of materiality. SAB 99 states that a registrant "should not assume that even small intentional misstatements … for example those pursuant to actions to 'manage' earnings, are immaterial."  When managing earnings, the SEC has found that management "presumably has done so believing that the resulting amounts and trends would be significant to users of the registrant's financial statements."  This is precisely the case here, as Defendants "managed" Volta's reported revenue growth and customer demand, which it new to be highly material to investors. As discussed in more detail in ¶¶ 116-25 by CW 1, the end-of-quarter pull-in sales transactions were intentional.

162.    The Misstatements Involve Fraudulent Financial Reporting.  SAB 99, citing standards used in the auditing profession, describes that "misstatements arising from fraudulent financial reporting are intentional misstatements or omissions of amounts or disclosures in financial statements to deceive financial statement users . . ."  The same auditing standards further state "that fraudulent financial reporting may involve falsification or alteration of accounting records; misrepresenting or omitting events, transactions or other information in the financial statements; and the intentional misapplication of accounting principles relating to amounts, classifications, the manner of presentation, or disclosures in the financial statements."  According to SAB 99 "the clear implication" is that even quantitatively small misstatements may amount to fraudulent financial reporting.

163.    The Misstatements Concern a Segment or Other Portion of the Volta's Business that Has Been Identified as Playing a Significant Role in the Registrant's Operations or Profitability. Another qualitative consideration that may render even a small quantitative misstatement or omission material is whether the misstatements concern a critical business segment or component of operations.  The pull-in transactions alleged herein were designed to inflate the Company's "Behavior & Commerce" revenue

that was comprised primarily of revenue from ad sales. As discussed in more detail in ¶¶ 313-14, Defendants viewed the Behavior & Commerce revenue as a "***critical differentiating factor***." Indeed, Behavior & Commerce revenue accounted for over 86% of Volta's total revenue for the three months ended September 30, 2021.

164.    The Misstatements Mask a Change in Earnings or Other Trends.  As described by CW 1, the end-of-quarter pull-in sales transactions allowed Volta to conceal lumpy advertising revenue, disappointing trends in advertising revenue, and declining advertising revenues resulting from Volta's disappointing stall installation results. *See* ¶¶ 119-21. Indeed, CW 1 stated specifically that this practice was significant to Volta's revenue and ability to attract investors. For example, in connection with the third quarter of 2021, which was the first quarter that Volta reported as a public company, the Company's EVP of Sales instructed the Sales team to engage in this practice because "you need to book as much revenue as possible. We can't post we're short in our first public reporting."

165.    The Misstatements and Omissions Would Have Resulted In a Significant Negative Stock Price Reaction. SAB 99 states the demonstrated stock price volatility in response to certain types of disclosures should be taken into account when considering whether a misstatement or omission is material. As discussed in more detail in Section VII.E, when the truth of Defendants' fraud was finally revealed, Volta's stock sharply declined as a result.

166.    The Misstatements and Omissions Involved Concealment of an Unlawful Transaction. Another qualitative consideration that may render even a small quantitative misstatement or omission material is whether the misstatement involves concealment of an unlawful transaction. SAB 99 describes that intentional misstatements may violate the books and records provisions of the Exchange Act, Section 13(b)(2), and thus be an unlawful act. Under these provisions, a registrant must "make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of assets of the registrant and must maintain internal accounting controls that are sufficient to provide reasonable assurances that, among other things, transactions are recorded as necessary to permit the preparation of financial statements in conformity with GAAP." In assessing whether a misstatement results in a violation of a registrant's obligation to keep books and records that

are accurate "in reasonable detail," SAB 99 lists several criteria. For example, "how the misstatement arose—[i]t is unlikely that it is ever 'reasonable' for registrants to record misstatements or not to correct known misstatements — even immaterial ones — as part of an ongoing effort directed by or known to senior management for the purposes of 'managing' earnings."  As alleged in more detail in ¶¶ 116-25, Defendants were attempting to "manage" Volta's reported revenue growth by pulling in future sales.  In doing so, Defendants knowingly failed to prevent Volta from recording revenue on certain transactions which had clearly not met GAAP's, and Volta's own, well-defined revenue recognition criteria.

> #### d) Volta's Reporting of its Liabilities and Cash Balances Was False and Misleading

167.    Volta's reporting of its liabilities on its leases with property owners that the Company paid to host its charging stations, as well as its available cash balance to funds its operations, was highly misleading and deceptive to investors.

168.    As described by multiple confidential witnesses, Volta did not tell investors that its payments owed to its key site owners were long overdue and led to contentious discussions with the site owners that put Volta's relationships with the site owners at risk. The Company was behind on these contracts specifically because its senior executives wanted to make the Company's cash balance look better. Volta's reporting of its liabilities on its leases with site owners and of its cash balance were therefore biased toward making Volta's cash balances look better than they actually were while failing to disclose the urgent need to pay significant liabilities or else risk losing a substantial amount of business. Volta also exacerbated this problem by failing to pay taxes due on certain properties for several years.

169.    Volta's reporting of its liabilities and cash balances was misleading because Volta claimed it had adequate cash reserves and strong relationships with site hosts while failing to disclose that its liabilities to its site hosts were so overdue that Volta was on the verge of losing those key relationships. These statements were particularly misleading because Volta misrepresented its relationship with its site hosts as one of its main strengths.

41

1

2

e)    **Volta's Projections of Station Installations Were False, Misleading, and Unfounded**

3        170.    Volta's projections for the number of charging stations that it would install were false

4   because they had no basis in fact. Multiple Company insiders described how the Company's projections

5   were not realistic in light of the substantial difficulties that Volta faced installing charging stations,

6   including local regulations that impeded installations, difficulties reaching agreements with site hosts,

7   having unqualified employees on these projects, and mounting costs.

8        171.    Volta's unfounded projections for the number of station installations were one of the key

9   metrics that it reported to investors. For example, on August 15, 2022, the SEC questioned the basis for

10  Volta's recent revenue outlook. Volta responded in a September 9, 2022 letter by explaining that this

11  metric is:

12          [H]elpful to investors because it provides supplemental information that, when combined
            with the information included in our financial statements, promotes a more meaningful
13          understanding of the quality and sustainability of our performance, as well as additional
            insight to the Company's future growth plans." [Volta explained that it provided targeted
14          ranges for revenue, the number of total incremental stalls connected, and the total
            incremental connected sites, in order] to give investors an indication of our future growth
15          plans and, more importantly, the expected pace of that growth. Given our relatively small
            size in relation to the potential opportunity for growth across the entire electric vehicle
16          charging sector, we believe disclosing target ranges for connected stalls, sites and total
            revenue is helpful to investors because this information provides context around the pace
17          of our growth relative to trends impacting the entire sector in which the Company
            operates.
18

19        172.    These projections for station installations were especially important because Volta

20  highlighted the "network effects" that its stations would have in which each station would be more

21  valuable as its total network increased and large companies would then see more value in advertising on

22  Volta's far-reaching network. As Volta highlighted in the Registration Statement, and on multiple slides

23  in the Investor Presentation, chargers "grow in value as the network scales."

24        173.    Several confidential witnesses discussed above confirmed the importance of network

25  effects to Volta being able to obtain revenue from key advertisers. These witnesses also corroborated

26  each other in attesting to the fact that Volta was far from achieving these network effects and was

27  therefore still unable to sell ads to key large advertisers. Volta's unfounded projections for the number

28

of charging stations it would install were therefore not only false and misleading in their own right, but also adversely affected Volta's revenue projections, which depended on Volta having a certain number of stations installed.

**C.    False and Misleading Statements for the Securities Act Claims**

174.    On May 14, 2021, Tortoise filed its initial Registration Statement on Form S-4 with the SEC in connection with the Merger. The Registration Statement was signed by Defendants Cubbage, Pang, Daboub, Leidel, and Tassin. Volta is responsible for the statements in the Registration Statement about the Company because Volta and its management, including Defendants Mercer, Wendel, and Chadwick, prepared that information for the purpose of being disseminated in the Registration Statement. Defendants Mercer, Wendel, and Chadwick are further responsible for the statements in the Registration Statement to the full extent permitted by law, due to their respective roles as control persons of Volta.

175.    The principal factors the Registration Statement disclosed that Tortoise considered as supporting the Merger included:

> *Volta's Strong Customer Demand*. The TortoiseCorp Board considered the national real estate footprint and portfolio of long-term contracts that Volta has with leading grocery store chains and real estate investment trusts including Giant Food, Albertsons Companies, Kroger and Brookfield Properties.
>
> *Volta's Revenue Diversity and Unit Economics*. The TortoiseCorp Board considered Volta's multiple revenue streams and the expectation that Volta's charging stations will grow in value as its network scales due to the impact of network effects.
>
> . . .
>
> *Financial Condition*. . . . The TortoiseCorp Board also considered the fact that after consummation of the Business Combination (and assuming no redemptions), Volta would have enough cash on hand to fund the planned expansion of its charging infrastructure through 2025. . . .

176.    The statements in ¶ 175 were materially false and misleading because: (1) as CWs 3 and 9 stated, contrary to having "[s]trong [c]ustomer [d]emand," these statements failed to disclose that many of Volta's potential customers would not make deals with Volta until its charging network grew to scale, a point which Volta had not reached at the time the Registration Statement was filed; (2) as

CWs 3, 4, 5, and 6 stated, contrary to having "[s]trong [c]ustomer [d]emand," these statements failed to disclose that Volta routinely did not pay its contractual obligations on time, which allowed it to delay accounting for its liabilities and to keep cash on hand, but soured relationships with larger customers and site hosts; and (3) these statements touted the "expectation that Volta's charging stations will grow in value as its network scales due to the impact of network effects" but failed to disclose that, as CWs 1, 2, 3, 4, 6, and 7 stated, Volta's projected ability to scale its network failed to disclose that (i) regulatory, logistical, and bureaucratic difficulties had already interfered with Volta's installing its charging stations; (ii) Volta already had a history of missing projections at the time of the Registration Statement; and (iii) Volta was already frequently not in compliance with local laws and ordinances applicable to its charging stations.

177.    The Registration Statement also projected Volta's revenue and other key financial metrics through 2025:

| | Fiscal Year Ending December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2021E | | 2022E | | 2023E | | 2024E | | 2025E |
| | | | | | (in millions) | | | | |
| Total Revenue | $ | 47 | $ | 141 | $ | 280 | $ | 492 | $ | 826 |
| Gross Profit | | 19 | | 66 | | 135 | | 242 | | 436 |
| Total Operating Expenses | | (59) | | (92) | | (149) | | (211) | | (303) |
| EBITDA | | (30) | | (1) | | 33 | | 109 | | 252 |

178.    The Registration Statement also stated that Volta prepared these projections based on "the following assumptions that Volta's management believe[d] to be material," including the number of charging stations that Volta projected it would install from 2021 through 2025:

With respect to Total Revenue:

. . .

An increase in Volta's projected charging station network capacity *from 3,142 charging stations in 2021E to 26,242 charging stations in 2025E* (70% CAGR from 2021E to 2025E) and representing a 3% and 5% market share of U.S. public chargers, respectively (based on total U.S. chargers projected by BNEF);

. . .

An increase in the average number of available media screens from 2,237 in 2021E to 14,817 in 2025E (60% CAGR from 2021E to 2025E), which creates national scale for Volta's Behavior and Commerce activities;

A decrease in the cost per thousand impressions ("CPM") rate of approximately 2.5% from 2021E to 2025E as the network grows beyond core media markets;

With respect to Gross Profit:
An increase in Gross Profit from -15% in 2021E to 47% in 2025E driven by economies of scale in the sale of media content, maturation of the charge-for-charge effort and robust build out of the data product[.]

179.    The Registration Statement also explained that Volta's projected revenue was based on Volta "scaling with accelerating deployment of its station network. Network effects are driven by completion of national coverage of key media markets, growing EV penetration and full build out of its technological capabilities."

180.    The statements in ¶¶ 177-79 were materially false and/or misleading because: (1) these stall projections failed to disclose that, as CWs 1, 2, 3, 4, 6, and 7 stated, Volta's projected ability to scale its network failed to disclose that (i) regulatory, logistical, and bureaucratic difficulties had already interfered with Volta's installing its charging stations; (ii) Volta already had a history of missing projections at the time of the Registration Statement; and (iii) Volta was already frequently not in compliance with local laws and ordinances applicable to its charging stations; and (2) the revenue and stall projections failed to disclose that (i) as CW 10 stated, Volta's model for its revenue projections included in the Registration Statement was "totally unrealistic" and (ii) as CWs 1 and 4 stated, Volta's past revenue figures were inflated due to Volta's practice of improperly recognizing revenue by pulling revenue into earlier quarters when it should not have been recognized until the subsequent quarter.

181.    The Registration Statement disclosed the following amount of revenue the three months ended March 31, 2020 to March 31, 2021, explaining that "Behavior and Commerce revenue increased by $2.4 million, or 212%, from March 31, 2020 to March 31, 2021, primarily due to large sales of media campaigns with several national brands in the three months ended March 31, 2021":

| | Three Months Ended March 31, | | Variance | |
|---|---|---|---|---|
| Revenues | 2021 | 2020 | $ | % |
| Behavior and Commerce | $ 3,529,646 | $ 1,132,684 | $ 2,396,962 | 212% |
| Network Development | 1,000,740 | 2,305,464 | $ (1,304,724) | (57)% |
| Charging Network Operations | — | 464,189 | (464,189) | (100)% |
| Network Intelligence | 210,000 | — | 210,000 | —% |
| Total revenue | $ 4,740,386 | $ 3,902,337 | $ 838,049 | 21% |

182.    The Registration Statement described the "Behavior and Commerce" category of revenue as follows:

> Behavior and Commerce revenue is generated by displaying paid media content on the Company's network of media-enabled charging stations. National and regional businesses pay for content either directly or through their relationships with advertising agencies, based on the number of impressions delivered over the contract term, which is typically less than one year. Behavior and Commerce revenue is recognized ratably over time as the impressions are displayed on media-enabled charging stations over the contract term. The Company typically bills customers in advance on a monthly basis, and payments are typically due within one month after content delivery. Behavior and Commerce revenue is recorded in service revenue in the consolidated statements of operations and comprehensive loss.

183.    The Registration Statement contained a section titled "Revenue Recognition," describing how Volta's revenue recognition policies comply with ASC 606:

> **Revenue recognition**
>
> *ASC 606*
>
> Revenue is recognized when promised goods or services are transferred to customers in an amount that reflects the consideration to which the Company expects to be entitled in exchange for those goods or services by following a five-step process, (i) identify the contract with a customer, (ii) identify the performance obligations in the contract, (iii) determine the transaction price, (iv) allocate the transaction price, and (v) recognize revenue when or as the Company satisfies a performance obligation.
>
> The Company generally considers a sales contract and/or agreement with an approved purchase order as a customer contract provided that collection is considered probable, which is assessed based on the creditworthiness of the customer. The Company combines contracts with a customer if contracts are entered into at or near the same time with the same customer and are negotiated with a single commercial substance or contain price dependencies. As it enters contracts with customers, the Company evaluates distinct

46

goods and services promised in the contract to identify the appropriate performance obligations. The performance obligations include advertising services, charging stations, which include Level 2 (L2) or Direct Current Fast Charging ("DCFC") stations, installation services, operation and maintenance services, installed infrastructure, regulatory credits and Software-as-a-Service ("SaaS"). The Company generally contracts with customers at fixed amounts and has not experienced significant returns or price concessions and discounts. To the extent the Company is entitled to variable consideration on the sale of goods or services, it will estimate the amount it expects to collect as part of the transaction price provided it is probable that a significant reversal of revenue will not occur when the uncertainty related to variable consideration is resolved.

When a contract contains multiple performance obligations, the Company allocates the transaction price to each performance obligation using the relative standalone selling price ("SSP") method. The determination of SSP is judgmental and is based on the price the Company would charge for the same good or service if it were sold separately in a standalone sale to similar customers in similar circumstances. As the charging stations, installation and operation and maintenance services are never sold separately, the Company utilizes an expected cost plus a margin approach to determine the SSP of each of the separate performance obligations. Revenue is recognized upon transfer of control of promised products or services to customers in an amount that reflects the consideration to which the Company expects to be entitled in exchange for promised goods or services.

184.    The Registration Statement also disclosed the following revenue figures (with Behavior and Commerce revenue recorded as Service Revenue):

**Statement of Operations Data**

| | Three Months Ended March 31, | | Year Ended December 31, | |
|---|---|---|---|---|
| | 2021 | 2020 | 2020 | 2019 |
| **REVENUES** | | | | |
| Service revenue | $ 4,231,349 | $ 3,100,866 | $ 15,719,852 | $ 13,434,486 |
| Product revenue | 299,037 | 337,282 | 2,891,854 | 1,492,345 |
| Other revenue | 210,000 | 464,189 | 838,719 | 338,778 |
| Total revenues | 4,740,386 | 3,902,337 | 19,450,425 | 15,265,609 |

185.    The statements in ¶¶ 181-84 were materially false and misleading because: (1) they failed to disclose that as CWs 1 and 4 stated, these revenue figures were inflated due to Volta's practice of improperly recognizing revenue by pulling revenue into earlier quarters when it should not have been recognized until the subsequent quarter, sometimes with customer permission, and sometimes without customer permission, with the motive of making cash holdings more appealing to investors (hereafter referred to as "revenue pull-ins"); (2) these revenue pull-ins may have technically violated ASC 606,

1  GAAP, and the FASB principle of neutrality; and (3) even if these revenue pull-ins did not violate

2  GAAP, they were still qualitatively material and misleading as described in more detail at ¶¶ 160-66.

3      186.    When describing "Key Factors Affecting Operational Results," the Registration

4  Statement stated:

5      *Relationships with Real Estate and Retail Partners*

6      In order to build its charging network, ***Volta will need to continue to establish and***
7      ***maintain relationships with real estate partners, retail partners and site partners with***
       ***national, multi-state and local portfolios of commercial and retail properties***. Site hosts
8      can span a diverse array of industries and locations, and if such hosts believe the benefits
       offered by Volta's competitors exceed the benefits of partnering with Volta, Volta may
9      lose access to high quality property owners that it needs to achieve profitability.

10     187.    The statements in ¶ 186 were materially false and misleading because: (1) as CWs 3 and

11 9 described, many of Volta's potential customers would not make deals with Volta until its charging

12 network grew to scale, a point which Volta had not reached at the time the Registration Statements was

13 filed; and (2) as alleged in more detail by CWs 3, 4, 5, and 6, Volta routinely did not pay its contractual

14 obligations on time in order to delay accounting for its liabilities and to keep cash on hand, which

15 soured relationships with larger customers and site hosts.

16

17     188.    The Registration Statement explained under the heading "Contractual Obligations" that

18 "In the normal course of business, Volta enters into obligations and commitments that require future

19 contractual payments. The commitments result primarily from operating leases and long-term debt."

20 The following table showed that Volta owed over $78 million in Operating Leases:

21

| | Total | Less than 1 year | 1 to 3 years | 3 to 5 years | More than 5 years |
|---|---|---|---|---|---|
| Operating Leases | $ 78,716,954 | $ 7,954,690 | $ 21,213,894 | $ 19,493,172 | $ 30,055,198 |
| Long Term Debt | 52,193,300 | 9,784,021 | 34,242,612 | 8,166,667 | — |
| Financing Obligations | 5,716,752 | 886,599 | 2,682,289 | 1,928,429 | 219,435 |
| Total | $ 136,627,006 | $ 18,625,310 | $ 58,138,795 | $ 29,588,268 | $ 30,274,633 |

240

25     189.    Volta also discussed its leases by stating that "***Volta maintains multiple lease***
26 ***arrangements depending on negotiating contracts with customers relating to installed charging***
27 ***stations***. . . . Volta uses significant estimates in accounting for lease liabilities and ROU assets, which

48

are recognized at the lease commencement date based on the present value of the future minimum lease payments over the lease term. The lease interest rate used to determine the present value of future lease payments is based on Volta's incremental borrowing rate. ***Volta's leases are all long term, extending beyond a twelve-month period, and include periods under options to extend or terminate the lease when it is reasonably certain Volta will exercise such options.***"

190.    The statements in ¶¶ 188-89 were materially false and misleading because: (1) as CWs 3 and 9 described, many of Volta's potential customers would not make deals with Volta until its charging network grew to scale, a point which Volta had not reached at the time the Registration Statement was filed; and (2) as CWs 3, 4, 5, and 6 stated, by the time of the Registration Statement Volta routinely did not pay its contractual obligations on time in order to delay accounting for its liabilities and to keep cash on hand, which soured relationships with larger customers and site hosts.

191.    The Registration Statement summarized Volta's "*EV Charging-Related Services*" with the following description of Volta's relationship with the hosts of its charging stations:

> ***Volta installs its chargers in premium parking spaces owned or leased by commercial or public-entity site hosts that desire to provide EV charging services at their respective locations. Volta's site hosts include retail centers, grocery stores, pharmacies, movie theaters, parking lots, healthcare/medical facilities, municipalities, sport and entertainment venues, parks and recreation areas, restaurants, schools and universities, certain transit and fueling locations and office buildings and other locations.*** Under both its master services agreements and negotiated agreements for specific sites, Volta typically targets agreements for the installation of its charging stations at host sites with ***an initial term of ten years, with the option to extend the lease for up to two five year terms***. Such agreements address both Volta rental payments and access to and payment for electricity at host sites. In addition, Volta has sold EV charging stations to select business partners and site hosts under contractual arrangements pursuant to which Volta performs related installation, operation and maintenance services, while retaining the exclusive right to sell media display time on the charging stations for the duration of the contract term, commonly ten years.

192.    The Registration Statement also described the last category by stating that "Volta also sells content-driven EV charging stations to select business partners and continues to perform the related installation, operation and maintenance services, generating recurring revenue while retaining the exclusive right to sell media display time on the charging stations for the duration of the contract term."

193.    The statements in ¶¶ 191-92 were materially false and misleading because: (1) as CWs 3 and 9 stated, many of Volta's potential customers would not make deals with Volta until its charging network grew to scale, a point which Volta had not reached at the time the Registration Statements was filed; and (2) as CWs 3, 4, 5, and 6 stated, Volta routinely did not pay its contractual obligations on time as a tactic to delay accounting for its liabilities and to keep cash on hand, souring relationships with larger customers and site hosts.

194.    The Registration Statement described projected installations as a "**Competitive Strength**" by highlighting that its "**Visible site pipeline creates predictable growth**":

> *As of March 31, 2021, Volta's contracted backlog includes more than 2,000 additional screens, more than 1,000 additional charging stations and more than 450 additional sites, as well as a pipeline of more than 5,000 potential sites under master service agreements with national partners, which provide the framework for deploying Volta charging stations to such national partners' sites* by establishing a mutual agreement with such partners to work with Volta to agree upon such national partner's sites for installation of Volta charging stations with the execution of a specific further agreement governed by the terms of the master service agreement. Volta currently has more than 20 of these master service agreements in place (see also "Partnerships and Strategic Relationships" in the table on page 259 for a representative sample of partners with which Volta has master services agreements). This expected pipeline of more than 5,000 potential sites reflects management's good faith estimate, based on their experience and industry knowledge, of the prospective additional target sites under master service agreements that Volta has the opportunity to contract for, and there can be no assurances that the 5,000 potential sites currently under master services agreements will be developed due to permitting, constructing or other factors or a determination that any such sites may not be of commercial value to Volta's business model. *In addition, Volta's pipeline expectations do not include opportunities for negotiated agreements for specific sites that are not under master services agreements*, given the differences in contracting for such sites described above, or any opportunities outside of the United States. *Volta continues to pursue commercial relationships under both master service agreements and site-specific agreements as part of its ordinary course of business and believes these opportunities will lead to predictable growth as Volta deploys additional capital to scale its network.*

195.    The statements in ¶ 194 were materially false and/or misleading because: (1) the statements touting Volta's backlog failed to disclose that, as CWs 1, 2, 3, 4, 6, and 7 stated, (i) regulatory, logistical, and bureaucratic difficulties had already interfered with Volta's installing its charging stations; (ii) Volta already had a history of missing projections at the time of the Registration

Statement; and (iii) Volta was already frequently not in compliance with local laws and ordinances applicable to its charging stations.

196.    The Registration Statement highlighted "**Volta's Partnerships and Strategic Relationships**" as follows:

> *Volta is focused on establishing and maintaining strong long-term relationships with real estate and retail partners and site hosts with national and regional multi-site portfolios of commercial properties to build out its charging network*. Such site hosts can span a wide array of industries and locations and currently include retail centers, grocery stores, pharmacies, movie theaters, parking lots, healthcare/medical facilities, municipalities, sport and entertainment venues, parks and recreation areas, restaurants, schools and universities, certain transit and fueling locations and office buildings and other locations. For Volta's partners with multi-site portfolios, Volta executes master service agreements with site hosts that help facilitate conversion of prospect sites into developable locations by standardizing terms and conditions for site leasing and access. *Volta's management believes the benefits offered to site hosts by its business model will continue to provide Volta with access to the highest quality property owners and site hosts. Such access and continued premier placement of Volta's stations will in turn allow it to continue demonstrating the benefits of its content display offerings to its partners, leveraging the expansion of its EV charging network to grow its relationships with key national and regional content partners as the Volta network scales.*

197.    The Registration Statement went on to provide a table listing the parties with which Volta does business. It explained that "the site partners listed under 'Stores' below are representative of the types of top national brands with which Volta has a master services agreement or specific marquee site agreements. The site partners listed under 'REITS' below are representative of additional site partners with whom Volta has contractual relationships with and who control important national or regional portfolios of properties that Volta believes would add value to its network. . . . In the 'Behavior & Commerce' category below, each of the OEMs and national brands listed paid for advertising content on Volta's media-enabled charging stations and are representative of the type of household names that we believe perceive value in Volta's advertising network."

198.    The Registration Statement provided the following table to support these statements:





199.    The statements in ¶¶ 196-98 were materially false and misleading because: (1) as CWs 3 and 9 stated, many of Volta's potential customers would not make deals with Volta until its charging network grew to scale, a point which Volta had not reached at the time the Registration Statement was filed; and (2) as CWs 3, 4, 5, and 6 stated, Volta routinely did not pay its contractual obligations on time in order to delay accounting for its liabilities and to keep cash on hand, which soured relationships with larger customers and site hosts.

200.    The Registration Statement incorporated by reference the Investor Presentation that Volta filed with the SEC on February 8, 2021.[9] Defendants referenced the Investor Presentation several times in describing the background of the Merger and noted in a Form S-4 filed with the SEC on May 17, 2021, that on February 5, 2021, just before the Merger Agreement was reached and disclosed to the public, "an updated investor presentation" along with the "the final Business Combination Agreement" was posted "to the Private Placement Financing virtual data room."  Similarly, in a June 25, 2021 publicly filed letter to the SEC, Volta "advise[d] the Staff [of the SEC] that the New Private Placement Investors received an investor presentation, which was publicly filed on the date of the announcement

---

[9]    Even if the Investor Presentation was not incorporated into the Registration Statement, the key revenue and station installation projections from the Investor Presentation were also included directly in the Registration Statement. (*See* ¶¶ 177-79).

of the Business Combination Agreement [February 8, 2021] and contained the same information as what is disclosed in the Registration Statement."

201.    The Investor Presentation also contained unrealistic and unsupported projections for charging stall installations, and compared Volta to companies such as Netflix, Amazon, and Airbnb. Volta told investors that it expected to have 6,492 cumulative charger installations by the end of 2022, as compared to 3,142 through 2021 and just 1,507 that it actually had through 2020:



202.    Volta also represented in the Investor Presentation that its "Network traction builds flywheel velocity" because it had 1,507 charging stations installed as of January 1, 2021, it had 1,112 additional stations contracted for installation, and had an additional 10,068 stations in the "Pipeline."

203.    When Volta updated the Investor Presentation on June 17, 2021, it described its "[e]xpected best-in-class growth" as "due to extensive development backlog." It stated that its "[c]urrent pipeline unlocks unit economic growth" because while it had 1,877 chargers installed as of March 31, 2021, it was already contracted to install an additional 1,267 chargers and had approximately 10,000 more in the "pipeline" based on "station potential under currently signed" agreements with property owners such as large retail chains and real estate owners. This updated presentation also described Volta's revenue growth as even better than before, estimating that it would achieve a five-

year compound annual growth rate of 108% from 2020 through 2025.

204.    Based on these figures, Volta projected in the Investor Presentation that it would have $141 million in revenue in 2022 and $47 million in revenue in 2021, as compared to $25 million that it had in 2020. Volta also predicted that its revenue would grow at a compound annual growth rate ("CAGR") of 100% from 2020 through 2025—in other words, that its revenue would ***double every year*** for its first five years as a public company:



205.    The statements in ¶¶ 201-04 were materially false and/or misleading because: (1) these stall projections failed to disclose that, as CWs 1, 2, 3, 4, 6, and 7 stated, Volta's projected ability to scale its network failed to disclose that (i) regulatory, logistical, and bureaucratic difficulties had already interfered with Volta's installing its charging stations; (ii) Volta already had a history of missing projections at the time of the Registration Statement; and (iii) Volta was already frequently not in compliance with local laws and ordinances applicable to its charging stations; and (2) the revenue and stall projections failed to disclose that (i) as CW 10 stated, Volta's model for its revenue projections included in the Registration Statement was "totally unrealistic" and (ii) as CWs 1 and 4 stated, Volta's past revenue figures were inflated due to Volta's practice of improperly recognizing revenue by pulling revenue into earlier quarters when it should not have been recognized until the

subsequent quarter.

206.    The Registration Statement on Form S-4 was subsequently amended on June 25, 2021, July 15, 2021, and July 29, 2021, with each subsequent amendment containing the same false and misleading statements described above in this Section.

**COUNT I: FOR VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT OF 1933 (AGAINST DEFENDANTS TORTOISE, CUBBAGE, PANG, DABOUB, LEIDEL, TASSIN, VOLTA, MERCER, CHADWICK, AND WENDEL (THE "SECURITIES ACT DEFENDANTS"))**

207.    Plaintiffs repeat and incorporate each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct. Plaintiffs expressly disavow reliance on, or incorporation of, any allegation of fraud, recklessness or intentional misconduct for purposes of claims under the Securities Act. These Securities Act claims expressly do not make any allegations of fraud or scienter.

208.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against the Securities Act Defendants.

209.    The Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

210.    Defendant Tortoise is the registrant for the Offering. Defendants Cubbage, Pang, Daboub, Leidel, and Tassin signed the Registration Statement on behalf of Tortoise were responsible for the contents and dissemination of the Registration Statement.

211.    Defendants Volta, Mercer, Chadwick, and Wendel are responsible for the statements in the Registration Statement described above, to the full extent permitted by law, due to their role in preparing and disseminating the statements in the Registration Statement about Volta.

212.    Volta is additionally liable for the statements in the Registration Statement because following the Merger, Volta is the same entity as Tortoise or, in the alternative, Volta is the successor in interest to Tortoise.

213.    Defendants Mercer, Chadwick, and Wendel are further responsible for the statements in

the Registration Statement to the full extent permitted by law, due to their role as control persons of Volta.

214.   As issuer of the shares, the Securities Act Defendants are strictly liable to Plaintiffs and the Class for the misstatements and omissions.

215.   The Securities Act Defendants possessed the power and authority to control the contents of the Registration Statement. These Defendants were provided with copies of the Registration Statement prior to or shortly after its issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. These Defendants are liable for the false statements and omissions in the Registration Statement pleaded herein.

216.   None of the Securities Act Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

217.   By reasons of the conduct herein alleged, each of the Securities Act Defendants violated, and/or controlled a person who violated Section 11 of the Securities Act.

218.   Plaintiffs and the Class purchased or otherwise acquired Volta securities pursuant and/or traceable to the Registration Statement.

219.   Plaintiffs and the Class have sustained damages. The value of Volta securities has declined substantially subsequent to the Securities Act Defendants' violations.

**COUNT II:  FOR VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT OF 1933 (AGAINST DEFENDANTS CUBBAGE, PANG, DABOUB, LEIDEL, TASSIN, MERCER, CHADWICK, AND WENDEL ("THE SECURITIES ACT INDIVIDUAL DEFENDANTS"))**

220.   Plaintiffs repeat and incorporate each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct. Plaintiffs expressly disavow reliance on, or incorporation of, any allegation of fraud, recklessness or intentional misconduct for purposes of claims under the Securities Act. These Securities Act claims expressly do not make any allegations of fraud or scienter.

221.   This count is asserted against the Securities Act Individual Defendants and is based upon Section 15 of the Securities Act.

222.    The Securities Act Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Tortoise and/or Volta within the meaning of Section 15 of the Securities Act. The Securities Act Individual Defendants had the power and influence and exercised the same to cause Volta to engage in the acts described herein.

223.    The Securities Act Individual Defendants were each culpable participants in the violation of Section 11 of the Securities Act alleged in Count One above, based on their having signed or authorized the signing of the Registration Statement, their role in preparing and disseminating the statements in the Registration Statement about Volta, and having otherwise participated in the process that allowed the Merger to be successfully completed.

224.    By virtue of the conduct alleged herein, the Securities Act Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiffs and the Class for damages suffered.

## VI.    VIOLATIONS OF SECTION 14(a) AND 20(a) OF THE EXCHANGE ACT

225.    The claims in Counts Three and Four below are brought under Sections 14(a) and 20(a) of the Exchange Act (the "Proxy Claims"). The Proxy Claims are brought on behalf of investors who beneficially owned and/or held Tortoise Class A common stock as of the Record Date of July 15, 2021 and were eligible to vote at Tortoise's extraordinary general meeting on August 25, 2021. The Proxy Claims are based solely on negligence. They are not based on any knowing or reckless conduct by or on behalf of Defendants, and Plaintiffs specifically disclaim any allegations of fraud, scienter or recklessness in these non-fraud claims.

226.    These Proxy Claims incorporate, and are based on, the same substantive allegations described in Section V above in connection with the Securities Act.

227.    Defendants' proxy solicitations included all statements which served to color the market's view of the Merger and encourage Tortoise Class A common stockholders to vote in favor of the Merger. These statements were made in the following proxy solicitations, including statements that these documents incorporated by reference (collectively, the "Proxy Solicitations"):

(a)    the Form S-4 Registration Statement filed on May 14, 2021, which included a

Preliminary Proxy Statement Subject to Completion dated May 14, 2021, as set forth above in ¶¶ 60 and 206;

(b)      Amendment No. 1 to Form S-4 Registration Statement filed on June 25, 2021, which included a Preliminary Proxy Statement Subject to Completion dated June 25, 2021, as set forth above in ¶¶ 60 and 206;

(c)      Amendment No. 2 to Form S-4 Registration Statement filed on July 15, 2021, which included a Preliminary Proxy Statement Subject to Completion, dated July 15, 2021, as set forth above in ¶¶ 60 and 206;

(d)      Amendment No. 3 to Form S-4 Registration Statement filed on July 29, 2021, which included a Preliminary Proxy Statement Subject to Completion, dated July 29, 2021, as set forth above in ¶¶ 60 and 206; and

(e)      the Proxy Statement on Form 424(b)(3) filed on August 2, 2021, as set forth above in ¶ 62.

228.    All of the Proxy Solicitations were materially false and misleading.

229.    Among other things, the Proxy Solicitations included statements misrepresenting Volta's revenue from its customers that purchased advertisements on the media screens on Volta's charging stations, Volta's relationship with its customers that hosted Volta's charging stations, Volta's liabilities to those customers, Vola's cash balances, and Volta's projections for the number of charging stations it would install and for revenue growth. These statements are the same as those described in Section V.C above in connection with the Securities Act, because the preliminary Proxy Statements were included in the Registration Statement and all of the statements alleged to be false and misleading from the Registration Statement (including statements that were incorporated by reference, such as the those made in the Investor Presentation) were included in the Proxy Solicitations.

230.    The materially false and misleading statements and omissions set forth above directly and proximately caused the economic loss suffered by Plaintiffs and the Class. As discussed in more detail in Section VII.E, throughout the Class Period, the price of Volta securities was artificially inflated and/or maintained at an artificially high level as a result of Defendants' materially false and

1    misleading statements and omissions identified herein until the truth was revealed through a series of

2    partial corrective disclosures starting in March 2022 and continuing through the end of the Class

3    Period.

4        **A.    No Safe Harbor**

5        231.    The statutory safe harbor provided for forward-looking statements under certain

6    circumstances does not apply to any of the allegedly false statements pleaded in this Complaint under

7    Section 14 of the Exchange Act. In addition, the statements alleged to be false and misleading herein all

8    relate to then-existing facts and conditions. Furthermore, to the extent certain of the statements alleged

9    to be false may be characterized as forward looking, they were not identified as "forward-looking

10    statements" when made and there were no meaningful cautionary statements identifying important

11    factors that could cause actual results to differ materially from those in the purportedly forward-looking

12    statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any

13    forward looking statements pleaded herein, Defendants are liable for those false forward-looking

14    statements because at the time each of those forward-looking statements was made, the speaker had

15    actual knowledge that the forward-looking statement was materially false or misleading, and/or the

16    forward-looking statement was authorized or approved by an executive officer of Volta who knew that

17    the statement was false when made.

18

19    **COUNT III: FOR VIOLATIONS OF SECTION 14(a) OF THE SECURITIES EXCHANGE
    ACT OF 1934 AND SEC RULE 14a–9 (AGAINST DEFENDANTS TORTOISE, CUBBAGE,
20    PANG, DABOUB, LEIDEL, TASSIN, VOLTA, MERCER, CHADWICK, AND WENDEL)**

21        232.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing

22    paragraphs as if fully set forth herein, and expressly exclude any allegations specified to relate solely to

23    Plaintiffs' claims under Section 10(b) and 20(a) of the Exchange Act.

24        233.    This claim does not sound in fraud. For the purposes of this claim, Plaintiffs expressly

25    exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or

26    intentional or reckless misconduct. This claim is based solely on negligence.

27        234.    This claim is brought against all Defendants pursuant to Section 14(a) of the Exchange

28    Act (15 U.S.C. § 78n(a)) and Rule 14a 9 promulgated thereunder (17 C.F.R. § 240.14a 9), on behalf of

all former shareholders of Tortoise who held SNPR shares of Tortoise Class A common stock as of the Record Date and were entitled to vote at the Tortoise extraordinary general meeting on August 25, 2021 with respect to the Merger.

235.    Defendants' statements issued to solicit shareholder approval of the Merger, including the Proxy Solicitations, and the documents incorporated therein, and other proxy solicitation materials, contained statements that were false and misleading with respect to material facts, and omitted material facts necessary in order to make the statements not false or misleading.

236.    Moreover, Defendants were under a continuing duty to update and/or correct these material misrepresentations and omissions, between dissemination of these documents and the shareholder vote on August 25, 2021, by disclosing the relevant facts, as well as update and/or correct any false or misleading statements regarding Volta. In violation of these duties, Defendants never disclosed any of the omitted facts or corrected the misleading statements before the shareholder vote on the Merger that was held on August 25, 2021. Significantly, Defendants updated and/or supplemented the Proxy multiple times, including on June 24, 2021, July 15, 2021, and July 29, 2021, and then filed the final Proxy on August 2, 2021, without correcting their misrepresentations or disclosing any of the material facts originally omitted.

237.    Defendants named in this Count, jointly and severally, solicited and/or permitted use of their names in solicitations contained in the Proxy Statement and other proxy solicitation materials.

238.    Volta is additionally liable for these statements because following the Merger, Volta is the same entity as Tortoise or, in the alternative, Volta is the successor in interest to Tortoise.

239.    By means of the Proxy Solicitations and documents attached thereto or incorporated by reference therein and other proxy solicitation materials, Defendants sought to secure Plaintiffs' and other Class members' approval of the Merger and solicited proxies from Plaintiffs and other members of the Class.

240.    Each Defendant named in this Count acted negligently in making inaccurate statements of material facts, and/or omitting material facts required to be stated in order to make those statements not misleading, as well as in failing to update these statements. Defendants were required to ensure that

the Proxy Solicitations and all other proxy solicitation materials fully and fairly disclosed all material facts to allow an investor to make an informed investment decision.

241.    The solicitations described herein were essential links in the accomplishment of the Merger.

242.    In the alternative, Plaintiff and the Class's reliance may established through the presumptions of reliance established under the fraud-on-the-market doctrine or *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

243.    Plaintiff Padget, and other members of the Class eligible to vote on the Merger, were misled by Defendants' false and misleading statements and omissions, were denied the opportunity to make a fully informed decision in voting on the Merger, and were damaged as a direct and proximate result of the untrue statements and omissions set forth herein.

244.    The false and misleading statements and omissions in the Proxy Solicitations and other proxy solicitation materials are material in that a reasonable stockholder would consider them important in deciding how to vote on the Merger and/or whether to exercise their conversion right to receive $10.00 in cash per share of Tortoise stock. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy Solicitations, additional proxy solicitation materials, and in other information reasonably available to stockholders.

245.    The untrue statements and omissions as set forth above proximately caused foreseeable losses to Plaintiffs and other members of the Class.

246.    By reason of the foregoing, the Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a 9 promulgated thereunder, 17 C.F.R. § 240.14a 9.

**COUNT IV: FOR VIOLATIONS OF SECTION 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934 IN CONNECTION WITH THE PROXY CLAIMS (AGAINST DEFENDANTS CUBBAGE, PANG, DABOUB, LEIDEL, TASSIN, MERCER, CHADWICK, AND WENDEL)**

247.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein, and expressly exclude any allegations specified to relate solely to Plaintiffs' claims under Section 10(b) and 20(a) of the Exchange Act.

248.    This claim does not sound in fraud. For the purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct. This claim is based solely on negligence.

249.    This Count is asserted against Defendants Cubbage, Pang, Daboub, Leidel, Tassin, Mercer, Chadwick, and Wendel, and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

250.    These Defendants acted as controlling persons of Tortoise and/or Volta within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Tortoise and/or Volta's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, these Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Tortoise and/or Volta, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. These Defendants were provided with or had unlimited access to copies of Volta's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

251.    In particular, these Defendants had direct and supervisory involvement in the day to day operations of Tortoise and/or Volta and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. These Defendants also reviewed the Merger Agreement between Tortoise and Volta and voted to approve the Merger, signed the Proxy Solicitations, and solicited approval of the Merger.

252.    As set forth above, these Defendants each violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in

connection with their purchases of Tortoise's securities during the Class Period.

253.    By reason of the foregoing, these Defendants named in this Count violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

## VII.    VIOLATIONS OF SECTION 10(b) AND 20(a) OF THE EXCHANGE ACT

254.    Plaintiffs bring Counts V and VI, addressed in this Section, under Sections 10(b) and 20(a) of the Exchange Act.

255.    These claims are for violations of Sections 10(b) and 20(a) of the Exchange Act.

### A.    Substantive Allegations

#### 1.    Volta Began Exploring Methods to Raise Capital in Early 2022

256.    Shortly after becoming a public company through the SPAC Merger, Volta began internally exploring ways to raise additional capital because the Company's management was aware that the Company's rate of cash burn was unsustainable.

257.    On February 8, 2023, Volta filed with the SEC a Schedule 14A containing a preliminary proxy statement regarding the then-proposed acquisition by Shell. In a section titled "Background of the Merger," Volta stated that in January 6, 2022, Volta management informed Volta's board that the Company needed to "raise between $300 million and $350 million of additional capital for Volta to pursue its growth strategy beyond June 30, 2022," and Volta's Board "concluded that the cost structure reflected in the proposed budget was unsustainable and . . . directed Volta's prior management team to come back to the Volta board of directors with another operating plan that addressed its concerns." Following this board meeting, according to Volta, Volta's Chief Strategy Officer met with representatives from Shell twice in February and March 2022, and shortly after, Mercer and Wendel allegedly "resigned." Shortly after these "resignations," "the lenders that had been negotiating a potential debt facility with Volta terminated their discussions." The February 8, 2023 Schedule 14A stated:

> On January 6, 2022, at a meeting of the Volta board of directors held by video conference, Volta's prior management team presented to the Volta board of directors an operating plan and budget that required Volta to raise between $300 million and $350 million of additional capital for Volta to pursue its growth strategy beyond June 30, 2022.

Under the operating plan, if Volta was unable to raise such capital, Volta would not be able to continue pursuing its growth strategy beyond June 30, 2022 and Volta would need to significantly curtail its operations. The Volta board of directors concluded that the cost structure reflected in the proposed budget was unsustainable and directed Volta's prior management team to provide further details regarding the proposed budget and cost structure, including Volta's operating, hiring and expense management plans, plans for obtaining financing, and current and forecasted headcount needs, and directed Volta's prior management team to come back to the Volta board of directors with another operating plan that addressed its concerns.

On February 7, 2022, Mr. Lipsher spoke by video conference with Mr. Abreu to follow up on Volta's earlier discussions with him and another representative of Shell.

On March 14, 2022, certain members of Volta's prior management team met for an in-person introductory discussion with Mr. Abreu, Mr. Delpiano and other representatives of Shell at Volta's office location in San Francisco.

On March 28, 2022, Volta announced the resignations of Volta's former Chief Executive Officer, Scott Mercer, and Volta's former President, Christopher Wendel, as officers and employees of Volta and as members of the Volta board of directors.

Following the announcement of Volta's 2021 financial results and the resignations of various members of Volta's prior management team, the lenders that had been negotiating a potential debt facility with Volta terminated their discussions.

258.    CW 11 corroborated the chronology of the events described in ¶ 257, but stated that the Board fired Mercer and Wendel.  CW 11 recounted that in the beginning of 2022, "the CEO – Scott Mercer – had a term sheet for $300 million" with "a venture capital firm," and noted that "[t]here were terms being passed around but the Board fired Scott [Mercer] and the term sheet went away."  This witness also corroborated that this term sheet would have helped the Company continue on its growth strategy, noting "that would have solved our problems for a bit … That would have paid for installs," and "that $300 million would put in the backlog of stations we had on order for Mike Schott's division to sell stuff." But, as this witness explained, this potential deal disappeared after Mercer and Wendel's "resignations": "No one's going to give you $300 million without a CEO."

259.    Volta, however, did not disclose the extent of these financial problems during the Class Period, which show that Volta's business model would not survive without a massive influx of capital. Defendants instead concealed this truth from investors and downplayed Volta's true financial condition.

1

2.    **Volta's Unfounded Revenue Projections During the Class Period**

2        260.    Volta's former employees describe how Volta's revenue projections during the Class

3    Period were unrealistic.  CW 10 was hired at Volta in January 2022 to work on its models for financial

4    projections. This witness stated that in their first few months at Volta, they worked on improving the

5    Company's process for setting up financial forecasts. That process took six months before the witness

6    could start creating new forecasts based on the new models they worked on. This witness focused on

7    Volta's overall model related to its total operations, which plugged in inputs such as revenue

8    projections, which CW 10's colleague at the same reporting level worked on. CW 10 stated that both

9    this master model and the one specifically for revenue forecasts that Volta was using when the witness

10    arrived in January 2022 needed to be fixed.

11        261.    This witness explained that Volta's revenue projections for 2022 were based on a

12    different model than the one used for the SPAC Merger, but that the model used for 2022 was also

13    flawed. CW 10 also reviewed this model that was used for 2022 when CW 10 arrived at Volta and

14    could not understand how it obtained the figures that it did. The witness described it as "very

15    confusing." In addition, this witness explained that Volta's revenue projections for 2022 were

16    unrealistic because they were inflated above what the model that was in place when the witness joined

17    the Company projected.

18        262.    CW 10 stated that the managers in the Financial Planning & Analysis department took

19    the results that the model projected for 2022 revenue and added what the witness described as a "go

20    get," which the Sales team would then have to figure out how to go get going forward. CW 10 stated

21    that this addition to Volta's projected revenue was even more unrealistic after the first quarter of 2022

22    because Volta missed its revenue target for the second quarter of 2022. CW 10 stated that Volta

23    maintained its revenue projection for 2022 even after the Company missed its revenue target for the

24    second quarter because they said internally that Volta would make up for the shortfall in the third and

25    fourth quarters. But CW 10 said that was not realistic because if the Company was not able to hit its

26    target for the second quarter, "how would they hit later ones?"

27        263.    CW 10 stated specifically that this applied to the $70 million to $80 million that Volta

28

65

projected for 2022, which Volta maintained from prior quarters when it reported its second quarter results. The witness remembered specifically that the "go get" for this 2022 revenue projection was in the range of $10 to $15 million. Most of this "go get" was from media sales and the rest of it was from network development revenue that came from site hosts paying Volta for installing charging stations and that Volta would then pay back in rent over time. For example, CW 10 stated if the "go get" was $10 million, then $7 million to $8 million came from media sales and the remainder came from network development.

264.    CW 10 described specifically how the revenue model worked. It would project how many charging stations Volta would have installed in the quarter and then project media revenue based on that figure. The "go get" was added on top of the revenue projection that the model forecast. It was not tied to the model.

265.    CW 10 also stated that the Financial Planning & Analysis group did the forecasting process each quarter. The process was that Michael Standifer, who CW 10 reported to, would be involved in creating the revenue projection figure and it would then be reviewed by Garret Little and Defendant Chadwick. CW 10 stated that Chadwick was definitely aware of the revenue projection figure and approved it each quarter. The number was included in a Powerpoint presentation that was presented in a quarterly hourlong meeting that included Chadwick, Standifer, and Little. CW 10 stated that the "go get" was clear from the presentation that Chadwick reviewed at this meeting. After the accounting team closed the books for the quarter, the FP&A team would do the full reforecast. The meeting with Chadwick, Standifer, and Little would then take place before the projections were disclosed publicly. For example, for the second quarter of 2022, which ended at the end of June 2022, the meeting at which the revenue projection, including the "go get," was presented to Chadwick, would have taken place in late July, before Volta reported its results for the quarter in August. CW 10 stated that the "go get" was still in the projections that Volta reported and was not removed before the projections were reported publicly. CW 10 also described this process of applying a "go get" to inflate Volta's projected revenue beyond what was realistic as part of Volta's standard practice for projecting revenue that existed before CW 10 started working at Volta and that continued when CW 10 started

66

during the third quarter of 2022 to work on Volta's revenue projections for 2023.

266.    As described in more detail in Section VII.B, these "go gets" rendered Volta's revenue projections starting in 2022 as false and/or misleading.

267.    In addition, CW 10 explained that they interacted with Volta's accounting team in the course of working on projections and in 2022, the Company's accounting was a complete mess and never closed on time. There was difficulty producing forecasts because the Company's actual results for the prior month were not ready on time. In addition, everything was in Excel and Volta did not have systems in place to keep track of things. Overall, CW 10 described Volta's accounting practices as not up to par for a public company.

268.    CW 10 also described a strained relationship with the Company's accounting team. When this witness would question whether items were accounted for properly with Max Anderson, Volta's Controller who reported to Defendant Chadwick, Anderson was "very combative" and wanted accounting to be a "black box." CW 10 stated that nobody ever thought that Volta's revenue figures were correct and did not know how Accounting was getting their numbers. This disconnect between the Financial Planning & Analysis team and the Accounting team was very unusual based on CW 10's prior experience at Fortune 500 companies. Normally, FP&A and Accounting are highly intertwined, with regular check-ins, pre-close reviews before the end of a month, and discussions of things to be aware of in different accounting categories for the following month.

### 3.    Volta Delayed and/or Failed to Pay Vendors and Site Hosts Due to its Cash Burn

269.    Volta admitted in the Proxy for the Shell merger that its business model was unsustainable from the start. (*See supra* ¶¶ 256-58). As a result, the Company did not make timely payments to site hosts and vendors, to conceal from investors the true state of the Company's finances. As Volta's cash shortage worsened in early 2022, and the Board secretly decided that Mercer and Wendel's business plan was fundamentally flawed—leading to their firings—the Company became unable to pay key site hosts and the vendors that manufactured Volta's charging stations, but did not disclose to investors the Company's true financial condition. These delinquent payments hampered

Volta's ability to meet its charging station installation projections.

270.     The confidential witnesses mentioned above described the problems in Volta's business from before it went public. (*See supra* Sections V.B.2-4). Those issues worsened as Volta struggled after the SPAC Merger because of its unsustainable business model.

271.     CW 3 confirmed Volta's problems managing its real estate partnerships with site hosts. One of the costliest mistakes occurred with Brookfield/GGP, which was one of Volta's most important site hosts (*see supra* ¶ 107). Brookfield, which had partnered with Volta for years, was a unique client, because Volta generally developed, owned and operated its own stations – except for with Brookfield. Brookfield struck a deal where it paid for 51% of the capital expenditures for equipment and installation, taking a majority ownership position. In exchange, Brookfield paid Volta $18 million to deploy the sites, along with service and maintenance fees, and Volta would pay an inflated rental rate. But because of issues with Volta's financial accounting systems and structures, the Company was often late paying rent to Brookfield, which led to default notices and angry phone calls from Brookfield. Even more problems arose when it was revealed that Volta had not paid taxes to the local tax authority for three to four years. "That was not a small mistake and it was not a small amount of money." Volta was slow to respond, which forced Brookfield to pay the back taxes. Brookfield then charged Volta for this, plus service fees and interest markups, which caused a large rift in the partnership. Brookfield hired a new CFO, who came to Volta in early 2022, irate over the tax snafu and Volta's chronically late payments. Volta finally paid Brookfield back in 2022 and the new CFO insisted that, over a six-month period, Volta buy back all ownership of stations that Brookfield had invested in.

272.     This large payment to Brookfield is consistent with Volta's unexpected and unexplained large expense in the third quarter of 2022 that Barclays noted on November 15, 2022, was "incurred largely in observance of some sort of contractual agreements from what we can tell."

273.     CW 10 confirmed Brookfield's importance to Volta.  CW 10 stated that through the first half of 2022, Brookfield and Volta had contracted "probably 300 or 400 stations, which was at any given point in 2022 or 2023 at least 10 percent of [Volta's] network."  CW 10 added that "Revenue wise [Brookfield's contract] was at least a few million dollars," and "on an annual basis [it was] at least

68

3 or 4 or 5 million dollars which could be considered material to the revenue charges [Volta] had for the year."

274.    CW 3 also said that there were dozens of companies to which Volta owned sums of approximately $500,000.

275.    CW 3 explained further that Volta owed substantial sums to multiple site hosts (who hosted Volta's charging stations on their property) and, separately, to vendors that provided materials and services to Volta related to the construction of the Company's charging stations. Volta stopped paying them in the second quarter of 2022 because it was running out of money.

276.    Another site host that CW 3 described Volta as owing a substantial sum to was Kohl's department store. Volta simply stopped paying rent to Kohl's in the second quarter of 2022. Volta had at least 2 charging stalls at each of 100 Kohl's locations (giving it at least 200 stalls total at Kohl's)[10] and owed Kohl's between $200 and $250 per stall per month.[11]

277.    CW 3 described Kohl's as one of Volta's top ten most important site host relationships, so Volta treated Kohl's better than many other site hosts. CW 3 stated that because Volta stopped paying a site host that was high on Volta's priority list, it was doing this with other site hosts even earlier. For example, CW noted that starting in the second quarter of 2022, Volta also stopped paying rent to site hosts Edwards Realty (in Chicago), Ahold Delhaize (the owner of supermarket chains Food Lion and Shop Rite), Albertsons, Kimco, Regency, and the Chicago Bulls.

278.    Volta featured several of these companies as key site hosts, including Brookfield, Kohl's, Albertson's, Walgreens, Regency, Kimco, and Giant. (*See supra* ¶ 198 and *infra* ¶ 378).

279.    CW 3 also named several vendors to whom Volta owed over $500,000, which were mostly architectural and engineering firms that provided site evaluation and construction services to

---

[10]    Volta had 2,548 total stalls installed as of the end of the first quarter of 2022 and 2,920 stalls as of the end of the second quarter of 2022. The 200 or more stalls that CW 3 described Volta as having at Kohl's was therefore at least 8% of Volta's total stalls at the start of the second quarter of 2022 and at least 7% of total stalls at the end of the second quarter.

[11]    This means that starting in the second quarter of 2022 (which began in April 2022), Volta was behind at least $40,000 to $50,000 per month just to Kohl's.

Volta for the installation of charging stations. These vendors included:

      a.  Peerless AV, which worked out of Aurora, Illinois, and assembled Volta's charging stations, to which Volta owed approximately $5 million;

      b.  Kimley Horn, to which Volta owed approximately $2 million;

      c.  MD7, to which Volta owed approximately $1 million;

      d.  Amped (a contractor) to whom Volta owed $600,000; and

      e.  Stone Inc. in Chicago (one of Volta's regional installers in the Midwest).

280.    CW 3 stated that these sums were as of October 2022, when the witness left Volta. By the end of the second quarter of 2022, they were approximately 60% of that amount.

281.    CW 3 also described how Volta's financial problems prevented it from being able to install new charging stations. For example, Volta touted some of its big-name agreements for charger installations, such as with Walgreens, where the agreed deal was for Volta to install 200 stations per year for five years, at over 500 Walgreens locations. But as of October 2022, when the witness left the Company, Volta had installed no more than 20 chargers. The witness stated that Volta was "on the precipice of losing" the contract and "[t]here was no path forward because there was no money. They can't pay for chargers or installs."

282.    CW 11 similarly described how in 2022, Volta was running out of money and it was "robbing Peter to Pay Paul."[12] This witness corroborated CW 3's statement that Volta had "dozens" of vendors that were owed over $500,000, emphasizing that it was dozens. CW 11 stated that in June or July 2022, the witness was no longer allowed to sign new deals with site hosts for the installation of new charging stations because Volta could no longer afford to install them.

283.    In addition, CW 11 stated that in January following when Volta went public (*i.e.*, January 2022), people at the Company were already worried about it having enough money. CW 11 also confirmed that Kimley Horn was owed as much as millions of dollars that Volta did not pay it and

---

[12]    Both CW 1 and CW 11 repeatedly used this exact same phrase independently, without it being mentioned to them. This corroboration shows the extent to which this was a common way that high-level Volta employees working in separate parts of the Company described Volta's finances.

that Peerless AV was owed even more because it manufactured Volta's charging stations.

284.    CW 6, who worked on product development and planning, reiterated the statements by the witnesses described above that Volta was notoriously slow at paying its vendors, which this witness attributed to a general lack of financial accounting preparedness. At one point after Volta went public, this witness was negotiating vendor contracts as the product lead for new station enhancements that required updated hardware and software for media and data collection. CW 6 said that those contracts slowed dramatically, because he or she could not get them past Legal and Finance approval. The witness "could see them pumping the brakes because they couldn't afford the contracts."

285.    CW 3 also described Volta's lack of cash available to fund its operations. The witness stated that "[a]n executive vice president told me off-the-record in June or July 2022 that we only have $55 million left the bank." At this point in time, Volta's "leadership refused to approve capital allocation for any new builds." CW 3 stated that it appeared in the recent earnings calls that Volta had lied to investors. "They were not telling the truth about the fact that they are almost out of cash. This is failure on a thousand levels." The witness stated that these problems occurred because Volta overstaffed and overcommitted when the witness believes the executive team clearly knew some time in the first quarter of 2022 that the Company was headed for financial dire straits.

286.    CW 1 confirmed these problems with Volta's projections for how many charging stations it would install and its cash balance. This witness stated that Volta spent money at a burn rate of $40 million per quarter while it had $105 million in the bank. The Company's leadership tried to compare its revenue model to Google and Facebook, which this witness described as "a smoke and-mirrors game on what the real valuation was and what revenue we were generating as media sellers."

287.    Volta's extreme challenges in its ability to fund its business depleted its cash balance. As of September 30, 2021, soon after the completion of the Merger, Volta had $331 million in cash and equivalents on hand to funds its business.[13] This number dropped precipitously in each of Volta's successive quarterly reports as a public company, to $262.3 million as of the end of 2021, $205.4

---

[13]    Mercer provided this figure on the Company's November 10, 2021 earnings call for the third quarter of 2021.

million as of March 31, 2022, $105.3 million as of June 30, 2022, and a meager $15.6 million as of September 30, 2022. This $105.3 million that Volta disclosed as of June 30, 2022, is nearly double the $55 million that CW 3 described an executive vice president telling them was left "off-the-record in June or July 2022." Moreover, these disclosures concealed how dire Volta's financial situation was and were misleading because (1) Volta was taking extreme steps to avoid paying its liabilities in order to make its cash balances look better than they were and (2) as of January 2022, Defendants knew that Volta would not be able to "pursue its growth strategy beyond June 30, 2022." (*See supra* ¶¶ 256-58). In fact, as reported by CW 3 and CW 11, during the second quarter of 2022, Volta's financial situation was so dire that had stopped paying rent to many of its site hosts and the vendors that made its charging stations. (*See supra* ¶¶ 274-83).

288.    In addition, these statements implied that Volta's problems could be solved by raising additional capital. In reality, however, when Mercer told Volta's Board on January 6, 2022, that the Company needed to raise over $300 million to fund its growth beyond June 30, 2022, rather than pursue the term sheet for $300 million in funding that Mercer proposed, the Board fired Mercer and Wendel and pursued the Shell acquisition. Defendants' discussion of Volta's cash balances and need for funding thus misrepresented the more fundamental problem that the Company's business model was unsustainable and that it needed to be acquired to survive.

### 4.    Mercer and Wendel's Unexpected "Resignations"

289.    On March 28, 2022, Volta abruptly announced that Mercer and Wendel were resigning from their positions as CEO and President of the Company, respectively, and from their roles on Volta's Board of Directors.  As described in more detail in ¶¶ 335-37 and 354-58, Defendants described these resignations as voluntary. The progression of events described above, however, makes clear that the Board fired Mercer and Wendel because their business plan for the Company was "unsustainable." Mercer told the Board on January 26, 2022, that Volta could not pursue its current growth plan for more than six months and proposed raising over $300 million. The Board rejected that plan, pursued the Shell acquisition instead, and Mercer and Wendel's resignations were announced shortly thereafter.

290.    Statements by former employees of Volta confirm that, contrary to Defendants

characterizations, Mercer and Wendel did not agree to resign "voluntarily" and that it was not "mutually determined that now [was] the right time" for them leave.

291. For example, several former employees stated that they received an abrupt, early morning email from Mercer on March 28, 2022, that suggested that his departure was not voluntary:

    a. CW 1 stated that it was suspicious that Mercer announced his departure with an early morning email – between 4 and 5 am – without any other statements or goodbyes from Mercer or Wendel.

    b. CW 8 described Mercer's 4:30 am resignation email as a complete surprise to the witness and other employees, and that it was clear to the witness that Mercer was forced out of the Company. CW 8 believed that it was a Board decision to push Mercer out because they did not have confidence in Mercer to move Volta forward following the SPAC merger.

    c. CW 6 recalled that Mercer and Wendel each sent terse or cryptic emails around the time of their resignations. Mercer notified Volta employees that he was leaving the Company in an early morning email sent on or around March 28, 2022 that the witness recalled was sent at 4:44 a.m. The email talked about Mercer "moving on, but it was unclear why." The witness explained that Mercer was forced out of Volta because the Company was Mercer's "baby, if nothing else. Why would he leave unless this is more like he's been forced to leave or something's wrong."

    d. CW 3 described how, on the morning of March 28 — a Monday — Mercer sent an internal email that announced his resignation that was widely regarded as strange, and there was a sense internally that Mercer may not have actually sent it himself.

292. Several former Volta employees also described internal meetings following this announcement that suggested that Mercer and Wendel's departures were not voluntary:

    a. CW 1 recalled that a few days after Mercer's early morning email, Volta had its usual all-hands Zoom meeting on a Friday. CW 1 observed that at this meeting, Cubbage and others from the C-suite seemed like they were reading from a script when discussing this

73

topic. CW 1 also described that it was not until a few weeks later, at another Zoom meeting, that the Board really addressed Mercer and Wendel's departures. At that point, Cubbage "took charge." The witness stated that "[t]hese are pretty much his exact words: 'Sometimes after a company goes public - you have to credit the founders for their idea [of Volta] - but it becomes clear that the founders are not able to execute and get the company to the next level.' He [Cubbage] made it clear that they [Mercer and Wendel] got kicked to the curb." CW 1 stated that Cubbage's message was that the Board lost confidence in Mercer and Wendel's ability to grow the Company and take it to the next level.

b. CW 3 also described a meeting within 24 hours of Mercer's email which Cubbage led. During this meeting, executives told employees a story that aligned with Volta's press release: that the departure was mutually agreed upon. But CW 3 stated that "[e]very one of us in our guts knew they didn't just one day over a weekend [decide to] walk away from the thing they'd spend 13 years working on." The witness stated that "[n]o one trusted leadership after the spin that this was a mutually agreed upon situation. Brandt [Hastings] and Cubbage read off a script on Zoom. After that, it was all fully scripted."

c. CW 6 also recalled an all-hands zoom meeting in April 2022, during which Volta executives, including General Counsel Jim DeGraw, Chief People Officer Julie Rogers and interim CEO Brandt Hastings, discussed Mercer and Wendel's departures. This witness also described that "[t]hey all seemed to be reading off a script. It seemed like there were things they could and couldn't say."

293. Several former employees recalled that Mercer and Wendel's lack of involvement with Volta after the announcement of their departures indicated that their departures were not voluntary, and that they did not continue to work with Volta in any capacity, contrary to the Company's announcement:

a. CW 6 stated that upon Mercer and Wendel's resignations, they were immediately deactivated from Volta's internal Slack channel. During the "scripted" Zoom meeting

74

described above, this witness asked the "tough question" everyone was wondering: "Why are Chris and Scott no longer on the company Slack if they are still working for us? Are they fired or not?" But the witness stated that "[w]e never got a clear answer."

b.  CW 1 confirmed CW 6's account of this this meeting.

c.  CW 3 also stated that despite Volta's statement that Mercer would stay on in an advisory role, Volta employees never heard from Mercer again – not in an email, on Zoom, or in any other capacity.  According to CW 3, Mercer moved all his belongings out of Volta within three weeks.

294.  Volta's former employees provided other various reasons that they thought Mercer and Wendel's departures were not voluntary:

a.  CW 10 stated that Michael Standifer (the Director of Financial Strategy) and Garrett Little (the Vice President of Finance who reported to Defendant Chadwick), stated that "the Board removed" Mercer and Wendel because "they weren't adequate in their function."

b.  CW 11 was close with Mercer and Wendel. This witness was positive that they were fired. CW 11 stated that they "ate, slept, and drank" the Company and that it was Mercer's baby.

c.  CW 3 stated that neither Mercer nor Wendel resigned on their own accord. The witness stated that "[w]e were absolutely told in no uncertain terms this was a mutual separation of parties – and it was not." The witness based this statement on a short conversation with Wendel, a text message exchange with a current employee, and information that the witness received from an in-house attorney at Volta. The short conversation with Wendel took place on the telephone in or around early May 2022 (around six weeks after Wendel left the Company). The witness stated that Wendel "implied this was an unfortunate set or series of events that 'I wish would have ended differently.'" CW 3 then had a later conversation with an in-house attorney who intimated that then-General Counsel Jim DeGraw had convinced the Company's Board to push out Wendel and

Mercer. The witness also recalled a later text exchange with a Vice President of Sales who was the third employee at Volta, who said, effectively, "you know this wasn't their choice." The Vice President of Sales found this out from a private conversation with Mercer in someone's house in San Francisco. In addition, the Vice President of Sales told CW 3 that as part of their exit agreement/understanding, Mercer and Wendel were not supposed to speak with or have contact with certain Volta employees for a period of time.

**B.      False and Misleading Statements**

295.    All of Defendants' false and misleading statements in the Registration Statement, Proxy Solicitations, and Investor Presentation described in Sections V.C and VI above in connection with Plaintiffs' claims under the Securities Act and Section 14(a), respectively, are also false and misleading under Section 10(b). The following additional statements alleged in this Section are also false and misleading under Section 10(b).

296.    On September 1, 2021, Volta filed a Current Report on Form 8-K with the SEC that was signed by Defendant Mercer as Volta's CEO. This September 1, 2021 report contained certain of the same, or substantially similar, descriptions of Volta's business and of its accounting policies that were in the Registration and Proxy Statements. (*See supra* ¶¶ 182, 183, 186, 188, 189).

297.    The statements in ¶ 296 were materially false and misleading for the same reasons that those statements were materially false and misleading when described in the Registration and Proxy Statements.

298.    This September 1, 2021 report also contained updated financial figures in Volta's unaudited consolidated financial statements for the six months ended June 30, 2021, including the following statements of Volta's revenue for the three and six months ended June 30, 2020 and 2021:

Volta Industries, Inc. and Subsidiaries

Unaudited Consolidated Statements of Operations and Comprehensive Loss

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2021 | 2020 | 2021 | 2020 |
| REVENUES | | | | |
| Service revenue | $        6,825,867 | $        1,763,262 | $       11,056,516 | $       4,864,128 |
| Product revenue | — | 373,343 | 299,037 | 710,625 |
| Other revenue | 117,000 | 241,530 | 327,000 | 705,719 |
| Total revenues | 6,942,867 | 2,378,135 | 11,682,553 | 6,280,472 |

299.   This report also stated Volta's revenue broken down by category:

| Revenues | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2021 | 2020 | 2021 | 2020 |
| Behavior and Commerce | $ 6,484,155 | $ 834,931 | $ 10,013,800 | $ 1,967,615 |
| Network Development | 340,370 | 1,301,674 | 1,341,181 | 3,607,138 |
| Charging Network Operations | 642 | 243,530 | 642 | 705,719 |
| Network Intelligence | 117,000 | — | 327,000 | — |
| Total revenues | $ 6,942,167 | $ 2,378,135 | $ 11,682,583 | $ 6,280,472 |

300.   Under this chart, the report gave the following explanation for Volta's "Behavior and Commerce" category of revenue:

> Behavior and Commerce revenue increased by $5.6 million, or 677%, from June 30, 2020 to June 30, 2021, primarily due to large sales of media campaigns with several national brands in the three months ended June 30, 2021.

301.   The statements in ¶¶ 298-300 were materially false and/or misleading because: (1) Defendants touted increases in revenue in the "Behavior and Commerce" category, but failed to disclose that, as CW 1 stated, Volta's revenue pull-ins continued through the third quarter of 2021, which inflated Volta's revenue for this time period; (2) these revenue pull-ins, which were included in all of the periods covered by these statements, may have technically violated ASC 606, GAAP principles, and the FASB principle of neutrality; and (3) even if Volta's improper revenue recognition did not technically violate GAAP, it was qualitatively material and misleading under SAB 99, as discussed in more detail at ¶¶ 160-66.

302.   This September 1, 2021 report also noted Volta's liabilities for operating leases, which included "noncancellable operating leases, primarily for office space and the use of spaces for the installation of its electric vehicle charging stations ('site leases')," as follows:

| Operating lease costs | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2021 | 2020 | 2021 | 2020 |
| Fixed lease cost | $ 2,806,857 | $ 1,654,602 | $ 5,442,923 | $ 3,192,685 |
| Variable lease cost | 129,153 | (59,970) | 197,647 | (35,364) |
| Total operating lease costs | $ 2,936,010 | $ 1,594,632 | $ 5,640,570 | $ 3,157,321 |

303.   This report also noted the following operating lease liabilities as of June 30, 2021 and December 31, 2020, respectively (from left to right):

| | | |
| --- | --- | --- |
| Operating lease liability - current portion | 8,465,597 | 7,483,528 |
| Operating lease liability - non-current portion | 42,172,215 | 37,146,055 |

77

304.    The statements in ¶¶ 302-03 were materially false and misleading because, as stated by CWs 3, 4, 5, and 6, by the time Volta went public, the Company had already developed a practice of delaying payments to site hosts and vendors which concealed its inability to meet its contractual obligations.

305.    On November 10, 2021, Volta announced its financial results for the third quarter of 2021. Its press release quoted Defendant Mercer as stating that "[s]ince announcing our business combination with Tortoise in February, we have continued growing our Network Development partner relationships across multiple sectors and flagship community locations, while *further strengthening our Behavior and Commerce customer base*. I couldn't be more excited about Volta's future. Our *significant pipeline* provides a strong foundation for future growth that will further compound the value of our network."

306.    This announcement also disclosed the following results for the third quarter of 2021:

**Results for Third Quarter 2021**

Revenue grew 77% YoY to $8.5 million, compared to $4.8 million in the prior-year period, largely attributable to strong growth within Behavior and Commerce. *Behavior and Commerce revenue grew to $7.4 million from $2.2 million in the prior-year period, primarily due to increased sales of media campaigns with national brands.* Network Development revenue decreased YoY due to a decrease in customer-owned installations.

* * *

Results Nine Months Ended September 30, 2021

*Revenues increased 82% to $20.2 million, compared to $11.1 million in the prior-year period, largely attributable to strong growth within Behavior and Commerce.*

Revenues by Category

| *(in thousands)* | **Nine Months Ended September 30,** | | | |
| | **2021** | | **2020** | |
|---|---|---|---|---|
| **Revenues** | | | | |
| Behavior and Commerce | $ | 17,373 | $ | 4,181 |
| Network Development | | 2,412 | | 6,189 |
| Charging Network Operations | | — | | 706 |
| Network Intelligence | | 387 | | — |
| **Total revenue** | **$** | **20,172** | **$** | **11,076** |

**Total Stalls Connected, including Site Partners**

Total stalls connected at September 30, 2021, were 2,137, representing a 50% YoY increase. The company added 168 stalls in the quarter and now has sites in 23 states. Volta's stalls generated over 238,000 estimated charging sessions per month, 24% utilization per 24-hour period, with a total 3.5 GWh Network Throughput in the quarter.

The following table sets forth total stalls connected, together with total revenue, for the Nine months ended September 30, 2021 and September 30, 2020:

| (in thousands) | Nine Months Ended September 30, | |
| --- | --- | --- |
| | **2021** | **2020** |
| Total revenue | $  20,172 | $  11,076 |
| Total stalls connected, including site partners | 2,137 | 1,427 |

307.    The statements in ¶¶ 305-06 were materially false and/or misleading because Defendants touted "***strengthening our Behavior and Commerce customer base***" and their "***significant pipeline***," but failed to disclose that, as CW 1 stated, Volta's revenue pull-ins continued through the third quarter of 2021, which inflated Volta's revenue for this time period; (2) these revenue pull-ins, which were included in all of the time periods covered by these statements, may have technically violated ASC 606, GAAP principles, and the FASB principle of neutrality; and (3) even if Volta's improper revenue recognition did not technically violate GAAP, it was qualitatively material and misleading under SAB 99, as discussed in more detail at ¶¶ 160-66.

308.    The November 10, 2021 release announcing Volta's third quarter 2021 also disclosed that Volta's "Operating lease liability - current portion" was 9.267 million and 7.484 million as of September 30, 2021 and December 31, 2020, respectively, and its "Operating lease liability - non-current portion" was $47.844 million and $37.146 million for those same time periods.

309.    The statements in ¶ 308 were materially false and/or misleading because they failed to disclose, as stated by CWs 3, 4, 5, and 6, that by the time Volta went public, the Company had already developed a practice of delaying payments to site hosts and vendors which concealed its inability to meet its contractual obligations.

310.    In addition, the November 10, 2021 release announcing Volta's third quarter 2021 results announced the following full-year guidance:

**Full Year 2021 Outlook**

Based on current business conditions, business trends and other factors, for the full year ending December 31, 2021, the Company expects:

- Revenue in the range of $32 million to $36 million
- Total signings to be in the range of 600 sites to 700 sites
- Total operational stalls in the range of 2,300 to 2,500, with 1,300 plus stalls in our construction queue.

311. The statements in ¶ 310 were materially false and/or misleading because: (1) the revenue projections failed to disclose that, (i) as CW 1 stated, Volta's revenue pull-ins continued through the third quarter of 2021, which inflated Volta's projected revenue for 2021; (ii) these revenue pull-ins may have technically violated ASC 606, GAAP principles, and the FASB principle of neutrality; and (iii) even if Volta's improper revenue recognition did not technically violate GAAP, it was qualitatively material and misleading under SAB 99, as discussed in more detail at ¶¶ 160-66; (2) the "Total signings" projections failed to disclose that, as stated by CWs 3, 4, 5, 6, and 11, Volta's practice of delaying payments to site hosts and vendors which concealed its inability to meet its contractual obligations soured relationships with partners and made signings less likely; and (3) the stall projections failed to disclose that these delayed payments slowed Volta's stall installations.

312. Also on November 10, 2021, Volta held its earnings call to discuss its results for the third quarter of 2021. Defendants Mercer, Wendel, and Chadwick participated in this call.

313. On this call, Defendant Wendel stated that Volta's Behavior and Commerce category of operations "initially sells media display time to advertisers, which provides us with a potentially high value revenue stream that we believe will compound over time, with the increased growth and utilization of our network. ***We think this revenue stream is a critical differentiating factor that will provide a long-term competitive advantage***."

314. In addition, Wendel described Volta's relationship with advertisers as follows:

[W]e've signed up national brand advertisers, other media channel partners, programmatic platforms and our site partners as they start to look towards marketing their businesses to consumers, and how to drive product sales in store. In Q3, we welcomed new brand partners Visa, DHL and discover to the platform. We also saw Comcast, Dunkin, FedEx and Hulu come back for additional campaigns. And we finally saw continued growth in our programmatic business. ***We view this flywheel of providing***

***value to consumers, property partners and advertisers as positioning as well to monetize our network on day one, create a deeper connection with the community and increase the total value of our network.***

315.    Defendant Chadwick then stated that "Third quarter revenues were $8.5 million, compared to $4.8 million in the prior year period, largely attributable to strong growth within behavior and commerce. Behavior and commerce revenue grew to $7.4 million from 2.2 million in the prior year period, primarily due to increased sales of media campaigns, with several national brands."

316.    Chadwick also described the "three simple reasons that we are so excited about where Volta is today and what its future holds," including "[a] differentiated business model enables us to monetize our infrastructure from day one and compound our returns as our network scales with EV growth. Finally, ***our industry leading utilization and using unit economics allow us to attract valuable partners that will help scale and expand our overall network, which ultimately compounds our returns over the longer term***."

317.    When asked whether Volta would meet its revenue guidance for the fourth quarter that implied sequential growth of around 75%, and whether that would include "continued very strong performance in behavior and commerce," Wendel responded, "Yes, we were looking to and ***we strongly believe and expect that continued strong growth in the behavior and commerce, media the advertising***. And as we look at the network development, there's obviously, only a few months left in it, ***we do still believe we've got a very, very strong pipeline***. Timing on the permits could be a slight issue for us, but we don't expect that to be a big detrimental hit to the quarter as we round out the year end."

318.    The statements in ¶¶ 313-17 were materially false and/or misleading for touting revenue in the Behavior and Commerce category, but failing to disclose that, (1) as CW 1 stated, Volta's revenue pull-ins continued through the third quarter of 2021, which inflated Volta's revenue for this time period; (2) these revenue pull-ins may have technically violated ASC 606, GAAP principles, and the FASB principle of neutrality; and (3) even if Volta's improper revenue recognition did not technically violate GAAP, it was qualitatively material and misleading under SAB 99, as discussed in more detail at ¶¶ 160-66.

319.    Financial analysts covering Volta received these false and misleading statements

positively.  For example, DA Davidson published a report on November 11, 2021, stating "we believe VLTA is executing well – its contracted backlog is strong (dominated by new sites), revenue and gross profit metrics per unit installed continue to trend higher (validating the value inherent in its niche charging model), new MSA signings are continuing, and the company continues to add new media brands."  Likewise, Cantor Fitzgerald published a report on December 14, 2021 initiating coverage on Volta, noting "VLTA has attained partnerships with strategic hosts such as retailers like Whole Foods, REITs like Brookfield Properties, OEMS like Ford & Toyota, and advertising partnerships with national brands like Coca-Cola and Facebook. We believe VLTA has a competitive advantage with these partnerships, which could result in rapid growth and continuous customer acquisition."

320.    Also on this call, an analyst asked how Volta would explain the "gap between" the 2,400 stations that Volta was projecting to have installed at the end of the year, as compared to the approximately 3,100 in Volta's "SPAC-related projection." In response, Wendel attributed the shortfall to permitting, stating "the delta is really reasonably simple. We have, as Francois mentioned, 1300 stations in the construction queue. ***And it's mostly down to permit time***." Wendel also stated that "we are installing in areas that are not yet as experienced with this infrastructure. And sometimes your teaching permit authorities what to do, you might be the first time anybody's asked for a permit for charter literally happens. So the expectation on how long that takes has been slightly longer than we thought when we made that prediction now nearly 12 months ago"—even though Volta had reiterated that estimate of over 3,100 stations by the end of 2021 in the Investor Presentation that it updated in June 2021.

321.    During the same call, Mercer attributed the gap to "a COVID driven thing for us that the permitting processes are moving in different jurisdictions"—even though the higher estimates were made well into the pandemic.

322.    The statements in ¶¶ 320-21 were materially false and/or misleading because the gap between the number of installations that Volta projected in the Registration Statement as compared to the number of installations it projected on this call resulted not from permitting issues, or COVID 19-related delays, but rather, from the fact that, as CWs 1, 2, 3, 4, 6, 7, and 11 stated, (1) Volta did not

have enough cash on hand to install the number of requisite stations or to fund its expansion; and (2) Volta's practice of shirking its contractual obligations to site hosts and vendors limited its ability to install new charging stations.

323.    On November 12, 2021, Volta filed with the SEC its report on Form 10-Q for the third quarter of 2021 ("Q3 2021 10-Q"). The Q3 2021 10-Q was signed by Defendants Mercer (as Volta's CEO and Principal Executive Officer) and Chadwick (as CFO and Volta's Principal Financial Officer and Principal Accounting Officer).

324.    Mercer and Chadwick each signed certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX") attesting that, based on their knowledge, the Q3 2021 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

325.    These SOX certifications also attested to Mercer and Chadwick's responsibility for Volta's internal controls over financial reporting, their having disclosed "any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting" and that Mercer and Chadwick had disclosed to Volta's auditors and Audit Committee of the Board "[a]ll significant deficiencies" in internal controls and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

326.    Mercer and Chadwick also signed certifications pursuant to Section 906 of SOX, attesting to that Q3 2021 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, and that information contained in such Quarterly Report on Form 10-Q fairly presents in all material respects the financial condition and results of operations of

the Company."

327.    Mercer and Chadwick's SOX certifications described in ¶¶ 324-26 were materially false and/or misleading because they failed to disclose that, (i) as CW 1 stated, Volta's revenue pull-ins continued through the third quarter of 2021, which inflated Volta's revenue for this time period; (ii) these revenue pull-ins may have technically violated ASC 606, GAAP principles, and the FASB principle of neutrality; and (iii) even if Volta's improper revenue recognition did not technically violate GAAP, it was qualitatively material and misleading under SAB 99, as discussed in more detail at ¶¶ 160-66.

328.    The Q3 2021 10-Q contained certain of the same, or substantially similar, descriptions of Volta's business and of its accounting policies that were in the Registration and Proxy Statements. (*See supra* ¶¶ 182, 183, 186, 188, 189).

329.    The statements in ¶ 328 were materially false and misleading for the same reasons that those statements were materially false and misleading when described in the Registration and Proxy Statements.

330.    In addition, the Q3 2021 10-Q repeated the historical financial figures from the November 10, 2021 press release referenced in ¶¶ 305-06.

331.    The statements in ¶ 330 were materially false and misleading for the same reasons that those statements were materially false and misleading when described in the November 10, 2021 press release.

332.    On February 15, 2022, Volta filed a Form 8-K with the SEC, signed by Defendant Chadwick, that attached an investor presentation for investor meetings in February 2022. This presentation highlighted how "Volta sites compound in value as EV penetration increases," with individual sites showing "41% [compound annual growth rate] over 10 years."

333.    This presentation also promoted Volta's relationships with the property owners that host its charging stations and with the companies that provide its main source of revenue (Behavior & Commerce revenue) by placing ads on its stations, as follows:



334.     The statements in ¶¶ 332-33 were materially false and/or misleading because: (1) they touted Volta's relationship with Brookfield but failed to disclose that, as stated by CW 3, Brookfield had hired a new CFO in early 2022 who was irate over the tax issue and Volta's chronically late payments, and according to CW 10, Brookfield accounted for 10% of Volta's network; (2) they touted Volta's relationships with other partnerships and vendors but failed to disclose that, as CWs 3, 4, 5, 6, and 11 stated, Volta routinely did not pay its contractual obligations on time; and (3) they touted future growth but failed to disclose that in January 2022, management had told the Board that the Company needed to raise $300-350 million or its growth strategy would not survive past June 2022, which the Board deemed "unsustainable."

## C.     The Truth Begins to Emerge in Several Partial Disclosures While Defendants Continued to Mislead Investors

### 1.     March 2022 Partial Disclosures and False and/or Misleading Statements and Omissions

335.     On March 28, 2022, Volta filed a Form 8-K with the SEC signed by James DeGraw (as General Counsel and Chief Administrative Officer), announcing "that the Company and the Company's Chief Executive Officer, Scott Mercer, and the Company's President, Christopher Wendel, ***have agreed***

to the resignation of each of Mr. Mercer and Mr. Wendel as an officer and employee of the Company." The Form 8-K also stated that "Wendel's resignation is effective immediately, while Mr. Mercer will continue as Chief Executive Officer for a transition period ending on the earlier of (i) the date on which the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2021 is filed with the Securities and Exchange Commission and (ii) April 29, 2022" and that "Mr. Mercer *will serve as an independent advisor* to the Company's board of directors (the 'Board') *through March 31, 2023*. . . . in exchange for a $375,000 consulting fee."

336.    This Form 8-K contained an accompanying press release in which Defendant Cubbage represented these departures as mutual, stating that "'Since Volta was founded 12 years ago, it has created an entirely new industry as well as an unparalleled experience for both customers and drivers,' said Vince Cubbage, Co-Chair of the Board. 'With Volta's listing as a public company last August, *the Board and Founders mutually determined* that now is the right time to identify new leadership with experience in managing public companies to serve the best interests of stakeholders and unlock the company's full value potential.'"

337.    The statements in ¶¶ 335-36 were materially false and/or misleading because: (1) Mercer and Wendel did not resign "voluntarily," their departure from the Company was not "mutual[]," and Mercer did not serve  as an independent advisor to the Board or have any further involvement with the Company — rather, Mercer and Wendel were terminated because they were responsible for Volta's financial problems described above such that shareholders could be concerned about the fallout from these high ranking executives' terminations; and (2) these statements disclosed Mercer's and Wendel's departures, but failed to disclose that (i) Mercer and Wendel had presented to Volta's Board in January 2022 that the Company needed $300-350 million for its growth strategy to survive through June 2022 but the Board deemed that strategy unsustainable; (ii) a term sheet for that amount existed in early 2022 due to Mercer's negotiation with a venture capital firm; and (iii) when the Board fired Mercer, the term sheet disappeared, and Volta no longer had the means to secure the needed funds.

338.    As a direct result of this partial corrective disclosure, the Company's share price fell $0.76, or 18%, to close at $3.37 per share on March 28, 2022, on unusually heavy trading volume that

was over three times the average trading volume of the prior 20 trading days.  However, Defendants also made false and/or misleading statements and omissions in the Form 8-K and accompanying press release that served to buffer the impact of Mercer and Wendel's departures and maintained the artificial inflation in Volta's stock price.

339.    Specifically, the press release accompanying the announcement quoted Defendant Mercer as stating, "I am incredibly proud of Volta and what this team has achieved so far, and I am truly excited for its *next phase of growth* as the industry accelerates and matures. Volta was started with the ambition to be the best business model in the EV charging space, and now the company's focus needs to turn to scaled, public-market-facing growth."  Similarly, Cubbage was quoted as stating that Wendel and Mercer's departures provided the opportunity to "unlock the company's full value potential."

340.    Indeed, financial analysts covering Volta reacted negatively to this news and what it signaled about Volta, but were ultimately reassured by the Company's messaging following Mercer and Wendel's "departures."  For example, Canaccord published a report on March 28, 2022, downgrading its outlook on Volta, noting that Mercer and Wendel had resigned "[u]nexpectedly," which "*was a surprise to us*, especially after meeting Scott [Mercer] and Chris [Wendel] a few weeks earlier at headquarters. *Neither gave any indications that they were on the way out; rather, both seemed like active and invested founders*." Cantor Fitzgerald likewise published a report on March 28, 2022 stating "the transition changes were *unexpected*," but also published a report on April 4, 2022 stating that "We continue to like VLTA's business model . . . . Management continues to note that, despite the recent changes in leadership, there are no indications of any misconduct that affects the company's financials. Additionally, management will aim to do a better job improving visibility and transparency about the company's key metrics, which we believe will be helpful to investors."  However, this transparency was not forthcoming.  The *Motley Fool* also noted that "Mercer's departure isn't the only one rattling shareholder confidence. Effective immediately, Chris Wendel, Volta's co-founder and president, has also resigned from the company and the board."

341.    On March 31, 2022, Volta filed a Form 8-K with the SEC, signed by Defendant

Chadwick, that contained a press release announcing the Company's fourth quarter and full year 2021 results, as well as guidance for the 2022. In this press release, Volta "announced preliminary revenues of approximately $12 million for its fourth quarter 2021, up 45% year-over-year, and revenues of $32 million for the full year ended December 31, 2021, up 66% year-over-year. Total stalls connected as of December 31, 2021 was 2,330."

342.    Volta also announced in this press release for its fourth quarter and full year 2021 results that it "expects first quarter 2022 revenues to range from $8 million to $8.5 million. For full year 2022, the Company anticipates revenues to range from $70 million to $80 million. Volta expects 2022 revenue to be greater in the second half of the year, as a reflection of the growing scale of our network and accompanying seasonal media revenue patterns." This press release also announced that "[f]or 2022, *the Company expects total incremental, connected stalls in the range of 1,700 to 2,000*."

343.    The statements in ¶¶ 341-42 were materially false and/or misleading because: (1) as CW 10 stated, beginning in early 2022, Volta's revenue projections issued its quarterly results were unrealistic because they were inflated by a "go get" and based on an unsupported model; and (2) the projected stall installations failed to disclose that by early 2022, Volta's failure to pay vendors and site hosts (specifically, Brookfield, as noted by CW 3) made these projections unachievable.

344.    Financial analysts covering Volta were reassured by the Company's rosy projections following Mercer and Wendel's "departures." For example, Cantor Fitzgerald published a report on April 4, 2022 stating that "We continue to like VLTA's business model . . . . Management continues to note that, despite the recent changes in leadership, there are no indications of any misconduct that affects the company's financials. Additionally, management will aim to do a better job improving visibility and transparency about the company's key metrics, which we believe will be helpful to investors." However, this transparency was not forthcoming.

### 2.    April 2022 False and/or Misleading Statements and Omissions

345.    On April 15, 2022, Volta filed its Form 10-K for the year 2021 ("2021 10-K") with the SEC, signed by Defendants Mercer (as CEO and Principal Executive Officer), Chadwick (as CFO, Principal Financial Officer and Principal Accounting Officer), Cubbage (as a Director), and the

Company's other Directors. The 2021 10-K was accompanied by SOX certifications signed by Mercer and Cubbage that were substantially similar to the ones that accompanied the Q3 2021 10-Q described in ¶¶ 324-26 above.

346.    Mercer and Chadwick's SOX certifications described in ¶ 345 were materially false and misleading because: (1) they failed to disclose that, (i) as CW 1 stated, Volta's revenue pull-ins occurred from before the SPAC Merger through the third quarter of 2021, which inflated Volta's revenue for the time periods that it continued to disclose in these financial statements; (ii) these revenue pull-ins may have technically violated ASC 606, GAAP principles, and the FASB principle of neutrality; and (iii) even if Volta's improper revenue recognition did not technically violate GAAP, it was qualitatively material and misleading under SAB 99, as discussed in more detail at ¶¶ 160-66.

347.    The 2021 10-K contained certain of the same, or substantially similar, descriptions of Volta's business and of its accounting policies that were in the Registration and Proxy Statements. (*See supra* ¶¶ 182, 183, 186, 188, 189).

348.    The statements in ¶ 347 were materially false and misleading for the same reasons that those statements were false and misleading when stated in the Registration and Proxy Statements.

349.    The 2021 10-K also stated that Volta had "concluded that there [was] substantial doubt that the Company cannot continue as a going concern in the next twelve months based on reasonable information available to us as of the date of this analysis," but did not disclose the January 2022 Board meeting, Mercer's term sheet for $300-350 million, that when the Board fired Mercer and Wendel, this term sheet disappeared, or that the Board deemed Mercer's business plan unsustainable:

> ***Going concern***
>
> The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 3 to the consolidated financial statements, the Company has an accumulated deficit of $428.7 million as of December 31, 2021 and incurred a net loss of $276.6 million during the year ended December 31, 2021. ***These conditions, along with other matters set forth in Note 3, raise substantial doubt about the Company's ability to continue as a going concern.*** Management's plans in regard to these matters are also described in Note 3. The consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty.

****

**Note 3 - Liquidity**

The Company's consolidated financial statements are prepared on a going concern basis, which contemplates the realization of assets and the settlement of liabilities and commitments in the normal course of business. For the year ended December 31, 2021, the Company incurred a net loss of $276.6 million and had negative cash flows from operating activities of $93.3 million. As of December 31, 2021, the Company had an accumulated deficit of $428.7 million and cash of $262.3 million.

*****

Legacy Volta entered into a Business Combination Agreement with Tortoise Acquisition Corp. II. on February 7, 2021 and following the Closing, began trading on the New York Stock Exchange (NYSE) (see Note 1 - Description of Business). The Company raised aggregate cash proceeds of over $350.1 million in cash following the Reverse Recapitalization through the sale of shares of Volta Common Stock. Additional cash obligations in the next twelve months are expected to include investments in the operations and purchases to expand the business. ***Management has considered conditions and events which provide substantial doubt about the Company's ability to continue as a going concern over the 12 months following the issuance of the consolidated financial statements. The Company concluded that there is substantial doubt that the Company cannot continue as a going concern in the next twelve months based on reasonable information available to us as of the date of this analysis***. No assurances can be provided that additional funding will be available at terms acceptable to the Company, if at all. ***If the Company is unable to raise additional capital, the Company may significantly curtail its operations, modify strategic plans and/or dispose of certain operations or assets***

350.    The statements in ¶ 349 were materially false and misleading because while they disclosed that there was a substantial doubt about the Company's ability to continue as a going concern "*over the [following] 12 months*," Defendants failed to disclose that three months earlier, in January 2022, (1) management had informed the Board that the Company needed to raise $300-350 million for its growth strategy to survive past June 2022, which the Board deemed unsustainable; (2) Mercer had negotiated a term sheet with a venture capital fund for that amount; (3) when the Board fired Mercer and Wendel in March 2022, this term sheet was taken off the table; and (4) as CW 11 stated, in January 2022, Volta employees were already worried about the Company having enough money.

351.    Also on April 15, 2021, Volta filed a Form 8-K signed by Defendant Chadwick containing a press release with its fourth quarter and full year 2021 results, as follows (with the

historical financial figures in this press release also contained in the 2021 10-K):

**Fourth Quarter 2021 Financial Highlights**

- Revenues increased 45% year-over-year to $12.1 million, compared to $8.4 million in the prior-year period.

*Revenues by Category*



- Selling, general and administrative expenses excluding stock-based compensation and one-time expenses were $32.2 million, compared to $13.1 million, also excluding stock-based compensation and one-time expenses, in the prior-year period.
- Net loss was $121.1 million, compared to a loss of $31.5 million in the prior-year period.
- Adjusted EBITDA was $30.7 million loss, compared to $12.9 million loss in the prior-year period.
- Cash and marketable securities were $262.3 million as of December 31, 2021.
- Weighted average shares outstanding for the three months ended December 31, 2021, were 160.4 million.

**Full Year 2021 Financial Highlights**

Revenues increased 66% year-over-year to $32.3 million, compared to $19.5 million in the prior-year.

*Revenues by Category*

- Net loss was $276.6 million, compared to a loss of $70.6 million in the prior-year period.

- Adjusted EBITDA was $83.8 million loss for the full year 2021, compared to $40.1 million loss in 2020.

*       *       *

**Total Stalls Connected, including Site Partners**

Total stalls connected as of December 31, 2021, was 2,330, representing a 44% year-over-year increase. A stall is attributed to a station based on the number of vehicles that can charge concurrently and there are certain configurations of Volta sites where one station is capable of charging more than one vehicle at a time. The Company added 193 stalls in the quarter and ended 2021 in 23 states.

352.    This press release also disclosed Volta's outlook for 2022 as follows:

**Full Year 2022 Outlook**

Based on current business conditions, business trends and other factors, for the full year ending December 31, 2022, the Company reiterates guidance of:

- ***Full year 2022 Revenue in the range of $70 million to $80 million***
- ***Total incremental, connected stalls in the range of 1,700 to 2,000***

In addition, the Company is now guiding to:

- ***Total incremental, connected sites to be in the range of 650 to 750 sites***

**First Quarter Outlook**

Based on current business conditions, business trends and other factors, for the three months ended March 31, 2022, the Company reiterates guidance of:

- First quarter Revenue in the range of $8 million to $8.5 million

353.    The statements in ¶ 351 were materially false and/or misleading because: (1) the revenue projections failed to disclose that as CW stated, Volta's revenue projections were misleadingly inflated by "go-gets"; (2) the stall projections failed to disclose that these numbers were rendered unachievable because as CWs 3 and 11 stated, Volta owed dozens of companies sums of as much as $500,000 and stopped paying site hosts (including Edwards Realty, Ahold Delhaize, Albertsons, Kimco, Regency, and the Chicago Bulls) and vendors in Q2 2022 because it was running out of money; and (3) failed to disclose how the revenue and stall projections would be impacted by the Company's inability to continue its growth strategy past June 2022 if it did not raise $300-350 million, as management presented to the Board in January 2022.

354.    This April 15, 2022 press release also announced the appointment of Brandt Hastings as Interim CEO and noting that "This appointment follows ***Scott Mercer's decision to step down as Chairman and CEO of Volta last month***." This release also stated that "[w]e want to thank Scott

Mercer, who built this company with an incredible vision. As the Board conducts a complete and formal search for a permanent CEO, we are confident that Brandt will lead Volta's teams to realize the company's significant potential."

355.    The statements in ¶ 354 were materially false and/or misleading because (1) Mercer did not "deci[de] to step down," but rather, was terminated because he was responsible for Volta's financial condition; (2) shareholders could be concerned about the fallout from this high ranking executive's termination for that reason; and (3) these statements failed to disclose that shortly before his firing, (i) Mercer had presented to Volta's Board in January 2022 that the Company needed $300-350 million for its growth strategy to survive through June 2022 but the Board deemed that strategy unsustainable; (ii) a term sheet for that amount existed in early 2022 due to Mercer's negotiation with a venture capital firm; and (iii) when the Board fired Mercer, the term sheet disappeared, and Volta no longer had the means to secure the needed funds.

356.    On April 18, 2022, Volta held its earnings call to discuss its results from the fourth quarter and full year 2021.

357.    On this call, Defendant Chadwick stated that "[o]n March 28, 2022, Volta announced that the company's Chief Executive Officer, Scott Mercer; and the company's President, Christopher Wendel, *agreed to the resignation* of each as an officer and employee of the company. Mr. Wendel's resignation was effective immediately, while Mr. Mercer continued for a transition period, ending on the filing of the company's annual report on Form 10-K for the fiscal year ended December 31, 2021 as filed on Friday 15th of April 2022. Mr. Mercer will serve as an independent adviser to the company's Board of Directors through March 31, 2023."

358.    The statements in ¶ 357 were materially false and misleading because (1) Mercer and Wendel did not "agree[]" to resign, but were instead ousted from their own Company and Mercer would not be serving as an independent advisor to the Board; (2) Mercer and Wendel were terminated because they were responsible for Volta's financial problems; (3) shareholders could be concerned about the fallout from these high ranking executives' terminations for that reason; and (4) these statements failed to disclose that (i) management told Volta's Board in January 2022 that the Company

needed $300-350 million for its growth strategy to survive through June 2022 but the Board deemed that strategy unsustainable; (ii) a term sheet for that amount existed in early 2022 due to Mercer's negotiation with a venture capital firm; and (iii) when the Board fired Mercer, the term sheet disappeared, and Volta no longer had the means to secure the needed funds.

359. Also on this call, Hastings stated that "*Our partners keep coming back to us because they see the impact that Volta Charging has on their properties over time. Ahold Delhaize USA, the largest grocery retailer group on the East Coast, which includes the Stop & Shop, Food Lion, Giant Foods, Giant Martin's and Hannaford brands, has been a wonderful partner to grow with*. . . . As mentioned, the value of a site is not only in the initial footprint, but also in the growth in stalls, energy delivery and purchasing influence that we can drive alongside the shift to electric mobility."

360. The statements in ¶ 359 were materially false and/or misleading because they touted relationships with Volta's partners, but failed to disclose that, as stated by CWs 3 and 11, by April 2022, Volta had stopped paying site hosts (including Brookfield, Edwards Realty, Ahold Delhaize, Albertsons, Kimco, Regency, and the Chicago Bulls) and vendors due to the Company's dire and undisclosed financial situation.

361. In addition, on this call, Chadwick emphasized that Volta's "priorities [for 2022] remain very much the same. It's all about hitting the revenue guidance, which we've mentioned the guidance for the year is $70 million to $80 million, and hitting the site locations and the stall installation cadence, we mentioned 1,700 to 2,000 stalls for 2022. I think that's the real focus." Chadwick also emphasized later on the call that "*we are going to hit our store installation guidance*" and "revenue guidance for 2022."

362. Hastings then "underscore[d] Francois' comments around, we are extremely focused on executing our business plan at Volta. And as we stated, including on this call, that falls into two very important categories. The first is revenue in that range of $70 million to $80 million in 2022. And second is a focus on continuing to put stalls in the ground, *with incremental connected stalls in the range of 1,700 to 2,000 stalls in 2022*."

363. In response to a question about "permitting being a material bottleneck around new

installations," Chadwick stated that "it's similar to what we were seeing in the past in certain places, in certain locations where the sort of the decarbonization and electrification has been advancing over time, though getting those permits is just an easier and a quicker process. As we go to locations where installing new stores or where a state or a city or a municipality, it doesn't have any stalls to date. That takes a little bit longer. I would say, ***no different than what we've seen in the past***. We've very same. We're facing the same issues the whole industry is facing. ***And we have continued to build out our permitting team***, so that we are as efficient and effective as possible to make sure that permitting doesn't slow us down."

364.    Later in the call, an analyst asked why Volta's guidance for the number stations it would install was "dramatically below" and "more than 2,000 units" below the 2022 year-end target that was presented in connection with the SPAC Merger.  Chadwick responded that "I don't want anybody to feel that the permits are the things that slow things down. As I mentioned before, in states where – in places and locations where there is already a permitting process, we're moving through those things very quickly. Some of the places that don't have a sort of a fully laid out process, that's where it's taking some additional time." Chadwick also emphasized that "***As it relates to the actual stall installs, I just want to point to once again our guidance and that I feel very robust, I feel very comfortable, I feel very confident having been at the company now for a year, having built out a strong financial team and built out many other teams in the supply chain management area and in our sales teams both for the stalls*** – our stalls sales team and our media sales team that the focus is on the guidance that I've just given."

365.    The same analyst asked Chadwick a follow-up question: "give us some more complete understanding of why the install rates are expected to be so much lower than the guidance that was given at the time of your SPAC merger. I think a lot of investors feel that understanding is essential to move beyond the volatility in your stock where there's been quite dramatic losses for equity investors." Chadwick declined to provide more information, and stated "I'm just going to come back and repeat to the guidance that I'm giving for the year."

366.    The statements in ¶¶ 361-65 were materially false and/or misleading because (1) the

revenue projections failed to disclose that as CW 10 stated, Volta's revenue projections that it issued in connection with its quarterly results were unrealistic because they were inflated by a "go get" and based on an unsupported model; and (2) the revenue and stall installation projections failed to disclose the true extent of Volta's financial struggles, and failed to disclose how Volta's inability to pay site hosts (like Brookfield, Edwards Realty, Ahold Delhaize, Albertsons, Kimco, Regency, and the Chicago Bulls) and vendors, rendered the stall installation projections unachievable.

367.    During the same call, in response to a question about Volta's "cash burn trajectory versus your liquidity," Chadwick responded:

> When I look at the cash burn, I look at the operating expenses and the burn through the OpEx and also then through the CapEx side of things. As I mentioned, with respect to the capital side of things, we have put in place this capital committee that does look at every project and it does look at that spend as it relates to the timeline for the return on that spend. So, feeling very good about that. As it relates to our operating expenses, what I do is I look at this – been looking at this very, very carefully. We have mapped out what those operating expenses are anticipated to be through 2022 and beyond. And I've installed a significant amount of discipline, financial discipline in matching the actual spend to the budgets. So I feel very, very good that we have in place those controls and those procedures to make sure that the burn, the liquidity burn is well controlled.

368.    The statements in ¶ 367 were materially false and/or misleading because (1) they described Volta's "cash burn" and "liquidity burn" as "well controlled," when, in reality, as CWs 3 and 11 stated Volta was running out of money to such a great extent that by the second quarter of 2022 it was forced to stop paying site hosts (like Brookfield, Edwards Realty, Ahold Delhaize, Albertsons, Kimco, Regency, and the Chicago Bulls) and vendors, which limited its ability to install new charging stations; and (2) they failed to disclose that Volta's Board had been informed in January 2022 that its cash burn was so dire that if Volta's growth strategy was to survive through June 2022, the Company would need to raise $300-$350 million in funds.

369.    Defendants' false and misleading statements regarding the Company's 4Q21 earnings continued to assure investors that the Company was on track to continue to grow its revenue.  For example, Cantor Fitzgerald published a report on April 18, 2022, stating that "We remain bullish, particularly as VLTA guided revenues to more than double in 2022E."

### 3.    May 2022 False and/or Misleading Statements and Omissions

370.    On May 13, 2022, Volta filed with the SEC its Form 10-Q for the first quarter of 2022 ("Q1 2022 10-Q"), which was signed by Defendants Hastings (as CEO and Principal Executive Officer) and Chadwick (as CFO, Principal Financial Officer and Principal Accounting Officer). The Q1 2022 10-Q was accompanied by SOX certifications signed by Hastings and Chadwick that were substantially similar to the ones that accompanied the Q3 2021 10-Q described in ¶¶ 324-26 above (except that one was now signed by Hastings instead of Mercer).

371.    Hastings and Chadwick's SOX certifications described in ¶ 370 were materially false and misleading because: (1) failing to disclose Volta's past use of revenue pull-ins.

372.    The Q1 2022 10-Q also included statements regarding Volta's liquidity, and similar to the 2021 10-K, stated that "Volta *may need to consider raising funds* through the issuance of debt or equity securities or additional borrowings *in the future*" and repeated

Sources of Liquidity

Volta has incurred net losses and negative cash flows from operations since its inception. To date, Volta has funded its operations primarily with proceeds from the issuance of Volta preferred stock, borrowings under its loan facilities, including its term loan, and other term loans. Until Volta is cash-flow positive, *Volta may need to consider raising funds through the issuance of debt or equity securities or additional borrowings in the future*.

****

The Company entered into a Business Combination Agreement with Tortoise Corp II on February 7, 2021 and following the Closing on August 26, 2021, Volta Inc. began trading on the New York Stock Exchange (NYSE). Please refer to "Note 1 - Description of Business" of the accompanying condensed consolidated financial statements for the three months ended March 31, 2022 for additional information. Additional cash obligations in the next twelve months are expected to include investments in the operations and purchases to expand the business. *Management has considered conditions and events which provide substantial doubt about the Company's ability to continue as a going concern for the 12 months following the issuance of the condensed consolidated financial statements*. The Company concluded that there is substantial doubt that the Company cannot continue as a going concern in the next twelve months based on reasonable information available to us as of the date of this analysis. No assurances can be provided that additional funding will be available at terms acceptable to the Company, if at all. If the Company is unable to raise additional capital, the Company may

97

significantly curtail its operations, modify strategic plans and/or dispose of certain operations or assets.

**Note 3 - Liquidity**

Legacy Volta entered into a Business Combination Agreement with Tortoise Acquisition Corp. II. on February 7, 2021 and following the Closing, began trading on the New York Stock Exchange (NYSE) (see Note 1 - Description of Business). The Company received net cash proceeds of over $350.1 million in cash following the Reverse Recapitalization through the sale of shares of Volta common stock. However, additional cash obligations in the next twelve months are expected to include investments in the operations and purchases to expand the business. ***Management has considered conditions and events which provide substantial doubt about the Company's ability to continue as a going concern over the 12 months following the issuance of the condensed consolidated financial statements. The Company concluded that there is substantial doubt about the Company's ability to continue as a going concern in the next twelve months based on reasonable information available to us as of the date of this analysis***. No assurances can be provided that additional funding will be available at terms acceptable to the Company, if at all. If the Company is unable to raise additional capital, the Company may significantly curtail its operations, modify strategic plans and/or dispose of certain operations or assets.

373.    The statements in ¶ 372 were materially false and misleading because while they disclosed that there was a substantial doubt about the Company's ability to continue as a going concern "***over the [following] 12 months***," and that Volta "***may need to consider raising funds***," Defendants failed to disclose that four months earlier, in January 2022, (1) management had informed the Board that the Company needed to raise $300-350 million for its growth strategy to survive past June 2022, which the Board deemed unsustainable; (2) Mercer had negotiated a term sheet with a venture capital fund for that amount; (3) when the Board fired Mercer and Wendel in March 2022, this term sheet was taken off the table; and (4) as CW 11 stated, in January 2022, Volta employees were already worried about the Company having enough money.

374.    Also on May 13, 2022, Volta filed a Form 8-K signed by Defendant Chadwick containing the Company's financial results for the quarter as follows (with historical financial figures also contained in the Q1 2022 10-Q):

**First Quarter 2022 Financial Highlights**

- Revenues increased 77% year-over-year to $8.4 million, compared to $4.7 million in the prior-year period.

*Revenue by Category*

| | Three months ended March 31, | |
|---|---|---|
| | 2022 | 2021 |
| | *(in thousands)* | |
| **Revenue** | | |
| Media Revenue (formerly Behavior & Commerce) | $ 6,118 | $ 3,536 |
| Network Development | 3,214 | 1,002 |
| Charging Network Operations | 1 | — |
| Network Intelligence | 11 | 710 |
| **Total Revenue** | $ 9,344 | $ 6,747 |

- Selling, general and administrative expenses excluding stock-based compensation were $39.7 million, compared to $15.3 million in the prior period.
- Net loss was $48.1 million, compared to a loss of $65.2 million in the prior-quarter period.
- Adjusted EBITDA was $41.4 million loss, compared to $15.9 million loss in the prior-year period.
- Cash and marketable securities were $205.4 million as of March 31, 2022.
- Weighted average shares outstanding for the three months ended March 31, 2022 were 172.0 million.

375.   This Form 8-K for the first quarter of 2022 also stated, under the heading "**Total Stalls Connected, including Site Partners**": "Total stalls connected as of March 31, 2022 was 2,548, representing a 39% year-over-year increase. . . . The Company added 218 stalls in the three months ended March 31, 2022 and now has stalls in 26 states." Volta's press release for the first quarter of 2022, dated May 13, 2022, also contained the following guidance:

**Full Year 2022 Outlook**
Based on current business conditions, business trends and other factors, for the full year ending December 31, 2022, the Company reiterates guidance of:

- ***Full year 2022 Revenue in the range of $70 million to $80 million***

- ***Total incremental, connected stalls in the range of 1,700 to 2,000***

- ***Total incremental, connected sites to be in the range of 650 to 750 sites***

**Second Quarter Outlook**

Based on current business conditions, business trends and other factors, for the three months ending June 30, 2022, the Company provides guidance of:

- Second quarter Revenue in the range of $13 million to $14 million

376.   This press release announcing Volta's results for the first quarter of 2022 also promoted the Company's performance by stating: "'We made continued progress against our strategy with total revenue growing 77%, media revenue up 73%, and total installed stalls growing 39% year-over-year,' said Hastings. 'New and expanded partnerships with top retail locations like Tanger Outlets and Six

Flags, national advertisers such as T-Mobile and PepsiCo, as well as enhancements to our AI and data-science offerings, position us to further accelerate growth and ownership of the rapidly expanding electric mobility marketplace.'"

377.    The statements in ¶¶ 374-76 were materially false and/or misleading because: (1)  as CW 10 stated, Volta's revenue projections issued in connection with its quarterly results were misleadingly inflated by a "go get" and were based on an unsupported model; and (2) the stall projections failed to disclose that by Q2 of 2022, Volta's cash burn prevented it from being able to pay site hosts (like Brookfield, Edwards Realty, Ahold Delhaize, Albertsons, Kimco, Regency, and the Chicago Bulls) and vendors, which made these projections unachievable.

378.    Volta also attached its presentation from its Q1 2022 earnings call to the Form 8-K that it filed with the SEC on May 13, 2022, which noted that the presenters included Defendants Hastings and Chadwick. This earnings presentation continued to promote Volta's relationships with the sites that hosted its charging stations and with the companies that provided it advertising revenue, as well as its plans to install new stations, including in the following slides:





379. The statements in ¶ 378 were materially false and misleading because: (1) as CW 10 stated, Volta's revenue projections issued in connection with its quarterly results were misleadingly inflated by a "go get" and were based on an unsupported model; and (2) the touting of current and new

partnerships and stall projections failed to disclose that by Q2 of 2022, Volta's cash burn prevented it from being able to pay site hosts (like Brookfield, Edwards Realty, Ahold Delhaize, Albertsons, Kimco, Regency, and the Chicago Bulls) and vendors, which made these projections unachievable.

380.    On May 17, 2022, Volta hosted an earnings call for 1Q22.  During his prepared remarks, Chadwick noted that "***Volta is currently in discussions with multiple parties to structure and provide appropriate facility in the range of $250 million to $300 million and is confident that a transaction can be completed in the next few months***."

381.    Chadwick's statements in ¶ 380 were false and/or misleading for failing to disclose that (1) Volta's Board had been informed in January 2022 that it needed $300-350 million for its growth strategy to survive through June 2022 but the Board deemed that strategy unsustainable; (2) a term sheet for that amount existed in early 2022; and (3) when the Board fired Mercer, the term sheet disappeared, leaving Volta without the necessary capital.

382.    Later in the call, during the question and answer portion, an analyst from Roth Capital asked for an update on installation projections: "I don't know if you've disclosed these numbers, but in the past, you had said 12 to 18 months with the installation expectations. So, I'm just wondering where that stands?"  Hastings confirmed Volta's installation projections, stating: "***Yes. So, I'll -- I can double down that the 12 to 18 months. That still stands***."

383.    The statements in ¶ 382 were materially false and misleading because this doubling down on stall projections failed to disclose that by Q2 of 2022, Volta's cash burn was so severe that it prevented the Company from being able to pay site hosts (like Brookfield, Edwards Realty, Ahold Delhaize, Albertsons, Kimco, Regency, and the Chicago Bulls) and vendors, which made these projections unachievable.

### 4.    June 2022 Partial Disclosures and False and/or Misleading Statements and Omissions

384.    On June 10, 2022, after the market closed, Volta announced that Defendant Chadwick would be resigning from his position as CFO "to pursue another professional opportunity" and that other senior executives were also resigning, including Julie Rogers, Chief People Officer of the

Company, Praveen Mandal, Chief Technology Officer of the Company, and James DeGraw, General Counsel, Secretary, and Chief Administrative Officer of the Company. Then, before the market opened on June 13, 2022 (the next trading day), Volta announced that Defendant Cubbage was appointed as Volta's new Interim CEO, replacing Brandt Hastings, who was the Interim CEO for just the two months, since Mercer's resignation upon the filing of Volta's 2021 Annual Report.

385.    As a direct result of this partial corrective disclosure, Volta's share price fell $0.72 per share, or 25.34%, to close at $1.65 per share on unusually heavy trading volume that was over three times the average trading volume of the prior 20 trading days.  However, Defendants also made false and/or misleading statements and omissions during these June 10, 2022 and June 13, 2022 announcements that served to buffer the impact of these executive departures and maintained the artificial inflation in Volta's stock price.

386.    Specifically, the June 10, 2022 Form 8-K touted the hiring of Stephen Pilatzke as Chief Accounting Officer.  Similarly, in a press release filed June 13, 2022 (the next trading day following the June 10, 2022 Form 8-K), Defendant Cubbage was quoted as saying "The Board and Executive Team are excited about the growth potential of Volta's multi-dimensional model and the significant opportunities ahead. I look forward to working alongside Brandt, Drew and our other talented teammates at Volta *to continue to drive* accelerated global momentum, *operational excellence, strong customer focus, expansion in our strategic partnerships*, and an exceptional workplace culture."

387.    These statements in ¶¶ 384-86 served to assure investors about Volta's growth strategy, but were false and/or misleading because (1) they failed to disclose and/or omitted that Volta had hit its June 2022 deadline, discussed in more detail in ¶¶ 256-58, without raising the necessary funds for its growth strategy to continue; (2) they touted "strong customer focus" and "expansion in our strategic partnerships" but failed to disclose that, (i) as stated by CWs 3 and 11, Volta had stopped paying site hosts (like Edwards Realty, Ahold Delhaize, Albertsons, Kimco, Regency, and the Chicago Bulls) and vendors in Q2 of 2022, and that Brookfield's new CFO was angry with Volta's failure to pay on time; and (ii) as stated by CW 11, by June or July 2022, they were no longer allowed to sign new deals with site hosts for the installation of new charging stations because Volta could no longer afford to install

them; and (3) they spoke optimistically about the Company's future but failed to disclose that in January 2022, management had informed the Board that the Company needed to raise $300-350 million to survive past June 2022, which the Board deemed unsustainable, and the Company had not raised those funds.

388.    Financial analysts covering Volta reacted negatively to this news, but they also expressed confidence in Volta's future because of Defendants' false and/or misleading statements and omissions.  For example, on June 13, 2022, D.A. Davidson downgraded its price target on Volta from $3.50 to $2.50, noting that "[w]ithin the last three days, VLTA has announced a number of changes in its executive leadership team, including another round of departures of top managers. . . . We remain on the sidelines with a NEUTRAL rating and $2.50 PT (lowered from $3.50) on VLTA, with a high degree of caution over its ability to assemble a cohesive, long-term-oriented team of leaders."  But, D.A. Davidson credited the "new Chief Accounting Officer role at the company; we expect this role will likely encompass responsibility for remediating VLTA's material weakness in internal control over financial reporting, among other public-company accounting duties."  Similarly, Cantor Fitzgerald published a report on June 13, 2022, which downgraded their rating to neutral, and stated that the departures were "unexpected," and that they had "become more conservative" about Volta, but also noted that "we believe revenue will likely more than double in 2022E and that the company will be a beneficiary of the ~$7.5B funding earmarked for U.S. states ($615M in 2022, and $5B over the next five years) as a result of the bipartisan IIJA Act."

### 5.    August 2022 False and/or Misleading Statements and Omissions

389.    On August 12, 2022, Volta filed with the SEC its Form 10-Q for the second quarter of 2022 ("Q2 2022 10-Q"), which was signed by Defendants Cubbage (as Interim CEO and Principal Executive Officer) and Chadwick (as CFO and Principal Financial Officer). The Q2 2022 10-Q was accompanied by SOX certifications signed by Cubbage and Chadwick that were substantially similar to the ones that accompanied the Q3 2021 10-Q described in ¶¶ 324-26 above (except that one was now signed by Cubbage instead of Mercer).

390.    Cubbage and Chadwick's SOX certifications described in ¶ 389 were materially false

and misleading because they failed to disclose Volta's past use of revenue pull-ins.

391.    The Q2 2022 10-Q also included a section titled "***Liquidity Concern***," which stated "Management has considered conditions and events which provide substantial doubt about the Company's ability to continue as a going concern ***over the 12 months***" and that "The Company concluded that there is substantial doubt about the Company's ability to continue as a going concern ***in the next 12 months*** based on reasonable information available as of the date of this analysis."

> ### Liquidity Concern
>
> The Company's unaudited condensed consolidated financial statements are prepared on a going concern basis, which contemplates the realization of assets and the settlement of liabilities and commitments in the normal course of business. ***Management has considered conditions and events which provide substantial doubt about the Company's ability to continue as a going concern over the 12 months following the issuance of the unaudited condensed consolidated financial statements. The Company concluded that there is substantial doubt about the Company's ability to continue as a going concern in the next 12 months based on reasonable information available as of the date of this analysis***. No assurances can be provided that additional funding will be available at terms acceptable to the Company, if at all. If the Company is unable to raise additional capital, the Company will need to significantly curtail its operations, modify strategic plans and/or dispose of certain operations or assets.

392.    The statements in ¶ 391 were materially false and misleading because while they disclosed that there was a substantial doubt about the Company's ability to continue as a going concern "***over the [following] 12 months***," Defendants failed to disclose that in January 2022, (1) management had informed the Board that the Company needed to raise $300-350 million for its growth strategy to survive past June 2022, which the Board deemed unsustainable; (2) Mercer had negotiated a term sheet with a venture capital fund for that amount; (3) when the Board fired Mercer and Wendel in March 2022, this term sheet was taken off the table, leaving the Company without the necessary funds to continue in the much more immediate future; and (4) as CW 11 stated, in January 2022, Volta employees were already worried about the Company having enough money.

393.    Also on August 11, 2022, Volta filed a Form 8-K containing its financial results for the quarter as follows (with historical financial figures also contained in the Q3 2022 10-Q):

**Second Quarter 2022 Financial Highlights**

- Revenues increased 121% year-over-year to $15.3 million, compared to $6.9 million in the three months ended June 30, 2021.

*Revenue by Category*

| | Three months ended June 30, | | |
|---|---|---|---|
| | 2022 | | 2021 |
| Revenues | *(In thousands)* | | |
| Media Revenue (formerly Behavior & Commerce) | $ | 11,221 | $ 6,485 |
| Network Development | | 3,577 | 340 |
| Charging Network Operations | | 370 | 1 |
| Network Intelligence | | 176 | 117 |
| Total Revenues | $ | 15,344 | $ 6,943 |

- Selling, general and administrative expenses excluding stock-based compensation were $37.6 million, compared to $16.1 million in the prior-year period.
- Net loss was $37.4 million, compared to a loss of $20.6 million in the prior-year period.
- Adjusted EBITDA was $33.4 million loss, compared to $15.1 million loss in the prior-year period.
- Cash and marketable securities were $105.3 million as of June 30, 2022.
- Weighted average shares outstanding for the three months ended June 30, 2022 were 167.4 million.

**Total Stalls Connected, including Site Partners**

In the second quarter Volta's installed base increased by a record 372 stalls, bringing Volta's installed base of total stalls connected as of June 30, 2022 to 2,920, representing a 48% year-over-year increase. A stall is attributed to a station based on the number of vehicles that can charge concurrently from that station and there are certain configurations of Volta sites where one station is capable of charging more than one vehicle at a time. The Company now has stalls in 28 states and territories.

394.    Volta's press release for the second quarter of 2022, dated August 11, 2022, also contained the following guidance:

**Full Year 2022 Outlook**

Based on current business conditions, business trends and other factors, for the full year ending December 31, 2022, the Company reiterates guidance of:

- ***Full year 2022 Revenue in the range of $70 million to $80 million***

- ***Total incremental, connected stalls in the range of 1,700 to 2,000***

- ***Total incremental, connected sites to be in the range of 650 to 750 sites***

**Third Quarter Outlook**

106

Based on current business conditions, business trends and other factors, for the three months ending September 30, 2022, the Company provides guidance of:

- Third quarter Revenue in the range of $17 million to $18 million

395. The press release announcing Volta's results for the second quarter of 2022 also promoted the Company's performance by quoting Defendant Cubbage as stating:

Volta had a record quarter, and these results demonstrate the power of our differentiated business model," said Vince Cubbage, Interim CEO. "By building not just a network of chargers, but a dual energy and digital advertising platform, we believe Volta can scale revenue even faster than the EV adoption curve – offering the quickest path to profitability and the highest revenue per station. I've been impressed by the exceptional work being done across Volta's business and see tremendous opportunity ahead as the Company moves through its next stage of growth.

396. The statements in ¶¶ 393-95 were materially false and/or misleading because: (1) the stall installation projections failed to disclose that (i) as stated by CWs 3 and 11, Volta had stopped paying site hosts and vendors by Q2 of 2022, which rendered these installation projections unachievable; and (ii) as stated by CW 11, by June or July 2022, they were no longer allowed to sign new deals with site hosts for the installation of new charging stations because Volta could no longer afford to install them; and (2) as CW 10 stated, Volta's revenue projections issued in connection with its quarterly results were misleadingly inflated by a "go get" and were based on an unsupported model.

397. Volta also included its presentation from its Q2 2022 earnings call with its Form 8-K that it filed on August 11, 2022. This presentation noted that the presenters on the call included Defendants Cubbage and Hastings, and continued to promote Volta's projected revenue and new stall installations in the following slide:

**Guidance**



1. Full year 2022 Revenue in the range of $70 million to $80 million



2. Total incremental, connected stalls in the range of 1,700 to 2,000



3. Total incremental, connected sites to be in the range of 650 to 750 sites

4. Third quarter Revenue in the range of $17 million to $18 million

398.    The statements in ¶ 397 were materially false and/or misleading because: (1) the stall installation projections failed to disclose that (i) as stated by CWs 3 and 11, Volta had stopped paying site hosts and vendors by Q2 of 2022, which rendered these installation projections unachievable; and (ii) as stated by CW 11, by June or July 2022, they were no longer allowed to sign new deals with site hosts for the installation of new charging stations because Volta could no longer afford to install them; and (2) as CW 10 stated, Volta's revenue projections issued in connection with its quarterly results were misleadingly inflated by a "go get" and were based on an unsupported model.

399.    On August 12, 2022, Volta hosted an earnings call regarding its 2Q 2022 financial results.  During his prepared remarks, Defendant Hastings touted the media business's "***solid repeat customers***."

400.    Later, during the question and answer portion of the call, when asked about "the third quarter [being] a bit light relative to the progression that we shared before," and how "that kind of looks like it puts pressure on the fourth quarter to achieve the full year revenue outlook,"  Cubbage responded that "***Our business model of making money on the media side is not available to anyone that hasn't built the team or the technology or the MSA portfolio or the backlog or the installed base that we***

*have*." Hastings added "***When [advertisers are] investing with Volta, it's because they like the return profile that they're seeing in terms of metrics back to their bottom line. And that's also driving our ability to grow our revenue as well***."

401.    The statements in ¶¶ 399-400 were false and/or misleading at the time they were made because they touted Volta's "***business model of making money on the media side***" and Volta's "a***bility to grow our revenue***" but failed to disclose that Volta's cash burn was so bad that that (i) as stated by CW 3, Volta had stopped paying site hosts (like Edwards Realty, Ahold Delhaize, Albertsons, Kimco, Regency, and the Chicago Bulls) and vendors, by Q2 of 2022, which rendered these installation projections unachievable; and (ii) as stated by CW 11, by June or July 2022, they were no longer allowed to sign new deals with site hosts for the installation of new charging stations because Volta could no longer afford to install them.

402.    During the question and answer portion of the call, a DA Davidson analyst expressed concern about Volta's stall projections. The analyst noted "it's implied that there's a really big second half of new [stall] additions" and "I feel like we had the same setup a year ago coming out of your second quarter and we kind of know where that ended up. So I'm wondering why we should feel that this year is different." In response, Cubbage acknowledged that "execution could have been better last year," but assured the analyst that "2022 included a management team that had built the model from the bottom up, had laid out the quarterly progression, met it in the first quarter, beat it in the second quarter and is optimistic towards the second half of the year. We also provided guidance, and you heard Stephen Palosky's words around that guidance that *we think those ranges are still viable*." Cubbage added that "In order to get into that range, *we need the capital to be on the terms and kind of the pace and timing that we expect it to be. But if you piece all that together, you can see that we're confident of the road ahead*."

403.    Cubbage's statements in ¶ 402 were false and/or misleading because (1) the stall projections were not "viable" because they failed to disclose that Volta's cash burn was so bad that that (i) as stated by CW 3, Volta had stopped paying site hosts (like Edwards Realty, Ahold Delhaize, Albertsons, Kimco, Regency, and the Chicago Bulls) and vendors, by Q2 of 2022, which rendered these

installation projections unachievable; and (ii) as stated by CW 11, by June or July 2022, they were no longer allowed to sign new deals with site hosts for the installation of new charging stations because Volta could no longer afford to install them; and (2) they failed to disclose that Volta's Board was informed in January 2022 that Volta's growth strategy would not survive past June 2022 without an influx of $300-350 million, which the Board deemed unsustainable, and that as a direct result of Mercer's termination, a then-existing term sheet for that amount was taken off the table, materially limiting Volta's available capital.

### 6.    September 2022 Partial Disclosures and False and/or Misleading Statements and Omissions

404.    On Monday, September 26, 2022, before the market opened, Volta partially disclosed the extent of its delayed need to raise capital when it announced that it entered into an agreement with Cantor Fitzgerald that would allow Volta to sell up to $150 million in common stock to the public.

405.    On this news, Volta's share price fell $0.34 per share, or 17.62%, on September 26, 2022, to close at $1.59 per share on unusually heavy trading volume that was over 1.5 times the average trading volume of the prior 20 trading days.  However, Defendants also made false and/or misleading statements and omissions during the September 26 announcement that served to buffer the impact of the Cantor Fitzgerald agreement, and maintained the artificial inflation in Volta's stock price.

406.    Specifically, the Form 8-K announcing the Cantor Fitzgerald agreement was false and/or misleading because it omitted that, (1) (i) Volta's Board had been informed in January 2022 that it needed $300-350 million for its growth strategy to survive through June 2022, which the Board deemed unsustainable; (ii) a term sheet for that amount existed in early 2022; and (iii) when the Board fired Mercer, the term sheet disappeared; and (2) this statement failed to disclose that Volta's cash burn was so bad that that (i) as stated by CW 3, Volta had stopped paying site hosts (like Edwards Realty, Ahold Delhaize, Albertsons, Kimco, Regency, and the Chicago Bulls) and vendors, by Q2 of 2022; and (ii) as stated by CW 11, by June or July 2022, they were no longer allowed to sign new deals with site hosts for the installation of new charging stations because Volta could no longer afford to install them.

407.    Then, on September 28, 2022, after the market closed, Volta announced that it was firing

approximately 10% of its full-time employees (which brought the reduction in its workforce since June 1, 2022, to approximately 18%), as part of "an organizational realignment to reduce costs and drive strategic priorities." Volta also announced in this same release that it was lowering its guidance for the Company's performance, stating that it "is revising its Q3 revenue guidance to between $13.5 million and $14.5 million. Furthermore, the company is withdrawing its full year 2022 revenue and install guidance until further notice."

408.    On this news, Volta's share price fell $0.24 per share, or 15.29%, on September 29, 2022, to close at $1.33 per share on unusually heavy trading volume that was over 1.5 times the average trading volume of the prior 20 trading days.  However, Defendants also made false and/or misleading statements and omissions during the September 28 announcement that served to buffer the impact of the reduction in headcount, and maintained the artificial inflation in Volta's stock price.

409.    Specifically, in the press release announcing the reduction in headcount, Volta painted the headcount as positive, stating that the Company was "reduc[ing] costs and driv[ing] strategic priorities" to "refocus[] resources on accelerating the company's successful digital advertising business, ***collaborating with Volta's numerous retail and commercial property partners***, and driving public-private partnerships that align with the $7.5 billion of funding the Federal government has allocated towards public EV charging infrastructure buildout under the Bipartisan Infrastructure Law."  Cubbage was quoted as stating that despite these "***near-term challenges***, there [was] significant opportunity ahead in the EV charging market as adoption accelerates and federal funding for EV infrastructure is deployed."

410.    The statements in ¶¶ 404-09 were false and/or misleading because (1) touting collaboration with "numerous retail and commercial property partners" failed to disclose that Volta's cash burn was so bad that that (i) as stated by CW 3, Volta had stopped paying site hosts (like Edwards Realty, Ahold Delhaize, Albertsons, Kimco, Regency, and the Chicago Bulls) and vendors, by Q2 of 2022; and (ii) as stated by CW 11, by June or July 2022, they were no longer allowed to sign new deals with site hosts for the installation of new charging stations because Volta could no longer afford to install them; and (2) describing these issues as "near-term challenges" failed to disclose that Volta's

Board was informed in January 2022 that Volta's growth strategy would not survive past June 2022 without an influx of $300-350 million, which the Board deemed unsustainable, and that as a direct result of Mercer's termination, a then-existing term sheet for that amount was taken off the table, materially limiting Volta's available capital, and Volta had not been able to secure that capital.

411.    Financial analysts following Volta expressed caution and lowered their assessments of Volta in response to these announcements, but remained convinced of Volta's long-term potential.  For example, Cantor Fitzgerald published a note on September 29, 2022 in which it lowered its price target on Volta from $4 per share to $3 per share, noting that "the withdrawing of guidance and revision of Q3 guidance add further uncertainty in our view. We remain conservative on [Volta] in the short term, given the company's uncertainty around its financing need to raise $250-300M in 2022," but noted that "Nonetheless, VLTA appears well-positioned to be a meaningful beneficiary from the $7.5B funding made available from the Infrastructure Investment and Jobs Act (IIJA), and from the National Electric Vehicle Infrastructure program (NEVI) that will provide $615M in funding in 2022,  and $5B over the next five years."

412.    Similarly, on September 30, 2022, Roth Capital Partners published a note in which it lowered its price target on Volta from $2.50 per share to $1.50 per share, but, mirroring Defendants' language in the September 28, 2022 press release, stated "We see this tightening of company spend as positive for a more conservative use of resources."  Likewise, on October 3, 2022, D.A. Davidson published a note in which it reduced its price target on Volta to $2 per share, from $2.50 per share, but noted that "we are hopeful that expense resets borne out of its RIF (10% workforce) and recent organic attrition (an incremental 8% of VLTA's workforce since 6/1/2022), provide a cushion relative to the reality of a tougher NT/MT organic sales environment," and "We are hopeful that go forward execution will continue to show signs of stabilization as appeared to be the case in 2Q22."

### 7.    November 14, 2022 Corrective Disclosure

413.    In November 2022, Volta could no longer conceal the severity of its cash crisis.  After the market closed on November 14, 2022, Volta announced its results for the third quarter of 2022. Volta's revenue for the quarter was $14.4 million ($12.2 million of which was from media revenue) and

it had installed just "173 stalls, bringing Volta's installed base of total stalls connected as of September 30, 2022 to 3,093." Defendant Cubbage was quoted as stating that "Volta's short-term challenges have been significant." Volta also disclosed in this release that its "[c]ash and marketable securities were $15.6 million as of September 30, 2022."

414.    On this news, Volta's share price fell $0.25 per share, or 25.67%, on November 15, 2022, to close at $0.72 per share on unusually heavy trading volume that was over four times the average trading volume of the prior 20 trading days.

415.    Analysts who followed Volta reacted strongly and negatively to this information.  For instance, Barclays published a note on November 15, 2022, lowering its price target of Volta by 75%, from $2 per share to $0.50 per share. Barclays stated that Volta was "stuck between a rock and a hard place," and "there is doubt about the company's 'ability to continue as a going concern' with liquidity being an issue in 4Q." Barclays also noted that while Volta had previously warned about its ability to continue as a going concern, that "concern is especially acute today" based on the disclosures that Volta made about its "cash burn" in connection with the third quarter of 2022.  Barclays also stated that Volta's "cash burn was materially more than expected during the quarter" and that its "[c]ontinuous need for external funding beyond current needs puts company in tough spot." Barclays added that Volta's need for additional funding made it unable "to support charger installation growth while media revenue growth is also challenged in the current backdrop." Barclays also noted that Volta's cash burn "resulted in an increase in the construction in progress line item on the balance sheet while lowering the number of chargers that are available to generate media revenues."

416.    Barclays also reported that it had serious concerns about Volta's solvency given its very low cash balance and the fact that it spent approximately $30 million to deploy 173 chargers during the third quarter of 2022, as compared to approximately $33 million spent on 372 chargers the prior quarter. Barclays also observed that this $30 million was spent on "construction work in progress, which VLTA incurred largely in observance of some sort of contractual agreements from what we can tell." According to Barclays, even if Volta could raise $150 million in 2023, which was the market cap of the Company, that "would only address cash burn while revenues will be unable to grow in a

meaningful" because Volta would still not be able to increase the number of stations it was installing. Barclays also stated that Volta had cut its expenses, "including a 54% reduction in full-time headcount," because if its "ongoing liquidity concerns." Barclays lowered its price target to just $0.50 per share, as compared to its prior price target of $2 per share.

417.    Similarly, on November 15, 2022, D.A. Davidson lowered its price target from $2 per share to $1 per share, noting the Company's "immediate need for capital" and the "reduced capital outlays associated with new stall builds due to balance sheet constraints." In particular, D.A. Davidson explained, "[t]he changes to our longer-term modeling assumptions reflect a materially reduced rate of capital deployment associated with new stall builds, particularly in the near-term and a more subdued capex expectation vs. its original business plan over the next few years. Given how revenue builds over a multi-year period post stall deployment, nearer-term dial backs in builds will impact longer-term model projections." This report also noted that "It is clear that VLTA is in need of an executive with a strong background in operational execution."

418.    Cantor Fitzgerald also published a note on November 15, 2022, in which it lowered its price target, from $3 per share to $2 per share "as we lower our FY22 sales estimate to $63.1M (from $68.5M)."

419.    A November 15, 2022 note from Roth Capital Partners described Volta as facing a "clearly distressed situation" and lowered its price target from $1.50 per share to $1 per share. This note stated that "Volta reported weak 3Q22 revenue" and that "Mgmt is slowing network growth to preserve capital." In addition, the Company's meager $15.6 million in cash was "leaving tight room for mgmt to execute on the turnaround plan, and substantial dilution likely from the $150m ATM line."

420.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

### D. Additional Scienter Allegations

#### 1. Defendants Knew of Facts Critical to Volta's Core Operations and Spoke About Them in Detail, Showing Their Awareness of These Issues

421.    Defendants Mercer, Chadwick, Wendel, Hastings, and Cubbage were, the CEO, CFO, President, and interim CEOs, respectively, of Volta. They were responsible for, and remained well informed of, issues critical to the Company's success. These Defendants repeatedly identified Volta's Behavior and Commerce revenue channel, Volta's ability to scale its business, and Volta's relationships with its partners and customers as such critical issues.

422.    Throughout the Class Period, these Defendants highlighted Volta's ability to generate revenue from advertisements through its stalls, touted Volta's purported "unit economics," and promoted its relationships with its partners. (*See supra* ¶ 316 (Chadwick on November 10, 2021 Earnings Call)). In fact, Defendant Chadwick, when describing "three simple reasons that we are so excited about where Volta is today and what its future holds," listed (1) "'[a] differentiated business model [which] enables us to monetize our infrastructure from day one;'" and (2) "'our industry leading utilization and using unit economics allow us to attract valuable partners that will help scale and expand our overall network, which ultimately compounds our returns over the longer term.'" *Id.*

423.    On that same call, Defendant Wendel stated that "sell[ing] media display time to advertisers, . . . provides us with a potentially high value revenue stream that we believe will compound over time, with the increased growth and utilization of our network. We think this revenue stream is a ***critical differentiating factor*** that will provide a long-term competitive advantage." (*See supra* ¶ 313 (November 10, 2021 Earnings Call)). On this call, Wendel also highlighted Volta's relationship with advertisers, stating "[w]e view this flywheel of providing value to consumers, property partners and advertisers as positioning as well to monetize our network on day one, create a deeper connection with the community and increase the total value of our network." (*Id.*)

424.    Similarly, during Volta's May 17, 2022 1Q22 earnings call, Defendant Chadwick noted that "Our primary bucket at 80% of our revenue in 2021 and 73% of our revenue in the first quarter is media."    He also reiterated later in the call that Volta's "media business . . . is the majority of our

current revenue stack."

425.    Other Defendants also specifically discussed these issues. *See, e.g*., Volta's April 18, 2022 earnings call (Defendant Hastings stating "Our partners ***keep coming back to us*** because they see the impact that Volta Charging has on their properties over time . . . . As mentioned, the value of a site is not only in ***the initial footprint***, but also in the growth in stalls, energy delivery and purchasing influence that we can drive alongside the shift to electric mobility."); *id.* (Hastings focusing on "two very important categories. The first is revenue in that range of $70 million to $80 million in 2022. And second is a focus on continuing to put stalls in the ground, with incremental connected stalls in the range of 1,700 to 2,000 stalls in 2022."); Volta's August 11, 2022 press release accompanying its quarterly earnings (quoting Defendant Cubbage as stating "[b]y building not just a network of chargers, but a dual energy and digital advertising platform, we believe Volta can scale revenue even faster than the EV adoption curve – offering the quickest path to profitability and the highest revenue per station.").

426.    Given their admission that revenue and Volta's number of charging stalls were "very important categories," these Defendants, Volta's most senior executives, can be presumed to have knowledge of adverse facts impacting the Company's revenue and number of charging stalls. The Company's practice of pulling advertising revenue from later quarters into earlier quarters skewed their revenue metrics. Volta's financial position was further undermined by its late payments to its site hosts, which made its cash balance worse than Defendants represented. In addition, Volta's scaling strategy was undermined by the Company's practice of not paying its partners and customers, by customers not signing up with Volta until it had sufficiently scaled its business, and by Volta's inability to install as many charging stations and stalls as it projected. These Defendants repeatedly made specific statements to the investing public regarding their focus on these issues demonstrates their knowledge of these adverse facts. Indeed, in light of the fact that Defendants described the importance of advertising revenue as a "critical differentiating factor," it would be absurd to suggest these Defendants were not aware that revenue was actually misrepresented and decreasing throughout the Class Period.

1

2

### 2. Statements by CWs Support an Inference of Scienter for Mercer, Wendel, and Chadwick

427. Statements by the CWs support an inference of scienter because they show that Mercer, Wendel, and Chadwick had knowledge of Volta's improper revenue practices and the Company's unsustainable business model. For example, CW 5 stated that despite the witness's efforts to revamp Volta's internal controls for handling contract payments and proper accounting practices, the witness's team was often overridden by Mercer and Wendel to "do whatever it took to keep the lights on." (*See supra* ¶¶ 107-10).

428. Additionally, CW 4 stated that internally, Volta employees referred to the Company's improper accounting practices as "Wendelian math" because of Wendel's pattern and practice of fudging numbers to make the Company's finances more appealing to investors. (*See supra* ¶ 127; *see also* ¶ 106). According to CW 4, Mercer and Wendel were too savvy to be unaware of Volta's improper accounting practices. The witness described Wendel as "a smart numbers guy" and Mercer as having "a background in finance." Indeed, the witness "ha[d] a really hard time believing that [Volta's improper accounting practices] would have slipped by the controller, the CFO, the CEO and president and the auditor."

429. Furthermore, CW 1 confirmed Chadwick's knowledge of the revenue pull-ins because the witness stated that after the third quarter of 2021, Chadwick told the Sales team to stop this practice because Volta could not engage in such conduct as a public company. (*See supra* ¶¶ 120, 124). This statement confirms that Chadwick was aware of the practice. Even though he told the Sales team to cease the practice, Chadwick continued to make, and allow others to issue, misstatements that repeated — and failed to restate — Volta's false past revenue figures, gave unsupported projections of future revenue, and falsely described Volta's revenue practices as in compliance with GAAP, while failing to correct Volta's past violations. CW 1 also confirmed Mercer and Wendel's knowledge regarding these revenue recognition practices. (*Id.*)

430. CW 1 also confirmed Mercer's scienter as to Volta's inability to scale its business. According to the witness, whenever Mercer was informed that one of Volta's charging stations was not in compliance with local laws or regulations, "[Mercer's] mentality was 'F*** that' — he said that

every other day — 'Put them in anyway.'" (*See supra* ¶ 97). Thus, despite his knowledge that Volta's charging stations ran afoul of local laws and regulations, Mercer made and allowed to be made misstatements that Volta was on target to meet its projections for installing stalls and scaling its business. In addition, CW 10 confirmed that Defendant Chadwick was aware that Volta's revenue projections were inflated by a "go get" that was added to the projections.

### 3. Management's January 2022 Board Presentation Supports an Inference of Scienter for Mercer, Wendel, Chadwick, and Cubbage

431.    As described in more detail in ¶¶ 256-58, Volta's management's January 2022 presentation to the Board supports an inference of scienter for Mercer, Wendel, Chadwick, and Cubbage as to Volta's dire financial situation and inability to survive as a company.  During this meeting, the Board was informed that the Company needed to raise $300-350 million dollars for the Company's growth strategy to survive past June 2022. Mercer, Wendel, and Cubbage were all aware of this meeting as members of Volta's Board. Moreover, as members of Volta's "prior management team," it is absurd to think that Mercer, Wendel and Chadwick were not aware of this presentation. Mercer's involvement in this presentation is corroborated by CW 11's description of the $300 million term sheet that he had. As a member of Volta's Board who was the CEO of Tortoise before the Merger and would lead Volta (including by becoming the Co-Chairperson of Volta's Board, followed by interim CEO) after Mercer and Wendel were fired, Cubbage received management's presentation and determined it was unsustainable. Mercer and Wendel, on the other hand, were fired because Cubbage did not view them as "able to execute and get the company to the next level" (¶ 292(a)). Mercer and Wendel were leading the "prior management team" whose business plan the rest of the Board rejected.

### 4. The Departure of Key Executives Supports an Inference of Scienter

432.    The departure of several key executives from Volta during the Class Period is indicative of scienter. Defendants Mercer and Wendel were forced from their positions of CEO and President on March 28, 2022, one week after Volta announced it would be restating its 3Q21 financials.

433.    As described in more detail in ¶¶ 256-58, Mercer and Wendel's purported "resignations" occurred shortly after they informed Volta's board of directors of the need to raise $300-350 million in

additional funding if the Company's growth strategy was to continue past June, 2022.  The Board concluded that their plan was unsustainable. Simultaneously, other members of Volta's management were discussing alternate options with Shell.  These facts, and statements by CWs 1, 3, 6, 8, 10, and 11, support the inference that Mercer and Wendel did not resign voluntarily, but rather, were fired after presenting a plan that Volta's Board deemed unsustainable.

434.    Not long after, on June 10, 2022, Volta filed a Form 8-K with the SEC that Defendant Chadwick had notified the Company on June 6, 2022, that he would resign as CFO. The announcement also stated that Julie Rogers, Chief People Officer of the Company, Praveen Mandal, Chief Technology Officer of the Company, and James DeGraw, General Counsel, Secretary, and Chief Administrative Officer of the Company, had also "recently departed from the Company."

435.    Analysts and other media were again surprised by these departures, (especially Chadwick's), and, viewing these departures in conjunction with those of Mercer and Wendel, took an even more negative outlook of the Company. For example, D A Davidson stated on June 13, 2022, that "it clearly appeared that Mercer and Wendel['s] [resignations] were not voluntary," and questioned who else would be leaving Volta "at this critical time in VLTA's development as a publicly-traded company." CWs 1, 2, 3, 6, 7, and 8 also viewed the Volta's string of executive departures as a result of the Company's improper accounting and financial practices. (*See supra* ¶¶ 290-94).

### 5.    Defendants Had Motive to Continue their Fraudulent Conduct to Promote Volta When It Went Public and to Maintain an Artificially High Stock Price to Obtain Additional Financing

436.    Defendants were motivated to maintain their fraudulent scheme to promote Volta as it went public through the SPAC Merger. They also were motivated throughout the Class Period to keep Volta's stock price high to attract additional financing.

437.    As CW 1 explained, Volta's executives were especially motivated to accelerate the Company's revenue in the third quarter of 2021 to look better to investors in Volta's first quarter as a public company because, as the Sales team was told, "[w]e can't post we're short in our first public reporting." (*See supra* ¶ 119). Moreover, following the completion of the Merger, Volta's cash balance dropped precipitously in each of Volta's successive quarterly reports as a public company.  (*See supra*

¶¶ 287-88; *see also* ¶¶ 274-86).   After management informed the Board in January 2022 that the Company would need $300-350 million in order for its growth strategy to survive past June 2022, Defendants were motivated to conceal the true state of their financial condition until they could secure additional financing.   As described in more detail in ¶¶ 287-88, Defendants partially disclosed the Company's need for additional capital, but never disclosed how close the Company was to collapse.   As noted in Volta's February 2023 proxy, described in more detail in ¶¶ 256-58, Volta was in communication with Shell throughout much of the Class Period.   These facts support the inference that Defendants were motivated to conceal the severity of its financial troubles until Volta could secure additional funding.

438.   Thus, throughout the Class Period, Defendants Mercer, Chadwick, Wendel, Hastings, and Cubbage were motivated to misrepresent Volta's revenues, avoid paying its liabilities, and misrepresent its ability to grow and scale its charging network, all in order to make Volta appear more attractive to investors. This was particularly important so that Defendants could prop up Volta's stock price, which Barclays cited as key to Volta's ability "to raise capital."

439.   Lastly, CW 4 described Mercer as being motivated by wanting to put Big Oil out of business, and Wendel as willing to embellish to be the big shot.

### E.   Loss Causation

440.   The market for Volta's common stock was open, well-developed, and efficient at all relevant times. Throughout the Class Period, Volta's common stock traded at artificially inflated prices as a direct result of Defendants' materially misleading statements and omissions of material fact, which were widely disseminated to the securities market, investment analysts, and the investing public. Plaintiffs and other members of the Class purchased or otherwise acquired Volta common stock relying upon the integrity of the market price for Volta's common stock and market information relating to Volta, and have been damaged thereby.

441.   When the relevant truth became known and/or the materialization of the risk that had been concealed by Defendants occurred, the price of Volta's common stock declined immediately and precipitously as the artificial inflation was removed from the market price of the stock, causing

substantial damage to Plaintiffs and the Class.

442.    As detailed herein, during the Class Period, Defendants: (a) misled investors with unsupported revenue and stall installation projections; (b) misled investors about the Company's revenues by pulling forward revenue in Volta's first quarter as a public company; (c) concealed from investors that by January 2022, the Company was losing money so rapidly that management told the Board that the Company needed to raise $300-350 million or the current growth strategy would not survive past June 2022, which the Board deemed unsustainable; (d) misled investors about declining revenues by including "go gets" in the Company's revenue projections beginning in early 2022; (e) concealed from investors that the Company's declining cash balance prevented Volta from timely paying vendors and site hosts, which strained relationships with vendors and site hosts, and materially limited Volta's ability to meet its stall installation projections; and (f) misled investors by maintaining unachievable stall installation projections, and disproportionately blaming permitting issues and COVID-19 for shortfalls.

443.    As this information and its impact on Volta's financial results entered the market through a series of partial disclosures, the price of Volta's stock significantly dropped, as the artificial inflation came out of the stock price over time. As a result of their purchases Volta stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

### 1.    March 28, 2022

444.    As set forth above in ¶¶ 335-36, on March 28, 2022, before the market closed, Volta filed a Form 8-K with the SEC signed by James DeGraw announcing that the Company, Mercer, and Wendel "ha[d] agreed to the resignation of each of Mr. Mercer and Mr. Wendel as an officer and employee of the Company." This partial corrective disclosure revealed that there were some undisclosed issues at Volta severe enough for Volta's founders to depart.  Yet, Defendants continued to mask from investors the extent of the Company's financial troubles and the true state of the Company's affairs.

445.    As a direct result of this partial corrective disclosure, Volta's stock declined from a price

of $4.13 per share on March 25, 2022 to a closing price of $3.37 per share on March 28, 2022, a drop of $0.76, or 18%, on unusually heavy trading volume of over 16 million shares, which was over four times the average trading volume of the prior 20 trading days.  The NASDAQ Composite Total Return Index increased 1.3% and Volta's Peer Group[14] decreased only .3%. The new Company-specific material information released on March 28, 2022 concerning undisclosed issues at Volta leading to Mercer and Wendel's purported resignations was directly related to the false and/or misleading statements and omissions previously made by Defendants.

446.    As set forth above in ¶¶ 337-40, Defendants continued to make false and/or misleading statements in the Form 8-K and accompanying press release that served to limit the impact of Mercer and Wendel's "resignations" and maintained the artificial inflation in Volta's stock price.

447.    Analysts reacted negatively to these departures and what they meant for the Company's future. For example, Canaccord Genuity reported on March 28, 2022 that "[t]his was a surprise to us, especially after meeting Scott and Chris a few weeks earlier at headquarters. Neither gave any indications that they were on the way out; rather, both seemed like active and invested founders." Cantor Fitzgerald also reported on April 4, 2022 that "[w]e continue to like VLTA's business model."

## 2.    June 13, 2022

448.    As set forth above in ¶ 384, on June 10, 2022, a Friday, after the market closed, Volta announced the resignation of Chadwick and other senior executives. Then, before the market opened on Monday, June 13, 2022 (the next trading day), Volta announced that Cubbage would replace Brandt Hastings as interim CEO after Hastings had been in the role for just two months.  This partial corrective disclosure informed investors that undisclosed issues with Volta's business required further executive shakeups, and yet Defendants continued to mask from investors the true extent of Volta's financial troubles and its threatened inability to continue its business model.

---

[14]    Because Volta seemingly did not report a peer index during the Class Period, Plaintiffs compare Volta's stock performance to a "Peer Group" included in an analyst report issued by D.A. Davidson & Co. dated January 19, 2022.  This Peer Group included Blink Charging Co., ChargePoint, Inc., EVgo, Services LLC, Tritium DCFC Limited, Wallbox, Inc., EO Charging/FSRG, Allego B.V., and ADS-TEC Energy PLC.

449.    As a direct result of this partial corrective disclosure, Volta's stock price declined 25.3% from a closing price of $2.21 per share on June 10, 2022 to a closing price of $1.65 per share on June 13, 2022 on unusually heavy trading volume of over 9.1 million shares, which was over three times the average trading volume of the prior 20 trading days. The NASDAQ Composite Total Return Index decreased only 4.7% and Volta's Peer Group only decreased 8.2%.  The new Company-specific material information released on June 10, 2022 after the market closed and on June 13, 2022, before the market opened, about Chadwick's and other senior executives' departures was directly related to the false and/or misleading statements and omissions previously made by Defendants.

450.    Analysts reacted negatively to this news.  For example, D.A. Davidson reported on June 13, 2022 that they "remain[ed] on the sidelines . . . with a high degree of caution over [Volta's] ability to assemble a cohesive, long-term-oriented team of leaders." Cantor Fitzgerald likewise reported on June 13, 2022 that they downgraded their rating to neutral, and stated that the departures were "unexpected," and that they had "become more conservative" on Volta as a result.

451.    As set forth above in ¶¶ 385-88, Defendants continue to make false and/or misleading statements in these announcements that served to limit the impact of these executive departures and maintained the artificial inflation in Volta's stock price.

### 3.    September 26, 2022

452.    As set forth above in ¶ 404, on Monday, September 26, 2022, before the market opened, Volta announced that the Company had entered into an agreement with Cantor Fitzgerald that would allow Volta to sell up to $150 million in common stock to the public.

453.    As a direct result of this partial corrective disclosure, Volta's stock price declined 17.6% from a closing price of $1.93 per share on September 23, 2022 to a closing price of $1.59 per share on September 26, 2022 on unusually heavy trading volume of over 5.4 million shares, which was over 1.5 times the average trading volume of the prior 20 trading days.  The NASDAQ Composite Total Return Index decreased only .6% and Volta's Peer Group increased .3%.  The new Company-specific material information released on September 26, 2022, before the market opened, about the Company's need to enter into an agreement with Cantor Fitzgerald to sell up to $150 million in common stock to the public

was directly related to the false and/or misleading statements and omissions previously made by Defendants.

454.    Analysts reacted negatively to this news.  For example, Cantor Fitzgerald reported on September 29, 2022 that "We remain conservative on [Volta] in the short term, given the company's uncertainty around its financing need to raise $250-300M in 2022."  Similarly, Roth Capital Partners reported on September 30, 2022 that "we see elevated risk in the company's equity given a weakening outlook and the recently announced $150m at-the-market offering."

455.    As set forth above in ¶¶ 405-06, Defendants continued to make false and/or misleading statements in this announcement that served to limit the impact of the Company's need to raise $150 million through this agreement with Cantor Fitzgerald and maintained the artificial inflation in Volta's stock price.

### 4.    September 28, 2022

456.    As set forth above in ¶ 407, on September 28, 2022, after the market closed, Volta announced that it was firing approximately 10% of its full-time employees (which brought the reduction in its workforce since June 1, 2022, to approximately 18%), as part of "an organizational realignment to reduce costs and drive strategic priorities." Volta also announced in this same release that it was lowering its guidance for the Company's performance, stating that it "is revising its Q3 revenue guidance to between $13.5 million and $14.5 million. Furthermore, the company is withdrawing its full year 2022 revenue and install guidance until further notice."

457.    As a direct result of this partial corrective disclosure, Volta's stock price declined 15.3% from a closing price of $1.57 per share on September 28, 2022 to a closing price of $1.33 per share on September 29, 2022 on unusually heavy trading volume of over 6.4 million shares, which was over 1.5 times the average trading volume of the prior 20 trading days.  The NASDAQ Composite Total Return Index decreased only 2.8% and Volta's Peer Group decreased only 5.7%.  The new Company-specific material information released on September 28, 2022, after the market closed, about Volta's 10% reduction in workforce to "reduce costs and drive strategic priorities" and lowering its guidance for 3Q

2022 was directly related to the false and/or misleading statements and omissions previously made by Defendants.

458.    Analysts covering Volta reacted negatively to this news.  For example, Cantor Fitzgerald reported on September 29, 2022 that "While the reduction in workforce may help with lowering overhead costs, the withdrawing of guidance and revision of Q3 guidance add further uncertainty in our view."  Similarly, D.A. Davidson reported on October 3, 2022 that "VLTA's execution thus far, relative to SPAC-related projections, has been underwhelming." As set forth above in ¶¶ 408-11, Defendants continued to make false and/or misleading statements in this announcement that served to buffer the impact of the reduction in headcount, and maintained the artificial inflation in Volta's stock price.

### 5.    November 15, 2022

459.    As set forth above in ¶¶ 413-19, on November 14, 2022, after the market closed, Volta announced its results for the third quarter of 2022.  Volta's revenue for the quarter was just $14.4 million ($12.2 million of which was from media revenue) and it had installed just "173 stalls, bringing Volta's installed base of total stalls connected as of September 30, 2022 to 3,093." Defendant Cubbage was quoted as stating that "Volta's short-term challenges have been significant." Volta also disclosed in this release that its "[c]ash and marketable securities were $15.6 million as of September 30, 2022."

460.    As a direct result of this partial corrective disclosure, Volta's stock price declined 25.7% from a closing price of $0.97 per share on November 14, 2022, to a closing price of $0.72 per share on November 15, 2022, on unusually heavy trading volume of over 21.7 million shares, which was over four times the average trading volume of the prior 20 trading days.  The NASDAQ Composite Total Return Index increased 1.4% and Volta's Peer Group increased 1%.  The new Company-specific material information released on November 14, 2022, after the market closed, about Volta's disappointing 3Q 2022 revenue and disappointing stall installations was directly related to the false and/or misleading statements and omissions previously made by Defendants.

461.    Analysts covering Volta reacted negatively to this news.  For example, Barclays reported on November 15, 2022 that the Company's "cash burn was materially more than expected during the quarter" and that its "[c]ontinuous need for external funding beyond current needs puts company in

tough spot." D.A. Davidson also reported on November 15, 2022 that "It is clear that VLTA is in need of an executive with a strong background in operational execution." Roth Capital Partners also reported on November 15, 2022 that Volta was facing a "clearly distressed situation."

### F.    The Presumption of Reliance Applies

462.    To the extent Plaintiffs allege that Defendants made affirmative misstatements, Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine, in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material to a reasonable investor;

(c)    Volta's securities traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

(e)    Plaintiffs and other members of the Class purchased the Company's securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts;

(f)    the Company's common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

(g)    as a regulated issuer, the Company filed periodic public reports with the SEC and the NYSE;

(h)    the Company regularly communicated with public investors via established market communication mechanisms, including, inter alia, regular dissemination of press releases on the national circuits of major newswire services and other wide ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(i)    the Company was followed by numerous securities analysts employed by major brokerage firms including, but not limited to, Barclays, Cantor Fitzgerald, D.A. Davidson, Roth Capital Partners, and other outlets, all of which wrote reports that were distributed to the public or to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace.

463.    As a result of the foregoing, the markets for the Company's securities were open, well-

developed, and efficient at all relevant times, and promptly digested current information regarding the Company from publicly available sources and reflected such information in the Company's securities price(s). Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of the Company's securities and market information relating to the Company. Under these circumstances, all persons and entities who or which purchased or otherwise acquired the Company's securities during the Class Period suffered similar injuries through their purchase of the Company's securities at artificially inflated prices and thus, the presumption of reliance applies.

464.    During the Class Period, the artificial inflation of the Company's securities was caused by the material misrepresentations and/or omissions particularized herein, causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about the Company's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of the Company and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated and maintained at artificially inflated levels at all relevant times, and when disclosed, negatively affected the value of the Company's shares.

465.    The material misrepresentations and omissions alleged herein would tend to induce, and did induce, reasonable investors to misjudge the value of the Company's securities. The material misrepresentations and omissions alleged herein would tend to induce, and did induce, reasonable investors to purchase the Company's securities at artificially inflated prices.

466.    Without knowledge of the misrepresented or omitted material facts alleged herein, Plaintiffs and other members of the Class purchased shares of the Company's securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

467.    To the extent Defendants concealed or improperly failed to disclose material facts with respect to the Company's business, Plaintiffs are entitled to a presumption of reliance in accordance

with the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972). Defendants were obligated to disclose, but failed to disclose, material facts with respect to the Company's business operations and financial prospects, so that "positive proof of reliance is not a prerequisite to recovery." *Id.*

### G. No Safe Harbor

468. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint under Section 10(b) of the Exchange Act. In addition, the statements alleged to be false and misleading herein all relate to then-existing facts and conditions. Furthermore, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Volta who knew that the statement was false when made.

### COUNT V: FOR VIOLATIONS OF SECTION 10(b) OF THE SECURITIES EXCHANGE ACT OF 1934 AND SEC RULE 10b-5 (AGAINST DEFENDANTS VOLTA, MERCER, CHADWICK, WENDEL, CUBBAGE, AND HASTINGS)

469. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

470. This Count is asserted against Defendants Volta, Mercer, Chadwick, Wendel, Cubbage, and Hastings (the "Section 10(b) Defendants"), and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

471. During the Class Period, the Section 10(b) Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing

public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Volta's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each Defendant, took the actions set forth herein.

472.    The Section 10(b) Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Volta's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

473.    The Section 10(b) Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Volta's financial well-being and prospects, as specified herein.

474.    The Section 10(b) Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Volta's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Volta and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

475.    Each of Defendants Mercer's, Chadwick's, Wendel's, Cubbage's, and Hastings' primary liability and controlling person liability arises from the following facts: (i) these Defendants were high-level executives and/or Directors at the Company during the Class Period and members of the

Company's management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

476.    The Section 10(b) Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Volta's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, the Section 10(b) Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

477.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Volta's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Section 10(b) Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by these Defendants, but not disclosed in public statements by Defendants

during the Class Period, Plaintiffs and the other members of the Class acquired Volta's securities during the Class Period at artificially high prices and were damaged thereby.

478.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Volta was experiencing, which were not disclosed by the Section 10(b) Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Volta securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

479.    By virtue of the foregoing, the Section 10(b) Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

480.    As a direct and proximate result of the Section 10(b) Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases and sales of the Company's securities during the Class Period.

**COUNT VI:   FOR VIOLATIONS OF SECTION 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934 (AGAINST DEFENDANTS MERCER, CHADWICK, WENDEL, CUBBAGE, AND HASTINGS ("THE SECTION 10(b) INDIVIDUAL DEFENDANTS")**

481.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

482.    This Count is asserted against Defendants Mercer, Chadwick, Wendel, Cubbage, and Hastings (the "Section 10(b) Individual Defendants") and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

483.    The Section 10(b) Individual Defendants acted as controlling persons of Volta within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Section 10(b) Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the

Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Section 10(b) Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

484. In particular, the Section 10(b) Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

485. As set forth above, the Section 10(b) Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Section 10(b) Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

486. As a direct and proximate result of the Section 10(b) Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases and sales of the Company's securities during the Class Period.

## VIII.    CLASS ACTION ALLEGATIONS

487. Plaintiffs bring this action as a class action on behalf of Classes under (1) the Securities Act (the "Securities Act Class"); (2) Sections 14(a) and 20(a) of the Exchange Act (the "Section 14(a) Class"); and (3) Sections 10(b) and 20(a) of the Exchange Act (the "Section 10(b) Class") (collectively, the "Classes"). Excluded from the Classes are Defendants and their families, the officers and directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

488. The Securities Act Class is brought on behalf of Class members that purchased or otherwise acquired Volta securities pursuant and/or traceable to the Registration Statement.

489. The Section 14(a) Class is brought on behalf of Class members that beneficially owned

and/or held SNPR Class A common stock as of July 15, 2021 and were eligible to vote at Tortoise's August 25, 2021 extraordinary general meeting.

490.    The Section 10(b) Class is brought on behalf of class members that purchased or otherwise acquired Volta securities between August 2, 2021 and November 14, 2022, both dates inclusive (the "Class Period").

491.    The members of the Classes are so numerous that joinder of all members is impracticable. While the exact number of Class members of each Class is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least thousands of members in each of the proposed Classes. Record owners and other members of the Classes may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

492.    For each Class, Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Classes are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

493.    Plaintiffs will fairly and adequately protect the interests of the members of the Classes and have retained counsel competent and experienced in class and securities litigation.

494.    Common questions of law and fact exist as to all members of the Classes and predominate over any questions solely affecting individual members of the Classes. Among the questions of law and fact common to the Classes, or for each Class, are:

a.    whether Defendants violated Sections 11 and 15 of the Securities Act;

b.    whether Defendants violated Section 14(a) and 20(a) of the Exchange Act;

c.    whether Defendants violated Section 10(b) and 20(a) of the Exchange Act;

d.    whether Defendants' statements contained false or misleading statements of material fact or omitted material information required to be stated therein; and

e.    to what extent the members of the Classes have sustained damages and the proper measure of damages.

495.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Classes to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class Representatives;

B.    Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in investigating, bringing, and maintaining this action, including counsel fees and expert fees; and

D.    Awarding such other and further legal or equitable relief as the Court deems just and proper.

## X.    DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable in this Action.

Dated: February 26, 2024                          Respectfully submitted,

                                                  **POMERANTZ LLP**

                                                  By: _s/ Michael Grunfeld_

                                                  Jennifer Pafiti (SBN 282790)
                                                  1100 Glendon Avenue, 15th Floor
                                                  Los Angeles, California 90024
                                                  Telephone:    (310) 405-7190
                                                  jpafiti@pomlaw.com

                                                  **POMERANTZ, LLP**
                                                  Jeremy A. Lieberman (_pro hac vice_)
                                                  Michael Grunfeld (_pro hac vice_)

134

600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:     (212) 661-1100
Facsimile:     (212) 661-8665
jalieberman@pomlaw.com
mgrunfeld@pomlaw.com

*Lead Counsel for Plaintiffs and the Class*

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Additional Counsel for Lead Plaintiff Steve Padget*

**ROBBINS GELLER RUDMAN & DOWD LLP**
**DAVID W. MITCHELL**
**JOSEPH J. TULL**
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
davidm@rgrdlaw.com
jtull@rgrdlaw.com

*Additional Counsel for Plaintiff Eric M. Walden*

135