1

2

3

4                         UNITED STATES DISTRICT COURT

5                       NORTHERN DISTRICT OF CALIFORNIA

6

7    KAROLINE KAMPE, et al.,                    Case No. 22-cv-02055-JST

8                  Plaintiffs,

9         v.                                    **ORDER GRANTING MOTION TO
                                                DISMISS**
10   VOLTA INC., et al.,                         Re: ECF No. 112

11                 Defendants.

12

13          Before the Court is Defendants' motion to dismiss the Second Consolidated Amended

14   Class Action Complaint ("SAC").  ECF No. 112.  The Court will grant the motion.

15   **I.      BACKGROUND**

16          Lead Plaintiff Steve Padget and additional plaintiffs Eric M. Walden and Jason Eckert

17   ("Plaintiffs") bring this action in which they assert, on their own behalf and on behalf of three

18   proposed classes, claims against Volta and several of its officers, as well as Tortoise and several of

19   its officers and directors (collectively, "Defendants"), under Sections 11 and 15 of the Securities

20   Act; Sections 14(a) and 20(a) of the Securities Exchange Act of 1934; and Sections 10(b) and

21   20(a) of the Securities Exchange Act of 1934 and U.S. Securities and Exchange Commission Rule

22   10b-5.  The claims are premised on dozens of statements made before and after Volta's merger

23   with Tortoise (the "Merger"), which Plaintiffs allege were false or misleading when made because

24   Defendants "failed to disclose substantial flaws in [Volta's] business" and because Defendants

25   "covered up" those flaws by "engaging in serious accounting violations and other financial

26   improprieties" before and after the Merger.  *Id.* ¶ 4.  These allegedly undisclosed "flaws," "serious

27   accounting violations," and "financial improprieties" which are described in more detail below,

28   concealed the true state of Volta's business.  *Id.* ¶¶ 4, 7.

United States District Court
Northern District of California

### A.      Overview of Facts Alleged in the Second Amended Complaint

For the purpose of  resolving the present motion, the Court accepts as true the factual allegations in the SAC.  ECF No. 107.

Defendant Volta is a public company that partners with real estate and retail businesses to deploy charging stations for electric vehicles at retail locations.  *Id.* ¶¶ 1, 7.  The Company generates revenue primarily from selling advertisements that are displayed on media screens on its charging stations.  *Id.* ¶¶ 1, 71.  It also generates revenue from installing and maintaining the charging stations and delivering electricity at the charging stations.  *Id.* ¶ 71.  Volta enters into contracts with property owners pursuant to which Volta pays the property owners ("site hosts") for the ability to place its charging stations on their property.  *Id.* ¶¶ 71, 75.

Volta was formed through the merger between Volta Industries, Inc., a private entity, and Tortoise Acquisition Corp. II ("Tortoise"), a special purpose acquisition company that had completed its initial public offering about a year before the Merger and whose shares were traded on the New York Stock Exchange at the time of the Merger.  *Id.* ¶¶ 2, 28, 33.  The Merger was completed on August 26, 2021, with the shares of the new combined entity, Volta, trading on the NYSE.  *Id.* ¶ 70.

Plaintiff alleges that from the time Volta went public through the Merger, it failed to disclose substantial flaws in its business that Defendants covered up by engaging in serious accounting violations and other financial improprieties.  *Id.* ¶ 4.  These troubles began to surface on March 28, 2022, when Volta terminated its CEO and its President (Defendants Scott Mercer and Christopher Wendel, respectively) after which Volta's stock price fell 18%.  *Id.* ¶¶ 12, 29, 32.  But Defendants did not at that time disclose the true extent of Volta's dire financial situation, and portrayed the Company's founders as having resigned on voluntary and amicable terms to maintain investor confidence.  *Id.*

Volta's stock price continued to decline as Volta missed its revenue projections and as the risks associated with the undisclosed "improper practices" materialized.  On January 18, 2023, Volta announced that it was being acquired by Shell in a deal that valued Volta at $169 million, which fell far short of the $1.4 billion valuation contained in the Registration Statement for the

merger with Tortoise.  *Id.* ¶¶ 15, 257.  Plaintiffs allegedly suffered damages "upon [the] revelation of the alleged corrective disclosures or materialization of undisclosed risk."  *Id.* ¶ 23.

Plaintiffs describe the alleged false and misleading statements as follows:

### 1.    Premature Accounting of Revenue

Plaintiffs allege that during every quarter from two years prior to the Merger through the third quarter of 2021, Volta's sales team would approach advertisers toward the end of each quarter to get the advertisers to agree to "pull" ads from a subsequent quarter forward to the current quarter so that Volta could book the revenue for those ads in the current quarter.  *Id.* ¶¶ 9, 117, 119, 122–24.  While advertisers often agreed to accept the free early ads, even when customers did not agree, Volta would still pull forward revenue without customers' knowledge.  *Id.* ¶ 117.  Plaintiffs allege that this revenue pull-forward practice was misleading because Volta would not be able to book more revenue from the advertisers in the following quarter.  *Id.* ¶¶ 119, 122–24.  According to Plaintiffs, this practice of pulling forward revenue to an earlier quarter violated GAAP rules.  *Id.* ¶ 129.

### 2.    Financial Stability

Plaintiffs allege that on January 6, 2022, Defendants Mercer and Wendel told the Volta Board that they needed to raise $300 to $350 million "for Volta to pursue its growth strategy beyond June 30, 2022."  *Id.* ¶ 257.  The Board allegedly rejected this plan, determining that it "was unsustainable" and required a different "operating plan" to address the Board's concerns.  *Id.* ¶¶ 257–58.  Plaintiffs allege that the Board fired Mercer and Wendel to pursue a relationship with Shell.  In the process, the Board scrapped a term sheet Mercer had allegedly secured with a venture capital firm for $300 million.  *Id.* ¶ 258.  By the second quarter of 2022, Volta stopped paying rent to the businesses that hosted its charging stations and stopped paying the vendors that built them.  *Id.* ¶¶ 269–88.  Among other statements, Plaintiffs challenge Volta's quarterly disclosures that there was "substantial doubt about the Company's ability to continue as a going concern" over the following twelve months.  *Id.* ¶¶ 349–50, 372–73, 391–92, 415–17.  Plaintiffs allege that these statements were misleading because they framed the risk as something that might happen sometime in the next year, when Volta's financial situation was so dire that the Board

already determined in January that Volta's business model was "unsustainable" past June 2022; that Volta stopped paying site hosts and vendors in the second quarter of 2022; and that by mid-2022, Volta was no longer signing deals for new installations.  *Id.* ¶¶ 257–58, 283–88.

### 3.   Executive Departures

Plaintiffs allege that Volta portrayed Defendants Mercer and Wendel as having "resigned on voluntary and amicable terms," when they were instead "terminated because they were responsible for Volta's financial problems" and because the Board deemed their business plan "unsustainable" in January 2022.  *Id.* ¶¶ 12, 257–58, 289, 337.

### 4.   Descriptions of Volta's Business

Plaintiffs allege that Volta's descriptions of its business, including its levels of funding, liabilities, and relationships with site hosts and customers, were false and misleading because Volta was unable to fund its business and had damaged those site host and customer relationships. *Id.* ¶¶ 258–59, 269, 287–88.  Specifically, Plaintiffs allege that Volta owed at least hundreds of thousands of dollars to many site hosts and vendors, and that by the end of Q2 2022, Volta owed millions of dollars to the vendors that built its charging stations.  *Id.* ¶¶ 274–88.

### 5.   Revenue and Stall Projection Guidance

Between March 31 and August 11, 2022, Volta projected that it would earn $70 to $80 million in revenue for the year and install 1,700 to 2,000 new charging stalls.  *Id.* ¶¶ 342, 352, 361–62, 375, 394.  Plaintiffs contend that these projections were knowingly false or misleading because Defendants knew that Volta would not be able to make up the shortfall in the remainder of the year.  *Id.* ¶¶ 84, 264, 342.  Plaintiffs also allege that the model used to create the projections used in the Merger yielded "totally made up" figures.  *Id.* ¶¶ 82–83.  As part of this modeling, Volta allegedly accounted for a "go-get," in which the company would project for a certain increase in revenue and instruct its sales team to find a way to realize the projections.  *Id.*

### B.   Claims

The Section 11 claim (Count 1), and the derivative Section 15 claim (Count 2), are premised on allegedly false or misleading statements in the Registration Statement for the Merger, which was filed with the SEC prior to the Merger.  *See id.* ¶¶ 207–24.  Plaintiffs assert the Section

United States District Court
Northern District of California

11 claim against (1) Defendant Tortoise, the registrant for the offering in connection with the Merger; (2) various officers and directors of Tortoise who signed the Registration Statement on behalf of Tortoise (Defendants Vincent T. Cubbage, Tortoise's CEO; Stephen Pang, Tortoise's CFO; and Juan J. Daboub, Karin M. Leidel, and Sidney L. Tassin, members of Tortoise's board of directors); and (3) Defendant Volta and some of Volta's officers (Defendants Mercer, Volta's CEO until April 15, 2022; Wendel, Volta's President until March 28, 2022; and Francois P. Chadwick, Volta's CFO until August 22, 2022), who allegedly prepared and disseminated the Registration Statement. Plaintiffs assert the Section 15 derivative claim against the same defendants, except for Tortoise and Volta.

The Section 14(a) claim (Count 3), and the derivative Section 20(a) claim (Count 4), are premised on allegations that the Proxy Statements for the Merger, which were a part of the Registration Statement, contained statements that colored the market's view of the Merger and encouraged Tortoise shareholders to vote in favor of it. *See id.* ¶¶ 225–30, 232–53. The statements that Plaintiffs challenge under Section 14(a) are the same statements in the Registration Statement that they challenge under Section 11. Plaintiffs assert the Section 14(a) claim against (1) Defendant Tortoise and some of its officers and directors (Defendants Cubbage, Pang, Daboub, Leidel, and Tassin); and (2) Defendant Volta and some of its officers (Defendants Mercer, Wendel, and Chadwick). Plaintiffs assert the derivative Section 20(a) claim against the same defendants, except for Tortoise and Volta.

The Section 10(b) and Rule 10b-5 claim (Count 5) (hereinafter, the "Section 10(b) claim"), and the Section 20(a) derivative claim (Count 6), arise out of (1) the same statements in the Registration Statement that Plaintiffs allege were false or misleading under Sections 11 and 14; and (2) statements made after the Merger in some of Volta's quarterly and annual reports, earnings calls and presentations, press releases, and other SEC filings. *See id.* ¶¶ 254–486. Plaintiffs assert the Section 10(b) claim against Defendant Volta and some of its officers (Defendants Mercer; Wendel; Chadwick; Brandt Hastings (Volta's interim CEO from April 15, 2022, to June 12, 2022, and Chief Commercial Officer of Volta since June 13, 2022); and Cubbage (CEO of Tortoise and Volta's Interim CEO since June 13, 2022)). *See id.* ¶¶ 29–34, 254–486. Plaintiffs assert the

1    derivative Section 20(a) claim against the same defendants, except for Volta.

2                    **C.      Procedural History**

3          This consolidated action began as two separate actions: (1) *Kampe v. Volta*, No. 22-cv-

4    2055, which was filed on March 31, 2022; and (2) *Alvarez v. Volta*, No. 22-cv-02730-JST, which

5    was filed on May 6, 2022.  On November 25, 2022, the Court appointed Steve Padget as Lead

6    Plaintiff and granted his motion to consolidate the two actions.  ECF No. 59.

7          Plaintiffs thereafter filed the Consolidated Amended Class Action Complaint (CAC).  ECF

8    No. 64-1.  The Court dismissed the CAC in its entirety.  ECF No. 81 ("CAC Order").

9          On February 26, 2024, Plaintiffs filed the SAC.  ECF No. 107.  The present motion seeks

10   the dismissal of the SAC in its entirety.  ECF No. 112 ("Mot.").  Plaintiffs oppose the motion.

11   ECF No. 117 ("Opp.").

12          **II.      JUDICIAL NOTICE AND INCORPORATION BY REFERENCE**

13         This Court has already taken judicial notice of the documents now marked as Exhibits 1–

14   14, 18, 20–24, and 26 to the Declaration of Stephen D. Hibbard (ECF No. 113).  CAC Order at 12.

15   Defendants now request that the Court incorporate by reference and take judicial notice of

16   Exhibits 15–17, 19, 25, and 27 to the Hibbard Declaration.  The Court grants Defendants'

17   requests.

18                  **A.      Incorporation By Reference**

19         In the Ninth Circuit, incorporation by reference is a doctrine that "treats certain documents

20   as though they are part of the complaint itself."  *Khoja v. Orexigen Therapeutics*, 899 F.3d 988,

21   1002 (9th Cir. 2018).  A document may be incorporated by reference into a complaint "if the

22   plaintiff refers extensively to the document or the document forms the basis of the plaintiff's

23   claim."  *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).  "Once a document is deemed

24   incorporated by reference, the entire document is assumed to be true for purposes of a motion to

25   dismiss, and both parties—and the Court—are free to refer to any of its contents."  *In re NVIDIA

26   Corp. Sec. Litig.*, 768 F.3d 1046, 1058 n.10 (9th Cir. 2014) (internal quotation marks and citation

27   omitted).  Although the truth of an incorporated document may not be considered *solely* to dispute

28   *well-pled* facts, the Court need not accept as true conclusory allegations that are contradicted by

United States District Court
Northern District of California

1   documents referenced in the complaint.  *See In re Eventbrite, Inc. Securities Litigation*, 2020 WL

2   2042078, at *7 (N.D. Cal. Apr. 28, 2020).

3        Plaintiffs do not appear to contest Defendants' request for incorporation by reference.

4   Instead, Plaintiffs contest Defendants' use of Exhibit 17 to counter the SAC's allegations.  Such

5   objections, however, "only limit how the Court may use these documents; they do not restrict the

6   Court's ability to take notice of or incorporate the documents."  *In re Intel Corp. Sec. Litig.*, 2023

7   WL 2767779, at *9 (N.D. Cal. Mar. 31, 2023), *aff'd*, 2024 WL 1693340 (9th Cir. Apr. 19, 2024)

8   (citing *Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at *3 (N.D. Cal. Aug. 7, 2020).  In

9   any event, the Court does not rely on any portion of Exhibit 17 for the purposes of deciding this

10   motion.

11        The Court grants the request to incorporate Exhibits 15–17, 19, 25, and 27 because they

12   are quoted or referred to extensively in the SAC.  *See Ritchie*, 342 F.3d at 908.

13                      **B.      Judicial Notice**

14        Under Federal Rule of Evidence 201, a court may take judicial notice of a fact "not subject

15   to reasonable dispute because it . . . can be accurately and readily determined from sources whose

16   accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).  Accordingly, a court may

17   take "judicial notice of matters of public record," but "cannot take judicial notice of disputed facts

18   contained in such public records."  *Khoja*, 899 F.3d at 999 (citation and quotations omitted).

19        Plaintiffs do not appear to contest Defendants request.  The Court finds that Exhibits 15–

20   17, 19, 25, and 27 are not subject to reasonable dispute, and the "accuracy" of these publicly filed

21   SEC documents "cannot reasonably be questioned."  *See Waterford Twp. Police v. Mattel, Inc.*,

22   321 F. Supp. 3d 1133, 1143 (C.D. Cal. 2018) (granting judicial notice of transcripts of excerpts of

23   SEC filings); *In re Aqua Metals, Inc. Sec. Litig.*, 2019 WL 3817849, at *5 (N.D. Cal. Aug. 14,

24   2019) (taking judicial notice of SEC filings); *Wochos v. Tesla, Inc.*, 2018 WL 4076437, at *2

25   (N.D. Cal. Aug. 27, 2018) (SEC filings subject to judicial notice); *Dreiling v. Am. Exp. Co.*, 458

26   F.3d 942, 946 n.2 (9th Cir. 2006) (noting that SEC filings are subject to judicial notice).

27   Accordingly, the Court takes judicial notice of Exhibits 15–17, 19, 25, and 27.  The Court takes

28   judicial notice of these documents for the purpose of considering what was disclosed to the

United States District Court
Northern District of California

7

market.  In doing so, the Court does not assume the truth of any of the facts asserted in those documents.  *See Wochos*, 2018 WL 4076437, at *2.[1]

### III.    JURISDICTION

The Court has jurisdiction under 28 U.S.C. § 1331.

### IV.    LEGAL STANDARD

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6).  "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory."  *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).  To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party."  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  Nonetheless, Courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

A complaint that sounds in fraud must satisfy the requirements of Rule 9(b).  Rule 9(b) provides that, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  *See* Fed. R. Civ. P. 9(b).  "To comply with Rule 9(b),

---

[1] Plaintiffs contend that Defendants' use Exhibits 1 and 3 to improperly manufacture a factual dispute regarding whether the exhibits warned investors of certain risks at issue.  The Court has already taken judicial notice of these documents "for the purpose of determining what information was available to the market."  CAC Order at 12–13.  The Court does not consider the content of these exhibits for any other purpose, including for "the purpose of resolving factual disputes."  *Id.* (citing *Khoja*, 899 F.3d at 999–1001).

1    allegations of fraud must be specific enough to give defendants notice of the particular misconduct

2    which is alleged to constitute the fraud charged so that they can defend against the charge and not

3    just deny that they have done anything wrong." *Glazer Cap. Mgmt., L.P. v. Forescout Techs.,*

4    *Inc.*, 63 F.4th 747, 765 (9th Cir. 2023) (citation and internal quotation marks omitted). "The

5    complaint must specify such facts as the times, dates, places, benefits received, and other details of

6    the alleged fraudulent activity." *Id.* (citation and internal quotation marks omitted). "If a claim

7    alleges securities fraud, the Private Securities Litigation Reform Act ('PSLRA'), 15 U.S.C. § 78u-

8    4, also applies." *Khoja*, 899 F.3d at 1008.

9         **V.     DISCUSSION**

10             **A.     Puzzle Pleading**

11        "In the securities fraud context, the term 'puzzle pleading' refers to a pleading that requires

12    a defendant and the court to 'match up' the statements that form the basis of the plaintiff's claims

13    with the reasons why those statements are misleading." *Park v. GoPro, Inc.*, No. 18-cv-00193-

14    EMC, 2019 WL 1231175, at *8 (N.D. Cal. Mar. 15, 2019) (quoting *In re Cisco Sys. Inc. Sec.*

15    *Litig.*, No. 11-cv-01568-SBA, 2013 WL 1402788, at *5 (N.D. Cal. Mar. 29, 2013)). "[P]uzzle

16    pleadings fail 'to set forth a "short and plain" statement of their claims in violation of Rule 8(a),'

17    to 'make each allegation "simple, concise and direct"' in violation of Rule 8 and to fulfill the more

18    exacting pleading requirements of the [PSLRA] for violations of the Exchange Act." *Primo v.*

19    *Pac. Bioscis. of Cal., Inc.*, 940 F. Supp. 2d 1105, 1112 (N.D. Cal. 2013) (quoting *In re Splash*

20    *Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1075 (N.D. Cal. 2001)). "[A] securities

21    fraud complaint that employs a true puzzle-style pleading format will recite lengthy statements

22    attributed to the defendants, followed by a generalized list of reasons that the statements may have

23    been false or misleading or a generalized list of omissions that were required to make the

24    statements not misleading." *Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at *4 (N.D.

25    Cal. Aug. 7, 2020) (alteration in original) (quoting *Tarapara v. K12 Inc.*, 2017 WL 3727112, at *9

26    (N.D. Cal. Aug. 30, 2017)). The SAC is generally organized in a manner that permits the reader

27    to connect the allegedly false or misleading statements with the reasons why Plaintiff challenges

28    those statements. Thus, the SAC "fulfills the purpose of Rule 8 by putting Defendants on notice

United States District Court
Northern District of California

1  of the true substance of the claims against them." *In re Intuitive Surgical Sec. Litig.*, 65 F. Supp.

2  3d at 831.

3  **B.**    **Claims Under Section 10(b) and 20(a) of the Securities Exchange Act**

4  Section 10(b) of the Securities Exchange Act of 1934 provides that it is unlawful "[t]o use

5  or employ, in connection with the purchase or sale of any security registered on a national

6  securities exchange or any security not so registered . . . any manipulative or deceptive device or

7  contrivance . . . ." 15 U.S.C. § 78j(b).  Under this section, the SEC promulgated Rule 10b-5,

8  which makes it unlawful, among other things, "[t]o make any untrue statement of a material fact or

9  to omit to state a material fact necessary in order to make the statements made, in the light of the

10  circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).  To

11  prevail on a claim for violations of either Section 10(b) or Rule 10b-5, a plaintiff must prove six

12  elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a

13  connection between the misrepresentation or omission and the purchase or sale of a security; (4)

14  reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."

15  *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).  At the

16  pleading stage, a complaint alleging claims under Section 10(b) and Rule 10b-5 must not only

17  meet the requirements of Federal Rule of Civil Procedure 8, but also satisfy the heightened

18  pleading requirements of both Federal Rule of Civil Procedure 9(b) and the Private Securities

19  Litigation Reform Act ("PSLRA").  *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th

20  Cir. 2012).  Under Rule 9(b), claims alleging fraud are subject to a heightened pleading

21  requirement, which requires that a party "state with particularity the circumstances constituting

22  fraud or mistake." Fed. R. Civ. P. 9(b).  Additionally, all private securities fraud complaints are

23  subject to the "more exacting pleading requirements" of the PSLRA, which require that the

24  complaint plead with particularity both falsity and scienter.  *Zucco Partners, LLC v. Digimarc

25  Corp.*, 552 F.3d 981, 990 (9th Cir. 2009), *as amended* (Feb. 10, 2009).  Under Section 20(a) of the

26  Exchange Act, "a defendant employee of a corporation who has violated the securities laws will be

27  jointly and severally liable to the plaintiff, as long as the plaintiff demonstrates 'a primary

28  violation of federal securities law' and that 'the defendant exercised actual power or control over

10

1    the primary violator.'" *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech.,*

2    *Inc.*, 856 F.3d 605, 623 (9th Cir. 2017) (citation omitted).

3         Under Section 20(a) of the Exchange Act, "a defendant employee of a corporation who has

4    violated the securities laws will be jointly and severally liable to the plaintiff, as long as the

5    plaintiff demonstrates 'a primary violation of federal securities law' and that 'the defendant

6    exercised actual power or control over the primary violator.'" *Id.* (citation omitted). A claim

7    under Section 20(a) fails if the plaintiff does not plead a primary violation of federal securities

8    law. *See id.*

9         Plaintiffs assert a claim under Section 10(b) and a derivative claim under Section 20(a)

10   premised on allegedly false or misleading statements made in the Registration Statement for the

11   Merger, and made after the Merger in Volta's SEC filings, press releases, investor presentations,

12   and earnings calls. Defendants move to dismiss the Section 10(b) claim, arguing that Plaintiffs

13   have not pleaded facts to support the elements of falsity, scienter, and loss causation.

14              **1.     PSLRA's Safe Harbor**

15        "The PSLRA exempts from liability any forward-looking statement that is 'identified as a

16   forward-looking statement, and is accompanied by meaningful cautionary statements identifying

17   important factors that could cause actual results to differ materially from those in the forward-

18   looking statement,' or that the plaintiff fails to prove was made 'with actual knowledge . . . that

19   the statement was false or misleading.'" *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1141

20   (9th Cir. 2017) (quoting 15 U.S.C. § 78u-5(c)(1)). "That is, a defendant will not be liable for a

21   false or misleading statement if it is forward-looking and either is accompanied by cautionary

22   language or is made without actual knowledge that it is false or misleading." *Id.* at 1141 (citing

23   *See In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010). Where defendants make mixed

24   statements containing non-forward-looking and forward-looking statements, the non-forward-

25   looking statements are not protected by the safe harbor of the PSLRA. *Id.*

26        The Court previously held that the projections now contained in Statement 27[2] (SAC ¶

27   _____

28   [2] The Court references the various statements contained in Plaintiffs' chart at ECF No. 116-1.

United States District Court
Northern District of California

310), Statement 28 (*id.* ¶ 313), Statement 46 (*id.* ¶ 342), Statement 51 (*id.* ¶ 352), Statement 55 (*id.* ¶ 361), Statement 56 (*id.* ¶ 362), Statement 58 (*id.* ¶ 364), Statement 59 (*id.* ¶ 365), Statement 64(b)[3] (*id.* ¶ 375), Statement 64(c) (*id.* ¶ 375), Statement 66 (*id.* ¶ 378), Statement 68 (*id.* ¶ 382), and Statement 74 (*id.* ¶ 394) were shielded under the PSLRA's safe harbor doctrine because they "fall within the definition of forward-looking statements (as they are projections or assumptions underlying those projections), were identified as such," and were accompanied by cautionary language that "meaningfully and exhaustively set forth the factors that could cause Volta's results to differ materially stall from the projections and assumptions at issue."  CAC Order at 44–46.[4]

Plaintiffs contend that these projections are actionable because Defendants did not appear to have a basis for making such projections.  Opp. at 9.  In support, Plaintiffs point to new allegations concerning Volta's "incoherent" revenue modeling and unfounded installation projections.  *Id.* ¶¶ 86–100, 114, 170–73, 264.  Confidential Witness 10 ("CW10"), a Financial Planning and Analysis Manager who worked on Volta's financial projections for most of the Class Period, recalled that senior managers in his department materially inflated projected revenue even though those figures had no basis in Volta's revenue model.  *Id.* ¶¶  52,262.  CW10 also described Volta's use of the "go-get" accounting tactic, most of which centered around media sales.  *Id.* ¶¶ 263, 265.  According to CW10, this significant "go-get" amounted to approximately $10 to $15 million of the $70 to $80 million projected for the year.  *Id.* ¶ 263.  CW10 described how senior managers, including Chadwick, were aware of these inflated revenue projections because these figures, including the "go-get," were included in a presentation that was discussed at a quarterly hourlong meeting before the projections were released.  *Id.* ¶ 265.

These new allegations do not provide a sufficient basis for the Court to depart from its previous ruling that the safe harbor applies.  CW10 does not claim that anyone in Volta's management, including the individual Defendants, shared his opinion that Volta's revenue

---

[3] Per Defendants' suggestion, the Court divides Statement 64 into three sections for its analysis: 64(a), 64(b), and 64(c).  *See* ECF No. 112-1 at 33–34.  Statement 64(a) is a statement of current fact describing stall installations.  Statements 64(b) and 64(c) are forward-looking projections.
[4] Defendants contend the Court held that Statement 78 (*id.* ¶ 400) to be forward looking.  Mot. at 16.  The CAC did not contain this statement, and the Court did not rule on this statement.

United States District Court
Northern District of California

1    projections were inflated or unrealistic.  Nor does CW10 provide a basis to infer that the "go-get"

2    was improper.  Confidential witness accounts supposedly corroborating CW10's claims that

3    Volta's modeling was "unrealistic" are too bare and conclusory to support Plaintiffs contention of

4    knowing falsity.  *See id.* ¶¶ 106, 110–15, 125–28, 267–68.

5         For the reasons discussed above, the Court finds newly alleged Statement 79 (*id.* ¶ 402) to

6    be forward looking and shielded by the safe harbor.[5]

7              **2.    Falsity**

8         For a statement to be actionable under the PSLRA, it must be both false or misleading and

9    material.  "Under Rule 10b-5, . . . a fraudulent omission is a failure to 'state a material fact

10   necessary in order to make the statements made, in the light of the circumstances under which they

11   were made, not misleading.'"  *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1188 (9th Cir. 2021) (quoting

12   17 C.F.R. § 240.10b-5(b)).  A statement is misleading "if it would give a reasonable investor the

13   'impression of a state of affairs that differs in a material way from the one that actually exists.'"

14   *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (quoting *Brody v.*

15   *Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)).

16        An omitted fact is material if there is a "substantial likelihood that the disclosure of the

17   omitted fact would have been viewed by the reasonable investor as having significantly altered the

18   'total mix' of information made available.  *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449

19   (1976).  "The inquiry into materiality is 'fact-specific.'"  *In re Alphabet, Inc. Sec. Litig.*, 1 F. 4th

20   687, 700 (9th Cir. 2021) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 43 (2011)).

21   As such, "resolving materiality as a matter of law is generally appropriate 'only if the adequacy of

22   the disclosure or the materiality of the statement is so obvious that reasonable minds could not

23   differ.'"  *Id.* (quoting *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995)).

24        As noted, Plaintiff challenges five overlapping categories of Defendants' statements: (1)

25   _____

26   [5] Plaintiffs' brief cites Statement 27 (*id.* ¶ 310) and Statement 32 (*id.* ¶ 317) as examples of
     statements not shielded by the safe harbor due to Defendants' knowledge of unrealistic and

27   inflated revenue and stall projections.  But the SAC does not connect these statements to the stall
     and revenue guidance.  Instead, the SAC alleges that Statement 27 is false and misleading due to

28   premature revenue recognition and payment delinquencies, and that Statement 32 is false and
     misleading only due to premature revenue recognition.

                                                      13

misleading statements regarding premature revenue recognition; (2) misleading statements regarding financing needs; (3) misleading statements regarding executive departures; (4) misleading statements regarding descriptions of Volta's business; and (5) misleading statements regarding revenue and stall installation projections.

a.      **Alleged Misrepresentations and Omissions Concerning Premature Revenue Recognition**

Plaintiffs allege that Volta approached advertisers toward the end of each quarter to get the advertisers to agree to "pull" ads from a subsequent quarter forward to the current quarter so that Volta could book the revenue for those ads in the current quarter.  Plaintiffs contend that this revenue pull-forward practice was misleading because Volta would not be able to book more revenue from the advertisers in the following quarter.  SAC ¶¶ 119, 122–24.  On these grounds, Plaintiffs specifically challenge Statement 22 (*id.* ¶¶ 298–300), Statement 24 (*id.* ¶ 305), Statement 25 (*id.* ¶ 306), Statement 27 (*id.* ¶ 310), Statement 28 (*id.* ¶ 313), Statement 29 (*id.* ¶ 314), Statement 30 (*id.* ¶ 315), Statement 31 (*id.* ¶ 316), Statement 32 (*id.* ¶ 317), Statement 35 (*id.* ¶ 324), Statement 36 (*id.* ¶ 325), Statement 37 (*id.* ¶ 326), Statement 47 (*id.* ¶ 345), Statement 61 (*id.* ¶ 370), and Statement 71 (*id.* ¶ 389).

In its prior Order, the Court held that Plaintiffs' theory of falsity regarding premature revenue recognition amounted to a general allegation that the practices at issue resulted in a false report of company earnings, which was not sufficient to state a claim for accounting fraud.  CAC Order at 22.  To remedy this deficiency, the SAC adds a more fulsome account from Confidential Witness 1 ("CW1"), Vice President of Media Sales at Volta.  SAC ¶¶ 117, 121.  But Plaintiffs still do not allege sufficient indicia of reliability for the Court to consider CW1's account.  First, Plaintiffs do not allege that CW1 performed an accounting function or aver any facts that would permit the Court to reasonably infer that CW1 was in a position to have reliable information about Volta's accounting practices.  Second, CW1 allegedly only represented a single sales region, but Plaintiffs still do not identify the region that they managed.  Third, the SAC still does not "aver what percentage of the sales in CW1's region were impacted by the alleged sales practice or how impacted sales in CW1's region affected Volta's overall revenue."  CAC Order at 20.  Finally,

CW1's suggestion that individuals in other regions also received instructions to "pull sales forward," does not allow the Court to infer that these purported instructions were followed. *Id.* ¶ 121. As such, CW1 still fails to quantify the amount of any alleged pull-ins in any of the sales or regions, nor do they describe which customers were involved.

Accordingly, Plaintiffs fail to allege facts to permit the Court to discern whether the alleged revenue recognition violations were "minor or technical in nature" or "constituted widespread and significant inflation of revenue" and were thus material and actionable. *See Daou*, 411 F.3d at 1016-17.[6]

### b.    Alleged Misrepresentations and Omissions Concerning Financing Needs

Plaintiffs allege that Volta misrepresented its need for financing. According to the SAC, in January 2022 Defendants Mercer and Wendel presented a business plan that would require Volta to find an additional $300 to $350 million in financing to pursue its growth strategy beyond June 2022. SAC ¶¶ 7, 12, 257. Finding the "cost structure" of the proposed business plan "unsustainable," the Board asked management to revise the plan. *Id.* ¶ 257. Two months later, the Board allegedly "terminated" Mercer and Wendel and a financing term sheet that Mercer had purportedly secured "disappeared." *Id.* ¶¶ 258, 337. As a result, Plaintiffs allege that "Volta no longer had the means to secure the needed funds." *Id.* ¶ 337. Plaintiffs allege that numerous subsequent statements, including those about the terminations and Volta's general business outlook, were misleading due to (1) Defendants' failure to disclose the initial efforts to raise capital in January 2022 and (2) Defendants' subsequent failure to secure funding because of the executive terminations. On these grounds, Plaintiffs specifically challenge Statement 40 *id.* (¶ 332), Statement 41 (*id.* ¶ 333), Statement 42 (*id.* ¶ 335), Statement 43 (*id.* ¶ 336), Statement 49 (*id.* ¶ 349), Statement 50 (*id.* ¶351), Statement 52 (*id.* ¶ 354), Statement 53 (*id.* ¶ 357), Statement 60 (*id.* ¶ 367), Statement 62 (*id.* ¶ 372), Statement 67 (*id.* ¶ 380), Statement 69 (*id.* ¶ 384),

---

[6] Plaintiffs cite this Court's decision in *Plantronics Inc. Sec. Litig.*, 2022 WL 3653333 (N.D. Cal. Aug. 17, 2022) to argue that Plaintiffs are not required to identify specific transactions when a company's statements about the reasons for its revenue growth are misleading because of an undisclosed, improper sales practice. Opp. at 14. That argument fails for the reasons the Court already identified in the CAC Order. CAC Order at 24–25.

United States District Court
Northern District of California

1   Statement 70 (*id.* ¶ 386), Statement 72 (*id.* ¶ 391), Statement 73 (*id.* ¶ 393), Statement 78 (*id.* ¶

2   400), Statement 79 (*id.* ¶ 402), Statement 80 (*id.* ¶ 404), Statement 81 (*id.* ¶ 407), and Statement

3   82 (*id.* ¶ 409).[7]

4        As for the alleged failure to disclose details about Volta's initial efforts to raise capital in

5   January 2022, Defendants contend that they repeatedly disclosed Volta's general need for

6   additional capital.  Defendants first point to the Offering Documents, which warned that Volta

7   might "need to raise additional funds," and that failure to raise such funds, which might "not be

8   available when needed," could "materially and adversely" affect the company.  Hibbard Decl., Ex.

9   1 at 55.  Defendants also point to Volta's FY2021 Form 10-K, which declared that "Volta expects

10   to need to raise additional capital in the near future" and that if it failed to do so, "its financial

11   condition, results of operations, business and prospects could be materially and adversely

12   affected."  *Id.*, Ex. 3 at 21, 28.  The same document included a "going concern" qualification from

13   Volta's independent auditors warning that there was "substantial doubt" about the "Company's

14   ability to continue as a going concern."  *Id.*, Ex. 3 at 78; SAC ¶ 349.  This filing also warned that

15   "[i]f the Company is unable to raise additional capital, the Company may significantly curtail its

16   operations, modify strategic plans and/or dispose of certain operations or assets."  *Id.*  Volta

17   repeated these warnings in its subsequently filed quarterly reports.  *See* Hibbard Decl., Ex. 6 at 22,

18   55; Ex. 8 at 2, 10; Ex. 10 at 2, 10.

19        Importantly, the "[s]ecurities laws . . . do not require real-time business updates or

20   complete disclosure of all material information whenever a company speaks on a particular topic."

21   *Weston Fam. P'ship LLLP*, 29 F.4th 611, 620 (9th Cir. 2022).  Instead, "a company can speak

22   selectively about its business so long as its statements do not paint a misleading picture."  *Id.*  In

23   light of Defendants' extensive disclosures, Plaintiffs have not adequately alleged that Defendants

24   "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from

25   the one that actually exist[ed]" when they did not disclose details about Volta's January 2022

26   financing efforts.  *Brody*, 280 F.3d at 1006.

27

28   [7] Plaintiffs also challenge Statement 51 (*id.* ¶ 352) on these grounds, but this is a forward-looking statement shielded under the PSLRA safe harbor.

United States District Court
Northern District of California

As for Plaintiffs' second theory of falsity concerning the allegedly scrapped term sheet, Plaintiffs rely on the conclusions of Confidential Witness 11 ("CW 11"), a "senior Volta employee."  SAC ¶¶ 53, 258.  But Plaintiffs fail to allege any basis for CW11's purported knowledge of this term sheet besides his status as a "senior employee."  Because Plaintiffs inadequately support CW11's conclusions, they have not plausibly alleged that these statements were misleading for the reasons alleged.

### c.   Alleged Misrepresentations and Omissions Concerning Executive Departures

Plaintiffs challenge statements that "portrayed the Company's founders as having resigned on voluntary and amicable terms," alleging that Mercer and Wendel were actually "terminated because they were responsible for Volta's financial problems."  *Id.* ¶¶ 12, 337.  Plaintiffs specifically challenge Statement 42 (*id.* ¶ 335), Statement 43 (*id.* ¶ 336), Statement 44 (*id.* ¶ 339), Statement 52 (*id.* ¶ 354), and Statement 53 (*id.* ¶ 357).

Plaintiffs point to confidential witness accounts suggesting that the terminations were not voluntary.  For example, Confidential Witness 3 ("CW3") cited a short conversation with Wendel, who implied that he "wish[ed] things would have ended differently," as well as conversations with both the Vice President of Sales and in-house counsel with Volta suggesting that the terminations were not voluntary.  *Id.* ¶ 294(c).  CW1 claimed that Mercer's e-mail announcing his departures was "suspicious" because it was sent "between 4 and 5 am" and did not include "any other statements or goodbyes."  *Id.* ¶ 291(a).  *See also*, *id.* ¶ 291(c) (Confidential Witness 6 ("CW6") described Mercer and Wendel's departure emails as "terse" and "cryptic"); *id.* ¶ 291(d) (CW3 described the departure emails as "strange").  CW1 and CW6 recalled that the Zoom announcement sounded scripted.  *Id.* ¶ 292(a), (c).  CW3 stated that "Volta employees never heard from Mercer again – not in an email, on Zoom, or in any other capacity."  *Id.* ¶ 293(c).  Plaintiffs also point to CW10's account that executives indicated that the Board removed Mercer and Wendel because "they weren't adequate in their function."  *Id.* ¶ 294(a).

Plaintiffs might plausibly allege that these terminations were involuntary.  But Plaintiffs do not adequately allege that Volta terminated Mercer and Wendel specifically due to their oversight

of "financial problems," as alleged in the SAC. Plaintiffs' primary support for this specific contention—a confidential witness account describing how unnamed executives provided a vague performance-based reason for Mercer and Wendel's departure—does not suffice.[8] As such, Plaintiffs fail to allege that the given statements were false or misleading.

### d. Alleged Misrepresentations and Omissions Concerning Volta's Business

Plaintiffs challenge statements concerning Volta's business, including those relating to "relationships with its advertising customers and site hosts," by allegedly failing to disclose that it was unable to pay its site hosts. Challenged statements relating to payment delinquencies include Statement 23 (*id.* ¶ 302–03), Statement 26 (*id.* ¶ 308), Statement 27 (*id.* ¶ 310), Statement 33 (*id.* ¶ 320), and Statement 34 (*id.* ¶ 321). Challenged statements relating to Volta's deteriorating relationships with site hosts include Statement 41 (*id.* ¶ 333), Statement 45 (*id.* ¶ 341), Statement 50 (*id.* ¶ 351), Statement 54 (*id.* ¶ 359), Statement 56 (*id.* ¶ 362), Statement 57 (*id.* ¶ 363), Statement 60 (*id.* ¶ 367), Statement 63 (*id.* ¶ 374), Statement 65 (*id.* ¶ 376), Statement 69 (*id.* ¶ 384), Statement 70 (*id.* ¶ 386), Statement 73 (*id.* ¶ 393), Statement 76 (*id.* ¶ 397), Statement 77 (*id.* ¶ 399), Statement 78 (*id.* ¶ 400), Statement 80 (*id.* ¶ 404), and Statement 81 (*id.* ¶ 407).[9]

In its prior Order, the Court held that Plaintiffs failed to plausibly allege that Volta's delayed payments to site hosts materially impacted the cash balances or liabilities that Volta reported to investors. Plaintiffs attempt to bolster their theory of falsity with confidential witness accounts noting that Volta's relationships with certain site hosts suffered because of Volta's

---

[8] Even if Plaintiffs had adequately plead such facts, the given statements would be unlikely to amount to material omissions. The Ninth Circuit has held that "[p]ro forma claims that an executive is leaving a company for personal reasons are ubiquitous and transparent" are not material because "[r]easonable people usually do not make investment decisions in reliance on them." *In re Foxhollow Technologies, Inc. Securities Litigation*, 359 F. App'x 802, 805 (9th Cir. 2009); *see also In re Intel Corp. Sec. Litig.*, 2023 WL 2767779, at *20 (N.D. Cal. Mar. 31, 2023), *aff'd*, 2024 WL 1693340 (9th Cir. Apr. 19, 2024) (noting that the "complaint contains no facts showing that personal reasons were not a contributing factor, and far from the statement creating an affirmative impression that all was well . . . analysts and investors reacted with immediate skepticism and concern about Intel's product development efforts").

[9] Plaintiffs also challenge on these grounds Statement 55 (*id.* ¶ 361), Statement 58 (*id.* ¶ 364), Statement 59 (*id.* ¶ 365), Statement 64 (*id.* ¶ 375), Statement 68 (*id.* ¶ 382), Statement 74 (*id.* ¶ 394), Statement 75 (*id.* ¶ 395), and Statement 79 (*id.* ¶ 402), but these are non-actionable as forward-looking statements.

inability to pay them or to install stations on their properties, including Brookfield, Kohls, Edwards Realty, Ahold Delhaize, Albertsons, Kimco, Regency, and the Chicago Bulls.  *See, e.g.*, *id.* ¶¶ 107–12, 115, 271–81, 282–86.  The SAC's new allegations do not remedy this deficiency.

In the first instance, the SAC's only new allegations relate to purported delinquencies during the second fiscal quarter of 2022.  *Id.*  ¶¶ 275–283.  These new allegations cannot support falsity for statements that predate Q2 2022.  Because Plaintiffs do not otherwise provide supporting allegations for pre-Q2 2022 statements or statements discussing pre-Q2 2022 results, Plaintiffs fail to allege that Statements 23, 26, 27, 33, 34, 40, 41, 56 and 66 are false or misleading.[10]

The remaining statements are not adequately alleged to be false or misleading for the reasons Plaintiffs advance:

Statement 64(a) (*id.* ¶ 375) details the number of charging stalls as of March 2022, but Plaintiffs do not connect the number of charging stalls with either the deteriorating site host relationships or the payment delinquencies related to those charging stalls.

Statement 45 (*id.* ¶ 341), Statement 50 (*id.* ¶ 351 ), Statement 63 (*id.* ¶ 374), Statement 73 (*id.* ¶ 393), and Statement 76 (*id.* ¶ 397) restate raw revenue figures, but Plaintiffs do not explain how faltering site host relationships or payment delinquencies rendered the revenue figures misleading.

Statement 54 (*id.* ¶ 359), Statement 57 (*id.* ¶ 363), Statement 65 (*id.* ¶ 376), Statement 70 (*id.* ¶ 386), Statement 76 (*id.* ¶ 397), and Statement 78 (*id.* ¶ 400) amount to vague statements about Volta's business.  These statements are not sufficiently specific to "affirmatively create an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Brody*, 280 F.3d at 1006.  Similarly, Statement 60 (*id.* ¶ 367) vaguely discusses procedures for mapping operating expenses, but Plaintiffs do not even allege that these alleged

_____

[10] Moreover, as for statements relating to delinquent payments specifically (Statement 23 (*id.* ¶ 302–03), Statement 26 (*id.* ¶ 308), Statement 27 (*id.* ¶ 310), Statement 33 (*id.* ¶ 320), and Statement 34 (*id.* ¶ 321)), Plaintiffs again fail to explain why the payment delinquencies from the "contractual obligations" would have been excluded from Volta's financial statements.  *See* CAC Order at 28; SAC ¶ 189.

United States District Court
Northern District of California

procedures are at all improper.

Statement 69 (*id.* ¶ 384) and Statement 80 (*id.* ¶ 404) concern executive departures. Plaintiffs allege that although Volta represented that Mercer and Wendel left the company voluntarily, Volta actually fired the pair due to Volta's business and financing struggles.  But Plaintiffs do not allege sufficient facts to connect the allegedly misleading statements with Volta's business and financing struggles.

### e.   Alleged Misrepresentations and Omissions Concerning Revenue and Stall Installation Guidance

Plaintiffs challenge statements of current fact that they used to support revenue and installation guidance projections, namely Statement 45 (*id.* ¶ 341), Statement 50 (*id.* ¶ 351), Statement 57 (*id.* ¶ 363), Statement 63 (*id.* ¶ 374),  Statement 64(a) (*id.* ¶ 375), Statement 65 (*id.* ¶ 376), Statement 73 (*id.* ¶ 393), Statement 75 (*id.* ¶ 395), and Statement 76 (*id.* ¶ 397).  Plaintiffs contend that these statements are false and misleading because Defendants failed to disclose Volta's alleged "go-get" tactic and because the stall installation guidance was unrealistic and inflated.

Statement 45 (*id.* ¶ 341), Statement 50 (*id.* ¶ 351), Statement 63 (*id.* ¶ 374), Statement 64(a) (*id.* ¶ 375), Statement 73 (*id.* ¶ 393), and Statement 76 (*id.* ¶ 397) report raw revenue and stall installation figures.  Plaintiffs allege that the "go-get" tactic or other failures in the model impacted revenue *projections*, but do not allege that these issues in the model impacted past or current revenue statements as reported in these statements.  Nor do Plaintiffs explain how the number of stalls was inflated or "unrealistic."

Statement 57 (*id.* ¶ 363) consists of a quote from Defendant Chadwick at the Q4 and FR 2021 Earnings Call on April 18, 2022:

> [I]t's similar to what we were seeing in the past in certain places, in certain locations where the sort of the decarbonization and electrification has been advancing over time, though getting those permits is just an easier and a quicker process.  As we go to locations where installing new stores or where a state or a city or a municipality, it doesn't have any stalls to date.  That takes a little bit longer.  I would say, *no different than what we've seen in the past*.  We've very same. We're facing the same issues the whole industry is facing.  *And we have continued to build out our permitting team*, so that we are as

1    efficient and effective as possible to make sure that permitting doesn't
     slow us down.

2    (emphasis in SAC).  Plaintiffs fail to explain why any representations concerning Volta's

3    "permitting team" are false or misleading due to the company's unrealistic revenue projections or

4    financing instability.  Plaintiffs also fail to adequately explain why Chadwick's statement that the

5    current permitting process is "no different than what we've seen in the past" is false or misleading

6    for the reasons advanced.

7    Statement 65 (*id.* ¶ 376) consists of a quote from Defendant Hastings in a May 13, 2022

8    press release:

9              We made continued progress against our strategy with total revenue
               growing 77%, media revenue up 73%, and total installed stalls
10             growing 39% year-over-year," said Hastings.  "New and expanded
               partnerships with top retail locations like Tanger Outlets and Six
11             Flags, national advertisers such as T-Mobile and PepsiCo, as well as
               enhancements to our AI and data-science offerings, position us to
12             further accelerate growth and ownership of the rapidly expanding
               electric mobility marketplace.
13

14   *Id.*  Plaintiffs do not explain how the "go-get," which only  impacts reported revenue projections,

15   could have impacted these reported revenue figures.  Plaintiffs also fail to explain how a statement

16   regarding Volta's "expanded partnerships with top retail locations" or "national advertisers"

17   supported Volta's revenue or stall projections.

18   Statement 75 (*id.* ¶ 395) quotes from a Volta press release on August 11, 2022, in which

19   Defendant Cubbage stated that "Volta had a record quarter, and these results demonstrate the

20   power of our differentiated business model" and that "[b]y building not just a network of chargers,

21   but a dual energy and digital advertising platform, we believe Volta can scale revenue even faster

22   than the EV adoption curve."  Plaintiffs again fail to explain how these representations are false or

23   misleading due to Volta's revenue projections.[11]

24   --------------------------------------------------

25   [11] Statement 21 (*id.* ¶ 296), Statement 38 (*id.* ¶ 328), Statement 39 (*id.* ¶ 330), Statement 47 (*id.* ¶ 345), and Statement 48 (*id.* ¶ 348) are derivative of other statements discussed above.  For

26   example, Plaintiffs allege that Statement 48 ("The 2021 10-K contained certain of the same, or substantially similar, descriptions of Volta's business and of its accounting policies that were in

27   the Registration and Proxy Statements") is false and misleading "for the same reasons that those statements were false and misleading when stated in the Registration and Proxy Statements."  *Id.* ¶

28   348.  For the reasons described above, the Court finds that these derivative statements are not alleged to be plausibly false or misleading.

United States District Court
Northern District of California

\* \* \*

Accordingly, Plaintiffs fail to plausibly allege that the statements at issue were false or misleading.[12]  Given this ruling, the Court need not reach Defendants' argument regarding scienter and loss causation.

Because the SAC pleads no underlying violation of the Securities Exchange Act, Plaintiffs' "control person" claims under Section 20(a) must also be dismissed.

### C.     Claims Under Sections 11 and 15 of the Securities Act

"Section 11 of the Securities Act contains a private right of action for purchasers of a security if the issuer publishes a registration statement in connection with that security that 'contain[s] an untrue statement of a material fact or omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'"  *Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1161 (9th Cir. 2009) (quoting 15 U.S.C. § 77k(a)).  "To prevail in such an action, a plaintiff must prove (1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment.'"  *Id.* (citation and internal quotation marks omitted).  "No scienter is required for liability under § 11; defendants will be liable for innocent or negligent material misstatements or omissions."  *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1403-04 (9th Cir. 1996).  The heightened pleading requirements of the PSLRA do not apply to claims under Section 11.  *See Rubke*, 551 F.3d at 1161.  However, if the complaint sounds in fraud, a claim under Section 11 must be pleaded with particularity under Rule 9(b).  *See id.*; *see also In re Stac Elecs. Sec. Litig.*, 89 F.3d at 1404.

"Section 15(a) of the 1933 Securities Act imposes joint and several liability upon every person who controls any person liable under sections 11 or 12."  *In re Daou*, 411 F.3d at 1029 (citation omitted).  A claim under Section 15 fails if there is no underlying violation of Section 11.

---

[12] Plaintiffs allege that all of Defendants' false and misleading statements in connection with Plaintiffs' claims under the Securities Act and Section 14(a), respectively, are also false and misleading under Section 10(b).  *Id.* ¶ 295.  The Court rejects these allegations for the reasons discussed in its analysis of the Securities Act and Section 14(a) of the Exchange Act claims.

1  *See id.*

2        The Section 11 claim and its derivative Section 15 claim are premised on allegedly false or

3  misleading statements in the Registration Statement for the Merger, which was filed with the SEC

4  prior to the Merger.

5                **1.**      **Safe Harbor**

6        Plaintiffs reallege statements that the Court held were protected by the PSLRA's safe

7  harbor.  Statement 2 (SAC ¶ 177), Statement 3 (*id.* ¶ 178), and Statement 4 (*id.* ¶ 179) involve

8  financial projections in the Offering Documents.  Plaintiffs argue that these statements are not

9  shielded by the safe harbor, citing only CW10's conclusions that Defendants knew that the

10  projections were "unrealistic."  *See id.* ¶ 81.   As noted, the Court does not consider CW10's

11  account as it lacks sufficient indicia of reliability.   Plaintiffs provide no other basis to depart from

12  the Court's previous holding.

13        Statement 17 (*id.* ¶ 201), Statement 18 (*id.* ¶ 202), Statement 19 (*id.* ¶ 203), and Statement

14  20 (*id.* ¶ 204) involve forward-looking statements included in an investor presentation.  The Court

15  already held that these statements are protected by the safe harbor because they "were identified as

16  forward-looking statements and were accompanied by cautionary language set forth in the Form 8-

17  K that Tortoise filed on February 8, 2021, as well as the cautionary language in the Registration

18  Statement itself."  CAC Order at 44.  Plaintiffs again provide no reason to depart from the Court's

19  previous holding.

20                **2.**      **Falsity**

21        If the complaint sounds in fraud, a claim under Section 11 must be pleaded with

22  particularity under Rule 9(b).  *See Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1161 (9th Cir.

23  2009).  Plaintiffs attempt to disclaim that the gravamen of the SAC lies in a uniform course of

24  fraudulent conduct, but the Court is not convinced.  Indeed, Plaintiffs appear to concede that "[a]ll

25  of the Defendants' alleged misstatements are part of [a] unitary theory of fraud."  Opp. at 28; *see*

26  *also id.* at 30 n.9.  Because the SAC "sounds in fraud," the stringent particularity requirements of

27  Rule 9(b) apply to *all* of Plaintiffs' claims, including under Section 11 and Section 14(a).  *Rubke*

28  v. *Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009).

United States District Court
Northern District of California

### a.      Alleged Misrepresentations and Omissions Concerning Premature Revenue Recognition

Plaintiffs contend that the revenue figures reported in the Offering Documents were false because of allegedly improper "channel stuffing."  *See* Statement 2 (SAC ¶ 177), Statement 3 (*id.* ¶ 178), Statement 4 (*id.* ¶ 179), Statement 5 (*id.* ¶ 181), Statement 6 (*id.* ¶ 182), Statement 7 (*id.* ¶ 183), Statement 8 (*id.* ¶ 184), Statement 17 (*id.* ¶ 201), Statement 18 (*id.* ¶ 202), Statement 19 (*id.* ¶ 203) and Statement 20 (*id.* ¶ 204.)  The Court finds that Plaintiffs fail to plead that these representations were false or misleading for the same reasons discussed in its analysis of alleged misrepresentations concerning premature revenue recognition.

### b.      Alleged Misrepresentations and Omissions Concerning Network Scale and Contractual Obligations

Plaintiffs allege that Defendants failed to disclose that "potential customers would not make deals with Volta until its charging network grew to scale."  *See* Statement 11 (*id.* ¶ 189), Statement 12 (*id.* ¶¶191), Statement 13 (*id.* ¶ 192), Statement 15 (*id.* ¶ 196), and Statement 16 (*id.* ¶ 198).  The Court held in its previous Order that the Offering Documents "repeatedly made clear that Volta could have difficulty contracting with certain advertisers until it had scaled, and that its post-merger success was dependent on its ability to 'aggressively' and 'effectively' do so."  CAC Order at 31-32 (quoting Dkt. 81 at 39).  Plaintiffs still do not allege facts to suggest that Defendants failed to disclose any adverse facts relating to potential customers' commitments.  Moreover, the generic explanations of Volta's lease accounting, corporate goals, and site partners contained in the statements do not constitute an affirmative misrepresentation as to network scale.

Plaintiffs also allege that Defendants failed to disclose that Volta "did not pay its contractual obligations on time."  *See* Statement 1 (*id.* ¶ 175), Statement 9 (*id.* ¶ 186), and Statement 10 (*id.* ¶ 188).  These statements fail to plead falsity for the reason discussed in the Court's analysis of alleged misrepresentations concerning payment delinquencies.

### c.      Miscellaneous Statement

The SAC reasserts a block quote that described "projected installations as a 'Competitive Strength.'"  Statement 14 (*id.* ¶ 194).  In its previous Order, the Court noted that Plaintiffs must state that the "figures reported with respect to 'contracted backlog' or 'pipeline'" were false or

misleading and "must also identify the reasons why they believe those figures were false or misleading." CAC Order at 47. Plaintiffs reallege the statement in the SAC with a functionally identical rationale as to falsity, making no attempt to remedy the deficiency. The Court again finds that Plaintiffs fail to plausibly allege that the statement was false or misleading.

### D.  Claims Under Section 14(a) and Section 20(a) of the Exchange Act

Plaintiffs assert a claim under Section 14(a), as well as a derivative claim under Section 20(a), based on the same allegedly false or misleading statements in the Registration Statement that Plaintiffs challenge under Section 11 and Section 10(b). Because the SAC sounds in fraud, the Section 14(a) claim and derivative Section 20(a) claim must satisfy the heightened pleading requirements of Rule 9(b).

The Court grants Defendants' motion to dismiss the Section 14(a) claim, and the derivative claim under Section 20(a), as the claims are premised (1) on statements in the Registration Statement that the Court has found are not plausibly materially false or misleading in connection with the Section 10(b) claim and (2) on statements in the Registration Statement that the Court has are protected under the PSLRA's safe harbor.

### VI.  LEAVE TO AMEND

"A district court's discretion to deny leave to amend is 'particularly broad' where the plaintiff has previously amended." *Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1133 (9th Cir. 2013) (quoting *Sisseton–Wahpeton Sioux Tribe v. United States*, 90 F.3d 351, 355 (9th Cir. 1996). The Court previously dismissed the complaint without prejudice and gave Plaintiffs specific directions to add to any additional factual allegations demonstrating falsity. That Plaintiffs "failed to correct these deficiencies in its . . . [amended complaint] is 'a strong indication that the plaintiff[ ] ha[s] no additional facts to plead.'" *Zucco Partners*, 552 F.3d 981, 1007 (9th Cir. 2009) (citing *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1098 (9th Cir. 2002)). The Court concludes that any further leave to amend would be futile.

### CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion to dismiss Plaintiffs' claim under Section 10(b) and derivative claim under Section 20(a). The Court also grants Defendants'

motion to dismiss Plaintiffs' claims under Section 11 and Section 14(a), as well as the derivative claims under Section 15 and Section 20(a).  The dismissal is with prejudice.  The Clerk shall enter judgment and close the file.

**IT IS SO ORDERED.**

Dated:  October 21, 2024



JON S. TIGAR
United States District Judge